1  | BERNSTEIN LITOWITZ BERGER
   |   & GROSSMANN LLP
2  | BLAIR A. NICHOLAS (Bar No. 178428)
   | TIMOTHY A. DeLANGE (Bar No.190768)
3  | NIKI L. MENDOZA (Bar No. 214646)
   | DAVID KAPLAN (Bar No. 230144)
4  | JOSEPH W. GOODMAN (Bar No. 230161)
   | 12481 High Bluff Drive, Suite 300
5  | San Diego, CA 92130
   | Tel:   (858) 793-0070
6  | Fax:   (858) 793-0323
   | blairn@blbglaw.com
7  | timothyd@blbglaw.com
   | nikim@blbglaw.com
8  | davidk@blbglaw.com
   | joe.goodman@blbglaw.com
9  |

10 | *Attorneys for Plaintiffs*

11 |

           UNITED STATES DISTRICT COURT
12 |
         CENTRAL DISTRICT OF CALIFORNIA
13 |

14 | THE GOVERNMENT OF GUAM          Case No.
   | RETIREMENT FUND; MONTANA        CV11 06239 PSG PJWx
15 | BOARD OF INVESTMENTS;
   | MARYLAND STATE RETIREMENT       COMPLAINT
16 | AND PENSION SYSTEM; NORGES
   | BANK; ROYAL MAIL PENSION PLAN;  DEMAND FOR JURY TRIAL
17 | STICHTING PENSIOENFONDS ZORG
18 | EN WELZIJN REPRESENTED BY
   | PGGM VERMOGENSBEHEER B.V.;
19 | THRIVENT FINANCIAL FOR
20 | LUTHERANS; ROBERT L. KOSNOSKI;
   | THRIVENT FINANCIAL FOR
21 | LUTHERANS FOUNDATION;
22 | KALAMAZOO ANESTHESIOLOGY
   | PSP FBO DR. BARBARA A. PAGE;
23 | THRIVENT LARGE CAP VALUE
24 | FUND, A SERIES OF THRIVENT
   | MUTUAL FUNDS; THRIVENT LARGE
25 | CAP STOCK PORTFOLIO, A SERIES
26 | OF THRIVENT SERIES FUND, INC.;
   | THRIVENT PARTNER ALL CAP
27 | PORTFOLIO, A SERIES OF THRIVENT
28 | SERIES FUND, INC.; THRIVENT

                                           COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LARGE CAP VALUE PORTFOLIO, A
SERIES OF THRIVENT SERIES FUND,
INC.; THRIVENT BALANCED FUND,
A SERIES OF THRIVENT MUTUAL
FUNDS; THRIVENT LARGE CAP
STOCK FUND, A SERIES OF
THRIVENT MUTUAL FUNDS;
THRIVENT LARGE CAP INDEX FUND
I, A SERIES OF THRIVENT MUTUAL
FUNDS; THRIVENT LARGE CAP
INDEX FUND, A SERIES OF
THRIVENT MUTUAL FUNDS;
THRIVENT BALANCED PORTFOLIO,
A SERIES OF THRIVENT SERIES
FUND, INC.; THRIVENT LARGE CAP
INDEX PORTFOLIO, A SERIES OF
THRIVENT SERIES FUND, INC.;
THRIVENT FINANCIAL DEFINED
BENEFIT PLAN TRUST; THRIVENT
CORE BOND FUND, A SERIES OF
THRIVENT MUTUAL FUNDS;
THRIVENT BOND INDEX FUND, A
SERIES OF THRIVENT MUTUAL
FUNDS; THRIVENT BOND INDEX
PORTFOLIO, A SERIES OF THRIVENT
SERIES FUND, INC.; THRIVENT
INCOME FUND, A SERIES OF
THRIVENT MUTUAL FUNDS;
THRIVENT LIMITED MATURITY
BOND FUND, A SERIES OF
THRIVENT MUTUAL FUNDS;
THRIVENT INCOME PORTFOLIO, A
SERIES OF THRIVENT SERIES FUND,
INC.; THRIVENT LIMITED
MATURITY BOND PORTFOLIO, A
SERIES OF THRIVENT SERIES FUND,
INC.; THRIVENT LIFE INSURANCE
COMPANY; AMERICAN CENTURY
INVESTMENT MANAGEMENT;
AMERICAN CENTURY CAPITAL
PORTFOLIOS, INC. – EQUITY INDEX
FUND; AMERICAN CENTURY

COMPLAINT

QUANTITATIVE EQUITY FUNDS, INC. – INCOME & GROWTH FUND; AMERICAN CENTURY VARIABLE PORTFOLIOS, INC. – VP INCOME & GROWTH FUND; NUVEEN INVESTMENTS, INC.; NUVEEN EQUITY PREMIUM OPPORTUNITY FUND; NUVEEN GROWTH ALLOCATION FUND, A SERIES OF NUVEEN INVESTMENT TRUST; NUVEEN MULTI-MANAGER LARGE-CAP VALUE FUND, A SERIES OF NUVEEN INVESTMENT TRUST; NUVEEN NWQ LARGE-CAP VALUE FUND, A SERIES OF NUVEEN INVESTMENT TRUST; NUVEEN NWQ MULTI-CAP VALUE FUND, A SERIES OF NUVEEN INVESTMENT TRUST; NUVEEN SANTA BARBARA DIVIDEND GROWTH FUND, A SERIES OF NUVEEN INVESTMENT TRUST II; NUVEEN QUALITY PREFERRED INCOME FUND; NUVEEN MULTI-STRATEGY INCOME AND GROWTH FUND 2; NUVEEN QUALITY PREFERRED INCOME FUND 2; NUVEEN QUALITY PREFERRED INCOME FUND 3; NUVEEN MULTI-STRATEGY INCOME AND GROWTH FUND; SUNAMERICA ASSET MANAGEMENT CORP.; STRATEGIC MULTI-ASSET PORTFOLIO, A SERIES OF ANCHOR SERIES TRUST; FOCUS GROWTH PORTFOLIO, A SERIES OF SEASONS SERIES TRUST; LARGE CAP COMPOSITE PORTFOLIO (MERGED INTO THE LARGE CAP GROWTH PORTFOLIO, A SERIES OF SEASONS SERIES TRUST), A SERIES OF SEASONS SERIES TRUST; LARGE CAP GROWTH PORTFOLIO, A SERIES

OF SEASONS SERIES TRUST; LARGE
CAP VALUE PORTFOLIO, A SERIES
OF SEASONS SERIES TRUST; STOCK
PORTFOLIO, A SERIES OF SEASONS
SERIES TRUST; FOCUSED VALUE
PORTFOLIO (RENAMED
SUNAMERICA STRATEGIC VALUE
PORTFOLIO), A SERIES OF
SUNAMERICA FOCUSED SERIES,
INC. (RENAMED SUNAMERICA
SERIES, INC.); EQUITY INDEX
PORTFOLIO, A SERIES OF
SUNAMERICA SERIES TRUST; MFS
TOTAL RETURN PORTFOLIO, A
SERIES OF SUNAMERICA SERIES
TRUST; ASSET ALLOCATION FUND,
A SERIES OF VALIC COMPANY I;
BLUE CHIP GROWTH FUND, A
SERIES OF VALIC COMPANY I;
DIVIDEND VALUE FUND, A SERIES
OF VALIC COMPANY I; STOCK
INDEX FUND, A SERIES OF VALIC
COMPANY I; T. ROWE PRICE
ASSOCIATES, INC.; T. ROWE PRICE
EQUITY INCOME FUND; T. ROWE
PRICE GROWTH STOCK FUND; T.
ROWE PRICE VALUE FUND; T. ROWE
PRICE BLUE CHIP GROWTH FUND; T.
ROWE PRICE EQUITY INCOME
PORTFOLIO; T. ROWE PRICE EQUITY
INDEX 500 FUND; T. ROWE PRICE
PERSONAL STRATEGY GROWTH
FUND; T. ROWE PRICE PERSONAL
STRATEGY BALANCED FUND; T.
ROWE PRICE FINANCIAL SERVICES;
T. ROWE PRICE GROWTH & INCOME
FUND; T. ROWE PRICE NEW
AMERICA GROWTH FUND; T. ROWE
PRICE PERSONAL STRATEGY
INCOME FUND; T. ROWE PRICE
CAPITAL OPPORTUNITY FUND; T.
ROWE PRICE BLUE CHIP GROWTH

PORTFOLIO; T. ROWE PRICE NEW
INCOME FUND; T. ROWE PRICE
PERSONAL STRATEGY BALANCED
PORTFOLIO; T. ROWE PRICE SHORT-
TERM BOND FUND; T. ROWE PRICE
TOTAL EQUITY MARKET INDEX
FUND; T. ROWE PRICE NEW
AMERICA GROWTH PORTFOLIO; T.
ROWE PRICE BALANCED FUND; T.
ROWE PRICE INSTITUTIONAL U.S.
STRUCTURED RESEARCH FUND; T.
ROWE PRICE INSTITUTIONAL
LARGE-CAP CORE GROWTH FUND;
T. ROWE PRICE INFLATION
FOCUSED BOND FUND; T. ROWE
PRICE GEORGIA TAX-FREE BOND
FUND; T. ROWE PRICE EQUITY
INDEX 500 PORTFOLIO; T. ROWE
PRICE LIMITED-TERM BOND
PORTFOLIO; T. ROWE PRICE
STRUCTURED RESEARCH COMMON
TRUST FUND; T. ROWE PRICE
EQUITY INCOME TRUST; T. ROWE
PRICE EQUITY INDEX TRUST; T.
ROWE PRICE STABLE VALUE
COMMON TRUST FUND; T. ROWE
PRICE GROWTH AND INCOME
TRUST; ALASKA LARGE-CAP
TRUST; T. ROWE PRICE MANAGED
BOND COMMON TRUST FUND; T.
ROWE PRICE GROWTH STOCK
TRUST; T. ROWE PRICE BOND INDEX
TRUST; ALASKA MONEY MARKET
TRUST; ALASKA INTERNATIONAL
TRUST; TEACHER RETIREMENT
SYSTEM OF TEXAS; TEACHERS
INSURANCE AND ANNUITY
ASSOCIATION – COLLEGE
RETIREMENT SERVICES; COLLEGE
RETIREMENT EQUITIES FUND
EQUITY INDEX ACCOUNT; COLLEGE
RETIREMENT EQUITIES FUND

COMPLAINT

GLOBAL EQUITIES ACCOUNT;
COLLEGE RETIREMENT EQUITIES
FUND STOCK ACCOUNT; TIAA-CREF
ASSET MANAGEMENT
COMMINGLED FUNDS TRUST I
LARGE CAP VALUE FUND; TIAA
SEPARATE ACCOUNT VA-1 STOCK
INDEX ACCOUNT; TIAA-CREF
FUNDS EQUITY INDEX FUND; TIAA-
CREF FUNDS LARGE-CAP VALUE
FUND; TIAA-CREF FUNDS LARGE-
CAP VALUE INDEX FUND; TIAA-
CREF FUNDS S&P 500 INDEX FUND;
TIAA-CREF LIFE FUNDS LARGE-CAP
VALUE FUND; TIAA-CREF LIFE
FUNDS STOCK INDEX FUND;
CALIFORNIA PUBLIC EMPLOYEES'
RETIREMENT SYSTEM; BLACKROCK
FINANCIAL MANAGEMENT, INC.;
OBSIDIAN MASTER FUND TRUST;
AUSGLEICHSFONDS DER ALTERS -
UND
HINTERLASSENENVERSICHERUNG;
MASTER S&P 500 INDEX SERIES OF
QUANTITATIVE MASTER SERIES
TRUST; EQUITY INDEX TRUST;
LARGE CAP VALUE INDEX TRUST
OF QA COLLECTIVE TRUST SERIES;
RUSSELL 1000 ALPHA TILTS FUND
B; EQUITY INDEX FUND; ALPHA
TILTS FUND B; iSHARES S&P 500
INDEX FUND; iSHARES RUSSELL
1000 VALUE FUND; RUSSELL 1000
INDEX FUND; RUSSELL 1000 VALUE
FUND; RUSSELL 1000 ALPHA TILTS
BL; ACTIVE STOCK FUND E; ASCENT
LIFE US EQUITY FUND; iSHARES
S&P 500 GROWTH FUND; BARCLAYS
INTERNATIONAL FUNDS - USA
EQUITY FUND; RUSSELL 1000
VALUE FUND B; RUSSELL 3000
INDEX FUND; US ALPHA TILTS –

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COMPLAINT

TOKYO PENSION CLIENTS; NC R3000 TILTS SEP ACCT; RUSSELL 1000 VALUE ALPHA TILTS FUND B; EQUITY INDEX FUND B; LARGE CAPITALIZATION CORE TILTS FUND B; U.S. EQUITY MARKET FUND B; ACTIVE STOCK MASTER PORTFOLIO; OMERS RUSSELL 1000 ENHANCED INDEX MANDATE; BLACKROCK CDN US ALPHA TILTS NON-TAXABLE FUND; FMC-US R3000 ALPHA TILTS U/A; iSHARES RUSSELL 1000 INDX FUND; BLACKROCK CDN US EQUITY INDEX NON-TAXABLE FUND; iSHARES RUSSELL 3000 INDEX FUND; iSHARES DOW JONES US FINANCIAL SECTOR INDEX FUND; CDP ALPHA TILTS SEPARATE ACCOUNT; MSCI U.S. EQUITY INDEX FUND B; NZ SUPER US TILTS; LUCENT EQ INDX SEP ACCT; AQUILA LIFE US EQUITY INDEX FUND; and ASCENT LIFE US EQUITY FUND,

Plaintiffs,

v.

COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE CAPITAL V, BANK OF AMERICA CORPORATION, ANGELO R. MOZILO, DAVID SAMBOL, ERIC P. SIERACKI, and KPMG LLP

Defendants.

COMPLAINT

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ..................................................................................1

II.  NATURE AND SUMMARY OF THE ACTION ........................................2

III. JURISDICTION AND VENUE.................................................................14

IV.  THE PARTIES ....................................................................................15

   A.   Plaintiffs ...................................................................................15

   B.   Defendants.................................................................................22

      1.   Countrywide Defendants .........................................................22

      2.   The Officer Defendants............................................................23

      3.   KPMG LLP ............................................................................27

V.   FACTUAL BACKGROUND AND SUBSTANTIVE
     ALLEGATIONS....................................................................................28

   A.   Countrywide's Mortgage Business ..............................................28

   B.   Countrywide's Goal Of Market Dominance ..................................31

   C.   Countrywide's Undisclosed Abandonment Of Prudent
        Underwriting Standards..............................................................34

      1.   Countrywide, And Mozilo In Particular, Regularly
           Highlighted The Company's Superior And
           Disciplined Underwriting Standards That
           Purportedly Generated Quality Loans .....................................34

      2.   Countrywide Approved Virtually Every Loan
           Without Regard To Risk ..........................................................41

      3.   Countrywide's Substantial Use Of "Exceptions"......................55

4.      Defendants Failed To Disclose The Extent Of Their Use Of "Liar Loans" And The Resulting Fraud ................................................................71

D.    Countrywide Misled Investors About The Creditworthiness Of Pay-Option ARM Borrowers............................75

E.    Countrywide Misled Investors About  Increased 100% Financing And HELOC Risks............................................87

F.    Countrywide's Secret  Internal Definition Of "Prime".....................90

G.    Countrywide Engaged In Widespread Predatory And Fraudulent Loan Origination Practices ................................99

VI.    DEFENDANTS CAPITALIZED ON THE FRAUD................................114

A.    Countrywide's Compensation Structure ...........................114

B.    Defendants' Substantial Insider Selling .............................116

VII.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS...................124

A.    The Company's False Statements Regarding 2003 Results ....................................................125

1.    2003 Form 10-K.................................................125

B.    The Company's False Statements Regarding 2004 Results ....................................................128

1.    First Quarter 2004 Form 8-K...................................128

2.    First Quarter 2004 Conference Call........................129

3.    First Quarter 2004 Form 10-Q ................................132

4.    Amended First Quarter 2004 Form 10-Q/A ............133

5.    Second Quarter 2004 Form 8-K..............................134

6.    Second Quarter 2004 Conference Call ...................135

7.    Second Quarter 2004 Form 10-Q.................................136

8.    Amended Second Quarter 2004 Form 10-Q/A..................138

9.    Third Quarter 2004 Form 8-K................................139

10.   Third Quarter 2004 Conference Call .......................140

11.   Third Quarter 2004 Form 10-Q..............................141

12.   Amended Third Quarter 2004 Form 10-Q/A ..................143

13.   Year End 2004 Form 8-K ...................................144

14.   Year End 2004 Conference Call ............................144

15.   2004 Form 10-K............................................146

C.    The Company's False Statements Regarding 2005
      Results ..................................................149

1.    March 15, 2005 Piper Jaffray Conference .................149

2.    First Quarter 2005 Form 8-K...............................152

3.    First Quarter 2005 Conference Call........................153

4.    First Quarter 2005 Form 10-Q .............................155

5.    May 24, 2005 Countrywide Analyst Meeting ................156

6.    June 2, 2005 Sanford Bernstein & Co. Strategic
      Decisions Conference .....................................159

7.    Second Quarter 2005 Form 8-K..............................160

8.    Second Quarter 2005 Conference Call ......................161

9.    Second Quarter 2005 Form 10-Q.............................164

10.   September 13, 2005 Lehman Brothers Financial
      Services Conference.......................................166

11.   Third Quarter 2005 Form 8-K...............................168

12. Third Quarter 2005 Conference Call .......................168

13. Third Quarter 2005 Form 10-Q ..............................169

14. Year End 2005 Form 8-K .....................................171

15. Year End 2005 Conference Call .............................172

16. 2005 Form 10-K ................................................173

D. The Company's False Statements Regarding 2006
Results .................................................................177

1. March 21, 2006 Piper Jaffray Conference ...............177

2. March 30, 2006 Financial Equity Investor's Forum ..............178

3. First Quarter 2006 Form 8-K ...............................181

4. First Quarter 2006 Conference Call .......................181

5. First Quarter 2006 Form 10-Q .............................182

6. May 17, 2006 American Financial Services
Association Finance Industry Conference For
Fixed Income Investors ......................................185

7. May 31, 2006 Sanford C. Bernstein Strategic
Decisions Conference ........................................187

8. Second Quarter 2006 Form 8-K ............................188

9. Second Quarter 2006 Conference Call ....................189

10. Second Quarter 2006 Form 10-Q ..........................190

11. September 12, 2006 Equity Investor's Forum ..........192

12. September 13, 2006 Fixed Income Investor Forum ..............193

13. Third Quarter 2006 Form 8-K ..............................198

14. Third Quarter 2006 Conference Call ......................198

15.  Third Quarter 2006 Form 10-Q..................................................200

16.  Year-End 2006 Form 8-K ........................................................202

17.  Year-End 2006 Conference Call...............................................203

18.  2006 Form 10-K.......................................................................205

E.  The Company's False Statements Regarding 2007
    Results ...........................................................................................209

    1.  March 6, 2007 Raymond James Institutional
        Investor Conference ................................................................209

    2.  March 13, 2007 CNBC Interview And March 22,
        2007 "Mad Money" Interview .................................................210

    3.  First Quarter 2007 Form 8-K ..................................................212

    4.  First Quarter 2007 Conference Call.........................................212

    5.  April 26, 2007 AFSA 7th Finance Industry
        Conference ...............................................................................215

    6.  First Quarter 2007 Form 10-Q .................................................218

F.  The Company's False Registration Statements And
    Prospectuses For Countrywide's Offerings Of Debt And
    Preferred Securities .......................................................................221

    1.  Series B Medium-Term Notes .................................................221

    2.  6.25% Subordinated Notes Due May 15, 2016 ........................223

    3.  7% Capital Securities ...............................................................224

VIII.  COUNTRYWIDE'S FINANCIAL STATEMENTS WERE
       MATERIALLY MISSTATED IN VIOLATION OF GAAP ....................226

    A.  Countrywide's Financial Statements Were Materially
        Misstated In Violation Of GAAP...................................................226

        1.  Risk Factors..........................................................................228

2.  Countrywide Inflated Earnings By Recording An Inadequate Allowance For Loan Losses ...................231

3.  Countrywide Inflated Earnings By Overvaluing Its Retained Interests From Securitizations ...................252

4.  Countrywide Inflated Earnings By Overvaluing Its Mortgage Servicing Rights ...................258

5.  Countrywide Inflated Earnings By Failing To Properly Reserve For Representations And Warranties ...................267

6.  Countrywide's Internal Controls Over Financial Reporting Were Ineffective ...................272

IX.  KPMG'S NEGLIGENT OR RECKLESS FAILURE TO CONDUCT AUDITS IN ACCORDANCE WITH GAAS ...................278

A.  The Standards Of GAAS And The AICPA Audit & Accounting Guide ...................279

B.  KPMG's Responsibility To Plan And Perform The Audits Of Countrywide's Financial Statements As It Relates To Fraud ...................281

C.  Financial Statement Misstatement Risk Factors ("Red Flags") In 2004 ...................287

1.  Red Flag: Implementation Of Aggressive Goal To Capture 30% Market Share ...................288

2.  Red Flag: Improper Documentation For Loans, Misclassification Of Subprime Loans As Prime Loans And Management Overrides ...................289

3.  Red Flag: 99% Increase In Nonprime Loans, 108% Increase In ARM Loans, 71% Increase In HELOC Loans ...................291

4.  Red Flag: ALL As A Percentage Of LHI Remained Flat Despite Increase In Higher Risk Loans ...................292

5.   Red Flag: Increase In MSR Balance, But Decrease
     In Valuation Allowance ........................................................294

6.   Red Flag: Based On Credit Risk Increases, Flawed
     Assumptions Used To Value RI ............................................296

D.   Financial Statement Misstatement Risk Factors ("Red
     Flags") In 2005 ...................................................................297

     1.   Red Flag: Implementation Of Countrywide's
          Exception Processing System .................................298

     2.   Red Flag: Shocking 335% Increase In Pay-Option
          ARM Loan Origination............................................300

     3.   Red Flag: 99% Increase In HELOC Delinquencies ..............302

     4.   Red Flag: Despite Increased Credit Risks, ALL As
          A Percentage Of LHI Decreased.............................303

     5.   Red Flag: Increase In Prime Rate From 2004 .......................303

     6.   Red Flag: Valuation Allowance For Impairment Of
          Countrywide's MSRs Dropped From 11% To Only
          3% Of Gross MSRs.................................................304

     7.   Red Flag: Decrease In Net Lifetime Credit Losses
          And Unreasonable Weighted Average Life Of
          Retained Interests..................................................304

     8.   Red Flag: 27% Drop In New R&W Provisions As
          A Percentage Of Relevant Securitizations.............................305

E.   Financial Statement Misstatement Risk Factors ("Red
     Flags") In 2006 ...................................................................307

     1.   Red Flag: Accumulated Negative Amortization On
          Pay-Option ARMS Increased 775%......................................307

     2.   Red Flag: 87% Increase In HELOC Delinquencies ..............308

     3.   Red Flag: ALL As A Percentage Of LHI
          Remained Flat ........................................................309

4.    Red Flag: No Modification To Fair Value Assumptions Used In MSR Model .........................310

5.    Red Flag: Historical Performance Used To Calculate Fair Value Of Retained Interests ...........311

6.    Red Flag: Insufficient R&W Reserve Relative To Skyrocketing Delinquency Rates ...............313

F.   KPMG Failed To Require Countrywide To Correct Materially Misstated Disclosures .......................314

G.   KPMG's Failure To Issue Adverse Opinions On Countrywide's Self-Assessment Of Internal Control Over Financial Reporting And On The Effectiveness Of Countrywide's Internal Control Over  Financial Reporting Based On KPMG's Audits ..............................317

X.    COUNTRYWIDE'S UNDISCLOSED UNDERWRITING AND LOAN ORIGINATION PRACTICES EXPOSED IT TO UNDISCLOSED CREDIT RISKS AND LIQUIDITY RISK ...................322

XI.   INVESTORS BEGIN TO LEARN THE TRUE FACTS ABOUT COUNTRYWIDE, CAUSING ITS SECURITIES PRICES TO PLUMMET DESPITE DEFENDANTS' EFFORTS TO CONCEAL THE TRUTH.................................326

A.   Corrective Disclosures ....................................328

1.    July 24, 2007 Partial Corrective Disclosure ...........................329

2.    August 2, 2007 Partial Corrective Disclosure ........................335

3.    August 14-16, 2007 Partial Corrective Disclosure ................339

4.    October 24, 2007 Partial Corrective Disclosure ....................348

5.    January 8-9, 2008 Partial Corrective Disclosure ...................352

6.    March 8, 2008 Partial Corrective Disclosure..........................356

XII.  DEFENDANTS' CONDUCT CAUSED PLAINTIFFS' LOSS................357

XIII.   PLAINTIFFS RELIED UPON DEFENDANTS' FALSE AND
        MISLEADING STATEMENTS AND OMISSIONS ...............................365

XIV.   TOLLING OF THE STATUTE OF LIMITATIONS ...............................366

XV.    INAPPLICABILITY OF STATUTORY SAFE HARBOR........................368

XVI.   AS COUNTRYWIDE'S SUCCESSOR, BANK OF AMERICA
       IS LIABLE FOR COUNTRYWIDE'S ACTIONS....................................369

XVII. CLAIMS FOR RELIEF .........................................................................379

COUNT I  VIOLATIONS OF SECTION 10(b) OF THE
         EXCHANGE ACT AND RULE 10b-5 PROMULGATED
         THEREUNDER (AGAINST COUNTRYWIDE, MOZILO,
         SAMBOL, AND SIERACKI) ...................................................................379

COUNT II  VIOLATIONS OF SECTION 10(b) OF THE
          EXCHANGE ACT AND RULE 10b-5 PROMULGATED
          THEREUNDER (AGAINST KPMG)........................................................382

COUNT III  VIOLATIONS OF SECTION 20(a) OF THE
           EXCHANGE ACT (AGAINST MOZILO, SAMBOL, AND
           SIERACKI)................................................................................................384

COUNT IV  VIOLATIONS OF SECTION 20A OF THE
          EXCHANGE ACT  (AGAINST MOZILO AND SAMBOL)...................385

COUNT V  VIOLATIONS OF SECTION 11 OF THE SECURITIES
         ACT BY PURCHASERS OF SERIES B MEDIUM-TERM
         NOTES (AGAINST COUNTRYWIDE, MOZILO, SAMBOL,
         SIERACKI AND KPMG) ........................................................................386

COUNT VI  VIOLATIONS OF SECTION 12(a)(2) OF THE
          SECURITIES ACT BY PURCHASERS OF SERIES B
          MEDIUM-TERM NOTES  (AGAINST COUNTRYWIDE)....................389

COUNT VII  VIOLATIONS OF SECTION 15 OF THE
           SECURITIES ACT BY PURCHASERS OF SERIES B
           MEDIUM-TERM NOTES (AGAINST MOZILO, SAMBOL,
           AND SIERACKI) ......................................................................................391

COUNT VIII  VIOLATIONS OF SECTION 11 OF THE
         SECURITIES ACT BY PURCHASERS OF 6.25% NOTES
         (AGAINST COUNTRYWIDE, MOZILO, SAMBOL,
         SIERACKI AND KPMG) ..................................................................393

COUNT IX  VIOLATIONS OF SECTION 12(a)(2) OF THE
         SECURITIES ACT BY PURCHASERS OF 6.25% NOTES
         (AGAINST COUNTRYWIDE) ...................................................395

COUNT X  VIOLATIONS OF SECTION 15 OF THE SECURITIES
         ACT BY PURCHASERS OF 6.25% NOTES  (AGAINST
         MOZILO, SAMBOL, AND SIERACKI) ....................................398

COUNT XI  VIOLATIONS OF SECTION 11 OF THE SECURITIES
         ACT BY PURCHASERS OF 7% CAPITAL SECURITIES
         (AGAINST ALL DEFENDANTS) ..............................................399

COUNT XII  VIOLATIONS OF SECTION 12(a)(2) OF THE
         SECURITIES ACT BY PURCHASERS OF 7% CAPITAL
         SECURITIES (AGAINST COUNTRYWIDE AND CCV) .....................402

COUNT XIII  VIOLATIONS OF SECTION 15 OF THE
         SECURITIES ACT BY PURCHASERS OF 7% CAPITAL
         SECURITIES  (AGAINST MOZILO, SAMBOL, AND
         SIERACKI)........................................................................404

COUNT XIV  SUCCESSOR LIABILITY AGAINST BANK OF
         AMERICA  (AGAINST BANK OF AMERICA) ......................................406

XVIII. PRAYER FOR RELIEF ..........................................................................407

XIX.  DEMAND FOR JURY TRIAL .................................................................408

# I.   <u>INTRODUCTION</u>

1.      The Government of Guam Retirement Fund, American Century Funds (as defined below), Maryland State Retirement and Pension System, Montana Board of Investments, Norges Bank, the Nuveen Funds (as defined below), Royal Mail Pension Plan, Stichting Pensioenfonds Zorg en Welzijn represented by PGGM Vermogensbeheer B.V., SunAmerica Funds (as defined below), T. Rowe Price Funds (as defined below), Teacher Retirement System of Texas, Thrivent Funds (as defined below), TIAA-CREF Funds (as defined below), the California Public Employees' Retirement System ("CalPERS") and BlackRock Funds (as defined below) (collectively "Plaintiffs"), by their undersigned counsel, for their Complaint against Countrywide Financial Corporation ("Countrywide" or the "Company"), Countrywide Capital V ("CCV"), Bank of America Corp. ("Bank of America"), Angelo R. Mozilo ("Mozilo"), Countrywide's former Chairman and Chief Executive Officer ("CEO"), David Sambol ("Sambol"), its former Chief Operating Officer ("COO"), and Eric P. Sieracki ("Sieracki"), its former Chief Financial Officer ("CFO") (collectively the "Officer Defendants"), allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.

2.      Plaintiffs' information and belief as to allegations concerning matters other than themselves and their own acts is based upon, among other things:  (i) review and analysis of documents filed publicly by Countrywide and certain affiliates thereof with the United States Securities and Exchange Commission (the "SEC"); (ii) review and analysis of press releases, news articles, and other public statements issued by or concerning Defendants named herein; (iii) review and analysis of research reports issued by financial analysts concerning Countrywide's securities and business; (iv) discussions with consulting experts; (v) other publicly available information and data concerning Countrywide and its securities, including information concerning investigations by federal and state governmental

agencies; (vi) investigations conducted by and through Plaintiffs' attorneys, which included interviews of former Countrywide employees; (vii) review and analysis of news articles, media reports and other publications concerning the mortgage banking and lending industries; (viii) review and analysis of documents and information, including internal emails produced by Countrywide, deposition testimony provided by its former officers and employees, and settlements and final judgments in the related case brought by the SEC against the Officer Defendants, *SEC v. Mozilo*, Case No. 09-cv-03994 (JFW) (C.D. Cal.) (the "SEC Action"); and (ix) review and analysis of documents and information disclosed in other litigations naming Countrywide or certain subsidiaries or affiliates as a defendant or nominal defendant.   Plaintiffs believe that substantial additional evidentiary support for the allegations herein exists and will continue to be revealed after Plaintiffs have a reasonable opportunity for discovery.

## II.   NATURE AND SUMMARY OF THE ACTION

3.     This action concerns fraud perpetrated by Countrywide and its top officers in a quest to triple Countrywide's market share and enrich themselves at the expense of the Company's investors, including Plaintiffs.

4.     Defendants, including Countrywide, Mozilo, Sambol, and Sieracki, blatantly issued materially false statements throughout the period between March 12, 2004 and March 7, 2008, inclusive (the "Relevant Period") regarding the Company's purportedly prudent, disciplined and superior underwriting and loan origination practices.   As detailed below, Defendants misled investors in a number of ways regarding the impact of the Company's shift away from traditional loans and drive for market dominance.   Among other things, contrary to their assertions:

- Countrywide failed to adhere to strict underwriting standards, and thus Defendants did not ensure that the loans originated by the Company were of high quality.   To the contrary, Defendants

decimated and abandoned Countrywide's loan origination and underwriting standards by permitting a very significant increase of "exception" loans to the already loose standards;

- Defendants knew that Countrywide's stated income loan products, its Pay-Option adjustable rate mortgage ("ARM") loans, its 100% financing loans and its Home Equity Lines of Credit ("HELOC") loans were not prudently underwritten and were likely to suffer significant default delinquencies, but concealed these facts from Plaintiffs and other investors and frequently mischaracterized them in Countrywide's SEC filings as "prime" loans;

- Defendants concealed the fact that Countrywide's internal definition of "prime" was inconsistent with the industry definition for that term, which rendered their statements about Countrywide's subprime exposure false and misleading;

- Countrywide engaged in widespread deceptive lending practices during the Relevant Period.  These practices garnered Countrywide huge fees from borrowers who were extended loans they could not repay, but exposed the Company and investors to undisclosed long-term risks.  As articulated by the Federal Trade Commission ("FTC") Chairman, Jon Leibowitz, Countrywide's "was a business model based on deceit and corruption and the harm caused to American consumers is absolutely massive and extraordinary"; and

- Defendants failed to properly increase the Company's loan loss reserves to reflect the increased risk in its portfolio, including for loans that the Company held for investment as well as loans sold to third parties for which the Company made certain representations and warranties.  Defendants further inflated Countrywide's

earnings by overstating the value of the Company's retained interests ("RIs") from securitizations, and overstating the value of the Company's mortgage servicing rights.

5.    Meanwhile, *at the same time Mozilo was defrauding unsuspecting investors and simultaneously forcing Countrywide to incur debt to buy back 2.5 billion of its own shares through repurchase programs*, he (and numerous other Countrywide officers and directors) was cashing in – exercising stock options by amending his insider trading plans multiple times and unloading over 13 million artificially inflated shares, at an average price of over $35, resulting in total Relevant Period insider trading proceeds of nearly a *half billion dollars*.

6.    This is not a case about a mortgage lender that simply expanded its loan offerings and underwriting guidelines during the housing bubble and fell victim to the housing decline.  Rather, while the market recognized that mortgage lenders across the board were expanding their loan menus and underwriting standards during the Relevant Period, Defendants repeatedly distinguished Countrywide from competitors, including what they referred to as the "frothy" subprime lenders, and assured the market that, unlike other mortgage lenders, Countrywide's drive for growth and expanded loan offerings did not come at the cost of loan quality.  Defendants repeatedly assured investors that Countrywide produced high quality loans that were qualitatively different from those of its competitors, who primarily engaged in riskier lending practices.  While Defendants appeared to provide sufficient information to satisfy analysts and the purchasers of its mortgage-backed securities ("MBS") that Countrywide was being fully forthcoming, in truth, Defendants concealed from investors and analysts the true impact of the Company's growth strategy on the quality of its loans, and the attendant substantial increase in Countrywide's credit risk and liability exposure. Unbeknownst to investors, Countrywide's essential operations were completely at odds with Defendants' public statements.

7.     Historically, Countrywide was known as one of the nation's largest mortgage lenders, which primarily offered traditional fixed-rate first-lien mortgage loans.  Countrywide originated and purchased these loans, then packaged and sold pools of loans and securitizations to the "secondary market," in order to generate income to fund its long-term capital needs. Because Countrywide's loans were primarily conforming loans that met with the requirements of Government Sponsored Entities ("GSEs"), such as the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), they were considered safer investments by the secondary market and were therefore sold at premium prices.

8.     Countrywide's stated underwriting guidelines, and the enforcement thereof, defined the Company's risk profile and was of critical importance to its operations, its investors, and its ability to sell loans to the secondary market.  In fact, the quality of Countrywide's loans was the single most important aspect of its business and operations.  Indeed, Countrywide's own internal guidelines confirmed that the Company's policy and underwriting philosophy was to "originate, purchase, and deliver investment quality loans."  The term "investment quality loan" was explicitly defined in Countrywide's guidelines to mean a loan made to a borrower "from whom timely repayment of the debt can be expected" and that "is adequately secured by real property."

9.     Beginning in 2003, Countrywide publicly disclosed its new goal to overtake its competitors and capture "market dominance" with 30% market share of the nation's residential loan market.  Notwithstanding concerns raised by analysts and others that this sudden increase in loan origination might translate into a reduction in overall loan quality, Defendants repeatedly assured the public and investors that their policies and procedures for underwriting loans were tightly controlled, conservative, superior, disciplined, and "designed to produce high quality loans."  Countrywide's founder, CEO and Chairman, Mozilo, repeatedly

assured investors that "[w]e don't see any change in our protocol relative to the quality of loans that we're originating"; he was "not aware of any change of substance in [Countrywide's] underwriting policies"; and Countrywide had not "taken any steps to reduce the quality of its underwriting regimen."   Mozilo assured investors that "*I will say this to you that under no circumstances will Countrywide ever sacrifice sound lending and margins for the sake of getting to that 30 percent market share*."[1]

10.     As other lenders, notably subprime lenders, began to fail, Defendants continued to falsely portray Countrywide as uniquely positioned to capitalize on any impending mortgage crisis because of its strict underwriting standards.  Mozilo even stated on *CNBC* that Countrywide would *benefit* from the housing crisis: **"*this'll be great for Countrywide at the end of the day because all of the irrational competitors will be gone.*"**

11.     The truth, however, is that beginning in 2003, Countrywide changed its business model to originate as many loans as possible by increasingly producing subprime, nontraditional and risky loans while disregarding its underwriting standards.  As detailed below, Defendants knew that Countrywide was granting exceptions **"*even more aggressive than our guidelines*,"** and they understood that Countrywide "appear[ed] to have *unacceptable risk on [its] balance sheet.*" Indeed, a former Countrywide board member and Secondary Markets Managing Director confirmed in a deposition in the related SEC Action against Mozilo and others that the **"*only*"** criteria for granting exceptions was whether or not the loan could be sold into the secondary market.  Moreover, according to his Expert Report, Professor Richard K. Green, Ph.D. ("Professor Green"), an industry expert who was prepared to testify in the SEC Action, calculated that *one-quarter* of Countrywide's loans in first quarter 2006, alone, were originated as exceptions to

---

[1]  All emphasis added unless otherwise noted.

Countrywide's underwriting standards; that ***more than one-third of the loans recommended for rejection by Countrywide's own underwriting model were ultimately approved***; and that Countrywide knowingly approved these loans to increase Countrywide's share of the mortgage market.  Based on his analysis, Professor Green concluded that from 2002 forward, Countrywide's residential lending activities became increasingly risky, thereby exposing Countrywide to an increasing probability of borrower delinquency and default.

12.   The Company publicly disclosed that, unlike "frothy" subprime lenders, it originated and underwrote only quality loans, including Pay-Option ARM loans – which Mozilo publicly stated "represent the best whole loan type available for portfolio investment from an overall risk and return perspective," and that "[t]he performance profile of this product is well-understood because of its 20-year history, which includes 'stress tests' in difficult environments."  In truth, however, Mozilo internally admitted that the Company was **"*flying blind*"** as to how the Pay-Option ARM loans will perform.  Mozilo further internally admitted that he **"*personally observed a serious lack of compliance with our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s],*"** and that with respect to Countrywide's 80/20 loan product, **"*[I]n all my years in the business I have never seen a more toxic product.*"**

13.   Moreover, to further conceal its greatly increased production of low quality loans that had a high likelihood of turning delinquent, Countrywide employed an internal, undisclosed definition of "prime" versus "subprime," and, in its public reports, classified loans as "prime" that clearly were subprime.

14.   When Countrywide executives recommended adding additional disclosures in Countrywide's SEC filings, those proposed disclosures were repeatedly rejected and never disclosed.  Countrywide's increasing risk was so great during 2006 that the Company's Chief Risk Officer ("CRO"), John

McMurray ("McMurray"), indicated that he would be resigning due to his "concerns about the company's risk philosophy" and "'can't say no' policy." The Company's refusal to include the disclosures by McMurray even caused him to submit an "addendum" to his Sarbanes-Oxley Certification – however, the addendum was not disclosed to investors.

15.     Eventually, Defendants could no longer hide the poor quality and deteriorating value of Countrywide's mortgages.  Investors learned the true state of Countrywide's operations through a series of corrective disclosures beginning in July 2007, when Countrywide announced a $417 million impairment charge largely on retained interests in Countrywide's MBS.  The Company also reported that rising delinquencies reduced second quarter profit by $388 million.  The Company further revealed that it had been misclassifying loans as "prime" that the industry would have properly viewed as "subprime" − leading analysts to remark **"The Kimono comes off; Prime is not what it seems"** − and that it had "recalibrated" its proprietary underwriting system and tightened its underwriting guidelines, particularly with respect to subprime and home equity loans.

16.     Thereafter, a series of additional, partially corrective disclosures revealed critical problems in Countrywide's mortgage portfolio and operations – including an increasing inability to obtain capital, a possible bankruptcy, and a Federal Bureau of Investigation ("FBI") probe of potential securities fraud. In January 2008, in order to avoid bankruptcy, Countrywide agreed to be acquired by Bank of America at a bargain-basement price.   The sale was closed on July 1, 2008, at a price equal to $4.33 per share – a decline of more than 90% from Countrywide's $45 per share price peak during the Relevant Period and a mere 12% of the $35 average price at which Mozilo cashed out his shares.

17.     A substantial amount of evidence – some of which is detailed herein – demonstrates that Mozilo and other high-level Countrywide executives were fully aware of but failed to disclose, and in fact expressly authorized and engaged in,

Countrywide's risky lending practices.  The scope of Defendants' fraud is reflected by, and well-documented in, among other things:   (i) the SEC Action which resulted in a record penalty and disgorgement of substantial "ill-gotten gains" from Mozilo; (ii) regulatory actions initiated by multiple state attorneys generals, which resulted in settlements worth over $8 billion; (iii) numerous actions by investors in and insurers of Countrywide's MBS, including a $1.6 billion settlement with Assured Guaranty to resolve the insurer's representations and warranties claims and a recently announced $8.5 billion settlement for certain repurchase and servicing claims; (iv) additional demands that Countrywide repurchase defective loans sold in breach of contractual representations and warranties or pursuant to indemnification obligations; (v) a securities class action that recently settled for $624 million; (vi) a derivative action that is currently on appeal to the Ninth Circuit Court of Appeals; (vii) myriad consumer protection lawsuits brought by defrauded homeowners; and (viii) the high number of delinquencies, defaults, and foreclosures in Countrywide's mortgages.

18.   As a result of these numerous actions and investigations (detailed below), volumes of internal Countrywide documents, statistical evidence, and other reliable sources have become available that evidence the falsity of the statements and omissions alleged herein and Defendants' knowledge in making these false statements.  Substantial evidence – trial, deposition, investigative, and regulatory testimony and internal documents examined by Plaintiffs' counsel, as well as interviews of numerous former Countrywide employees conducted by and through Plaintiffs' counsel – reveals that while Defendants were publicly disclosing Countrywide's purportedly conservative, superior, disciplined loan underwriting guidelines, they were aware of (and even ordered) the breakdown in Countrywide's procedures and the lack of compliance with Countrywide's underwriting guidelines in order to capture an unprecedented market share of residential mortgage originations and enrich themselves.

19.  <u>SEC Action</u>:  In June 2009, the SEC brought securities fraud and insider trading charges against Mozilo, Sambol, and Sieracki in federal court in the Central District of California.  Judge Walter, who oversaw the SEC Action, concluded that there is ample evidence of liability (which was produced and made publicly available) and denied Defendants' motions for summary judgment.  Judge Walter found that there is evidence that ***"Countrywide routinely ignored its official underwriting guidelines to such an extent that Countrywide would underwrite <u>any</u> loan it could sell into the secondary mortgage market."***  *SEC v. Mozilo,* 2010 WL 3656068, at *10 (C.D. Cal. Sept. 16, 2010) ("*Mozilo*") ("any" emphasized in original).  Judge Walter rejected Defendants' argument that their false statements were mere "puffery," explaining that this case "present[s] the extraordinary case where a company's essential operations were so at odds with the company's public statements that [the statements] . . . are rendered cognizable to the securities laws."  *Id.* at *11 (quoting *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1153 (C.D. Cal. 2008) ("*Countrywide*")).  Judge Walter concluded that "***[i]n light of this evidence, a reasonable jury could conclude that Countrywide all but abandoned managing credit risk through its underwriting guidelines, that Countrywide would originate any loan it could sell, and therefore that the statements regarding the quality of Countrywide's underwriting and loan production were misleading.***"  *Id.* at *10.

20.  After Judge Walter denied Defendants' motions for summary judgment and just days before trial, on October 15, 2010, the SEC announced a historic settlement of the action against the three individuals.  Mozilo agreed to a settlement in the amount of $67.5 million – one of the largest individual SEC settlements, including a $22.5 million penalty, which the SEC reports is "the SEC's largest ever financial penalty against a public company's senior executive."  Sambol and Sieracki agreed to pay an additional $5.65 million in penalties and

disgorgement.  In addition, Mozilo agreed to be barred for life from serving as a director or officer of a public company, and Sambol agreed to a three-year ban.

21.  <u>Securities Class And Derivative Actions:</u>  Defendants have also been subject to derivative litigation as well as class action securities litigation, including the class case in which Plaintiffs excluded themselves in order to pursue this direct action.  In the derivative case, in denying Defendants' motions to dismiss, Judge Pfaelzer concluded that the "allegations create a cogent and compelling inference that the [Countrywide officers and directors] misled the public with regard to the rigor of Countrywide's loan origination process, the quality of its loans, and the Company's financial situation – even as they realized that Countrywide had virtually abandoned its own loan underwriting practices."  *In re Countrywide Fin. Corp. Deriv. Litig.,* 554 F. Supp. 2d 1044, 1057 (C.D. Cal. 2008) ("*Countrywide Deriv.*").   In addition, Judge Pfaelzer found that the numerous confidential witnesses "paint a compelling portrait of a dramatic loosening of underwriting standards in Countrywide branch offices across the United States," representing "a rampant disregard for underwriting standards." *Id.* at 1058-59.

22.  Judge Pfaelzer rejected Defendants' arguments that they were oblivious of the widespread malfeasance at Countrywide, explaining: ***"[i]t defies reason, given the entirety of the allegations, that these [defendants] could be blind to widespread deviations from the underwriting policies and standards being committed by employees at all levels."*** *Id.* at 1082.

23.  Following her ruling in the derivative case, Judge Pfaelzer also rejected Defendants' motions to dismiss in the related securities class action.  In a 112-page opinion, Judge Pfaelzer concluded that "Plaintiffs have created a cogent and compelling inference of a company obsessed with loan production and market share with little regard for the attendant risks, despite the company's repeated assurances to the market." *Countrywide*, 588 F. Supp. at 1186.  Since the filing of the class plaintiffs' Second Amended Complaint over two years ago, a tremendous

amount of additional information and internal Countrywide documents have become publicly available, some of which is detailed herein.

In addition, in the direct action against Defendants brought by purchasers of Countrywide debentures, Judge Pfaelzer recently denied Defendants' motions to dismiss and again rejected, among other arguments, Defendants' "macroeconomic" loss causation and disclosure arguments. *Centaur Classic Convertible Arbitrage Fund Ltd. v. Countrywide Fin. Corp.*, -- F. Supp. 2d --, 2011 WL 2504637 (C.D. Cal. June 21, 2011).

24.  <u>Mortgage-Backed Securities Litigation:</u>  Courts in at least two actions have already sustained claims of fraudulent and negligent misrepresentations against Countrywide with respect to the issuance of MBS between 2005 and 2007. For example, fraudulent inducement claims brought by MBIA Insurance Corporation ("MBIA"), a guarantor of Countrywide's MBS, against Countrywide based on Countrywide's misrepresentations in ten MBS offering documents have been sustained and affirmed on appeal. *MBIA Ins. Corp. v. Countrywide Home Loans, Inc*., 2009 WL 2135167 (N.Y. Sup. July 8, 2009), affirmed in large part, -- N.Y.S. 2d --, 2011 WL 2567772 (N.Y.A.D. Jun 30, 2011).  Similarly, on November 29, 2010, a Pennsylvania state court sustained claims brought by the Federal Home Loan Bank of Pittsburgh against Countrywide for fraudulent and negligent misrepresentation based on the purchase of five Countrywide MBS.  *FHLB Pittsburgh v. Countrywide Sec. Corp.*, No. GF09-018482 (Court of Common Pleas of Allegheny County, Nov. 29, 2010).

25.  <u>Former Countrywide Employee And Expert Testimony:</u>  As detailed below, numerous Confidential Witnesses ("CWs") from different levels, different venues, and involved in different aspects of the Company's operations corroborate the dramatic and undisclosed nature of Countrywide's shift from traditional to high-risk mortgage lender.  For example, a former Countrywide underwriter from Florida described pressure from management to approve and push through as many

loans as possible.  According to this former employee, *as much as 80% of the loans originated at Countrywide involved significant variations from the underwriting standards that necessitated a signoff by management.*  A former underwriter from New York described how the Company extended loans to borrowers with spiraling debt to income ratios, and how the Company systematically sacrificed quality for quantity through its compensation structure.  A former senior underwriter from California and a compliance auditor from Texas both described Countrywide's policy of mischaracterizing loans as "prime" that were not prime, including loans to borrowers with recent bankruptcies or stated incomes far beyond the norm for their professions.  A diverse group of former employees, from loan officers to compliance auditors, have confirmed that the Company's "no doc" loan products were openly abused.  This included extending loans outside the Company's guidelines if it meant continuing to get referrals or preventing business from going to competitors.  Another former employee uncovered in Plaintiffs' investigation worked directly with Defendant Sambol to create the computer system used to route risky loans out of the normal loan approval system to ensure they were not rejected for violating the Company's stated underwriting guidelines.  This former Executive Vice President also confirmed that all top Countrywide executives received monthly reports issued by the CRO's department that measured the performance of Countrywide's loans by various metrics and adherence to theoretical underwriting guidelines.  As a former senior underwriter from Ohio put it: *the Company's "philosophy was that you didn't turn down loans" and employees "did whatever they had to do to close loans."*

26.     These CW accounts, together with the mass of litigation and investigations of Countrywide to date, provide a mosaic of the fraudulent lending practices that pervaded Countrywide from the top down.  As Judge Pfaelzer found in sustaining the related shareholder derivative complaint, these witnesses "*tell*

---

*what is essentially the same story − a rampant disregard for underwriting standards from markedly different angles.*"

27.     Evidence of the fraudulent conduct at Countrywide continues to be revealed, including in Bank of America's 2010 Form 10-K, filed with the SEC on February 25, 2011, which provides detailed figures demonstrating that Countrywide loans originated during the Relevant Period are performing very poorly.  For example, of the $293 billion outstanding principal balance of Countrywide loans originated between 2004-2008 sold to private (non-GSE) counterparties – *i.e.*, in connection with securitizations or whole loan sales – roughly $166 billion or 55% is severely delinquent or in default.  Of this amount, $27 billion or 16% is "prime" loans, $43 billion or 26% is Alt-A loans, and $50 billion or 30% is Pay-Option ARMs.  Bank of America's portfolio of loans acquired from Countrywide is also performing exceptionally poor.  Of $41.4 billion in Countrywide acquired loans, $15.5 billion or 37.5% is in the late stages of delinquency and only $21.5 billion (about half) are current.  A substantial amount of the loans are to borrowers with "refreshed" Fair Isaac Credit Organization ("FICOs") below 620 and/or loan-to-value ratios ("LTVs") greater than 90%.  Bank of America's allowance for such loans increased $2.5 billion from a year ago, to $6.3 billion.

28.     In addition, Bank of America agreed to pay $1.6 billion to settle representation and warranty claims by Assured Guaranty, and recently agreed to pay $8.5 billion to settle certain repurchase and servicing claims even before a complaint was filed.

III.   **JURISDICTION AND VENUE**

29.     The claims asserted herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l and 77o, Sections 10(b), 20(a) and 20A of the Securities Exchange Act of 1934 (the

"Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a) and 78t-1, and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

30.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1337(a).

31.     Venue is proper in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. §§ 1391(b), (c) and (d). Many of the acts and omissions charged herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in substantial part in the Central District of California. Countrywide maintained its corporate headquarters and principal executive offices in this District throughout the Relevant Period.

32.     In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of national securities exchanges and markets.

IV.    **THE PARTIES**

A.    **Plaintiffs**

33.     The Government of Guam Retirement Fund ("Guam") is a plaintiff in this action. Guam purchased Countrywide securities during the Relevant Period and suffered damages as a result of the violations pled herein. Plaintiff Guam oversees approximately $1.6 billion in net assets (as of September 30, 2010) for current and former government employees and their survivors.

34.     The following American Century Investment Management funds are plaintiffs in this action: American Century Capital Portfolios, Inc. – Equity Index Fund; American Century Quantitative Equity Funds, Inc. – Income & Growth Fund; and American Century Variable Portfolios, Inc. – VP Income & Growth Fund (collectively "American Century Funds"). American Century Funds

purchased Countrywide securities during the Relevant Period and suffered damages as a result of the violations pled herein.

35.    Maryland State Retirement and Pension System ("Maryland") is a plaintiff in this action.   Maryland purchased Countrywide securities during the Relevant Period and suffered damages as a result of the violations pled herein. Plaintiff Maryland administers survivor, disability and retirement benefits to its participants and manages approximately $37.5 billion of net assets (as of June 30, 2011).

36.    Montana Board of Investments ("Montana") is a plaintiff in this action.  Montana purchased Countrywide securities during the Relevant Period and suffered damages as a result of the violations pled herein.   Plaintiff Montana administers a number of different loan programs to meet the needs of individual businesses and local government and invests all state funds, including pension funds and trust funds with net assets of $13.5 billion (as of June 30, 2011).

37.    Norges Bank is a plaintiff in this action.  Norges Bank is responsible for the management of Government Pension Fund Global with approximately $528 billion in assets (as of the end of the fourth quarter 2010).  Norges Bank purchased Countrywide securities during the Relevant Period and suffered damages as a result of the violations pled herein.

38.    The following Nuveen Investments, Inc. funds are plaintiffs in this action:  Nuveen Equity Premium Opportunity Fund; Nuveen Growth Allocation Fund, a series of Nuveen Investment Trust; Nuveen Multi-Manager Large-Cap Value Fund, a series of Nuveen Investment Trust; Nuveen NWQ Large-Cap Value Fund, a series of Nuveen Investment Trust; Nuveen NWQ Multi-Cap Value Fund, a series of Nuveen Investment Trust; Nuveen Santa Barbara Dividend Growth Fund, a series of Nuveen Investment Trust II; Nuveen Quality Preferred Income Fund; Nuveen Multi-Strategy Income and Growth Fund 2; Nuveen Quality Preferred Income Fund 2; Nuveen Quality Preferred Income Fund 3; and Nuveen Multi-

Strategy Income and Growth Fund (collectively "Nuveen Funds"). The Nuveen Funds purchased Countrywide securities during the Relevant Period and suffered damages as a result of the violations pled herein.

39. Royal Mail Pension Plan ("Royal Mail") is a plaintiff in this action. Royal Mail purchased Countrywide securities during the Relevant Period and suffered damages as a result of the violations pled herein. Plaintiff Royal Mail is a pension fund managing approximately $38 billion (as of June 2011).

40. Stichting Pensioenfonds Zorg en Welzijn ("PFZW") represented by PGGM Vermogensbeheer B.V. ("PGGM") is a plaintiff in this action. PFZW is the pension fund for the healthcare and welfare sector in the Netherlands, and the second largest pension fund in Europe. As of first quarter end 2011, PFZW's assets (managed by PGGM) were €100.4 billion. PFZW invested in Countrywide securities during the Relevant Period and suffered damages as a result of the violations pled herein.

41. The following SunAmerica Asset Management Corp. funds are plaintiffs in this action: Strategic Multi-Asset Portfolio, a series of Anchor Series Trust; Focus Growth Portfolio, a series of Seasons Series Trust; Large Cap Composite Portfolio (merged into the Large Cap Growth Portfolio, a series of Seasons Series Trust), a series of Seasons Series Trust; Large Cap Growth Portfolio, a series of Seasons Series Trust; Large Cap Value Portfolio, a series of Seasons Series Trust; Stock Portfolio, a series of Seasons Series Trust; Focused Value Portfolio (renamed SunAmerica Strategic Value Portfolio), a series of SunAmerica Focused Series, Inc. (renamed SunAmerica Series, Inc.); Equity Index Portfolio, a series of SunAmerica Series Trust; MFS Total Return Portfolio, a series of SunAmerica Series Trust; Asset Allocation Fund, a series of VALIC Company I; Blue Chip Growth Fund, a series of VALIC Company I; Dividend Value Fund, a series of VALIC Company I; and Stock Index Fund, a series of VALIC Company I (collectively "SunAmerica Funds"). The SunAmerica Funds purchased

Countrywide securities during the Relevant Period and suffered damages as a result of the violations pled herein.

42.     T. Rowe Price Associates, Inc., on behalf of the following funds and trusts and on behalf of certain of its separately managed institutional clients and funds where it serves as investment manager or subadvisor (collectively "T. Rowe Price Funds"), are plaintiffs in this action:  T. Rowe Price Equity Income Fund; T. Rowe Price Growth Stock Fund; T. Rowe Price Value Fund; T. Rowe Price Blue Chip Growth Fund; T. Rowe Price Equity Income Portfolio; T. Rowe Price Equity Index 500 Fund; T. Rowe Price Personal Strategy Growth Fund; T. Rowe Price Personal Strategy Balanced Fund; T. Rowe Price Financial Services; T. Rowe Price Growth & Income Fund; T. Rowe Price New America Growth Fund; T. Rowe Price Personal Strategy Income Fund; T. Rowe Price Capital Opportunity Fund; T. Rowe Price Blue Chip Growth Portfolio; T. Rowe Price New Income Fund; T. Rowe Price Personal Strategy Balanced Portfolio; T. Rowe Price Short-Term Bond Fund; T. Rowe Price Total Equity Market Index Fund; T. Rowe Price New America Growth Portfolio; T. Rowe Price Balanced Fund; T. Rowe Price Institutional U.S. Structured Research Fund; T. Rowe Price Institutional Large-Cap Core Growth Fund; T. Rowe Price Inflation Focused Bond Fund; T. Rowe Price Georgia Tax-Free Bond Fund; T. Rowe Price Equity Index 500 Portfolio; T. Rowe Price Limited-Term Bond Portfolio; T. Rowe Price Structured Research Common Trust Fund; T. Rowe Price Equity Income Trust; T. Rowe Price Equity Index Trust; T. Rowe Price Stable Value Common Trust Fund; T. Rowe Price Growth and Income Trust; Alaska Large-Cap Trust; T. Rowe Price Managed Bond Common Trust Fund; T. Rowe Price Growth Stock Trust; T. Rowe Price Bond Index Trust; Alaska Money Market Trust; and Alaska International Trust.  The T. Rowe Price Funds purchased Countrywide securities during the Relevant Period and suffered damages as a result of the violations pled herein.

43.     Teacher Retirement System of Texas ("Texas Teachers") is a plaintiff in this action.  Texas Teachers purchased Countrywide securities during the Relevant Period and suffered damages as a result of the violations pled herein. Plaintiff Texas Teachers provides retirement and related benefits for those employed by the public schools, colleges and universities supported by the State of Texas and manages net assets of approximately $95 billion (as of August 31, 2010).

44.     The following Thrivent Financial for Lutherans funds are plaintiffs in this action:  Mr. Robert L. Kosnoski; Thrivent Financial for Lutherans; Thrivent Financial for Lutherans Foundation; Kalamazoo Anesthesiology PSP FBO Dr. Barbara A. Page; Thrivent Large Cap Value Fund, a series of Thrivent Mutual Funds; Thrivent Large Cap Stock Portfolio, a series of Thrivent Series Fund. Inc.; Thrivent Partner All Cap Portfolio, a series of Thrivent Series Fund, Inc.; Thrivent Large Cap Value Portfolio, a series of Thrivent Series Fund, Inc.; Thrivent Balanced Fund, a series of Thrivent Mutual Funds; Thrivent Large Cap Stock Fund, a series of Thrivent Mutual Funds; Thrivent Large Cap Index Fund I, a series of Thrivent Mutual Funds; Thrivent Large Cap Index Fund, a series of Thrivent Mutual Funds; Thrivent Balanced Portfolio, a series of Thrivent Series Fund, Inc.; Thrivent Large Cap Index Portfolio, a series of Thrivent Series Fund, Inc.; Thrivent Financial Defined Benefit Plan Trust; Thrivent Core Bond Fund, a series of Thrivent Mutual Funds; Thrivent Bond Index Fund, a series of Thrivent Mutual Funds; Thrivent Bond Index Portfolio, a series of Thrivent Series Fund, Inc.; Thrivent Income Fund, a series of Thrivent Mutual Funds; Thrivent Limited Maturity Bond Fund, a series of Thrivent Mutual Funds; Thrivent Income Portfolio, a series of Thrivent Series Fund, Inc.; Thrivent Limited Maturity Bond Portfolio, a series of Thrivent Series Fund, Inc.; and Thrivent Life Insurance Company (collectively, "Thrivent Funds").    The Thrivent Funds purchased

Countrywide securities during the Relevant Period and suffered damages as a result of the violations pled herein.

45.   The following Teachers Insurance and Annuity Association - College Retirement Services funds and accounts are plaintiffs in this action:  College Retirement Equities Fund Equity Index Account; College Retirement Equities Fund Global Equities Account; College Retirement Equities Fund Stock Account; TIAA-CREF Asset Management Commingled Funds Trust I Large Cap Value Fund; TIAA Separate Account VA-1 Stock Index Account; TIAA-CREF Funds Equity Index Fund; TIAA-CREF Funds Large-Cap Value Fund; TIAA-CREF Funds Large-Cap Value Index Fund; TIAA-CREF Funds S&P 500 Index Fund; TIAA-CREF Life Funds Large-Cap Value Fund; and TIAA-CREF Life Funds Stock Index Fund (collectively "TIAA-CREF Funds").  The TIAA-CREF Funds purchased Countrywide securities during the Relevant Period and suffered damages as a result of the violations pled herein.

46.   CalPERS is a plaintiff in this action.   Plaintiff CalPERS is an arm of the State of California, operating pursuant to the California Constitution (Article 16, Section 17) and the California Government Code.  Plaintiff CalPERS is the largest state public pension fund in the United States and was established for the benefit of California's public employees in 1932.  CalPERS is a defined benefit retirement plan with assets totaling approximately $237 billion (as of July 11, 2011).  CalPERS manages retirement benefits for more than 1.6 million California public employees, retirees and their families.  CalPERS purchased shares of common stock of Countrywide during the Relevant Period and suffered damages as a result of the violations pled herein.

47.   Funds managed by BlackRock Financial Management, Inc.  and its advisory affiliates (collectively the "BlackRock Funds"), including but not limited to the following funds, are plaintiffs in this action:  Obsidian Master Fund Trust; Ausgleichsfonds der Alters - und Hinterlassenenversicherung; Master S&P 500

Index Series of Quantitative Master Series Trust; Equity Index Trust; Large Cap Value Index Trust of QA Collective Trust Series; Russell 1000 Alpha Tilts Fund B; Equity Index Fund; Alpha Tilts Fund B; iShares S&P 500 Index Fund; iShares Russell 1000 Value Fund; Russell 1000 Index Fund; Russell 1000 Value Fund; Russell 1000 Alpha Tilts BL; Active Stock Fund E; Ascent Life US Equity Fund; iShares S&P 500 Growth Fund; Barclays International Funds - USA Equity Fund; Russell 1000 Value Fund B; Russell 3000 Index Fund; US Alpha Tilts – Tokyo Pension Clients; NC R3000 Tilts Sep Acct; Russell 1000 Value Alpha Tilts Fund B; Equity Index Fund B; Large Capitalization Core Tilts Fund B; U.S. Equity Market Fund B; Active Stock Master Portfolio; OMERS Russell 1000 Enhanced Index Mandate; BlackRock CDN US Alpha Tilts Non-Taxable Fund; FMC-US R3000 Alpha Tilts U/A; iShares Russell 1000 Indx Fund; BlackRock CDN US Equity Index Non-Taxable Fund; iShares Russell 3000 Index Fund; iShares Dow Jones US Financial Sector Index Fund; CDP Alpha Tilts Separate Account; MSCI U.S. Equity Index Fund B; NZ Super US Tilts; Lucent Eq Indx Sep Acct; Aquila Life US Equity Index Fund; and Ascent Life US Equity Fund.  The BlackRock Funds purchased Countrywide securities during the Relevant Period and suffered damages as a result of the violations pled herein.

48.     Particularized information regarding Plaintiffs' purchases and sales of Countrywide securities during the Relevant Period that Plaintiffs opted out of the Class action have been confidentially provided to Defendants pursuant to the requirements in the Class Notice and in connection with the Opt-Out letters submitted by the undersigned counsel and deemed valid in the Class action on behalf of each of the Plaintiffs, which are incorporated by reference herein.  Such purchases during the Relevant Period were at artificially inflated prices caused by Defendants' false statements and omissions as detailed herein.  As a result of those purchases of Countrywide securities during the Relevant Period, and Defendants'

wrongful conduct, Plaintiffs suffered substantial losses in an amount to be determined by proof at trial.

**B.  Defendants**

**1.  Countrywide Defendants**

49.  Defendant Countrywide was, at all relevant times, a Delaware corporation with its principal executive offices located at 4500 Park Granada, Calabasas, California.  Countrywide was a holding company which, through its subsidiaries, engaged in mortgage lending, mortgage banking, banking and mortgage warehouse lending, dealing in securities and insurance underwriting throughout the United States.   During all times relevant to this Complaint, its stock was registered pursuant to Section 12(d) of the Exchange Act and was listed on the New York Stock Exchange, and, until the demise of the Pacific Stock Exchange, it was listed on that Exchange as well.  On July 1, 2008, Countrywide merged into and became a wholly owned subsidiary of Bank of America.

50.  Defendant Countrywide Capital V ("CCV") is a Delaware Statutory Trust and wholly owned subsidiary of Countrywide, created by Countrywide solely for the purpose of issuing preferred securities. Countrywide guarantees all of CCV's offerings.

51.  Defendants Bank of America Corporation and its wholly owned subsidiary that was created for the sole purpose of facilitating the acquisition of Countrywide, Red Oak Merger Corporation ("Red Oak"; Red Oak and Bank of America Corporation are collectively referred to herein as "Bank of America") is a successor to Defendant Countrywide.  On July 1, 2008, Countrywide completed a merger with Red Oak pursuant to an Agreement and Plan of Merger, dated as of January 11, 2008, by and among Bank of America, Red Oak, and Countrywide. Bank of America is a successor-in-interest to Countrywide, and is thus liable for the conduct of Countrywide alleged herein.

## 2. **The Officer Defendants**

52.     Mozilo is a resident of Thousand Oaks, California. Mozilo, Countrywide's co-founder, was Chairman of Countrywide's Board of Directors starting in March 1999 and CEO starting in February 1998.  He was also President of Countrywide from March 2000 through December 2003.  Mozilo was a member of the Countrywide Board of Directors beginning in 1969, when Countrywide was founded, and served in other executive roles since then.  He left Countrywide on July 1, 2008.  During the Relevant Period, Mozilo disposed of over 13 million shares of Countrywide common stock in illegal insider sales for proceeds totaling nearly a ***half-billion dollars***.  In October 2010, Mozilo settled securities fraud claims brought against him by the SEC for $67.5 million, including a record $22.5 million penalty.  The settlement also permanently bars Mozilo from ever again serving as an officer or director of a publicly traded company.

53.     Sambol is a resident of Hidden Hills, California.  He was Countrywide's President and COO from September 2006 until its acquisition by Bank of America in 2008.  Sambol was Countrywide's Executive Managing Director, Business Segment Operations and Chief Production Officer from April 2006 until September 2006, and Executive Managing Director and Chief of Mortgage Banking and Capital Markets from January 2004 until April 2006. Sambol was a member of the Countrywide Board of Directors from 2007 until July 2008.  Sambol also held executive positions at certain Countrywide subsidiaries, including Countrywide Bank and Countrywide Home Loans, Inc.  During the Relevant Period, Sambol sold over 1.6 million shares in illegal insider sales, for proceeds totaling nearly $70 million.  In October 2010, Sambol settled securities fraud claims brought against him by the SEC for $5.52 million.  As part of the settlement, Sambol also agreed to be barred from serving as an officer or director of a public company for three years.

54.     Sieracki is a resident of Studio City, California.   Sieracki was Countrywide's CFO from the first quarter of 2005 until its acquisition by Bank of America in 2008.  In October 2010, Sambol settled securities fraud claims brought against him by the SEC for $130,000.

55.     Defendants Mozilo, Sambol, and Sieracki are collectively referred to herein as the "Officer Defendants" or "Individual Defendants."

56.     During the Relevant Period, Defendants Mozilo, Sambol, and Sieracki all worked at Countrywide's headquarters in Calabasas, California.  As detailed herein, the Officer Defendants were directly involved in the daily management of all aspects of Countrywide's core operations, including the Company's policies, procedures and standards for underwriting loans and the assessment and management of credit risk.  Moreover, Countrywide's day-to-day management was overseen by an Executive Committee whose members included the Officer Defendants as well as the CRO, Chief Economist, Chief Legal Officer and head of the Banking segment (Countrywide Bank), all of whom were executive officers of the Company.

57.     Both Sambol and Sieracki were members of Countrywide's Credit Risk Committee which had quarterly meetings – some of which are described below – wherein members were provided with detailed presentations highlighting Countrywide's increased credit risk.

58.     With respect to loan loss reserves in particular, Countrywide made clear in its Form 10-K reports that "[o]ur senior management is actively involved in the review and approval of our allowance for loan losses."  As stated in the Company's Form 10-K for 2006, executive management reviewed the Company's compliance with liquidity requirements on a monthly basis beginning in 2006:

> To ensure compliance with the LMP [Liquidity Management Plan], CHL, CSC and Countrywide Bank are required to maintain adequate contingent liquidity regardless of conditions and to diversify funding

sources. Each business unit has detailed metrics which are appropriate to its business line. The metrics are compared with performance positions and *reported to executive management monthly.*

59. Countrywide also maintained an Asset/Liability Committee ("ALCO") during the Relevant Period that was comprised of "several of [the Company's] senior financial executives" including the CRO. Additionally, ALCO was co-chaired by Sieracki. According to the Company's Forms 10-K, ALCO, "ultimately" determined the Company's valuation of retained interests and mortgage servicing rights ("MSR"). These filings made clear that *"[s]enior financial management exercises extensive and active oversight"* of valuation of retained interests and MSRs.

60. During the Relevant Period, the Officer Defendants prepared, reviewed, approved, ratified, signed and/or disseminated numerous documents, including Countrywide's SEC filings, which contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading. Indeed, each of the Officer Defendants bore responsibility for Countrywide's periodic filings.

61. In April 2004, Countrywide adopted a set of written Disclosure Controls and Procedures governing the preparation of the Company's periodic reports (the "Disclosure Guidelines"). The Disclosure Guidelines established a Disclosure Committee that was required to consult with the Executive Committee with respect to "any matters of significance relating to the Company's disclosure and reporting obligations." Sieracki joined the Disclosure Committee at least as early as December 2005, and was the sole individual who was a member of both the Disclosure Committee and the Credit Risk Committee.

62. The Disclosure Guidelines required Countrywide "to disclose on a timely basis any information that would be expected to affect the investment

decision of a reasonable investor or to alter the market price of the Company's securities." Countrywide's financial reporting staff was required to:

> seek input from, and discuss with, the Divisional Officers information pertaining to the past and current performance and prospects for their business unit, known trends and uncertainties related to the business unit, [and] significant risks and contingencies that may affect the business unit.

63.     To prepare the periodic filings, the senior vice president for financial reporting circulated to the head of each Countrywide division a questionnaire ("MD&A Questionnaire") that contained questions concerning the officer's division and the part of the previous period's filing that concerned that division. Countrywide's business units used the MD&A Questionnaire as a report to provide feedback on the quarter, and what may have changed that the Company should be disclosing.  Starting in the first quarter of 2006, the MD&A Questionnaire for credit risk management was sent to the CRO and solicited information regarding a number of topics related to credit risk, including (1) changes in the management of credit risks; (2) environmental risks and uncertainties; (3) deterioration in loan quality; and (4) changes in underwriting guidelines.  After circulating the draft MD&A Questionnaires to the divisions, the financial reporting group compiled them and produced the first draft of the periodic report, which was reviewed and edited by the chief accounting officer and the Deputy CFO. The revised draft then went to the legal department and the senior managing directors responsible for signing sub-certifications, as well as Sieracki, Sambol, and Mozilo.

64.     From the certifiers and the senior officers, the draft went to Countrywide's Board of Directors.  When all of the certifications had been compiled, Sieracki and Mozilo were notified and they signed Sarbanes-Oxley certifications.  Mozilo and Sieracki both reviewed drafts and signed all of the Forms 10-Q and 10-K and accompanying Sarbanes-Oxley certifications for fiscal

years 2005 through 2007, inclusive.  (Mozilo signed Sabanes-Oxley certifications beginning in the second quarter of 2003.)  Sambol also received and reviewed drafts of these documents, sub-certified the filings prior to his becoming President and COO, signed the Forms 10-Q for the third quarter of 2006 and all of the quarters in 2007, as well as the Form 10-K for year ended 2007.  According to deposition testimony in the SEC Action by Countrywide's former Deputy CFO (a partial transcript of which was produced in the SEC Action and reviewed by Plaintiffs' counsel), Sambol and Sieracki were the two individuals on Countrywide's Executive Committee "most closely involved with the SEC reporting process."[2]

### 3.   **KPMG LLP**

65.   Defendant KPMG LLP ("KPMG") is, and at all relevant times herein was, a public accounting firm with offices throughout the United States, including in California.  KPMG maintains its national headquarters at 345 Park Avenue, New York, New York 10154.   KPMG served as Countrywide's outside auditor beginning on or about January 5, 2004.  KPMG provided audit, audit-related, tax and other services to Countrywide during the Relevant Period, which included the issuance of audit opinions on the Company's financial statements for the years ended December 31, 2004, 2005 and 2006, and management's assessments of internal controls for the years ended December 31, 2005 and 2006, and opinions of management's assessments of internal controls for the years ended

---

[2] As discussed in detail herein, Sambol and Sieracki actively participated in decisions to *exclude* disclosures from Countrywide's SEC filings regarding the Company's widened underwriting standards, and Sambol was the individual whose decisions "trumped" and "slashed" such proposed disclosures advocated by the Company's CRO, including for the 2006 Form 10-K and in the second quarter of 2007.  In addition, Sambol directly participated in Countrywide's 2006 and 2007 securities offerings, but failed to take any action to correct false and misleading statements in the offerings documents, which he signed.

December 31, 2004, 2005 and 2006. KPMG consented to the incorporation by reference of its audit opinions on the Company's financial statements and its opinion of management's assessment of internal controls for the years ended December 31, 2004 and/or 2005, and 2006 in Countrywide's Prospectus Supplement dated September 27, 2005, Registration Statement dated February 9, 2006, Prospectus Supplement dated May 11, 2006, Amended Registration Statement dated October 27, 2006, and Registration Statement dated November 15, 2007.

66. According to the June 23, 2010 deposition testimony of John R. Taylor, produced in the SEC Action and reviewed by Plaintiffs' counsel, KPMG regularly discussed with the Company's Financial Reporting personnel Countrywide's public disclosures. KPMG also participated in Board Audit and Ethics Committee meetings and discussed disclosures contained in each of the earnings releases and the Form 10-K and Form 10-Q filings that it audited (for Forms 10-K) or reviewed (for Forms 10-Q), and reviewed and commented on drafts of the Company's Forms 10-K and Forms 10-Q.

67. As detailed herein, each Defendant was the "maker" of false and misleading statements and omissions alleged herein, in that he or it had ultimate authority over the statements or omissions, including their content and whether and how to communicate them.

## V.    FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS

### A.    Countrywide's Mortgage Business

68. For many years, Countrywide was one of the largest mortgage lenders in the United States. Co-founded in 1969 by Defendant Mozilo, Countrywide originated, sold, and serviced both prime and subprime mortgage loans. By 2005, Countrywide grew to become the largest mortgage lender in the United States, originating nearly $500 billion in mortgage loans. During 2006, Countrywide

originated or serviced approximately 17% of all residential mortgages in the United States, billing itself as "America's #1 Home Loan Lender."

69.     Historically, Countrywide's primary business had been originating traditional long-term, fixed-rate, first-lien and fully documented mortgage loans to prime borrowers.  These so-called "conforming loan" mortgages met the guidelines for sale to GSEs, Fannie Mae and Freddie Mac, and were traditionally limited to mortgage loans no greater than $417,000 for a single family residence.  Conforming loans, if properly underwritten and serviced, historically were the most conservative loans in the residential mortgage industry, with the lowest rates of delinquency and default.

70.     Countrywide managed its business through five business segments: Mortgage Banking, Banking, Capital Markets, Insurance, and Global Operations.  The Mortgage Banking segment was responsible for originating, purchasing, selling, and servicing residential mortgage loans.   The Banking segment, a federally chartered banking institution, took deposits and invested in mortgage loans (including HELOCs), the majority of which were originated by the Mortgage Banking segment.  The Capital Markets segment specialized in underwriting and trading MBS.   The Insurance Segment provided property, casualty, life and disability insurance as well as reinsurance coverage to primary mortgage insurers.  The Global Operations segment licensed software to overseas mortgage lenders and performed certain overseas administrative and loan servicing functions.

71.     During the Relevant Period, Countrywide's Mortgage Banking segment was its core business.  For the years 2004 through 2007, Mortgage Banking generated 65%, 59%, 48% and 50% of the Company's pre-tax earnings, respectively.   The Mortgage Banking, Banking and Capital Markets segments, collectively, consistently generated more than 90% of the Company's pre-tax earnings during the Relevant Period.  The operations of the three segments were interrelated, with the loan origination process feeding the other divisions.

Countrywide would originate home loans in the Mortgage Banking division, retain a portion of those loans on the Company's balance sheet as investments, mostly in the Banking division, and, during the Relevant Period, securitize and sell off the remainder of the mortgages or mortgage-related rights and obligations to third parties through the Capital Markets division.

72.    The majority of loans underwritten and originated by Countrywide during the Relevant Period were pooled and resold to investors in the secondary mortgage market, through either securitizations or whole loan sales.    In securitizations, Countrywide sold interests in the pooled loans, *i.e.*, MBSs.[3]    In whole loan sales, Countrywide sold pools of loans to investors and recorded gains on the sales.  Countrywide also performed the ongoing servicing functions related to most of the mortgage loans it originated.  Loans held for investment appeared as assets on Countrywide's balance sheet.

73.    Mortgage loan securitizations and whole loans sales were vital to Countrywide's financial success.  Unlike major banking institutions that could hold significant assets on their balance sheets long term, Countrywide needed to engage in mortgage loan securitizations and, to a lesser extent, whole loan sales so that it could remove the mortgage loan assets and potential liabilities from its balance sheet.  Not only did Countrywide's securitizations and whole loan sales generate well over $1 billion in pre-tax earnings, but the sale of these loans purportedly transferred the risk of the borrowers' default from Countrywide's balance sheet to third parties.

---

[3]    Mortgage securitization involves the conversion of illiquid whole loans into bond-like instruments that trade in capital markets.  Mortgage loan "pass-through" securities entitle the investor to payments from pools of mortgage loans.  Although the structure and underlying collateral of each offering varies, the basic principle remains the same: when borrowers make payments on the underlying mortgages, the cash flow is pooled and "passed through" to investors.

74.     Countrywide had significant short- and long-term financing needs in order to run its operations.   Short-term financing needs (such as the costs of warehousing loans pending sale to the secondary market, providing mortgage warehouse credit to others, and related to MBS trading activities) were generally met through unsecured commercial paper and medium-term notes, asset-backed commercial paper, revolving lines of credit, short-term repurchase agreements, unsecured subordinated debt, junior subordinated debt and deposit-gathering. Long-term financing needs (such as investments in mortgage loans, investments in mortgage servicing rights and interests the Company retained in securitizations, and hedging activity for interest rate risk) were funded primarily by the profits earned from secondary market sales.   Indeed, Countrywide relied substantially on the secondary mortgage market (its primary source of liquidity) as a source of long-term capital to support its mortgage banking operations.   According to Forms 10-K filed by Countrywide during the Relevant Period, Countrywide's primary business objective was to ensure "ongoing access to the secondary market by producing high quality mortgages and servicing those mortgages at levels that meet or exceed secondary mortgage market standards."

### B.     **Countrywide's Goal Of Market Dominance**

75.     Beginning in mid-2003, Countrywide, led by Mozilo and Sambol, became intent on dominating the residential home loan market.   During a conference call with analysts on July 22, 2003, Mozilo stated that the Company's goal was "to ***dominate*** the purchase market and to get our overall market share to the ultimate 30% by 2006, 2007."   Mozilo reiterated during a January 27, 2004 earnings call that Countrywide intended to have a 30% share of the United States mortgage market by 2008 and that its goal was "***market dominance***."

76.     To promote growth and increase its market share, Countrywide moved away from its historical core business of prime mortgage underwriting to aggressively matching loan programs being offered by other lenders, even

monoline subprime lenders.  This elevation of quantity over quality represented a major change in the Company's corporate culture.  According to a February 23, 2008 article in *The Wall Street Journal*, tensions between Sambol, who was emerging as a major force within the Company, and Countrywide's risk managers as to the best strategy to grow Countrywide's business, "boiled over" at a meeting of dozens of executives in the Company's headquarters in late 2003.  According to the article, the conflicts regarding how to grow the business were resolved as Sambol succeeded in imposing a new Company-wide mandate to originate more "non-conforming" loans to increase loan production across the board.

77.     When specifically asked, however, whether Countrywide's growth strategy would adversely affect loan quality, Mozilo repeatedly assured investors that there would be no compromise in loan quality.  On July 22, 2003, Mozilo assured the market:

> Going for 30% mortgage share here is ***totally unrelated to quality of loans we go after*** . . . .  There will be ***no compromise by this company in the overall quality of the product line*** . . . which manifests itself in delinquencies and foreclosures.  There will be no compromise in that as we grow market share.  Nor is there a necessity to do that.

78.     When Mozilo was asked during a March 15, 2005 analyst conference sponsored by Piper Jaffray ("March 15, 2005 Conference") how confident he was that his goal of attaining a 30% market share was achievable, Mozilo reaffirmed that "our objective is to dominate our industry" but assured the market: ***"I will say this to you, that under no circumstances will Countrywide ever sacrifice sound lending and margins for the sake of getting to that 30% market share."***

79.     Countrywide's drive for growth worked.  As discussed during an internal Countrywide Credit Risk Committee meeting, the minutes of which were publicly filed in the SEC Action and examined by Plaintiffs' counsel, by

April 2005, Countrywide was the "Market Leader" in four categories of subprime lending, and "Middle Market" in the remaining two categories.  A March 2008 Federal Reserve Bank of New York research paper entitled "*Understanding the Securitization of Subprime Mortgage Credit,*" identifies Countrywide as the third highest subprime loan originator, and the highest originator of subprime mortgage-backed securities, for 2006.  Indeed, at its height, Countrywide had approximately $200 billion in assets, 62,000 employees, and issued in excess of $400 billion in residential mortgages each year.  According to an October 24, 2007 *The Wall Street Journal* exposé, Countrywide originated over $490 billion in mortgage loans in 2005, over $450 billion in 2006, and over $408 billion in 2007.  Countrywide recognized pre-tax earnings of $2.4 billion and $2 billion in its loan production divisions in 2005 and 2006, respectively.  In 2005, Countrywide reported $451.6 million in pre-tax earnings from Capital Markets sales, representing 10.9% of its pre-tax earnings; in 2006, it recognized $553.5 million in pre-tax earnings from that division, representing 12.8% of its pre-tax earnings.

80.    In its 2006 annual report, Countrywide disclosed the fact that, "[w]hile the overall residential loan production market in the United States has tripled in size since 2000, from $1.0 trillion to $2.9 trillion at the end of 2006, *Countrywide has grown nearly three times faster, going from $62 billion in loan originations in 2000 to $463 billion in 2006.*"

81.    By increasing its origination of non-conforming and subprime loans and diminishing and abandoning its underwriting standards between 2003 and 2006, Countrywide was able to originate many more loans in those years and increase its market share, even as the U.S. residential real estate market leveled-off and then declined.

82.    While Countrywide boasted to investors that its market share was increasing, Company executives concealed that its market share increase came at the expense of prudent underwriting guidelines.  As a result, Countrywide's share

price rose from $25.28 on December 31, 2003, to a high of $45.03 on February 2, 2007, the **same day** that Mozilo amended his trading plan to add 1.28 million shares, and just five months before Countrywide publicly disclosed for the first time on July 24, 2007, that Countrywide had been employing a secret standard for classifying loans as subprime that differed materially from the accepted industry standard.

### C. Countrywide's Undisclosed Abandonment Of Prudent Underwriting Standards

#### 1. Countrywide, And Mozilo In Particular, Regularly Highlighted The Company's Superior And Disciplined Underwriting Standards That Purportedly Generated Quality Loans

83.     Countrywide consistently assured investors during the Relevant Period that the Company managed mortgage credit risk through rigorous standards for origination, underwriting, and ongoing surveillance of high quality loans. Countrywide also represented in SEC filings that the Company had a credit policy that established standards for the determination of acceptable credit risks. Countrywide portrayed its underwriting process as tightly controlled and supervised, and "***designed to produce high quality loans***" through careful pre-loan screening and post-loan auditing, appraisal and underwriting reviews.

84.     In particular, Countrywide's Forms 10-K disclosed the Company's "proprietary underwriting systems in our loan origination process that improve the consistency of underwriting standards, assess collateral adequacy and help to prevent fraud, while at the same time increasing productivity." In these public filings, Countrywide also described an "extensive post-funding quality control process" involving "comprehensive loan audits that consist of a re-verification of loan documentation, an in-depth underwriting and appraisal review, and if necessary, a fraud investigation." This post-funding quality control process further

involved a "pre- and post-funding proprietary loan performance evaluation system" that "identifies fraud and poor performance of individuals and business entities associated with the origination of our loans." According to Countrywide, "[t]he combination of this system and our audit results allows us to evaluate and measure adherence to prescribed underwriting guidelines with laws and regulations."

85. Countrywide's internal guidelines also confirmed the Company's stated policy of originating "quality" loans. The guidelines, which have been produced by Countrywide in the SEC Action and examined by Plaintiffs' counsel, stated at the beginning that it was the Company's policy and underwriting philosophy to originate "investment quality loans." The guidelines explicitly defined an "investment quality loan" as "one that is made to a borrower from whom timely payment of the debt can be expected, is adequately secured by real property, and is originated in accordance with Countrywide's Technical Manual and Loan Program Guidelines." For manually underwritten loans, the "guidelines" similarly stated that it was the Company's policy "to originate, purchase, and deliver investment quality mortgages," and explicitly defined "investment quality mortgage" as "a mortgage loan that is made to a borrower from whom timely payment of the debt can be expected, is adequately secured by real property, and is originated in accordance with requirements of the purchase documents."

86. While Countrywide was rapidly developing its portfolio of HELOCs, Pay-Option ARMs and other high-risk loans, Mozilo repeatedly emphasized the Company's purportedly superior underwriting skills to the market. When asked, for example, about the inherent risks of originating alternative mortgage products during an April 21, 2004 conference call ("April 21, 2004 Conference Call"), Mozilo responded:

> Sub-prime cannot be looked at generically. There is very, very good
> solid subprime business and there is this frothy business that you
> [refer] to . . . . [Y]ou can get so deep into this marginal credit that you

can have serious problems where you are taking 400 FICOs with no documentation; that is dangerous stuff. *So [I] think it is very important that you understand the disciplines that the Company had, particularly that Countrywide has, which are very strong disciplines in the origination of sub-prime loans. And maintaining that discipline is critically important to us* . . . . When you look at sub-prime, you have to look at it in various tranches, and we are at the high end of that tranche.

87.   During the same conference call, an analyst asked whether management was "comfortable" that subprime lending was a "long-term, profitable business" given a number of large lenders' recent exits from the industry. Mozilo responded:

*[W]e have successfully managed this product for years. And so I think using what our competitors do as a barometer will put you down the wrong path. We are a very different focused company that understands this product very well, how to originate it, how to manage it, how to underwrite, how to service it.* And so we look at . . . this sub-prime business as . . . one that has to be carefully manage[d], but one that has a tremendous opportunity for us long into the future, certainly through the balance of this decade and beyond.

88.   Similarly, Mozilo distinguished Countrywide from the rest of the industry during the March 15, 2005 Conference, stating:

I'm deeply concerned about credit quality in the overall industry. *I think that the amount of capacity that's been developed for subprime is much greater than the quality of subprime loans available.* And so they're pushing further down − as I observe it, they're pushing further down the credit chain into the 500 FICOs and below 550, 540, 530. And as you get down to those levels, it becomes

very problematic and I don't think there's any amount of money you can charge upfront to cover your losses on those type of loans.

So I'm deeply concerned about everybody going into subprime. As I have said very often, there's an old Yiddish expression that says when everybody goes to the same side of the boat, the boat tends to tip over. And we are − a lot of people are going to the same side of the boat. ***So we've had to remain very disciplined in our subprime efforts***. . . .

So I have to separate it. The overall industry I am troubled; Countrywide I'm not, because ***we have remained very disciplined in our origination of subprime loans***.

89.   Moreover, during a conference call with analysts on July 26, 2005 ("July 26, 2005 Conference Call"), Mozilo and Stanford L. Kurland ("Kurland"), Countrywide's former President, were asked to comment on a *The Wall Street Journal* article reporting that lenders were loosening underwriting standards. Mozilo reassured, however, that: "***I'm not aware of any loosening of underwriting standards that creates a less of a quality loan than we did in the past.***"

90.   When asked during the Company's July 26, 2005 Conference Call whether "credit quality in the nonprime mortgage sector" was stable or worsening, Mozilo confidently replied:

I think it's stable. . . . ***I do participate every day in originations myself, and it keeps me apprised of what's happening.*** I think that that situation has stabilized. ***I don't see any deterioration in the quality of those loans being originated.***

91.   Other senior Countrywide officers reiterated that Countrywide had not strayed from its underwriting standards, and would not do so in the future. For example, in an April 2005 conference call with analysts, Mozilo responded to a question about whether Countrywide had changed its underwriting protocols: "I think [FICO scores, combined loan-to-value ratios, and debt-to-income ratios] will

remain . . . consistent with the first quarter and most of what we did in 2004. *We don't see any change in our protocol relative to the quality of loans that we'll be originating*."

92.     To further convince investors that Countrywide's concerted shift toward riskier mortgage products would remain a relatively safe proposition, the Company stated publicly that it minimized credit risk by selling most of the loans it originated *"and by retaining high credit quality mortgages in our loan portfolio."*

93.     Each of these statements was false. In truth, as Mozilo and the Officer Defendants were well aware, Countrywide had in fact abandoned any "discipline" in the Company's "subprime efforts" and was "pushing further down the credit chain."

94.     Indeed, in a September 1, 2004, email produced by Countrywide in the SEC Action and examined by Plaintiffs' counsel, Mozilo wrote to Countrywide's then Chief Credit Risk Officer:

> As I look at production trends, not only at Countrywide, but also at other lenders, *there is a clear deterioration in the credit quality of loans being originated over the past several years*. In addition, from my point of view, the trend is getting worse as the competition for sub-prime, Alt-A and nonconforming in general continues to accelerate.

95.     Mozilo further predicted in the same email that "the type of loans currently being originated combined with the unprecedented stretching of all aspects of credit standards could cause a bump in the road that could bring with it *catastrophic consequences*." Consequently, Mozilo recommended that the Company "seriously consider securitizing and selling . . . a substantial portion of our current and future sub prime residuals."

COMPLAINT

96.   Countrywide's Risk Management department continuously had discussions with Countrywide's loan production division, which reported to Sambol, about the credit concerns identified in September 2004.  In fact, Risk Management conducted studies to identify relationships among certain credit variables and their effect upon the probability that a loan would go into serious delinquency or default.  One finding of these studies, the results of which were shared with Sambol and Sieracki (and made public in SEC Action and reviewed by Plaintiffs' counsel), was that the less documentation associated with a loan, the higher the probability of default.  Nevertheless, during the Relevant Period, Countrywide continued to produce low and no documentation loans, expand its underwriting guidelines, engage in various practices to evade those guidelines, and systematically make exceptions to those guidelines.  These facts were not disclosed to investors.

97.   Risk Management alerted the Officer Defendants to the increases in the Company's credit risk.  For example, at an April 6, 2005 meeting of the Corporate Credit Risk Committee attended by Sambol, the minutes of which were produced by KPMG and publicly filed in the SEC Action and reviewed by Plaintiffs' counsel, CRO McMurray reported that Countrywide's non-conforming loans originated in May 2002 were twice as likely to default as loans originated in January 2000, and the risk of home equity lines of credit defaulting had doubled over the past year, mainly due to the prevalence of reduced documentation in those loans.  McMurray also expressly reviewed a list of "exposures associated with stated income loans," and Rod Williams informed the participants that there is "not an audit step" to address reduced documentation loans.  The minutes further reveal that the participants further discussed that "[t]he subprime product line continues to expand and John McMurray noted that Countrywide is now a Market Leader on four of the categories and Middle Market on the remaining two categories.  At the

December meeting, Countrywide was Market Leader on two and Middle Market on four of the categories."

98.    Sambol and Sieracki also learned of the risks associated with the Company's aggressive guideline expansion in meetings of other Company committees.  For example, Sieracki was a member of the asset and liability committee, and Sambol attended certain of its meetings.  If a proposed guideline expansion had a modeled expected default rate in excess of 8%, the proposal had to be submitted to this committee for approval.   All proposed expansions to Countrywide's subprime menu from late 2005 through 2006 presented an expected default rate in excess of 8% and required approval of that committee.  In June 2005, Sambol and McMurray exchanged emails (later made public in the SEC Action and examined by Plaintiffs' counsel), regarding the impact of Countrywide's underwriting guideline expansion.  In that exchange, McMurray admitted that "as a consequence of [Countrywide's] strategy to have the widest product line in the industry, *we are clearly out on the 'frontier' in many areas*." McMurray went on to note that the frontier had "*high expected default rates and losses*."

99.    Thus, contrary to Mozilo's ringing public assurances, Countrywide was indeed "sacrificing sound lending and margins for the sake of getting to that 30 percent market share." Further, Mozilo and the Officer Defendants, contrary to Mozilo's statements, were "fully aware" of the Company's "loosening of underwriting standards" that created much lower quality loans than in the past.

100.    Indeed, in an internal document disclosed in the SEC Action and reviewed by Plaintiffs' counsel titled "Areas of Concern – 'Wall of Worries,'" discussed during a February 13, 2007 Credit Risk Committee meeting, unbeknownst to investors, one of the Credit Risk Committee's "areas of concern" was Countrywide's "loan quality," including "increased fraud," "exception underwriting," "guideline drift," "attribute deterioration," and "appraisal quality."

101.   Moreover, in November 2007, Countrywide prepared a "lessons learned" analysis (produced and deemed admissible in the SEC Action over Defendants' objections, and reviewed by Plaintiffs' counsel).   This analysis included key observations from interviews of Countrywide's employees and culminated in an internal presentation.   In this analysis, Countrywide repeatedly admits that it was wholly focused on market share, including, for example:

- "*We were driven by market share, and wouldn't say 'no' (to guideline expansion).*"
- "*Market share, size and dominance were driving themes . . . . Created huge upside in good times, but challenges in today's environment.*"
- "*The focus of production was volume and margin, not credit risk. There was also massive emphasis on share.*"

### 2.   Countrywide Approved Virtually Every Loan Without Regard To Risk

102.   At the direction of the Officer Defendants in 2003, Countrywide pursued a lending campaign that was characterized by chronic failures in standard appraisal, underwriting and credit qualification practices.   Unbeknownst to Countrywide's investors, including Plaintiffs, from mid-2003 onward, concurrent with the Company's mission to achieve a 30% market share, Countrywide continually loosened, ignored, and effectively abandoned its underwriting guidelines.

103.   While the Officer Defendants consistently hyped the Company's underwriting and credit qualification processes, the truth was that Countrywide had actually lowered the Company's FICO requirements and eased other qualifying criteria to facilitate the approval of huge volumes of loans, regardless of the credit quality of the loans or the magnitude of "exceptions" from the underwriting standards that would need to be granted in order to fund the loans.   Countrywide

and the Officer Defendants in fact were well aware that Countrywide had abandoned any discipline in these processes and had chosen quantity over quality in their quest to become the nation's largest home lender.  In pursuit of a dominant share of the market, unbeknownst to investors, Countrywide engaged in numerous practices that were directly contrary to its claims to prudent underwriting practices designed to produce high quality loans.  First, Countrywide had a matching strategy which instructed its loan production divisions to meet the guidelines of any competitor in the market, without applying that competitor's credit risk mitigants.  Second, in practice, Countrywide's only criteria for producing a loan was whether the loan could be sold into the secondary market.  Third, as a result of Countrywide's "Make Every Loan" strategy, Countrywide issued a remarkably high number of exception loans effectively ignoring and abandoning the Company's official underwriting standards and without regard to other compensating factors.

104.  Defendants also knew that Countrywide executives firmly believed that Countrywide should include greater credit risk disclosures in its SEC filings. Indeed, at least as early as March 2005, Countrywide's Executive Vice President Credit Risk Management, Christian Ingerslev ("Ingerslev"), advocated for increased disclosures.  According to a March 7, 2005 email produced in the SEC Action and examined by Plaintiffs' counsel, Ingerslev stated the following to McMurray:  "it's frustrating to try and hold the line and then just be overridden with whining and escalations, just reinforces that sales can have anything they want if they yell loud enough to drew . . . *[I] think we should start some regular reporting of loans outside of guidelines, volume, % of business, and delinquencies*."

105.  In addition, during 2006, McMurray and Countrywide's former Managing Director of Financial Reporting, Gregory Hendry ("Hendry"), discussed by email possible policy changes to Countrywide's disclosures of credit risk

management.   In response to Hendry's email (produced in the SEC Action and examined by Plaintiffs' counsel) stating that Hendry was in the process of drafting "more robust disclosures," McMurray wrote "I'm a huge advocate of expanding our disclosures in this area, including adding information to the Qs ahead of the K . . . .   In the meantime, can we please 'beef up' our disclosures in the following areas?"  McMurray's list included "house prices" and "credit guidelines."

106.   The lack of control over risk was so great during the course of 2006 that it led McMurray to indicate he would be submitting his resignation.   On November 3, 2006, he wrote in an email (produced in the SEC Action and examined by Plaintiffs' counsel) to Countrywide's Chief Information Officer ("CIO"), Kevin Bartlett ("Bartlett"), that "I will be resigning my position."  Hand-written notes on that email recount a subsequent discussion McMurray then had with Sambol and Bartlett in which he notes his concern for "personal risk" and that he did "not want to be blamed for products, guidelines, etc. that I never advocated and often recommended again[st].   Concern about inadequate controls, infrastructure, etc."   The notes further document McMurray's "concerns about company's risk philosophy, Discussed 'can't say no' culture, pressure from matching and no brokering policies."

107.   In addition, handwritten notes (produced and deemed admissible over Defendants' objection in the SEC Action and examined by Plaintiffs' counsel) reveal that Sambol *"slashed"* some of McMurray's proposed revisions to the credit disclosures in the 2006 Form 10-K, especially those disclosures regarding *"widened guidelines for affordability."*

108.  In August 2007, McMurray again suggested revisions to the Company's SEC filings – this time the Form 10-Q for the second quarter of 2007. As admitted by Hendry, Countrywide's former Managing Director of Financial Reporting, during his July 26, 2010 deposition in the SEC Action (a partial transcript of which was filed in the SEC Action and examined by Plaintiffs'

counsel), Hendry exchanged emails with McMurray in August 2007 wherein McMurray requested that Hendry include information in the prospective trends section of the Form 10-Q that would disclose the Company's widened underwriting guidelines. Hendry admitted in his deposition that, in response, he wrote back to McMurray, stating that he did not make McMurray's requested changes because he expected McMurray's requested changes would be "trumped" by certain reviewers, including Sambol. Hendry's August 7, 2007 email informing McMurray that he rejected his additional disclosures (produced in the SEC Action and examined by Plaintiffs' counsel) ends with "P.S. Please discard this document once you are done looking at it."

109. As admitted by Sieracki during his July 30, 2010 deposition in the SEC Action (a partial transcript of which was filed in the SEC Action and examined by Plaintiffs' counsel), Sieracki knew that when McMurray's requested disclosures were rejected, McMurray submitted an "addendum" to his second quarter 2007 Form 10-Q Sarbanes-Oxley certification. The addendum, however, was not included with the Form 10-Q filed with the SEC.

### a)   Countrywide's "Matching Strategy"

110. A key driver of Countrywide's aggressive expansion of its underwriting guidelines was its "matching strategy," also known as the "supermarket strategy." The strategy committed Countrywide to offering any product and/or underwriting guideline available from at least one "competitor," which included purely subprime lenders such as New Century and First Franklin, even if that product or policy violated Countrywide's stated underwriting guidelines. Countrywide's liberal use of any competitor's "composite guideline" made Countrywide's loan origination practices "the most aggressive in the industry." Countrywide's matching strategy was not limited to one single loan product, or limited to subprime loans.

111.  If Countrywide did not offer a product offered by a competitor, Countrywide's production division invoked the matching strategy to add the product to Countrywide's menu.  For example, if Countrywide's minimum FICO score for a product was 600, but a competitor's minimum score was 560, the production division invoked the matching strategy to reduce the minimum required FICO score at Countrywide to 560.

112.  Unbeknownst to investors, Countrywide's matching strategy allowed the Company's loan production divisions to meet the guidelines of any competitor in the market, *without applying that competitor's credit risk mitigants*.  As a result, Countrywide's underwriting guidelines were a composite of the most aggressive guidelines in the market.

113.  Indeed, in 2005, 2006 and 2007, CRO McMurray repeatedly internally expressed his concern over the potential impact of the "matching strategy."  In a June 14, 2005 email publicly disclosed in the SEC Action and examined by Plaintiffs' counsel, McMurray warned Defendant Sambol and several other Countrywide managing directors that:

> *As a consequence of CW's strategy to have the widest product line in the industry, we are clearly out on the 'frontier' in many areas. While I'm sure you already know this, I think we should be very deliberate since the outer boundaries are potentially controversial and have high expected default rates and losses*.

114.  Ten days later, on June 24, 2005, McMurray sent another email to Sambol and other managing directors, also publicly disclosed in the SEC Action and examined by Plaintiffs' counsel, expressing his strong reservations regarding Countrywide's practice of matching the "outer boundaries" of any competitor's most aggressive mortgage loan offerings, a practice which he noted was a "crucial component of [Countrywide's] corporate strategy."  McMurray explained that, "because the matching process includes comparisons to a variety of lenders, our

[guidelines] will be a composite of the outer boundaries across multiple lenders," and that because comparisons are only made to competitor guidelines where they are more aggressive (*e.g.*, high LTV/CLTV) and not used where they are less aggressive (*e.g.*, stated doc loans), Countrywide's "composite guides are likely among **the most aggressive in the industry**."   McMurray pointed out additional flaws in the matching strategy, such as Countrywide's institutional inability to match other lender's credit risk mitigants, *i.e.*, even if Countrywide was inclined to do so.   McMurray concluded the email, which he sent to Sambol in several iterations, by cautioning that while he understood that the matching strategy was a crucial component of Countrywide's corporate strategy, at the same time, he "wanted to be sure" management understood the extent of the strategy's risk from a credit perspective.

115.   According to a November 2, 2006 email, also publicly disclosed in the SEC Action and examined by Plaintiffs' counsel, that was forwarded to Sambol, McMurray informed Countrywide's CIO, Bartlett, that the matching strategy had caused Countrywide to cede its underwriting standards to the most aggressive lenders in the market:

> With this approach, our credit policy is ceded, on both a product-by-product as well as item-by-item basis, to the most aggressive lenders in the market.  Do we want to effectively cede our policy and is this approach 'saleable' from a risk perspective to those constituents who may worry about our risk profile?

116.   Shortly thereafter, McMurray sent a January 2, 2007 email to Seriacki and other Countrywide managing directors, produced by Countrywide in the SEC Action and examined by Plaintiffs' counsel, containing a five-page outline why delinquencies will increase and the impact this increase will have on Countrywide's financial results, specifying ***"widened guidelines"*** as one of the

principal reasons.[4]  McMurray forwarded the email later that day to others in Countrywide, including several accounting personnel, and confirmed that the outline was put together for Sieracki who in turned shared the outline with Sambol.

117.  McMurray testified in his deposition in the SEC Action (a partial transcript of which was reviewed by Plaintiffs' counsel) that the matching strategy at Countrywide was a "corporate principle and practice that had a profound effect on credit policy" at Countrywide.  McMurray explained why Countrywide's "matching strategy" ensured that Countrywide was the most aggressive originator in the market: "And so . . . if you match one lender on – on one – on certain guidelines or for certain products and then you match a separate lender on a different product or a different set of guidelines, then in my view the composite of that – of that two-step match would be more – would be *more aggressive* than either one of those competitor reference points viewed in isolation."  McMurray repeatedly explained his view and the risks of the "matching strategy" to others within Countrywide, including Defendant Sambol, but these concerns were ignored.

118.  Countrywide never disclosed to Plaintiffs or other investors that it had a matching strategy that caused it to cede its credit policy to the most aggressive lenders in the market.[5]  Defendants knew – but failed to disclose – that the quality

---

[4]  McMurray's January 2, 2007 outline also addresses in detail the impact of increased delinquencies on various aspects of Countrywide's business (including both loans held for sale and loans held for investment), and includes various accounting considerations such as the setting of various types of loss reserves and the adequacy of those reserves, and the valuation of the Company's mortgage servicing rights.

[5]  As discussed below, although Countrywide arguably disclosed that they had a policy of "matching" competitors' loan offerings, it never publicly disclosed that the match was in fact a more aggressive iteration of competitors' guidelines and that Countrywide disregarded the competitor's credit risk mitigants.  Without

of loans originated by Countrywide was deteriorating, and would continue to worsen.  Indeed, a February 11, 2007 email from McMurray to Sambol (produced in the SEC Action and examined by Plaintiffs' counsel) confirms that this strategy was not disclosed to anyone outside Countrywide:

> I doubt this approach would play well with regulators, investors, rating agencies etc.  To some, this approach might seem like ***we've simply ceded our risk standards and balance sheet to whoever has the most liberal guidelines***.

119.   In short, Defendants knew that the Company's widened guidelines and matching strategy increased the risk of defaults and delinquencies, yet Countrywide's periodic filings and other public statements concealed the unprecedented expansion of underwriting guidelines and the attendant increased credit risk.  Indeed, Mozilo would later admit in his deposition testimony in the SEC Action that it's a "dangerous game to play" to match other companies' underwriting guidelines.

120.   Information that Countrywide was actually ***the most aggressive lender*** in the industry would have been extremely material to analysts, Plaintiffs and other investors.  As Stifel, Nicolaus & Co., Inc. ("Stifel Nicolaus") analyst Brendler testified in the SEC Action, disclosure of the "matching strategy" "would have been a very disturbing disclosure" because "to know that [Countrywide was] basically seeking out the most aggressive policies and underwriting guidelines of [its] competitors without consideration for other factors" meant that Countrywide was "essentially creating a worst of the worst."

### b)   Countrywide's Loosened Underwriting

121.   Between 2003 and 2006, Countrywide's credit risk management

---

understanding the true reach of the matching strategy, it was impossible to understand Countrywide's true underwriting.

---

department ("Risk Management") spent a significant amount of its time processing requests for expansions of the Company's underwriting guidelines.

122.  Countrywide's underwriting policy was based on the principle that no borrower should be turned away without at least four attempts to underwrite the loan.  Loan applications were originally processed by an automated underwriting system known as "CLUES" (Countrywide Loan Underwriting Expert System).  The CLUES system applied the principles and variables set forth in the Countrywide underwriting manuals and its loan program guide. CLUES applied a device known as the "underwriting scorecard," which assessed borrower credit quality by analyzing several variables, such as FICO scores, loan to value ratios, documentation type *(e.g.,* full, reduced, stated) and debt-to-income ratios.  These variables were weighted differently within the scorecard, depending upon their perceived strength in predicting credit performance.   In underwriting a loan, Countrywide loan officers entered an applicant's information into CLUES, which would (1) approve the loan; (2) approve the loan with caveats; or (3) "refer" the loan to a loan officer for further consideration and/or manual underwriting.  Thus, the only possible results from automatic underwriting were an "accept" or a "refer."

123.  The CLUES program regularly "referred" loans even if a requirement of Countrywide's guidelines had not been met or if CLUES calculated that the loan presented an excessive layering of risk.  Referred loans went to a loan officer for further consideration or manual underwriting in the "Exception Processing System" ("EPS") "because it busted one or more of the program guidelines or because of these red flags," according to CRO McMurray.  If the loan officer could not rectify the problems and approve the loan in accordance with Countrywide's stated underwriting guidelines or some limited exceptions, the loan officer did not reject the application.  Rather, he or she would request an "exception" from the guidelines from more senior underwriters at Countrywide's loan production

structured lending desks ("Production SLD"), otherwise known as "the exception desk," where yet another underwriter, with even more authority to waive guideline requirements, attempted to make the loan. If that attempt to make the loan failed, the loan was referred to Countrywide's Secondary Markets Structured Lending Desk ("Secondary Markets SLD"), where no attempt was made to underwrite the loan at all, and the sole criteria for approving the loan was whether Secondary Marketing could sell the loan.

124. In this third tier – implemented in early 2005 specifically to approve last-ditch exceptions to create the maximum amount of MBS – *any* loan application would be approved as long as it met a single criteria: Could the loan be completely resold in the secondary markets such that Countrywide could transfer all of the risk? If the answer was yes, the loan would be approved, regardless of its quality and the fact that it did not meet Countrywide's underwriting guidelines. Consequently, Countrywide's underwriting system did not encourage prudent underwriting and engender adherence to the Company's stated underwriting standards, but rather encouraged and facilitated the systematic abuse of "exceptions" to avoid the Company's stated underwriting guidelines.

125. Defendant Sambol summarized the theory behind the Secondary Markets SLD in a February 13, 2005 email explaining that Countrywide "***should be willing to price virtually any loan that we reasonably believe we can sell/securitize without losing money, even if other lenders can't or won't do the deal***." In contrast to his public statements, as far back as September 1, 2004, Mozilo circulated an email, produced by Countrywide in the SEC Action and examined by Plaintiffs' counsel, expressing concern over the "clear deterioration in the credit quality of loans being originated over the past several years" and his opinion that "the trend is getting worse." In reaction to the worsening trend, Mozilo stated that Countrywide should "***seriously consider securitizing and***

*selling (NIMS) a substantial portion of our current and future sub prime residuals.*"

126.  Before July 2005, the Secondary Markets SLD approved any loan which it believed could be resold and securitized, as long as that loan was a 30-year fixed rate mortgage or an 80/20 ARM.  This changed in the summer of 2005. In a July 28, 2005 email sent by David Spector ("Spector"), Vice President, to Countrywide's Managing Directors and Secondary Markets senior executives, that was produced by Countrywide in the SEC Action and examined by Plaintiffs' counsel, Spector stated that, as a result of "increased demand from Production for exceptions on all products in general and on Pay Option loans in particular," he wanted to update them on "the changes we will be implementing going forward":

> As indicated in a previous note, when we first started the SLD, the intent was to be able to offer at least one option for borrowers who wanted exceptions to our underwriting guides.  The thought was that we would offer borrower exceptions in our two major loan programs: 30-year fixed rate and 5/1 ARMs.  In addition, both of these programs were set up for Alt A and as such we could price and sell under these programs.  ***While this process seemed to have worked well in the past, we have been recently seeing increased demand from Production for exceptions on all products in general and Pay Option loans in particular.***  In addition, Production has been expressing frustration that we were only offering major exceptions for 5/1 ARMs and 30-year fixed rates.  ***As such, to the widest extent possible, we are going to start allowing exceptions on all requests, regardless of loan programs, for loans less than $3 million effective immediately.***
>
> The pricing methodology we will use will be similar to that which we use for 30-year fixed rates and 5-1 Hybrids.  We will assume securitization in all cases.

COMPLAINT

* * *

The methodology from a saleability point of view will also be similar to that used for 30-year fixed rates and 5-1 Hybrids.  We will view the exception assuming securitization and will no longer take into account whole loan buyers.  In the past, this has caused some exceptions to be declined for Ratios, Balances and LTV/CLTV combinations.  **_Provided we can sell all of the credit risk (i.e. not be forced to retain a first loss piece due to a 80% LTV, 60 Back-end ratios $3 million loan) we will approve the loan as a salable loan._**  Finally, we will not be reviewing loans from an underwriting point of view but will rather be relying on Production to make certain that the loan [sic] meet all other underwriting Guideline and well [sic] have been reviewed for compliance acceptability and fraud.

127.  Other internal documents confirm that Defendants knew that Countrywide was granting exceptions "even more aggressive than our guidelines" (May 22, 2005 email from McMurray to Sambol, produced in the SEC Action and reviewed by Plaintiffs' counsel), and that they understood that Countrywide "appear[ed] to have **_unacceptable risk on [its] balance sheet_**" (Corporate Credit Risk Committee Final Minutes June 28, 2005, produced by KPMG in the SEC Action and reviewed by Plaintiffs' counsel).  In addition, McMurray reported that "FNMA and FHLMC request repurchases on 14% and 22% of foreclosures, respectively," thus confirming that even in the lower-risk conventional conforming market segment, Countrywide knew it had exposure to representation and warranty breaches as early as 2005, long before housing market deterioration began.

128.  Joshua Adler, a Secondary Markets Managing Director, confirmed in an SEC Action deposition (a partial transcript of which was produced in the SEC Action and reviewed by Plaintiffs' counsel) that the Secondary Markets SLD did

not review loans from an underwriting point of view, but reviewed them for their securitization potential only:

Q.     Do you know whether Countrywide sometimes originated loans that were considered to be exceptions to its underwriting guidelines?

A.     We did.

Q.     To your knowledge, was there a process by which such loans were approved?

*  *  *

A.     There generally was, yes.

Q.     And what is your understanding of that process?

A.     Well, I was -- I was at the tail end of that process. ***There was – we had guidelines, we had kind of core guidelines, and then we had these shadow guidelines, which were the kind of the second tier guideline, if you will.   And then there was this third tier which would come to me.***  But essentially there were – the tiering of guidelines related to the kind of the exception process.  And there was an underwriting, they called it, Structured Loan Desk process in the divisions where loans would get referred to the Structured Loan Desk if they were outside, I believe, of kind of the core guidelines.  ***And then if those loans were outside of even the shadow guidelines, then they would be referred to Secondary Marketing to determine if the loan could be sold given the exception that was being asked for.***

*  *  *

Q.     ***Was one of the criteria for granting exceptions at the Secondary Loan Desk in Secondary Marketing whether or not the loan could be sold into the secondary market?***

A.     ***That was the only criteria that we followed.***

COMPLAINT

129.   To investors and the public, Countrywide and the Officer Defendants extolled the integrity and consistency of its automated CLUES system.   In so doing, they bolstered the false impression that exception loans were underwritten in a safe manner that accounted for the risk associated with guideline exception. Although Countrywide and the Officer Defendants were eager to disclose Countrywide's "proprietary underwriting systems" that insured "quality mortgages" and the management of credit risk, they failed to inform investors that the Company's sole underwriting criteria was whether a loan could be sold.   In truth, the Company's increasingly wide underwriting guidelines and systemic abuse of "exceptions" vastly increased the Company's credit risk.

130.   Indeed, in Countrywide's 2007 "lessons learned" analysis produced and publicly filed in the SEC Action and reviewed by Plaintiffs' counsel, Countrywide admitted the following:

- *"With riskier products, you need to be exquisite in off-loading the risk.   This puts significant pressure on risk management.   Our systems never caught up with the risks, or with the pace of change."*
- *"Not enough people had an incentive to manage risk."*

Countrywide further admitted it "could have avoided the situation" if it had "not produce[d] risky loans in the first place."   Countrywide also admitted, however, that such strategy was "not very appealing at the time," and "would have hurt our production franchise and reduced earnings."

131.   The loosening of Countrywide's underwriting guidelines, and the extent of the attendant increased credit risk, was not adequately disclosed to investors, whether in Countrywide's own public securities filings or securities filings of other entities, such as MBS prospectuses filed by affiliated structured investment vehicles ("SIVs"), which, based on investigations by Plaintiffs' counsel, included numerous false and misleading statements, as well as false data buried within pages of tables and statistics.

132.   For example, prospectus supplements for MBS securitizations containing loans underwritten in nontraditional manners, such as based on reduced documentation, did not disclose that Countrywide expected these loans to experience rates of delinquency, foreclosure and bankruptcy that are higher, and that may be substantially higher, than those experienced by mortgage loans underwritten in a more traditional manner.  Indeed, Professor Michael LaCour-Little, an industry expert who prepared an Expert Report publicly filed in the SEC Action and examined by Plaintiffs' counsel, explained in his Expert Report that "in the course of my investigation, I reviewed three non-agency securitizations and the related prospectuses issued by subsidiaries of CW. . . .  While the documents provide detailed information about the particular mortgage pool backing the certificates and describe in detail how cash flows from the pool are distributed to investors, they do not identify underwriting deficiencies, layered risk, exception rates, instances of known borrower fraud, or CW management's analysis of these factors and their significance for CW's future business prospects."

### 3.   Countrywide's Substantial Use Of "Exceptions"

133.   As a result of its "Make Every Loan" strategy, Countrywide had an extraordinarily high rate of exception loans.  "Exceptions" or "exception loans" in the mortgage industry are loans whose criteria fall outside the Company's official underwriting standards but are approved nonetheless.  Countrywide's internal underwriting guidelines instructed that "[e]xceptions must be considered and approved in moderation."

134.   Confidential witnesses, expert statistical analyses, and Countrywide's internal documents provide compelling evidence that, under management's direction, approval of "exceptions" was the rule – regardless of the risk associated with the loan – and in contravention of (i) Countrywide's own policy that exceptions could be considered and approved only in moderation; and (ii) the Defendants' public statements about Countrywide's underwriting standards.

135.   For example, an internal Countrywide presentation created by former Countrywide President and COO Sambol, submitted in a criminal prosecution of a former Countrywide loan officer (*United States v. Partow*, No. 06-CR-00104 (HRH) (D. Alaska 2006)), listed the following objectives for the Exception Processing System:

- ***Approve virtually every borrower and loan profile with pricing add-on when necessary.***
- Identify alternative program to meet borrower needs.
- Process and price exceptions on standard products for high-risk products.
- Process exceptions for:
  – Credit Scores
  – LTV (loan-to-value) amount
  – Cash out amounts
  – Property types

136.   Similarly, as detailed above, a former Countrywide board member and Secondary Markets Managing Director confirmed in an SEC deposition (a partial transcript of which was produced in the SEC Action and reviewed by Plaintiffs' counsel) that the ***"only"*** criteria for granting exceptions was whether or not the loan could be sold into the secondary market.   This was corroborated by Confidential Witness 12 ("CW12"), a loan originator and then sales manager at a Countrywide location in San Jose, California, who added that lending practices were especially lax at Full Spectrum Lending (FSL), Countrywide's subprime lending division.   According to CW12, at FSL "[it] was like 'Got a pulse? Get a loan.'  "[P]eople with scores of 580 still [got] a stated product."

137.   Moreover, according to his Expert Report, Professor Richard K. Green, Ph.D. ("Professor Green"), an industry expert who was prepared to testify

in the SEC Action, calculated that *one-quarter* of Countrywide's loans in the first quarter 2006 alone were originated as exceptions to Countrywide's underwriting standards; that more than *one-third* of the loans recommended for rejection by Countrywide's own underwriting model were ultimately approved; and that Countrywide knowingly approved these loans to increase Countrywide's share of the mortgage market.  Based on his analysis, Professor Green concluded that from 2002 forward, Countrywide's residential lending activities became increasingly risky, thereby exposing Countrywide to an increasing probability of borrower delinquency and default.[6]

138.    The percentage of exception loans was reported to Sambol, as the head of the production divisions and later as COO, and exception loans were a topic of discussion at Credit Risk Management meetings at Countrywide.  As revealed by Sambol's deposition testimony in the SEC Action (a partial transcript of which was produced in the SEC Action and reviewed by Plaintiffs' counsel), every month, Countrywide produced a report called the "Credit Risk Leadership Reporting Package" which measured various metrics of Countrywide's loan production, among them, the number of loans originated pursuant to exceptions to the Company's underwriting policies.  The monthly reporting packages included statistics on the number of exception loans being made by product category.  Both Sambol and Sieracki were members of and participated in Credit Risk Committee meetings, Sambol from 2006 through 2007, and Sieracki from 2005 through 2007.

139.    In May 2005, Sambol was made aware by McMurray of the likelihood of significantly higher default rates on loans that were made on an exception basis. In a May 22, 2005 email produced by Countrywide in the SEC Action and examined by Plaintiffs' counsel, McMurray warned Sambol that, regarding

---

[6]  Professor Green's conclusions were based on his analysis of a random sample of 100,000 loans Countrywide originated during the approximately 10-year period from January 1998 through March 2008.

Countrywide's approach to making exception loans: "the main issue to [sic] make sure everyone's aware that we will see higher default rates . . . ."  McMurray stated that "exceptions are generally done at terms even more aggressive than our guidelines," and that "[g]iven the expansion in guidelines and growing likelihood that the real estate market will cool, this seems like an appropriate juncture to revisit our approach to exceptions."  He further predicted that a rise in defaults would trigger a rise in repurchase and indemnification requests from secondary market purchasers.  In response, the very next day Sambol requested that McMurray "set up a meeting" to discuss such issues further, including guideline exceptions.

140.   On June 28, 2005, Sieracki attended a Credit Risk Committee meeting in which Countrywide's failure to adhere to its own underwriting guidelines was made abundantly clear.  According to the meeting minutes (produced by KPMG in the SEC Action) and testimony (produced in the SEC Action) examined by Plaintiffs' counsel, at this meeting, a presentation was given informing Sieracki and others that ***1/3 of the loans which were referred out of Countrywide's automated underwriting system violated "major" underwriting guidelines and 1/3 violated "minor" guidelines.***  The presentation further informed that exception loans were much riskier than loans originated pursuant to the Company's stated underwriting guidelines: exception loans greater than $650,000 were performing 2.8 times worse than similar loans written within guidelines.   At the meeting, McMurray emphasized that the three key pieces where CFC retained risk included "HELOC and Sub prime residuals."   The minutes further reveal that the participants discussed "non-owner second home purchase loans.   This category has nearly tripled during the past two years. . . .   Stan [Kurland] asked why we have 5% of non-owner second home purchases at 95% CLTVs.   Drew said production makes exceptions to guidelines.   Stan said we appear to have unacceptable risk on our balance sheet from this type of loan."

141.   Further, the actual underwriting of exceptions was severely compromised. According to Countrywide's official underwriting guidelines, exceptions were only proper where "compensating factors" were identified which offset the risks caused by the loan being outside of guidelines.   In practice, however, unbeknownst to investors, ***Countrywide used as "compensating factors" variables such as FICO and loan to value, which had already been assessed by CLUES in issuing a "refer" finding.***   For example, Confidential Witness 11 ("CW11"), an underwriter for Countrywide at a branch in Denver, Colorado from 2005 – 2007, confirmed that loans that had been flagged by CLUES in issuing a "refer" finding were sometimes granted exceptions using compensating factors that had already been evaluated by CLUES in making the refer finding, such as FICO, LTV,  or cash down.   Although Countrywide disclosed that it was making exceptions, it did not disclose that it did so without any real compensating factors.

142.   Mozilo was well aware of the breakdown in Countrywide's procedures and the lack of compliance with Countrywide's underwriting guidelines.  For example, in early 2006, HSBC exercised its contractual rights and forced Countrywide to buy back many of the subprime 80/20 loans that it had purchased from Countrywide.  Many of the HSBC "kick-outs" of defaulted loans were due to the fact that many of the underlying loans had been originated outside of Countrywide's underwriting guidelines.   Following the HSBC incident, on April 13, 2006, Mozilo sent an email to Sieracki and Sambol that was produced by Countrywide in the SEC Action and examined by Plaintiffs' counsel, stating that he had "***personally observed a serious lack of compliance with our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]***."

143.   At a March 12, 2007 Corporate Credit Risk Committee meeting, attended by Sambol and Sieracki, Risk Management reported that 12% of the loans reviewed through Countrywide's internal quality control process were rated

"severely unsatisfactory" or "high risk," and that one of the principal causes for such a rating was that loans had debt-to-income, loan to value, or FICO scores outside Countrywide's underwriting guidelines.  An additional 14% of the loans audited had document deficiencies.  These statistics were reported in materials distributed at the meeting which were produced by Countrywide in the SEC Action and examined by Plaintiffs' counsel.

144.   Sambol and Sieracki also attended a May 29, 2007 Credit Risk Committee meeting, the minutes of which were produced by Countrywide in the SEC Action and examined by Plaintiffs' counsel, during which they were informed that even as Countrywide had been purportedly tightening underwriting guidelines, "loans continue[d] to be originated outside guidelines" primarily via the Secondary Structured Lending Desk without "formal guidance or governance surrounding Secondary SLD approvals."  A presentation made at the meeting, which was also produced by Countrywide in the SEC Action and examined by Plaintiffs' counsel, included a recommendation from the credit management department that two divisions "cease to grant exceptions where there is no major competitor offering the guideline."  This highlighted for Sambol and Sieracki the existence of the practice even as the Company was purportedly tightening guidelines.

145.   The "exceptions" culture at Countrywide started at the top.  Mozilo himself was responsible for exception loans.  Mozilo underwrote and approved loans pursuant to a program coined as Friends of Angelo ("FOA").  Hundreds of these "VIP" loans were given to government officials and regulators – including multiple United States Senators and two former CEOs of Fannie Mae – on highly favorable terms (such as reduced, noncompetitive interest rates) in an improper attempt to influence them, potentially in violation of government ethical rules, according to reports in *The Wall Street Journal* and scores of other media publications.  In many instances, Mozilo approved VIP loans that were in direct contravention of Countrywide's own credit policies and underwriting guidelines.

Countrywide's CRO McMurray testified in the SEC Action that he attempted to change the practice of granting FOA loans, which was in place for most of his tenure at the Company, but his involvement "wasn't warmly met" by Mozilo.  In one instance, Mozilo criticized McMurray for becoming involved in loans that Mozilo had "already approved," and admonished McMurray that Countrywide's balance sheet was "big enough" for his FOA loans.  McMurray's testimony and the email chain in which Mozilo approved the subject loan – a cash-out refinance by TV personality Ed McMahon for 100% of the property's then-current value of $4.5 million done on a reduced documentation basis – was publicly filed in the SEC Action and reviewed by Plaintiffs' counsel.  The FOA loans are subject to Congressional investigation.[7]

146.  Defendants never disclosed to investors the high percentage of exception loans Countrywide was making to its already aggressive underwriting guidelines and without regard to compensating factors.[8]

---

[7]  On February 16, 2011, the chairman of the United States House of Representatives oversight committee, Daniel Issa ("Issa"), issued a subpoena to Bank of America for information about Countrywide's FOA program. "This subpoena will allow us to obtain the information needed to answer the outstanding public interest questions regarding the full size and scope of the VIP program.  The American people have a right to know the totality of who participated in the Countrywide's VIP program and what they did in return for access to it," Issa said in a prepared statement.  On April 5, 2011, Congressman Issa sent a letter to Federal Housing Finance Agency (FHFA) General Counsel raising concern that 173 Countrywide VIP loans given to 42 Fannie Mae and Freddie Mac employees, including three former Fannie Mae CEOs, violated ethics rules and created a conflict of interest.

[8]  For example, even MBS offering documents represented that the underlying Countrywide loans were "originated or acquired in accordance with Countrywide's underwriting standards," noting only that "exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower."  Countrywide also represented that "Countrywide Home Loans' underwriting standards are applied . . . to evaluate the prospective borrower's credit standing and repayment ability and the value and

147.   As a result of widening its guidelines to be a composite of the most aggressive guidelines in the industry, and implementing an underwriting system that encouraged systemic exceptions to those already wide guidelines, Countrywide abandoned prudent underwriting.   That failure to appropriately underwrite its loans led to a serious deterioration in the quality of Countrywide's loan production.   This deterioration became evident, for example, in the post-closing audits of loan production performed by the Quality Control functions at Countrywide.   According to testimony provided in the SEC Action by a Countrywide Managing Director and examined by Plaintiffs' counsel, the Quality Control Audits could result in the ranking of four categories of loans:   Severely Unsatisfactory, High Risk, Document Deficiency, or Acceptable.   High rates of

---

adequacy of the mortgaged property as collateral."   Although Countrywide disclosed that each MBS could contain loans originated under "exceptions" to its stated underwriting guidelines if "compensating factors" existed, Defendants failed to disclose Countrywide's strategy of matching the guidelines of any competitor in the market, without applying that competitor's credit risk mitigants, or its policy of accepting without any underwriting any loan that could be securitized.   Indeed, Countrywide falsely stated during investor conference calls that its policy was to "keep our exceptions low."   In addition, prospectus supplements filed by Countrywide SIVs did not disclose what percentage of (or in many cases, whether any) securitized loans were approved pursuant to *exceptions* to Countrywide's stated underwriting guidelines.   Nor did the prospectus supplements define anywhere the types of exceptions that Countrywide employed generally in the loan pool, or specifically for each loan.   In fact, as confirmed by several senior executives at Countrywide, including executives directly involved in loan securitizations, Countrywide never disclosed in any of the relevant offering documents or in any other public filings the amount of loans it was underwriting on an exceptions basis for any loan product or division.   Paul Liu, an attorney who worked for Countrywide and participated in the preparation of the offering documents, testified in the SEC Action that the prospectus supplements did not disclose the number or percentage of loans included in each securitization that were underwritten pursuant to exceptions, or even in many cases whether any loans within that securitization were underwritten pursuant to exceptions – just that exceptions "may be made."

Severely Unsatisfactory and High Risk loans were internally detected no later than 2006 and 2007. A "Severely Unsatisfactory Loan" defined by at least one Countrywide Managing Director as a loan that "was essentially outside of the guidelines" and "might not be expected to perform throughout the life of the loan" – in other words, a loan that should never have been made.

148. Numerous confidential witnesses further confirm that Countrywide loosened and abandoned its underwriting standards. Many of the same confidential witness accounts by former Countrywide employees are featured in the shareholders derivative complaint – *In re Countrywide Fin. Corp. Deriv. Litig.*, Lead Case No. 07-CV-06293 (C.D. Cal. 2007). In denying Countrywide's motion to dismiss the derivative complaint, the court held that the "numerous confidential witnesses" – whose accounts are detailed herein – "support a strong inference of a Company-wide culture that, at every level, emphasized increased loan origination volume in derogation of underwriting standards." In drawing this inference, the court noted that the allegations of misconduct came from Countrywide employees (i) located throughout the United States; (ii) in varying levels of the Countrywide hierarchy (including underwriters, senior underwriters, senior loan officers, vice presidents, auditors, and external consultants); and (iii) employed at varying times. In the court's words, *these witnesses "tell what is essentially the same story − a rampant disregard for underwriting standards − from markedly different angles."*

149. For example, according to Confidential Witness 1 ("CW1"), an underwriter for Countrywide in the Jacksonville, Florida processing center between June 2006 and April 2007, *as much as 80% of the loans originated at Countrywide involved significant variations from the underwriting standards* that necessitated a sign-off by management. According to CW1, Countrywide was very lax when it came to underwriting guidelines. Management pressured underwriters to approve loans and this came from "up top" because management was paid

based, at least in part, on the volume of loans originated.  CW1's manager told CW1 to approve as many loans as possible and push loans through.  According to CW1, most loans declined by underwriters would "come back to life" when new information would "miraculously appear" – which indicated to CW1 that Countrywide was not enforcing its underwriting standards.

150.   According to Confidential Witness 2 ("CW2"), a senior underwriter in Roseville, California from September 2002 to September 2006, Countrywide would regularly label loans as "prime" even if made to unqualified borrowers (including those who had recently gone through a bankruptcy and were still having credit problems).  According to CW2, Countrywide's lending practices got riskier in 2006 and the Company was more lax in enforcing its underwriting policies during that year.

151.   According to Confidential Witness 3 ("CW3"), an underwriter from Long Island, New York between March 2000 and January 2007, Countrywide extended loans to individuals with increasing debt to income ratios.  Initially, the Company limited debt to income ratios to 38%, but this rose to 50%.  According to CW3, like CW1 and CW2, Countrywide branch managers' compensation was tied to loan origination volume and not the quality of the Company's loans.  Thus, according to CW3, branch managers pushed originators to sell more loans despite the riskiness of these loans.  As such, the Company regularly sacrificed quality for quantity.

152.   According to Confidential Witness 5 ("CW5"), a former senior underwriter at Countrywide in Independence Ohio, between August 2006 and April 2007, the Company's "philosophy was that you didn't turn down loans." According to CW5, the Company "did whatever they had to do to close loans" including making exceptions to underwriting guidelines – everyone was motivated to increase loan volume and "approv[e] things that should not have been approved."

153.  According to Confidential Witnesses 14 ("CW14"), a former underwriter at Countrywide in Charlotte, North Carolina between 1997 and 2007, there was "a lot of pressure" on underwriters to approve a high volume of loans in order to keep their job.  According to CW14, underwriters were held to a quota of at least eight files a day − preferably ten − and supervisors preferred more.  The Regional VP told underwriters that "as long as you get a CLUES Accept" they should approve the loan, and "if you don't do some bad loans, you're not doing your job."  According to CW14, there were incentives at Countrywide to approve as many loans as possible regardless of quality, the primary incentive being "keeping your job."  In fact, CW14 stated that s/he was ultimately let go for not approving enough loans.

154.  According to Confidential Witness 16 ("CW16"), who held various positions at Countrywide between 2001 and 2006 including in the Registration Department, Closing Department, and as a "conduit" between the back-office and sales team at a Countrywide wholesale branch in Charlotte, North Carolina, the volume of loans coming into her branch became very heavy – and average of 150 loans per day – "so there was pressure to do overtime and push loans through." According to CW16, underwriters were expected to meet a production quota of ten loans per day.  "If you didn't meet the quota, you'd be fired."

155.  Moreover, according to Confidential Witness 7 ("CW7"), a former Senior Loan Officer that worked in the Consumer Markets division of Countrywide in the Atlanta, Georgia branch office between 2000 and August 2005, if a borrower didn't meet the guidelines for Countrywide's loan products, loan officers were instructed to approve the loan anyway if doing so would allow Countrywide to continue receiving borrower referrals from a particular source.

156. According to Confidential Witness 13 ("CW13"), a former underwriter at Countrywide's Full Spectrum Lending Division from October 2005 until 2007, the underwriting practices at Countrywide were "pretty much 'anything

goes'" and "there's nothing we wouldn't do." CW13 worked as part of a team of eight or nine underwriters at a branch office in Chandler, Arizona. According to CW13, quality restrictions did not slow down this team. And while a quality review group was supposed to evaluate the loans, originators worked on a bonus system where negative quality ratings meant a deduction bonus points – and negative ratings were "few and far between."

157.  The Company also masked the true riskiness of its loan originations by giving "prime loans" to persons who clearly did not qualify for prime loans. Confidential Witness 9 ("CW9") was a Compliance Auditor II in Countrywide's Capital Markets, Plano, Texas facility from 2000 until October 2004. CW9's job was to audit loans that had previously been sold by Countrywide's Capital Markets department and were being returned to the Company (usually because the loans had been originated in violation of the Company's representations and warranties provided to the purchaser at the time of sale). According to CW9, many of the loans being returned to the Company were labeled "prime loans" but the borrower was clearly not qualified for a prime loan.

158.  According to CW9, the Company was making purportedly "prime loans" to borrowers who had gone through bankruptcy within the past two years, and the Company was making "prime loans" to borrowers whose stated income was clearly beyond the norm for a person in the borrowers' occupation.

159.  According to CW9, in 2004 the Company was being forced to repurchase an increasing number of loans that were already in default within sixty days after being originated. Many of these loans – in which the borrower defaulted within sixty days of the origination – were prime loans, but the borrower was clearly a speculator. According to CW9, by 2004 there was an increasing number of defaults by borrowers who were buying investment homes hoping to flip the homes for a quick profit. These borrowers, according to CW9, often clearly could

not even afford the first payment on the loans unless they could put a renter in the home immediately (or flip the house at a profit).

160.   According to CW9, the Company's failure to eliminate loans to speculators was just another example of how the Company was relaxing underwriting and origination procedures to facilitate increasing loan volume and report increasing earnings in the short-term.

161.   According to CW9, the culture in the Plano office was to "make numbers."   Loans coming back for repurchase showed a lack of management attention to proper procedures and adherence to qualification criteria.   As alleged in detail herein, Defendants knew Countrywide was extending substantial amounts of loans that did not comply with the Company's underwriting policies and procedures.

162.   According to Confidential Witness 10 ("CW10"), Defendant Sambol clearly knew about the Company's rampant deviations from its underwriting policies and procedures – and endorsed this conduct.   CW10 was an Executive Vice President ("EVP") of Production Operations and later an EVP of Process Improvement.   CW10 worked at Countrywide for seventeen years, leaving the Company in October 2005.

163.   As EVP of Process Improvement in 2005, CW10 worked directly with Defendant Sambol to create the computer system (or "rules engine"), EPS, described in detail above, that routed highly risky loans out of the normal loan approval process and to a central underwriting group for evaluation.   According to CW10, the EPS identified loans that violated the Company's underwriting requirements.   For instance, the EPS flagged loans in which the loan-to-value ratio was too high when compared with the borrower's FICO score.   Flagged loan applications were routed to Countrywide's "Central Underwriting" group located in Plano, Texas (the headquarters of the Retail Lending group).

164.   However, according to CW10, loans identified by the EPS as violating the Company's underwriting standards were not rejected.   Rather, according to CW10, Defendant Sambol wanted the Company's Central Underwriting group to review such loans to evaluate whether these loans should require a higher price (up front points) or a higher interest rate in light of the violation at issue.   Central Underwriting entered information into the EPS about its decisions to approve such loans and charge additional fees to the borrower.

165.   Indeed, according to CW10, it was "evident" that one of Countrywide's goals was to be able to fund any loan.   According to CW10, senior management didn't want to have to turn down any loan applications because it wanted to grow market share and didn't want borrowers, mortgage brokers, or other mortgage companies that sought warehouse lines of credit from Countrywide to take their business to competitors.   As a result, according to CW10, loans that did not meet Countrywide's underwriting standards were approved and funded routinely.   CW10 added that senior management's philosophy was that if the risks associated with a particular loan were simply "priced right," Countrywide should be able to fund any loan.

166.   According to CW10, the data collected in the EPS was available to top company executives either online or though system-generated reports.   This witness verified that Defendant Sambol had access to the EPS and could review the data in it at any time.

167.   Thus, according to CW10, Countrywide originated loans that did not comply with the Company's underwriting standards, and the Company's EPS provided Defendants with hard evidence of this practice.

168.   In addition to the EPS, according to CW10, the Company's CRO's department generated numerous other reports detailing all kinds of factors measuring the performance of Countrywide's loans, the Company's adherence to underwriting policies, and other similar issues.   According to CW10, these resports

were reviewed and discussed with Countrywide's former CRO McMurray. And, according to CW10, all of the top Countrywide executives received copies of reports issued by the CRO's department, which came out at least monthly. Additionally, CW10 recalled that the Investor Accounting Department in the Simi Valley office, which dealt with outside purchasers of Countrywide's loans and ensuring that they were paid when the loans were paid off, did virtually nothing other than generate reports.

169.   Lawsuits filed by insurers of some of Countrywide's mortgage loans also confirm Countrywide's deviation from its stated underwriting practices and material deficiencies prevalent in the loans underwritten pursuant to these deviations. For example, on September 30, 2008, MBIA filed a complaint against Countrywide in New York state court, entitled *MBIA Ins. Corp. v. Countrywide, et al.*, Index No. 602825/2008. The MBIA complaint alleges that Countrywide fraudulently induced MBIA to provide insurance for certain Certificates. Through an investigation of approximately 19,000 loan files, MBIA discovered that there was "an extraordinarily high incidence of material deviations from the underwriting guidelines Countrywide represented it would follow." MBIA discovered that many of the loan applications "lack[ed] key documentation, such as a verification of borrower assets or income; include[d] an invalid or incomplete appraisal; demonstrate[d] fraud by the borrower on the face of the application; or reflect[ed] that any of borrower income, FICO score, or debt, or DTI [debt-to-income] or CLTV, fail[ed] to meet stated Countrywide guidelines (without any permissible exception)." Significantly, "MBIA's re-underwriting review . . . revealed that almost 90% of defaulted or delinquent loans in the Countrywide Securitizations show material discrepancies." The court sustained MBIA's common law fraud claims against Countrywide. *See MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, Index No. 602825/08, 2009 WL 2135167

(Supreme Ct. NY July 8, 2009), *aff'd* in large part, --N.Y.S. 2d--, 2011 WL 2567772 (N.Y.A.D. June 30, 2011).

170.   Other complaints filed by bond insurers Ambac Assurance Corporation (*Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, Index No. 641612/2010 (filed in the Supreme Court of the State of New York on May 6, 2010); Syncora Guarantee Incorporated (*Syncora Guarantee Inc. v. Countrywide Home Loans, Inc.*, Index No. 650042/09E (Amended Complaint filed in the Supreme Court of the State of New York on May 6, 2010, after the initial Complaint was largely sustained on March 31, 2010); and Mortgage Guaranty Insurance Corporation (arbitration) also reveal shocking fraud by Countrywide loan officers.

171.   Countrywide's secret, rampant, and unjustified use (and abuse) of the exceptions process is further corroborated by the particularized allegations in a lawsuit by another financial guarantor − *Financial Guaranty Insurance Company v. Countrywide Home Loans, Inc.*   The plaintiff in that lawsuit states that at two separate meetings between the parties at Countrywide's headquarters on April 24, 2007, and December 13, 2007, Countrywide admitted "that it had, apparently since sometime in 2006, undertaken a deliberate practice to routinely make increased exceptions to and expansion of its underwriting guidelines . . ." According to Countrywide, "[t]he reason . . . for these undisclosed exceptions and expansion of the guidelines was to try to retain [its] existing share of the mortgage origination market."   Countrywide also informed Financial Guaranty Insurance Company that it had discovered borrower misrepresentation, speculation, and fraud at an increasing rate in 2006, which it admitted "had been a significant factor in the underperformance of the 2006 securitized HELOC portfolios."

172.   In other recent lawsuits, Countrywide employees have confirmed the prevalence of these practices. One former Countrywide employee quoted in a class action complaint filed by Countrywide debt holders, *Argent Classic Convertible*

*Arbitrage Fund v. Countrywide Financial Corp.*, No. 07-CV-07097-MRP(MANx) (C.D. Cal.), stated that Countrywide routinely approved loans through the EPS that violated its underwriting guidelines. And another former Countrywide employee, a former Assistant Vice President of Risk Management with Countrywide's Structured Loan Desk in Plano, Texas and an underwriter from 2004 until 2006 responsible for evaluating credit risk, stated that Countrywide's management "encouraged more and more loans" to be processed through the EPS beginning in 2004. During 2006, Countrywide processed between 15,000 and 20,000 loans a month through the EPS.

**4.  Defendants Failed To Disclose The Extent Of Their Use Of "Liar Loans" And The Resulting Fraud**

173. Defendants also failed to disclose their actual knowledge that Countrywide's "no doc" or "low doc" loans, in fact, had a specific high rate of fraud. These loans reduced or eliminated the need for any documentation to prove loan applicants' income and/or assets. In "stated-income," "stated-asset," or "no doc" loans, for example, the loans were issued based on a borrower's bare representations about his or her ability to repay, with no documentation to substantiate those representations. A borrower simply asserted his income (or assets) on a form.

174. "Low doc" and "no doc" loans were originally intended for professionals and business owners with high credit scores, who preferred not to provide their confidential financial information every time they applied for a mortgage. These loans generally required the highest level credit scores and low loan-to-value ratios. Countrywide, however, routinely extended these loans to borrowers with weak credit, and knew that such "low doc" or "no doc" loans, particularly when coupled with nontraditional products like ARMs, were highly likely to contain misinformation from the borrower, such as overstated incomes, that would result in increased defaults. Because borrowers would be told that there

would be no inquiry into the veracity of their representations in loan applications, Countrywide employees referred to these products as ***"liar loans."***

175.   Many branch managers (whose compensation was allegedly tied to loan origination volume) pushed originators to sell "liar loans," because these loans could be processed without the "burden" of paperwork.  This was confirmed by, among others, a loan processor who worked at the Company's Anchorage, Alaska branch from October 2002 to May 2006, Confidential Witness 4 ("CW4"). According to CW4, among other former employees of the Company, borrowers were oftentimes approved for loans pursuant to stated incomes that were patently ridiculous (such as a cab driver who claimed to earn $13,000 a month).

176.   Indeed, Countrywide knew that its underwriting practices allowed, and in many cases encouraged, fraudulent information regarding income and employment.   An investigation initiated by bond insurer MBIA prior to suing Countrywide for fraudulent representations related to Countrywide's mortgage loan practices revealed that Countrywide's representations that its loan officers obtained at least telephonic verification of employment and salary with respect to its stated income loans were false.  MBIA discovered that Countrywide did not, in fact, obtain independent verification of income for borrowers who applied for these loans, which constituted a significant percentage of the total number of mortgage loans within the certificates.

177.   According to allegations in a whistleblower complaint filed in the Southern District of Texas, No. 4:08-cv-01464, by Mark Zachary ("Zachary"), a former Regional Vice President of Countrywide's joint venture with KB Home, against Countrywide, Countrywide regularly approved "stated income" or no-documentation loans even though the same applicant had been refused a loan under the Company's full-documentation loan program.  In such instances, according to Zachary, the Company's loan officers would "assist" the applicant in switching to a no-document loan.   Zachary brought this information to the attention of

Countrywide Employee Relations Department and Risk Management officials in 2006 and early 2007.

178.   Additional witnesses confirm and corroborate the lack of underwriting standards in connection with the no documentation loans, including Confidential Witness 6 ("CW6"), an External Home Loan Consultant at Countrywide who worked at the Company from 2000 through August 2007 and who was responsible for originating prime loans for the residential market; Confidential Witness 7 ("CW7"), a former Senior Loan Officer that worked in the Consumer Markets division of Countrywide in the Atlanta, Georgia branch office between 2000 and August 2005; Confidential Witness 8 ("CW8"), a Compliance Auditor who worked at the Company between 2001 and mid-2007, in both Texas and Georgia; and Confidential Witness 12 ("CW12"), a Loan Consultant/Loan Originator and then a Sales Manager who worked at Countrywide from 2001 until 2008 and managed a team of eight originators in San Jose, California.  According to these confidential witnesses, the no document loan process lacked independent verification of borrowers' stated income and was openly abused.

179.   Indeed, Countrywide's Quality Control group performed an audit for the 10-month period ending on April 30, 2006 (the "4506 Audit"), comparing the stated income from a borrower's loan application to the income reported by that borrower to the Internal Revenue Service ("IRS").  The results of the audit, which were ruled admissible by Judge Walter over Defendants' objection and produced in the SEC Action and reviewed by Plaintiffs' counsel, were reported in a handout at an April 2006 meeting of the Credit Risk Committee.  The 4506 Audit revealed that *one-half* of reduced documentation loans held for investment at Countrywide had income that was overstated by *10% or more*, and of those nearly *70%* had an income variance *greater than 50%* between their loan application and their tax return.  The 4506 Audit further revealed that *one-third* of the Pay-Option loans held for investment at Countrywide had income that was *overstated by 50% or*

*more*.  When asked about the results of the 4506 Audit in his February 24, 2010, deposition (a partial transcript of which was produced in the SEC Action and reviewed by Plaintiffs' counsel), Cliff Rossi, the former CRO responded:

> I believe that not every one of these overstatements of income would be reflective of fraud or misrepresentation.  I would say, however, that the vast majority would likely be.

180.   Defendants were well aware of the results of the 4506 Audit as well as other random audits.  For example, following discussion of the 4506 Audit results at a meeting of the Credit Risk Management Committee on April 24, 2006, Sambol shared the results of the 4506 Audit with Mozilo.  In response, Mozilo wrote in a June 1, 2006 email to Stan Kurland, Sambol and others, produced by Countrywide in the SEC Action and reviewed by Plaintiffs' counsel, that:

> In a discussion with both Stan and Dave it came to my attention that *the majority of pay options being originated by us, both wholesale and retail are based upon stated income*.  There is also some evidence that the information that the borrower is providing us relative to their income *does not match up with IRS records*.

181.   During his SEC investigative testimony in 2008 (produced in the SEC Action and reviewed by Plaintiffs' counsel), Mozilo elaborated on his concerns:  "it didn't sound right to me as to – why would they do it on stated income?  Why wouldn't they go through the normal documentation process?"[9]

---

[9]   Further, Sambol was forwarded the results of the 4506 Audit along with analysis by Countrywide CRO McMurray and others, in a June 2, 2006 email.  According to a June 6, 2006 internal email from McMurray, Mozilo called McMurray into his office and expressed concern about reduced documentation loans (in particular, with respect to Pay-Options), "especially after hearing the results from the Bank's recent 4506 Audit."  Both of these emails were produced by Countrywide in the SEC Action and examined by Plaintiffs' counsel.

### D. Countrywide Misled Investors About The Creditworthiness Of Pay-Option ARM Borrowers

182. Countrywide began offering Pay-Option ARMs in 2003 and quickly became a leader in what *The Wall Street Journal* called a "profitable and growing part of the mortgage market." Adjustable rate mortgages, or "ARMs," are characterized by an initial interest rate that is lower than that of a fixed rate mortgage, for a predetermined introductory or "teaser" period ranging between two and ten years. A significant portion of the ARMs the Company issued were called "2/28 loans," meaning that the teaser rate would last for only two years before "resetting" to higher rates, tied to whatever criteria was set forth in the loan documentation, for the next twenty-eight years. "Resetting" after the teaser period usually resulted in a significant increase in the borrower's minimum monthly payments. ARMs are inherently riskier loans and will generally result in higher delinquency rates than fixed-rate loans unless the lender is careful to sell these loans only to those borrowers whose financial condition and credit history demonstrate that they are likely to be able to pay the higher principal and interest payments when the rates "reset." Countrywide's ARM programs also included pre-payment penalties, so that if the borrower refinanced before the end of the introductory rate period (and avoided the increased monthly payments), the borrower would have to pay a penalty to Countrywide.

183. "Pay-Option" ARMs permit a borrower to select from among various monthly payments, including payments that neither paid down principal nor covered the full amount of interest due in a given month. Specifically, the borrower is allowed, in a given month, to choose (1) to pay down the principal; (2) make an "interest only payment"; or (3) make a "minimum monthly payment" lower than the interest for the period. Under the third option, which deferred payment of both principal *and* interest, the loan would begin a process of "negative amortization" in which the unpaid interest is added to the outstanding principal

amount owed, thus increasing the overall loan balance.  Countrywide's Pay-Option ARM loans placed limits on the amount of missed interest that could be rolled into the principal balance, usually 110-125% of the original loan amount.  When a borrower hit the cap, the interest rate on the loan typically reset and required the borrower to begin paying down the principal.  So, in addition to the reset that occurred at the end of the teaser period described above, loan payments for Pay-Option ARMs were re-calculated when the loan balance increased to 110%-125% of the original loan as a result of negative amortization.  At that point, the loan was "recast" and expected to be repaid on a fully-amortized basis over the remaining term.  Consequently, the risk of default increases as the principal reaches the amortization cap.

184.   Pay-Option ARMs, according to a November 2007 article in *The New York Times*, "were especially lucrative. Internal company documents from March [2007] show that Countrywide made gross profit margins of more than 4 percent on such loans, compared with 2 percent margins earned on loans backed by the Federal Housing Administration." However, by providing a material number of such loans to those with inappropriate credit histories and/or financial histories, the Company, undisclosed to investors, including Plaintiffs, exposed its securities to a significant risk of loss.

185.   During the Relevant Period, as detailed below, Countrywide represented that borrowers receiving Pay-Option ARMs were relatively wealthy and sophisticated, minimizing the risk of default and loss.  For instance, in its 2005 Form 10-K, Countrywide assured investors that its Pay-Option loan portfolio had "a relatively high initial loan quality," and that it "only originate[d] pay-option loans to borrowers who [could] qualify at the loan's fully-indexed interest rates." Likewise, in its 2006 Form 10-K, Countrywide proclaimed that it had "prudently underwritten" its Pay-Option ARMs. On May 31, 2006, Mozilo gave a speech in which he stated, "Pay-Option loans represent the best whole loan type available for

portfolio investment from an overall risk and return perspective"; that "[t]he performance profile of this product is well-understood because of its 20-year history, which includes 'stress tests' in difficult environments"; and that Countrywide "actively manages credit risk through prudent program guidelines . . . and sound underwriting."

186.   Contrary to their public statements emphasizing the purported virtues of Countrywide's Pay-Option ARM loans, Defendants internally concluded that the product's risk to Countrywide were severe. For example, Mozilo advised in a May 2006 internal e-mail that ***"Irrespective of the volatility [of the market] I believe that the payoptions continue to present a longer term problem unless rates are reduced dramatically from this level and there are no indications, absent another terrorist attack, that this will happen."***

187.   According to a Senate Subcommittee on Investigations, *Wall Street and the Financial Crisis:  Anatomy of a Financial Collapse,* dated April 13, 2011, by 2006, Countrywide was the largest Pay-Option ARM originator in the country. By 2005, Countrywide had originated approximately $93 billion of Pay-Option ARMs.  By the second quarter of 2005, 21% of Countrywide's loan production was Pay-Option ARMS.

188.   According to an analysis conducted by UBS AG for *The Wall Street Journal,* published on October 24, 2007, the Company rapidly increased its production of Pay-Option ARMs by "giving these loans to riskier and riskier borrowers." Indeed, an internal Countrywide sales document indicated that Pay-Option ARMs would benefit "[a]nyone who wants the lowest possible payment!"

189.   Moreover, despite the risky nature of Pay-Option ARMs, Countrywide increased its production of these loans by offering them to persons who could not or would not document their income or assets. The majority of the Pay-Option ARM loans originated by Countrywide were reduced documentation loans.  By issuing these loans without analyzing the creditworthiness of borrowers,

Countrywide increased its risk and that of its investors, including Plaintiffs. Pay-Option ARMs are high-risk loans on their own. Lending without checking on the creditworthiness of a borrower is a high-risk activity. The combination of granting a high-risk loan to a borrower whose creditworthiness is unknown is deadly to a lender. The investing public was kept in the dark about this risk. According to *The Wall Street Journal's* October 2007 analysis of Countrywide's lending practices, 78% of the Pay-Option ARMs originated by Countrywide in 2004 "were 'low doc' mortgages in which the borrower didn't fully document income or assets." By the end of 2006, according to the Company's Form 10-Q report filed on November 9, 2007, **81% of the Pay-Option ARMs that the Company was holding for investment were loans with low or no income documentation.**

190.   Countrywide also increased its origination of Pay-Option ARMs by allowing borrowers to obtain them without making substantial down payments. According to the UBS survey reported in *The Wall Street Journal:*

> Countrywide also allowed borrowers to put down as little as 5% of a home's price and offered "piggyback mortgages," which allow borrowers to finance more than 80% of a home's value without paying for private mortgage insurance. By 2006, nearly 29% of the option ARMs originated by Countrywide and packaged into mortgage securities had a combined loan-to-value of 90% or more, up from just 15% in 2004, according to UBS.

191.   At the same time Countrywide was increasing its origination of risky loans, it was also increasing the amount of Pay-Option ARMs held by the Company for investment. As of December 31, 2006, Pay-Option ARMs represented 46% of the Company's mortgage loans held for investment. The amount of Pay-Option ARMs held for investment grew rapidly from approximately $4.7 billion in 2004, to more than $26 billion in 2005, to more than $32.7 billion in

2006.  This growth occurred as it became more and more difficult for Countrywide to sell its loans on the secondary market.

192.  While Countrywide may have disclosed many of the risk features inherent in this *type* of loan – the possibility that the loan could negatively amortize due to the borrower making less than the interest only payment, and cause future "payment shock" to a borrower – nowhere did Defendants disclose to investors the features specific to Countrywide's underwriting, or complete lack thereof, that greatly increased that risk.  Specifically, Defendants did not tell investors that Countrywide permitted second liens to be originated concurrently with the Pay-Option, thus reducing the borrowers' equity.  Nor did Defendants disclose that Countrywide was holding loans in its portfolio, a portfolio described by Defendants as "high FICO," with subprime FICO scores.[10]  Defendants did not disclose that Countrywide's internal audits revealed a significant amount of misstatement in borrowers incomes, leading management to conclude that somewhere between 30 and 40% of the loans held for investment had materially misstated income, and therefore misstated debt to income ratios.

193.  The Company's Credit Risk Committee's second quarter 2004 meeting presentation (produced by KPMG in the SEC Action and reviewed by Plaintiffs' counsel) confirms that Defendants were aware of "Specific ARM concerns," including the following:

    – Rising rate environment

    – Payment shock potential

    – Potential defaults from payment shock

---

[10] Countrywide has argued that it disclosed the average FICO scores for Pay-Option ARM loans held-for-investment. However, disclosure of the average FICO score for such loans without discussion of the range of FICO scores would have been misleading because the scores did not fall within a tight band around the mean but rather were widely dispersed from it, and included subprime FICO scores.

− No ARM data from rising rate environments

− Do consumers understand risk

− Combining ARMS with other risky features (I/O [Interest/Only] and/or undocumented income).

194. The presentation further confirms that Defendants were aware that "Credit Risk is Increasing":

- Loan quality is deteriorating throughout the market
  - UW standards have become more aggressive
  - More loans being originated under riskier loan programs (e.g., ARMS), with riskier features (e.g., low/no doc, IO) and at higher CLTVs.
- Our loan and execution mix is deteriorating along with the rest of the market
  - HELOC and subprime production increasing
  - We're doing more executions where we retain most (e.g., HELOCs) or a substantive amount (e.g., subprime) of the underlying credit risk.

195. In June 2005, Risk Management warned senior executives, including Sieracki, that action was needed to address the increasing pace of negative amortization and the potential for payment shock associated with Pay-Option ARMs. According to minutes of the Corporate Risk Management Committee dated June 28, 2005, disclosed by the Financial Crisis Inquiry Commission ("FCIC"), this committee began to warn senior executives, including Sieracki, that action was needed to address the increasing pace of negative amortization and the potential for payment shock associated with Pay-Option ARMS. The Committee noted that 70% of new originations were experiencing negative amortization within the first three months of the loan. The COO noted that Countrywide was taking on "too much" balance sheet risk in HELOCs and subprime loans and had

taken on "unacceptable risk" from non-owner occupied loans made at 95% combined loan-to-value ratios, which were an exception to Countrywide's then existing underwriting guidelines. Risk Management also reported at that meeting that non-conforming loan programs accounted for 40% of Countrywide's loan originations and that subprime production had tripled, rising from 4% to 14% of total production. At the same meeting, Risk Management reported to the committee on evidence of borrowers misrepresenting their income and occupation on reduced documentation loan applications, and the increasing credit risks associated with Pay-Option ARMs, for example, negative amortization, payment shock and the necessity of raising the initial interest to reduce the speed of negative amortization on the loans.[11]

196. However, less than two months later, Mozilo falsely reassured investors, at the May 31, 2006 Sanford C. Bernstein Strategic Decisions Conference, that Pay-Option ARMs were a "sound investment" for Countrywide and that they were "well understood" by the Company.  In reality, as the above described emails reveal, the Officer Defendants were desperately trying to get a handle on out-of-control negative amortization and delinquencies from Countrywide's Pay-Option ARM portfolio.

197.  Just one day later, June 1, 2006, Mozilo sent an email to Sambol and other executives, publicly disclosed in the SEC Action and examined by Plaintiffs' counsel, in which he expressed concern that the majority of the Pay-Option ARM loans were originated based upon stated income, and that there was evidence that a significant percentage of borrowers who were taking out stated income loans were engaged in mortgage fraud.  Mozilo viewed stated income as a factor that

---

[11]  Risk Management explained that while the start rate remained constant at 1%, short term rates (upon which borrowers' fully amortizing payments were based) had risen steadily, thereby increasing the pace of negative amortization and the severity of the resulting payment shock.

increased credit risk and the risk of default.  In his email, Mozilo reiterated his concern that in an environment of rising interest rates, resets were going to occur much sooner than scheduled, and because at least 20% of the Pay-Option borrowers had FICO scores less than 700, *borrowers "are going to experience a payment shock which is going to be difficult if not impossible for them to manage."*  Mozilo concluded that the Company needed to act quickly to address these issues because "we know or can reliably predict what's going to happen in the next couple of years."  Mozilo directed Countrywide Bank to (1) stop accumulating loans with FICO scores below 680 unless the loan-to-value ratio was 75% or lower; (2) assess the risks that the Bank faced on loans with FICO scores below 700 and determine if they could be sold out of the Bank and replaced with higher quality loans; and (3) take a careful look at the reserves and "begin to assume the worst."

198.  The Officer Defendants received still more warnings in June 2006 about the deteriorating credit quality of Countrywide's loan portfolio.  On June 2, 2006, Sambol received an email reporting on the results of a quality control audit at Countrywide Bank that showed that 50% of the stated income loans audited by Countrywide Bank showed a variance in income from the borrowers' IRS filings of greater than 10%.  Of those, 69% had an income variance of greater than 50%.  These material facts were never disclosed to investors.

199.  At a June 22, 2006 Credit Risk Committee meeting, the minutes of which were publicly filed in the SEC Action and reviewed by Plaintiffs' counsel, that was attended by Sambol and Sieracki, Risk Management noted that the median time to reset on the Pay-Option loans was getting shorter as negative amortization was accruing at a faster than expected pace.

200.  On July 10, 2006, Mozilo received an internal monthly report, called a "flash report," that tracked the delinquencies in the Pay-Option portfolio, as well as the percentage of borrowers electing to make the minimum payment and the

amount of accumulated negative amortization on each loan.[12]  Mozilo learned that from September 2005 through June 2006, the percentage of Pay-Option borrowers choosing to make the minimum payment had nearly doubled, from 37% to 71%. Mozilo believed that these statistics were significant enough that he requested that the Company include a letter in bold type with every new Pay-Option loan to inform borrowers of the dangers of negative amortization and to encourage full payment.

201.   About a month later, on August 16, 2006, Mozilo received an email from another member of Countrywide's Board of Directors, asking whether the Company anticipated any significant problems with the Pay-Option portfolio. Mozilo responded three days later in an email produced by Countrywide in the SEC Action and examined by Plaintiffs' counsel, by reiterating the ongoing concerns he had shared with senior management earlier in 2006.  By this point in time, Mozilo explained, over 75% of the Pay-Options borrowers were opting for the minimum payment, which, along with rising interest rates, continued to accelerate negative amortization.  As a result, Mozilo continued, the loans would reset much faster than the borrowers expected with accompanying payment shock. "The only out," Mozilo wrote, was "to refinance the loans before reset," but this would be difficult in light of decreasing home values and rising interest rates. Mozilo concluded that only a "significant" rise in home values and/or a "dramatic" drop in interest rates would "alleviate payment shock in the future."

202.   Internally, Mozilo urged other Countrywide executives to dump the Company's portfolio of Pay-Option loans.  On September 25, 2006, Mozilo and Sambol discussed the Pay-Option ARM loan portfolio.  The following day Mozilo

---

[12]   Mozilo testified during his SEC investigative testimony (a partial transcript of which was produced in the SEC Action and reviewed by Plaintiffs' counsel) that he regularly received flash reports, and that the flash reports included delinquency trends not only on Pay-Option loans, but on all products offered by Countrywide.

sent an email to Sambol and Sieracki, produced by Countrywide and examined by Plaintiffs' counsel, asking Sambol and Sieracki to "seriously consider" selling "all newly originated pay options" and begin selling, "in an orderly manner," Pay-Options currently on the Bank's balance sheet.  In the email, Mozilo referred to Pay-Options as the "lightening rod" of "exotic loans," described how Pay-Options were "getting the attention of rating agencies, regulators, and the press," and underscored Countrywide's inability to accurately assess the "real risk of these loans":

> ***We have no way, with any reasonable certainty, to assess the real risk of holding these loans on our balance sheet.***  The only history we can look to is that of World Savings however their portfolio was fundamentally different than ours in that their focus was equity and our focus is fico.  In my judgment, as a long time lender, I would always trade off fico for equity.  The bottom line is that ***we are flying blind*** on how these loans will perform in a stressed environment of higher unemployment, reduced values and slowing home sales.

203.  In his September 26, 2006 email, Mozilo further stated that ***"pay options are currently mispriced in the secondary market and that spread could disappear quickly*** if there is an foreseen [sic] headline event such as another lender getting into deep trouble with this product or because of negative investor occurance [sic]."  He explained that the "timing [wa]s right" to sell Countrywide Bank's portfolio of Pay-Option loans, and recommended that the Bank "sell all newly originated pay-options and begin rolling off the bank balance sheet, in an orderly manner, pay-options currently in their port[folio]."

204.  Mozilo's "flying blind" email was sent to McMurray, who responded within a half an hour to Mozilo that he was "very happy to see" Mozilo's email given his own concerns about Pay-Option risk.  In McMurray's email response, which was publicly filed in the SEC Action and examined by Plaintiffs' counsel,

the CRO agreed with Mozilo that Countrywide "should be shedding rather than adding Pay-Option risk to the portfolio."  McMurray went so far as to cut and paste into his email and an earlier internal email he had sent warning against adding more Pay-Option risk, including that Countrywide was not receiving sufficient compensation on these loans to offset the escalating risk of retaining them on its balance sheet, and the extremely favorable credit environment had begun to deteriorate and it was plausible that the impending down cycle would be more severe than in previous downturns.  McMurray wrote to Mozilo:

> Would it make more sense to follow a balance sheet strategy where we're taking advantage of market conditions (both spreads and environment)?  We appear to be following a strategy that's exactly the opposite of this approach.

205.   Indeed, Mozilo never became comfortable with the risk presented by the Pay-Option loan. In a January 29, 2007 email that was produced by Countrywide in the SEC Action and examined by Plaintiffs' counsel, Mozilo instructed the president of Countrywide Bank "to explore with KPMG the potential of selling out (one time transaction because of the tarred reputation of Pay-Options) the bulk to the Pay-Options on the Bank's balance sheet and replace them with HELOCS."   Indeed, in a July 9, 2007 email that was produced by Countrywide in the SEC Action and examined by Plaintiffs' counsel, Mozilo admitted that "The fact that almost 90% of the pay options are making the minimum payment in a market where real estate values are dropping precipitously is a formula for disaster."

206.   Then, on November 4, 2007, Mozilo bluntly stated in an email to the president of Countrywide Bank that "Pay options have hurt the Company and the Bank badly despite your belief that it is a viable product."  Mozilo admitted that "World Savings culture permits them to make these loans in a sound manner and our culture does not."  Further, contrary to his public assurances throughout the

Relevant Period that Countrywide's Pay-Option ARM portfolio was of a higher quality than other subprime lenders because of higher FICO scores, Mozilo stated in this internal email that "fico scores are no indication of how these loans will perform." Mozilo instructed the president of the Bank that he did not "want any more Pay Options originated for the Bank" and questioned "whether we should touch this product going forward because of *our inability to properly underwrite these* combined with the fact that these loans are inherently unsound unless they are full doc, no more than 75% LTV and no piggys." Mozilo's November 4, 2007 email was publicly disclosed in the SEC Action and reviewed by Plaintiffs' counsel.

207. Yet, despite the repeated warnings of Mozilo, McMurray, and the CIO, and following their discussions with KPMG, the Pay-Option ARMs were not sold, and the substantial and many Pay Option risks known to Countrywide were not disclosed to investors.

208. Countrywide has since been forced to concede that it extended Pay-Option ARMs during the Relevant Period that were excessively risky because the borrowers did not fit the descriptions the Company had previously given. According to the Company, and as reported in the *Los Angeles Times*, on December 28, 2007, *89% of the Pay-Option ARMs Countrywide issued during 2006 ($64 billion), and 83% of the Pay-Option ARMs it issued during 2005 ($74 billion), could not have been approved under the Company's "new," more conservative lending practices adopted in 2007.* However, the "new" guidelines actually represented Countrywide's pre-Relevant Period guidelines, which the Company abandoned during the Relevant Period in its aggressive push to pump up its earnings and stock price by selling substantial amounts of loans with little consideration given to the borrowers' ability to pay.

209. While Countrywide may have disclosed many of the risk features inherent in this *type* of loan – the possibility that the loan could negatively

amortize due to the borrower making less than the interest only payment, and cause future "payment shock" to a borrower − nowhere did Defendants disclose to investors the features specific to Countrywide's underwriting, or complete lack thereof, that greatly increased that risk.   Specifically, Defendants did not tell investors that Countrywide permitted second liens to be originated concurrently with Pay-Option loans, thus reducing the borrowers' equity from inception.   Nor did Defendants disclose that Countrywide was holding loans in its portfolio, a portfolio described by Defendants as "high FICO," with low subprime-level FICO scores.   Defendants did not disclose that Countrywide's internal audits revealed a significant amount of actual misstatement in borrowers incomes, leading management to conclude that between 30 and 40% of the loans held for investment had materially misstated income, and therefore misstated debt to income ratios.

### E.   Countrywide Misled Investors About Increased 100% Financing And HELOC Risks

210.   Defendants were well aware of the serious undisclosed risks Countrywide incurred by originating 100% financing[13] and HELOC loans[14] and, in

---

[13]   "100% financing" refers to loans that borrowers could obtain without making a down payment, *i.e.*, loans equal to the full purchase price of the home. "80/20 Programs" were also no-money-down loans, and sidestepped the need for borrowers to purchase private mortgage insurance (which was usually required when the loan was for more than 80% of the home price).   The home buyer took out two loans, one for 80% of the purchase price, and a second, "piggyback" loan for the remaining 20% of the purchase price.   A borrower who takes out a "piggyback" loan is essentially borrowing the down payment in addition to the mortgage.

[14]   HELOCs are second mortgages secured only by the difference between the value of the home and the amount due on a first mortgage.   HELOCs were in the "first loss" position, meaning that in the event of a default and foreclosure, the Company would receive proceeds from the foreclosure sale only after the first lien holder was paid in full.   Consequently, even a relatively modest decline in home prices can have a devastating effect on the collateral securing HELOCs, resulting in the entire amount of the HELOC becoming unsecured.   Countrywide could

COMPLAINT

fact, repeatedly questioned the wisdom of continuing to offer the products. For example, in an email dated May 22, 2005, produced in the SEC Action and reviewed by Plaintiffs' counsel, McMurray warned Sambol that "[m]any of the exception transactions we do are structured as a piggy-back transaction where we're providing a second lien." He further queried, "Are we comfortable with the current approach where [Countrywide] takes much of the credit risk on exceptions?" About a month later, as revealed in Credit Risk Committee meeting minutes dated June 28, 2005, (which were publicly disclosed in the SEC Action and reviewed by Plaintiffs' counsel), the committee recommended to Sambol that a new rule be adopted to prevent the SLD from making an exception loan with a HELOC.

211. In addition, in an email dated March 27, 2006, from Mozilo to Sambol, Sieracki and others (also publicly disclosed in the SEC Action and examined by Plaintiffs' counsel), Mozilo directed them to undertake certain actions to "avoid the errors of both judgment and protocol that have led to the issues that we face today caused by the buybacks mandated by HSBC." Mozilo indicated further that the 100% loan-to-value (also known as 80/20) subprime product is "*the most dangerous product in existence and there can be nothing more toxic* and therefore requires that no deviation from guidelines be permitted irrespective of the circumstances." [15]

212. In an April 13, 2006 email to Sieracki, Sambol and others (which was produced by Countrywide in the SEC Action and reviewed by Plaintiffs' counsel),

---

charge higher interest and fees for HELOCs, making HELOCs very attractive to Countrywide.

[15] Also, in March 2006, Sieracki sent two private emails (produced and deemed admissible in the SEC Action over Defendants' objection and reviewed by Plaintiffs' counsel) admitting that in connection with his experiences at Countrywide, he could "go to jail" – while simultaneously referring to the guilty verdicts in the Enron case.

Mozilo indicated that there were numerous issues that needed to be addressed relating to the 100% subprime seconds business in light of the losses associated with a buyback of loans sold to HSBC. Mozilo noted that loans had been originated "through our channels with serious disregard for process [and] compliance with guidelines." Mozilo further stated that:

> [i]n my conversations with Sambol he calls the 100% sub prime seconds as the 'milk' of the business. Frankly, ***I consider that product line to be the poison of ours***. Obviously, as CEO I cannot continue the sanctioning of the origination of this product until I can get concrete assurances that we are not facing a ***continuous catastrophe***.

Mozilo concluded the email by demanding "a plan of action not only from Sambol but equally from McMurray as to how we can manage this risk going forward."

213.   In another email dated April 17, 2006, from Mozilo to Sambol and others regarding the Company's "Subprime seconds" business (also publicly disclosed in the SEC Action and examined by Plaintiffs' counsel), Mozilo stated:

> ***In all of my years in the business I have never seen a more toxic product. It's not only subordinated to the first but the first is sub-prime***. In addition the fico's [sic] are below 600, below 500 and some below 400 . . . . With real estate values coming down . . . this product will become increasingly worse. There has to be major changes in the program including substantial increases in the minimum fico. . . . Whether you consider this business milk or not I am prepared to go without milk, irrespective of the consequences to our production.

214.   However, rather than tighten underwriting guidelines for HELOCs, Countrywide continued to expand them. On December 7, 2006, Mozilo circulated a memorandum (produced by Countrywide in the SEC Action and examined by Plaintiffs' counsel) to the Board of Directors and all Countrywide managing

directors, including Sambol and Sieracki, in which he made the following observations:

- Countrywide had expanded its subprime underwriting guidelines in every conceivable area, lowering minimum FICOs, raising maximum loan size and LTV and making interest only, stated income and piggyback second loans available to subprime borrowers.

- Countrywide expected that subprime loans originated in 2006 (the "2006 Vintage") would be the worst performing on record, driven by wider guidelines and the worsening economic environment, which included rising interest rates and declining home values.

- The percentage of 60-and 90-day delinquencies in the 2006 Vintage (at 8.11% and 4.03%, respectively), exceeded the percentages from each of the previous six years, and the Company expected these percentages to rise.

- 62% of Countrywide's subprime originations in the second quarter of 2006 had a loan to value ratio of 100%.

215. Even after a so-called "no exceptions" policy was issued for 80/20 loans, Countrywide's production and secondary market divisions continued to grant such exceptions, as reflected by McMurray's September 7, 2007 email, explaining that they "basically continued to operate as though they never received this policy."

**F.   Countrywide's Secret**
**Internal Definition Of "Prime"**

216. In addition to failing to disclose the truth about the Company's loosening and abandonment of its underwriting guidelines during the Relevant Period, and engaging in a Company-wide practice of originating and funding loans without regard to underwriting standards and engaging in widespread predatory

and fraudulent lending practices, Defendants also concealed from investors the true extent of Countrywide's exposure to subprime loans.

217.   Countrywide made regular public disclosures distinguishing between its "prime" and "subprime" (sometimes referred to as "nonprime") loan originations and securitizations.  As detailed below, the Company periodically reported its volumes of prime and subprime mortgage loans produced and sold, the volumes of purportedly "prime" and "subprime" loans held for investment, and the value of the Company's credit-sensitive retained (or "residual") interests in securitized prime and subprime loans.

218.   Defendants were well aware that the appearance of being predominantly engaged in prime lending was of critical importance to Countrywide's survival.  For example, during an investor conference with analysts at Lehman Brothers on September 13, 2006, Mozilo insisted that Countrywide had only a minor position in subprime, stating that subprime loans are "only 9% of our production today."   During the same conference, Sambol claimed that "[o]ur profile in the subprime market has been one where we have, for the most part, been on the sidelines."   One year earlier, during a September 13, 2005 analyst call, Mozilo, referring to securitized loans, stated that "all loans originated and sold" were "primarily prime quality."

219.   These statements classifying and distinguishing between "prime" and "subprime" loans were false and misleading because Countrywide, during the Relevant Period, employed a private, internal standard to distinguish between "prime" and "subprime" loans that, as the Officer Defendants knew, differed materially from the standard used by government agencies, generally accepted in the mortgage banking industry, and understood by the public at large.  Thus, while Countrywide repeatedly assured the market that it adhered to a conservative approach to loan origination and underwriting that set it apart from other, inferior mortgage lenders known to be deeply engaged in subprime lending, Countrywide

was itself engaged in the same risky type of business but hid that fact from investors, including Plaintiffs, by operating under a private standard for classifying loans as "prime" while failing to disclose that its standard was substantially below the benchmark accepted in the industry and understood by investors and analysts. This internal definition of "prime" utilized by Countrywide included both loans to borrowers with blemished credit – in some cases, severely blemished credit – as well as high risk loan products, including loans with increased and layered risk factors, that were similarly inconsistent with the prevailing definition of "prime."

220.   The most widely accepted measure of the creditworthiness of a borrower used in the mortgage and consumer lending industry, and which Countrywide used and relied upon heavily throughout the Relevant Period, is the borrower's FICO credit score.  Fair Isaac describes the FICO score, which ranges from 300 to 850, as "the standard measure of US consumer credit risk" and "the recognized industry standard in consumer credit risk assessment."  FICO scores are developed from a variety of data in a prospective borrower's credit reports, including payment history, amounts owed to creditors, length of credit history, new credit sources, and the types of credit used.  Generally, the higher the FICO score, the better the borrower's credit and the lower the risk of default.

221.   According to Fair Isaac, the United States median FICO score is in the 720 range. Approximately 27% of the United States population has a FICO score between 750 and 799, 15% has a score below 600, and 27% has a score below 650.

222.   The FICO score is a key determinant of whether a given borrower will be classified as "prime" or "subprime."  During the Relevant Period, Fitch Ratings termed FICO scores the "best single indicator" of mortgage default risk. Countrywide itself described FICO scores in its 2006 Form 10-K as "[a] commonly used measure of consumer creditworthiness" used "to assess a prospective borrower's credit history and the impact of the prospect's current borrowing arrangements on their ability to repay a loan."

223.   There is a strong presumption in the mortgage lending industry that a FICO score of 660 divides prime and subprime borrowers.  The principal industry definition of "subprime" is found in the *Expanded Guidance for Subprime Lending Programs* (the "*Expanded Guidance*"), issued jointly on January 31, 2001, by the United States Office of the Comptroller of the Currency ("OCC"), the Board of Governors of the Federal Reserve System, the FDIC and the Office of Thrift Supervision. The *Expanded Guidance* was sent to Mozilo and other banking CEOs on or about February 2, 2001, and Countrywide management was required to be familiar with it.  The guidance advises financial institutions that the elevated levels of credit and other risks arising from subprime lending tend to require heightened risk management and additional capital reserves.

224.   As explained in the *Expanded Guidance:*

[t]he term 'subprime' refers to the credit characteristics of individual borrowers. Subprime borrowers typically have weakened credit histories that include payment delinquencies, and possibly more severe problems such as charge-offs, judgments and bankruptcies. They may also display reduced repayment capacity as measured by credit scores, debt-to-income ratios, or other criteria that may encompass borrowers with incomplete credit histories.

225.   The Office of Thrift Supervision's February 2001 transmittal letter advises that the *Expanded Guidance* was intended to provide, among other things, "a more specific definition of the term subprime."   Among the credit risk characteristics listed in the *Expanded Guidance* that label a borrower as "subprime" is a "[r]elatively high default probability as evidenced by, for example, a credit bureau risk score (FICO) of 660 or below (depending on the product/collateral), or other bureau or proprietary scores with an equivalent default probability likelihood."

226. Standard & Poor's, one of the principal securities rating agencies, similarly states: "Standard & Poor's considers subprime borrowers to have a FICO credit score of 659 or below." Conversely, "Standard & Poor's considers prime borrowers to have a FICO credit score of 660 or above."

227. Freddie Mac, one of the GSEs that purchased loans from Countrywide during the Relevant Period, stated in its February 2003 public guidelines that:

> FICO scores objectively evaluate all the information in the Borrower's repository credit file at the time the FICO score was created. Freddie Mac has identified a strong correlation between Mortgage performance and FICO scores.

For loans on single-family properties, Freddie Mac views a borrower with a FICO score above 660 as "likely to have an acceptable credit reputation." Further, FICO scores between 620 and 660 "should be viewed as an indication that the Borrower's willingness to repay and ability to manage obligations as agreed are uncertain." A FICO score below 620, according to Freddie Mac, "should be viewed as a strong indication" that the borrower's credit profile is "not acceptable."

228. By contrast, Countrywide employed an internal FICO of 620 – *or none at all*, and not 660, to differentiate between prime and subprime loans. In fact, Countrywide consistently made loans that were classified as prime to borrowers with FICO scores below 660, and even below 620, in proportions and amounts far greater than those suggested by the Company's top executives, and contrary to Countrywide's public assurances that it was a conservative and cautious lender in subprime loans and in general.

229. In Sambol's responses to requests for admissions in the SEC Action (reviewed by Plaintiffs' counsel), Sambol admitted that certain loans identified as "prime" in Countrywide's periodic SEC filings for years 2005 through 2007 were issued to borrowers with FICO scores below 620. He further admitted that loans

identified as "prime" in those filings were originated "based on varying levels of documentation of borrower income and/or assets," and "were originated with loan to value ratios above 95%." Mozilo and Sieracki made similar admissions in their respective responses (also reviewed by Plaintiffs' counsel).

230.   Numerous confidential witnesses confirm that Countrywide employed private standards for classifying loans as "prime" that were substantially below the industry benchmark. For example, Confidential Witness 17 ("CW17"), a former home loan consultant at Countrywide between 2001 and 2007, confirmed that Countrywide primarily distinguished between prime and subprime loans based on credit score, and that prime or "A-paper" loans "could go as low as 580." Likewise, Confidential Witness 15 ("CW15"), who worked at Countrywide for over eighteen years between 1992 and 2010 at various offices in Florida as branch operations manager, underwriting manager, senior underwriter, home loan consultant and sales manager, recalled loans to borrows with FICO scores as low as 580 considered prime at Countrywide.

231.   Countrywide's Forms 10-K deceptively described the types of loans upon which the Company's business depended.   While Countrywide provided statistics about its originations which reported the percentage of loans in various categories, the information was misleading because its descriptions of "prime non-conforming" and "nonprime" loans in its periodic filings were insufficient to inform investors what types of loans were included in those categories and that its standard for prime loans was different than in the rest of the industry.   "Prime" loans were described in Countrywide's 2005, 2006, and 2007 Forms 10-K as follows:

> Prime Mortgage Loans include conventional mortgage loans, loans insured by the Federal Housing Administration ("FHA") and loans guaranteed by the Veterans Administration ("VA").   A significant portion of the conventional loans we produce qualify for inclusion in

guaranteed mortgage securities backed by Fannie Mae or Freddie Mac ("conforming loans").  Some of the conventional loans we produce either have an original loan amount in excess of the Fannie Mae and Freddie Mac loan limit for single-family loans ($417,000 for 2006) or otherwise do not meet Fannie Mae or Freddie Mac guidelines.  Loans that do not meet Fannie Mae or Freddie Mac guidelines are referred to as "nonconforming loans."

232.  Nothing in that description informed investors that Countrywide's "prime non-conforming" category included loan products with increasing amounts of credit risk.  As noted above, guidance issued by the banking regulators referenced a FICO score at 660 or below as being an indicator of a subprime loan. Countrywide, however, did not consider *any* FICO score, even below 620, to be too low to be categorized within "prime."  The above description also did not disclose that Pay-Option ARM loans, including reduced documentation Pay-Option ARM loans, were included in the category of prime loans.  Moreover, to the extent these extremely risky loans were below the loan limits established by the GSE that purchased these loans, they would have been reported by Countrywide as prime conforming loans. In 2005 and 2006, Countrywide's Pay-Option ARMs ranged between 17% and 21% of its total loan originations.  It maintained the majority of these loans for investment portfolios at Countrywide Bank.[16]

---

[16]  In addition, "charts" of various aspects of Countrywide's servicing portfolio shown at various investor conferences which purportedly disclose, for example, that Countrywide prime loans included borrowers with credit scores below 660 and as low as 560 reflect only components of Countrywide's Servicing Portfolio, *i.e.*, the loans generating servicing fees.  These charts are not loan origination charts, nor do they reflect the content of Countrywide's retained portfolio or its exposure to the secondary market.  Nowhere is there any discussion or a tie-in between these charts and the extreme exposure Countrywide faced to secondary market repurchases and indemnity because of Defendants' gross departure from even nominal underwriting guidelines and credit risk management.

233.   Countrywide routinely referred to "prime" loans in SEC filings and other public statements *without clarifying that its unique definition of "prime" was inconsistent with the public's and industry's understanding of that term*, thereby rendering those statements misleading.   Significantly, the Countrywide periodic filings do not define "nonprime" in any way, and Countrywide's Forms 10-K and other periodic filings failed to disclose that loans in the category of subprime were not merely issued to borrowers with blemished credit, but that this category included loans with significant additional layered risk factors, such as one or more of the following factors: (1) subprime piggyback seconds, also known as 80/20 loans; (2) reduced or no documentation loans; (3) stated income loans; (4) loans with loan to value or combined loan to value ratios of 95% and higher; and (5) loans made to borrowers with recent bankruptcies and late mortgage payments.

234.   The fact that Countrywide's internal definition of "prime" was inconsistent with the public's and industry's definition remained concealed until the Company's July 24, 2007 conference call (the "July 24, 2007 Conference Call").   During the call, McMurray, the Company's CRO stated in his opening presentation that "[a] prime FICO loan − a prime loan with FICOs in the low 500s is going to be over 30 times more likely to be seriously delinquent than a prime loan with an 800 FICO, holding all other variables constant."   Later during the call, in response to a question about delinquencies among the Company's "prime mortgages," McMurray stated:

> There is a belief by many that prime FICOs stop at 620.   That is not the case.   There are affordability programs and Fannie Mae- expanded approval, as an example, that go far below 620, yet those are still considered prime.

235.   Based on this explanation and other statements made during the July 24, 2007 Conference Call, an analyst from HSBC Securities promptly stated in an analyst report that:

> [w]e do believe in some color given by management, that the definition of 'prime' (or Alt-A for that matter) was loosened in the recent boom.  Management referred to certain affordability programs where FICO scores went 'far below' 620 (which already is well below the bank regulator's definition of subprime, which has a 660 cutoff)."

The same analyst noted that "management acknowledged that the higher combined loan to value (CLTV) and reduced documentation higher CLTV products − classic speculator products − are accounting for a disproportionate share of credit costs."

236.   This analyst was plainly observing for the first time that Countrywide categorized as "prime" borrowers who should have been categorized as subprime, while lowering income documentation standards below prudent levels and increasing loan-to-value ratios above prudent levels.

237.   Likewise, a July 27, 2007 analyst report by Merrill Lynch questioned Countrywide's newly disclosed definition of "prime" as follows:

> **The Kimono comes off; Prime is not what it seems**
>
> Countrywide frequently boasts that its HELOC portfolios are high-quality prime borrowers, though it admitted on the earnings call that prime is not really prime, but really a derivative of prime.

238.   Another July 27, 2007 analyst report, by Stifel Nicolaus discussing the disappointing second quarter results, questioned the analyst's own "sanguine views" on the Company's credit exposure, stating:

> given the magnitude of the credit problems in the bank, we think mgmt made serious miscalculations (and possibly misrepresentations) about the quality of the loans added to the bank.  In the analysis we present later in this note, we find that Countrywide's home equity securitizations are performing roughly in line with LEND's [a competing subprime lender's] subprime deals.  We also find that

underwriting standards deteriorated through 2006 and have only improved slightly in 2007.

239.  The Stifel Nicolaus report further examined the gravity of Countrywide's loose lending practices and expanded definition of "prime" by disclosing that almost 20% of Countrywide's reportedly prime HELOCs in the first two quarters of 2007 were given to subprime borrowers with FICO scores of less than 660.  Moreover, almost 23% of the prime HELOCs in those quarters had a CLTV greater than 100%.  In the analyst's view, "the increasing share of sub-660 FICO, 100%+ CLTV, and second home/non-owner occupied loans [was] disturbing."

**G.   Countrywide Engaged In Widespread Predatory And Fraudulent Loan Origination Practices**

240.  A further example of Countrywide's conscious abandonment of its underwriting standards is its widespread use of deceptive lending practices during the Relevant Period.  These practices garnered Countrywide huge fees from borrowers who were extended loans they could not repay, resulting in the risk of increased defaults and foreclosures to the detriment of the Company and its investors, including Plaintiffs.

241.  Predatory lending is a practice whereby a lender deceptively convinces a borrower to agree to unfair and abusive loan terms, including interest rates and fees that are unreasonably high.  A borrower who has more assets generally poses less risk to a lender, and will typically get a better interest rate and/or few up-front fees or points on a loan as a result. However, as indicated above, Countrywide's software prevented the input of borrowers' cash reserves so that loan officers would have to pitch higher-cost loans to borrowers.

242.  On August 26, 2007, *The New York Times* ran an exposé titled *Inside the Countrywide Lending Spree,* explaining that Countrywide, as a matter of

company practice, regularly steered borrowers to risky loan programs with unfavorable terms in order to generate maximum profits for the Company:

> On its way to becoming the nation's largest mortgage lender, the Countrywide Financial Corporation encouraged its sales force to court customers over the telephone with a seductive pitch that seldom varied. "I want to be sure you are getting the best loan possible," the sales representatives would say.

> But providing "the best loan possible" to customers wasn't always the bank's main goal, say some former employees. Instead, potential borrowers were often led to high-cost and sometimes unfavorable loans that resulted in richer commissions for Countrywide's smooth-talking sales force, outsize fees to company affiliates providing services on the loans, and a roaring stock price that made Countrywide executives among the highest paid in America.

> Countrywide's entire operation, from its computer system to its incentive pay structure and financing arrangements, is intended to wring maximum profits out of the mortgage lending boom no matter *what it costs borrowers,* according to interviews with former employees and brokers who worked in different units of the company and internal documents they provided. One document, for instance, shows that until last September *the computer system in the company's subprime unit excluded borrower's cash reserves,* which had the effect of steering them away from lower-cost loans to those that were more expensive to homeowners and more profitable to Countrywide.

243. Countrywide agreed to pay borrowers $108 million in a settlement with the FTC in June 2010, based on Countrywide's charging excessive fees when borrowers fell behind on mortgages. As articulated by the FTC Chairman, Jon

Leibowitz, *Countrywide "was a business model based on deceit and corruption and the harm caused to American consumers is absolutely massive and extraordinary*."

244.   Countrywide and its management knew from the start of the Relevant Period that the Company operated within specific statutory and regulatory parameters that limited the interest rates and other fees Countrywide was legally permitted to charge borrowers and the types of sales practices the Company could employ.  Countrywide consistently assured investors during the Relevant Period that it was in compliance with these laws and regulations. Countrywide's Forms 10-K for 2003 and 2004 stated, for example:

> Currently, there are a number of proposed and recently enacted federal, state and local laws and regulations addressing responsible banking practices with respect to borrowers with blemished credit.  In general, these laws and regulations will impose new loan disclosure requirements, restrict or prohibit certain loan terms, fees and charges such as prepayment penalties and will increase penalties for non-compliance.  Due to our lending practices, we do not believe that the existence of, or compliance with, these laws and regulations will have a material adverse impact on our business.

245.   On February 4, 2003, Defendant Mozilo gave a lecture at Harvard University's Joint Center for Housing Studies, which included the following remarks:

> These [predatory lending] laws were allegedly enacted to protect borrowers from lenders who abuse the unsophisticated, low-income, elderly and minority communities by charging high interest rates and fees and fraudulently imposing unfair terms.  *These lenders deserve unwavering scrutiny and, when found guilty, an unforgiving punishment.*

246.  Despite Countrywide's assurances and Mozilo's pointed remarks, Countrywide did not comply with applicable regulatory and statutory restrictions on predatory lending.  These abusive activities by the Company, while increasing Countrywide's revenues in the short-term, posed a significantly increased risk to investors from borrower defaults that was not disclosed to the public.  Simply put, as Countrywide harmed borrowers, Countrywide put itself and therefore its investors, including Plaintiffs, at increased risk, and ultimately harmed investors, including Plaintiffs.

247.  Further, according to the *Times* exposé, "documents from the subprime unit also show that Countrywide was willing to underwrite loans ***that left little disposable income for borrowers' food, clothing and other living expenses.***" For example, one Countrywide manual stated that a borrower with a family of four could obtain a loan even if the monthly mortgage payment left the family with only $1,000 to live on for the month.  A single borrower could obtain a loan whose payment left him or her only $550 for food, clothing or other expenses for the month.

248.  A complaint filed in federal court in the Central District of California against Countrywide on December 21, 2007, illustrates the Company's predatory lending practices with respect to Pay-Option ARMs.  As alleged in that complaint, Edward Marini ("Marini") lives in Little Egg Harbor Township, New Jersey.  In or around February 2005, Mr. Marini entered into a subprime loan with another lender that was soon sold to Countrywide.  Within a few months, Countrywide contacted Mr. Marini by telephone and convinced him to refinance his mortgage with Countrywide Home Loans in the form of a Pay-Option ARM on his primary residence.  At the time of the loan, Countrywide did not disclose to Mr. Marini that his monthly payments would increase soon after taking out the loan, or that if he made the "minimum payment" the principal amount of the loan would actually increase each month.

COMPLAINT

249.   Since this refinancing, the amount of principal Mr. Marini owes has increased by approximately $17,000.  Mr. Marini has also received a "Significant Payment Increase Alert" letter from Countrywide dated August 6, 2007, indicating that the minimum payment on his mortgage will soon increase to more than double what he is currently paying, based on negative amortization.   Mr. Marini anticipates that, as a result, he will need to file for bankruptcy, because he cannot make his monthly payments and has been unable to refinance his loan with Countrywide.

250.  Similarly, on July 25, 2007, Audrey Sweet ("Sweet") of Maple Heights, Ohio, testified before Congress that Countrywide approved a mortgage that she and her husband could not afford.  When she and her husband "were finally told the amount of the monthly mortgage payment, [they] were shocked!" Although they expressed concern about the amount of the mortgage, they "were told not to worry about it, as long as [they] paid the mortgage on time for a year [they] would be able to refinance to a better rate."  Additionally, she testified that loan documents were falsified.   In this regard, Ms. Sweet stated that in subsequently reviewing her loan application, she discovered several things that she had apparently overlooked until then:

> The first was that my gross monthly income was recorded as $726 dollars more than it actually was.  Secondly, I have two sets of loan documents, one that was created 10 days before we closed and one that was created the day of closing.  The closing day documents list my assets as $9400.00 in my Charter One Bank account. I have never had $9400 in the bank.  Indeed, coming up on payday, I am fortunate to have $94 left!  The final item I noticed was that the tax amount listed on the appraisal report was $1981.34, which comes to about $165.00 a month but Countrywide listed $100.00 a month as the tax amount.

251.   Because Ms. Sweet and her husband could not afford their mortgage payments, they face default and foreclosure.  Countrywide's increased risk of not being able to collect on the Sweets' mortgage put investors, including Plaintiffs, at increased risk.

252.   A November 13, 2008, *Business Week* story corroborates accounts that fraud was "rampant" in Countrywide offices throughout the country and was known to Countrywide headquarters.   According to a former Countrywide wholesaler John Sipes ("Sipes"), "underwriters at the Santa Monica (Calif.) and Beverly Hills branches of Countrywide often shredded tax documents they received from borrowers to destroy proof of the borrowers' incomes and extend bigger loans than they could afford."  The story revealed:

> The practice was so rampant in those two branches that the corporate offices launched an internal probe.   Each night, Sipes says, Countrywide investigators collected the bins from paper shredders and analyzed their contents.   After a while, he says, the branch managers told them: "Don't put anything in the shredder bins at work.  If you're going to shred, take it home."

253.   To highlight just how simple it could be to borrow large amounts of money, Countrywide marketed one of its stated-income products as the "Fast and Easy Loan."   The March 22, 2009, *Dateline NBC* episode detailed specific instances of mortgage fraud at Countrywide, including a borrower who earned less than $20,000 a year but who Countrywide loaned the full purchase price of a $260,000 home (in two loans – a 2/28 ARM, and piggyback second at 11% interest) based on an application that falsely listed her income at $7,300 a month – more than four times her real monthly income.  According to the borrower, Paula Taylor, Countrywide "finagle[d] the numbers to say that I could afford the property."

254.   According to Brian Koss ("Koss"), a senior regional vice president at Countrywide who was interviewed for a January 17, 2008 *BusinessWeek* article, Countrywide "approached making loans like making widgets, focusing on cost to produce and not risk or compliance."   Koss, who spent four years running fifty-four Countrywide branches in New England and upstate New York, stated that it was well known within Countrywide that the "Fast and Easy Loans" programs were abused and misused by loan officers who were more concerned with "getting the deal done."

255.   According to an article by William K. Black and L. Randall Wray (both professors of economics at the University of Missouri, Kansas City) for the *Huffington Post* on November 4, 2010, a review of the high delinquency rates for Countrywide loans acquired by Bank of America leads to the conclusion that fraud must have been rampant in Countrywide's loan originations:

> [T]hese data suggest that the delinquency/foreclosure rate for Countrywide-originated mortgages must have been well over 20 percent − over ten times the normal delinquency rate and four times the traditional rule of thumb for fatal losses.   These exceptionally large rates of horrible loans, defaulting so quickly after origination, are a powerful indicator that Countrywide was engaged in accounting control fraud.

256.  The Mortgage Guaranty Insurance Corporation ("Mortgage Guaranty"), an insurer of mortgage lenders against borrower defaults, is also embroiled in litigation with Countrywide.  Mortgage Guaranty filed an arbitration demand against Countrywide seeking to exercise its right to refuse to pay insurance claims on stated-income loans on which the borrowers defaulted, claiming that Countrywide's representations regarding the loans were "riddled with materially false information."   In order to support its demand, Mortgage Guaranty hired investigators to root out representative examples of Countrywide's fraud, and

provided ten of these representative examples in the complaint.  In one example, a borrower's application listed his occupation as a dairy foreman with a monthly stated income of $10,500.  With those credentials, he qualified for a $350,000 primary residence mortgage loan with a reported debt-to-income ratio of 43.26%, within Mortgage Guaranty's eligibility threshold.  After the borrower defaulted and Countrywide submitted a claim to Mortgage Guaranty, the insurer investigated the claim and uncovered the following facts:  the borrower was actually a dairy milker making $1,100 per month who was not purchasing the home as a primary residence, and had a debt-to-income ratio of 403.40%, nearly ten times higher than what was represented by Countrywide.  What is most shocking is that the borrower disclosed all of this information to the Countrywide loan officer:

> [The borrower] disclosed his true employment, his actual income, and his intention to help [borrower's son] purchase the property to loan officer [redacted]. [Loan officer] falsely informed [borrower] that [borrower] could help his son buy the home without bearing responsibility for the monthly mortgage payments. [Loan officer] described the transaction to [borrower] as "lending your son your credit."  [Borrower], who cannot read English, signed the closing documents where [loan officer] told him to.  [Loan officer] knew that [borrower] never intended to live at the property or to make any mortgage payments.  The mortgage broker was completely aware of this fraud, according to the complaint. Nonetheless, the borrower got a $350,000 mortgage.

257.  The other examples in the *Mortgage Guaranty* action provide similar evidence of misfeasance, including inflated debt-to-income based on falsified income and loan-to-value ratios due to falsified appraisals, along with other deficiencies, all stemming from stated or reduced documentation loan applications which made it easy for the borrower and loan officer to falsify information.  The

complaint by Mortgage Guaranty reads: "By about 2006, Countrywide's internal risk assessors knew that in a substantial number of its stated-income loans – fully a third – borrowers overstated income by more than 50 percent." The complaint adds, "Countrywide deliberately disregarded these and other signs of fraud in order to increase its market share."

258. Despite Mozilo's public statements criticizing other lenders for engaging in predatory lending practices, Countrywide has been the target of numerous state and federal investigations and proceedings regarding its lending, underwriting, and appraisal practices during the Relevant Period.

259. To date, Countrywide has entered into agreements to settle charges of violations of predatory lending, unfair competition, false advertising, and banking laws with the Attorneys General of at least thirty-nine states, including Alaska, Arizona, California, Colorado, Connecticut, Delaware, Florida, Georgia, Iowa, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Maine, Michigan, Mississippi, Montana, Nebraska, Nevada, New Jersey, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Dakota, Tennessee, Texas, Virginia, Washington, West Virginia, Wisconsin, and Wyoming. The Attorneys General of these states alleged that Countrywide violated state predatory lending laws by (i) making loans it could not have reasonably expected borrowers to be able to repay; (ii) using high pressure sales and advertising tactics designed to steer borrowers towards high-risk loans; and (iii) failing to disclose to borrowers important information about the loans, including the costs and difficulties of refinancing, the availability of lower cost products, the existence and nature of prepayment penalties, and that advertised low interest rates were merely "teaser" rates that would adjust upwards dramatically as soon as one month after closing.

260. These settlements include a landmark, multi-state *$8.68 billion settlement* to provide foreclosure and financial relief for those victimized by

Countrywide's lending practices, including up to $3.5 billion to California borrowers.   Pursuant to the agreement, Bank of America agreed to pay to restructure (modify) up to 390,000 Countrywide subprime and Pay-Option ARM loans.   "With this settlement, homeowners will receive direct relief from the ***catastrophic damage caused by Countrywide***," said California's then-Attorney General Jerry Brown.   "***Countrywide's lending practices turned the American dream into a nightmare for tens of thousands of families by putting them into loans they couldn't understand and ultimately couldn't afford.***"

261.   The substantiated allegations in the complaints filed as part of these investigations further confirm the internal Countrywide documents and insider testimony discussed herein.   For example, the Illinois Attorney General investigated Countrywide's loan practices and, on June 25, 2008, filed an action in the Chancery Division of the Circuit Court of Cook County, Illinois, entitled *Illinois v. Countrywide Fin. Corp., et al.*, No. 08CH22994 (the "Illinois AG Complaint").   The California Attorney General also investigated Countrywide's lending activities and filed a complaint in the Northwest District of the Superior Court for Los Angeles County, entitled *California v. Countrywide Fin. Corp., et al.*, No. LC081846 (the "California AG Complaint").   Many of the allegations in the Illinois and California AG Complaints were confirmed by investigations in other states such as Connecticut, Washington, West Virginia, Indiana and Florida. Significantly, on October 6, 2008, Countrywide announced that it had settled the claims brought by eleven states, including California and Illinois, agreeing to implement an estimated $8.4 billion program to modify pre-2008 Countrywide-originated mortgages.

262.   According to the Illinois AG Complaint, Countrywide employees whom the Illinois Attorney General interviewed stated that Countrywide originated loans that did not meet its underwriting criteria because Countrywide employees were incentivized to increase the number of loan originations without concern for

whether the borrowers were able to repay the loans.  With respect to stated income loans, Countrywide employees explained to the Illinois Attorney General that, while Countrywide had a "reasonableness standard" in order to check fraudulent stated income, employees were only required to use their judgment in deciding whether or not a stated income loan seemed reasonable.  To supplement an employee's judgment as to whether or not a potential borrower's income was "reasonable," beginning in 2005, Countrywide required its employees to utilize a website, www.salary.com, to determine the reasonableness of a potential borrower's stated income.  However, this website was actually used by Countrywide employees to gauge how much income needed to be "stated" in order to approve the loan, regardless of whether that stated income was legitimate.  Even if the stated salary was outside of the range provided by the website, Countrywide employees could still approve the loan.

263.   A former California loan officer for Countrywide quoted in the California AG Complaint further explained that Countrywide's loan officers typically explained to potential borrowers that "with your credit score of X, for this house, and to make X payment, X is the income that you need to make," after which the borrower would state that he or she made X amount of income.

264.   The Illinois AG Complaint also alleges that Countrywide employees did not properly ascertain whether a potential borrower could afford the offered loan, and many of Countrywide's stated income loans were based on inflated estimates of borrowers' income.  For example, according to the Illinois AG Complaint: (i) a Countrywide employee estimated that approximately 90% of all reduced documentation loans sold out of a Chicago office had inflated incomes; and (ii) one of Countrywide's mortgage brokers, One Source Mortgage Inc., routinely doubled the amount of the potential borrower's income on stated income mortgage applications.

265.   Similar to the Illinois AG Complaint, the California AG Complaint also alleged that Countrywide departed from its stated underwriting standards.  For example, the California AG Complaint alleged that employees were pressured to issue loans to unqualified borrowers by permitting exceptions to underwriting standards, incentivizing employees to extend more loans without regard to the underwriting standards for such loans, and failing to verify documentation and information provided by borrowers that allowed them to qualify for loans.  The California AG Complaint further alleged that Countrywide deceived borrowers by misrepresenting loan terms, loan payment increases, and borrowers' ability to afford loans.

266.   Countrywide's predatory lending was also the subject of an investigation by a panel of the United States Senate.  During an August 29, 2007 press conference, reported in *The Wall Street Journal,* the panel's chairman, Senator Charles Schumer, stated:

> [Countrywide] brokers . . . can earn an extra 1 percent of the loan's value in commission by adding a three-year prepayment penalty to loans . . . . "Countrywide's most lucrative brokers are those that make bad loans that are ***largely designed to fail the borrower."***

267.   Finally, according to the FCIC Report, Countrywide had about 5,000 internal referrals of potentially fraudulent activity in its mortgage business in 2005, 10,000 in 2006, and 20,000 in 2007, according to Francisco San Pedro, the former Senior Vice President of Special Investigations at the Company.  But it filed only 855 Suspicious Activity Reports with the Financial Crimes Enforcement Network in 2005, 2,895 in 2006, and 2,261 in 2007.

268.   Countrywide also failed to disclose that it used the appraisal process to inflate the purported value of properties because doing so would result in lower LTV ratios.  A lower LTV ratio would allow a loan to be approved when it otherwise would not be, and would appear less risky to Plaintiffs and other

investors.  But loans based on inflated appraisals are more likely to default and less likely to produce sufficient assets to repay the second lien holder in foreclosure. Part of Countrywide's plan to increase market share and to make as many loans as possible also involved the practice of pressuring and intimidating appraisers – many of which were affiliated with Countrywide and thus had a conflict of interest – into using appraisal techniques that met Countrywide's business objectives even if the use of such appraisal techniques was improper and in violation of industry standards and routinely circumvented.   Defendants knew the appraisals were inaccurate because, as detailed herein, Countrywide itself required the use of specific appraisers, pressured appraisers to falsely inflate the appraised values, and blacklisted appraisers who did not comply.

269.   Because of the importance of appraisals in the home lending market, state and federal statutes and regulations require that appraisals be accurate and independent.   The Uniform Standards of Professional Appraisal Practice ("USPAP"), incorporated into federal law, 12 C.F.R. § 34.44, requires appraisers to conduct their appraisals independently: "An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests. In appraisal practice, an appraiser must not perform as an advocate for any party or issue."  USPAP Ethics Rule (Conduct).

270.   A civil complaint filed by a real estate appraisal company Capitol West Appraisals, LLC ("Capitol West") provides compelling evidence that Countrywide encouraged and engaged in a practice of pressuring real estate appraisers to artificially increase appraisal values for properties underlying mortgages Countrywide originated and/or underwrote.   According to the complaint, Countrywide loan officers sought to pressure Capitol West to increase appraisal values for three separate loan transactions.  When Capitol West refused to vary the appraisal values from what it independently determined was appropriate, Countrywide placed Capitol West on its "Field Review List," or an Exclusionary

List.  The Field Review List or Exclusionary List was a Countrywide database containing the names of appraisers whose reports Countrywide would not accept unless the mortgage broker also submitted a report from a second appraiser. According to the complaint, the practical effect of being placed on the Field Review List was to be "blacklisted" – no mortgage broker would hire an appraiser appearing on the Field Review List to review a property sale in which Countrywide would be the lender because the broker simply would not pay to have two appraisals done.  Instead, the broker would simply retain another appraiser who was not on the Field Review List.  While an honest lender might have a legitimate purpose to maintain a list of appraisers it was unwilling to use, Capitol West claimed that Countrywide was falsely and fraudulently using their Exclusionary List to punish and retaliate against appraisers who even attempted to maintain the designed integrity and independence of the appraisal process.

271.   According to Capitol West, Countrywide created certain procedures to further enforce its blacklisting of uncooperative appraisers.  For example, if a mortgage broker were to hire an appraiser that happened to be on the Field Review List, Countrywide used its wholly owned subsidiary, LandSafe, Inc. ("LandSafe"), to perform an appraisal and cut off the offending appraiser.  As part of the scheme, LandSafe performed a "field review" of the appraisal performed by the blacklisted appraiser, which was specifically intended to "shoot holes" in the appraisal. LandSafe's appraisal would then be used to complete the loan.

272.   In addition, allegations in the whistleblower complaint filed in the Southern District of Texas, *Zachary v. Countrywide Fin. Corp., et al*., No. 4:08-cv-01464, by Mark Zachary ("Zachary") (a former Regional Vice President of Countrywide's joint venture with KB Home), against Countrywide, confirm that the Company blatantly ignored its underwriting policies and procedures by knowingly relying on overstated, low-quality appraisals that failed to conform to industry standards.  In September 2006, Zachary informed Countrywide about the

questionable use of only one appraiser to perform all of the appraisals on KB Home properties being purchased with Countrywide's loans.   According to Zachary, Countrywide executives knew that the appraiser was being strongly encouraged to inflate appraisal values by as much as 6% to allow homeowners to "roll up" all closing costs.   According to Zachary, this practice resulted in borrowers being "duped" as to the values of their homes.   This also made loans more risky because when values were falsely increased, LTV ratios calculated with these phony numbers were necessarily incorrect.   Zachary also stated that Countrywide loan officers were permitted to discard appraisals that did not support loans in favor of appraisals by replacement appraisers that supported a qualifying LTV ratio.

273.   Zachary also advised Countrywide executives that this practice misled investors who later purchased these loans through securitizations because these investors were not made aware that the actual home values were less than the inflated appraised values.   According to Zachary, the inflated appraised values put buyers "upside down" on their homes immediately after purchasing them; that is, the borrowers immediately owed more than their homes were worth.   Thus, the buyers were set up to be more susceptible to defaulting on their loans.   This practice also put Countrywide at risk because they deliberately were unaware of the true value of the assets on which the Company was loaning money.   Zachary brought his concerns first to the executives of the Countrywide/KB Homes joint venture, but when he was "brushed aside" by them, he turned to Countrywide executives in Houston, the Company's Employee Relations Department and finally the Company's Senior Risk Management Executives.   In January 2007, an audit

was conducted and brought to the attention of these Countrywide executives which corroborated his concerns.[17]

274.   Countrywide and its appraisal subsidiary, LandSafe, have also been sued by Fannie Mae and Freddie Mac investors for damages arising from inflated appraisals for property underlying mortgage packages sold to both Fannie Mae and Freddie Mac.

## VI.   DEFENDANTS CAPITALIZED ON THE FRAUD

### A.   Countrywide's Compensation Structure

275.   Countrywide's strategy shift from traditional lending to a "pump and dump" operation was further fueled by a compensation structure, devised and approved by management, that was closely linked to loan volume and not tied to the quality of loans originated.   This structure facilitated a widespread and pervasive abandonment of sound risk management at the Company, an increase in the volume of exception loans that were processed, and an extraordinary amount of falsified data entered into Countrywide's computer systems.   According to a former

---

[17]   The offering materials in connection with the RMBS offerings also failed to disclose Countrywide's use of inflated appraisals.   For example, prospectus supplements represented, for example, that independent appraisals were prepared for the properties and the LTV ratios did not exceed maximums ranging from 65% to 100%, depending on the offering.   These representations were false because: (i) the appraisers were not independent from Countrywide, which pressured appraisers to provide inflated, false values; and (ii) the actual LTV ratios for many mortgage loans underlying the RMBS would have exceeded 100% if the properties had been independently appraised.   Offering documents also represented that over 93% of the RMBS were worthy of being rated "AAA," signifying that the risk of loss was virtually non-existent, and that the remaining RMBS were worthy of being rated investment grade – "AA" or "A" – signifying that the risk of loss was minimal. Prospectus supplements represented that "[t]he ratings . . . address the likelihood of the receipt of all distributions on the mortgage loans by the related certificate holders under the agreements pursuant to which the certificates are issued." Defendants, however, provided inaccurate information to the rating agencies and knew that the ratings were therefore unreliable.

COMPLAINT

sales representative quoted on August 26, 2007, in *The New York Times* exposé, "[t]he whole commission structure in both prime and subprime was designed to reward salespeople for pushing whatever programs Countrywide made the most money on in the secondary market."

276.   Countrywide's executives knew that the Company's incentive compensation schemes inappropriately incentivized brokers and branch managers to sell Pay-Option ARM loans over any other mortgage product.  With respect to the issue of employee compensation by mortgage lenders, the *Interagency Guidance* provided the following cautionary guidance:

> Attention should be paid to appropriate legal review and to using compensation programs that do not improperly encourage lending personnel to direct consumers to particular products.

> \* \* \*

> Further, institutions should consider the effect of **employee incentive programs** that could produce higher concentrations of nontraditional mortgage loans.

277.   Notwithstanding this clear guidance, Countrywide awarded its lending personnel powerful incentives to approve loans regardless of quality.  According to a February 2008 article in *The Wall Street Journal,* Countrywide was so focused on growing loan origination that in at least one building, oversized replicas of monthly bonus checks were hung above employees' cubicles so everyone could see which employees were most successful in originating new mortgages.  Brokers who induced borrowers to take out subprime loans were even rewarded in some instances by prizes such as all-expense-paid trips to Las Vegas.  According to an October 27, 2007 article, the Company secretly encouraged employees to sell Pay-Option ARMs and sold them to borrowers who did not fully understand their terms:

COMPLAINT

In one California branch office, employees could win prizes, such as a trip to Hawaii, for selling the most option ARMs, says Cindy Lau, who worked for the company for more than six years.  Only a small portion of borrowers "understood the loan and knew what they were getting themselves into," Ms. Lau adds.

278.   Terry Garner, a former Countrywide loan officer in Twin Falls, Idaho during the Relevant Period commented to *The Wall Street Journal* that pressure from superiors to boost loan volumes created "unbelievable" stress levels at Countrywide.

279.   Countrywide also encouraged brokers to add prepayment penalty terms to loans. A broker's sales commission would be increased by 1% if he or she added a three-year prepayment penalty to a loan.  Additionally, if a broker convinced a borrower to take out a HELOC in addition to a mortgage loan − which was commonplace in the Company's sales of so-called 80/20 loans − the broker received an extra 0.25% commission.

280.   Simply put, Countrywide's whole business was designed with the goal of originating loans and selling them to the secondary markets as quickly as possible, regardless of the quality of the loans, the suitability of the products for the borrower, or the number and magnitude of exceptions to Countrywide's supposedly sound underwriting standards. Any incentive the Company (or its employees) may have had to ensure that borrowers could repay the loans was outweighed by the incentive to originate, bundle and sell as many loans as possible; accordingly, almost anyone could get a loan from Countrywide, even if he or she had very little ability to pay it back.

**B.**     **Defendants' Substantial Insider Selling**

281.   Defendants Mozilo and Sambol, as well as other Countrywide officers and directors, engaged in substantial insider trading in Countrywide securities during the Relevant Period while Countrywide's stock was trading at artificially

inflated prices.   This insider trading made Countrywide officers and directors absurdly rich, and reinforces the already strong inference of scienter pleaded herein.  In particular, the insider trading constitutes strong evidence of a high level of scienter, given the amount and percentage of shares sold, the amount of sales compared with the officer or director's prior trading history, and the timing of the sales.

282.   Rampant insider selling occurred at Countrywide during the Relevant Period.  Between 2004 and the end of 2007, Countrywide officers and directors sold nearly $850 million of their stock at artificially inflated prices, led by Mozilo (who sold over $476 million); President and COO Kurland (who sold over $191 million); and COO Sambol (who sold over $69 million).

283.   The amount and percentage of the insider sales during the Relevant Period were extraordinarily large.  Mozilo's Relevant Period sales of Countrywide common stock, for example, totaled nearly a ***half-billion dollars***, representing almost 75% of the total shares he had available for sale during the Relevant Period. He disposed of over thirteen million shares at an average price of over $35.00. By comparison, after the fraud was fully revealed, Bank of America valued Countrywide at only $4.33 per share.

284.   Kurland, Countrywide's President and COO from before the Relevant Period until September 2006, sold nearly $200 million of his stock, representing more than 90% of his total holdings.  Likewise, Sambol sold nearly half of his total holdings, for proceeds of more than $64 million.

285.  The chart below summarizes the sale of significant amounts of Countrywide common stock by Mozilo, Kurland, Sambol, and certain other officers and directors of the Company:

| Defendant | Date Of Sales | Shares Disposed | Proceeds |
|---|---|---|---|
| **Mozilo** | **5/5/04 – 10/12/07** | **13,344,835** | **$476,487,845.75** |
| **Kurland** | **1/7/04 – 10/9/06** | **5,532,843** | **$196,621,453.71** |
| **Sambol** | **1/2/04 – 7/19/07** | **1,849,405** | **$69,878,744.13** |
| Garcia | 3/12/04 – 6/21/07 | 1,638,595 | $64,264,344.81 |
| Robertson | 11/15/05 – 7/27/07 | 272,000 | $10,215,668.00 |
| Dougherty | 11/29/04 – 6/15/07 | 227,905 | $9,191,552.73 |
| Snyder | 9/21/04 – 12/19/06 | 206,400 | $7,960,864.30 |
| Cisneros | 11/29/04 – 5/30/07 | 153,475 | $5,637,373.36 |
| Donato | 12/29/04 – 12/15/06 | 151,370 | $5,461,032.90 |
| Cunningham | 4/3/06 – 2/2/07 | 75,000 | $3,006,700.00 |
| **TOTALS** | | **22,169,086** | **$848,598,338.75** |

286.   In addition to being substantial in absolute and percentage terms, the insider selling was extraordinary when compared to prior selling activity.   For example, Mozilo's Relevant Period shares sales increased *over 300%* compared to the number of shares he sold during the equal-length period immediately preceding the Relevant Period, beginning March 16, 2000 and ending March 11, 2004 (the "Control Period"), as demonstrated below:



287.   The proceeds from Mozilo's sales also increased dramatically – over 800% from the Control Period, as demonstrated below:



288.   Likewise, Sambol's sales tripled, and Kurland's sales quadrupled during the Relevant Period when compared to their respective stock sales during

the Control Period.   The contrast is striking whether measured in terms of percentages, shares, or dollars.

289.   This high rate of selling is particularly suspicious because it occurred just as Countrywide initiated two stock repurchase programs, the first on October 24, 2006, and the second on May 16, 2007.   In October 2006, Countrywide authorized a share repurchase program of up to $2.5 billion, signaling to the market that the Company believed its shares to be underpriced.[18]   The market reaction to this announcement, and Defendants' other false and misleading statements detailed herein, was strong.   From November 2006 to February 2007, Countrywide's share price rose over $6.50 per share to arrive at an all-time high of $45.03 per share on February 2, 2007.   While publicly proclaiming through the repurchase announcement that Countrywide shares were being traded at a bargain price, however, senior officers and directors were aggressively liquidating their own stock holdings.   In the fourth quarter of 2006 alone, the Company spent $1.5 billion repurchasing 38,639,876 shares with an average price of $38.83 per share.   At the same time, Company officers and directors *sold* over 1.2 million shares of Countrywide stock, to correspond with the repurchase program and increased share price, for profits of approximately $52 million.   Then, in the second quarter of 2007, the Company spent an additional $900 million to repurchase 21,503,512 shares at an average price of $40.37 per share.   At the same time, Company officers and directors sold approximately 2.5 million shares of Countrywide stock for profits of approximately $96 million while the Company repurchased shares.   In

---

[18]   As the *Daily News* of Los Angeles noted in reporting on Countrywide's first $2.5 billion stock, "[c]ompanies typically buy back stock when they think it is undervalued."   Gregory J. Wilcox, *Housing Slowdown Costs Jobs*, Daily News of L.A., Oct. 25, 2006.   However, insiders usually sell their personal stock when they believe it is *over*valued.

effect, the Company was increasing or supporting the stock price while allowing insiders to sell at the artificially inflated prices.

290.   As Judge Pfaelzer queried in denying Defendants' motion to dismiss in the related derivative case, ***"How could the [Countrywide] Board members approve a repurchase of $2.4 billion dollars worth of stock, and nearly contemporaneously liquidate $148 million of their personal holdings just months before the stock dropped some 80-90%?"***

291.   The insider trading is even more suspicious considering Mozilo's frequent revisions to his supposedly "passive" Rule 10b5-1 stock sale plan to sell additional shares each month, all while the Company incurred billions from repurchasing its own shares.

292.   Rule 10b5-1 stock sale plans were created to allow corporate insiders to sell stock based on predetermined triggers, like specified dates or prices, without any direct involvement.  Recent academic studies have argued that executives are manipulating such plans, which have been described as "Mozilo plans" due to his extensive use of them.  As a senior compensation analyst for the Corporate Library told the *Los Angeles Business Journal*, "[t]his Mozilo clause is clearly a loophole in the entire trading system . . . it's obviously a way for executives like him to enrich themselves, and it's highly convenient that most of his transactions tend to coincide with a negative earnings release."

293.   As CEO, Mozilo was the public face of Countrywide and its biggest booster.  And for years, he backed-up his cheerleading by accumulating equity in Countrywide and insisting that for as long as he worked there, he would not sell any Countrywide stock except to the extent he was forced to do so by expiring purchase options.  In late 2006, however, Mozilo experienced a change of heart. During that year, as detailed below, Mozilo became aware of numerous red flags concerning Countrywide's deteriorating underwriting guidelines and practices, its eroding credit risk profile and ability to manage that risk, the state of its portfolio,

and the significant threats these trends posed to the Company's financial well-being.  For example, he learned that Countrywide would be forced to repurchase certain subprime second mortgages − which he described as "toxic" and "the most dangerous product in existence" − because of "errors in both judgment and protocol" by Countrywide.  He received data that loan quality was deteriorating beyond expectations on pay-option adjustable loans, with a resulting increase in credit risk to Countrywide.  Indeed, Mozilo urged others in senior management to sell off the pay-option loans held in the portfolio of Countrywide's internal bank because the Company was "flying blind" as to the true severity of the credit risk they posed.  Moreover, Mozilo knew by late 2006 that subprime loans originated in 2006 would be the worst performing in history, in significant part because of Countrywide's virtual abandonment of its purportedly "prudent" underwriting standards.

294.   Mozilo, therefore, began to hedge his bets.  On October 27, 2006, Mozilo executed two trading plans, one designed to sell 3,989,588 shares of Countrywide stock and one designed to sell another 91,999 shares.  This was done just as Countrywide was approving the substantial share repurchase described above.  Further, Mozilo gave final approval to create this plan on September 25, 2006, a mere one day before sending his internal email detailed above stating that Countrywide was "flying blind" regarding the performance of its Pay-Option loans.  On November 13, 2006, Mozilo executed a trading plan designed to sell another 100,000 shares of Countrywide stock.  On December 12, 2006, he executed a trading plan to sell another 1,389,580 shares of Countrywide stock.  Contemporaneous with entering into this plan, Mozilo acknowledged to Countrywide's Board of Directors that Countrywide had lowered underwriting guidelines in every conceivable area, thereby increasing the Company's credit risk exposure.  And, on February 2, 2007, Mozilo amended the December plan to sell an additional 1,393,197 shares (bringing the total number of shares to be sold

under the December plan to 2,782,777). The shares sold pursuant to those trading plans yielded Mozilo gross profits (net of the strike prices) of more than $140,000,000.

295.   On September 29, 2007, *The Los Angeles Times* published an article titled:  "CEO sold as stock dropped; Countrywide's Mozilo made changes to trading plan that raise red flags, experts say.  Firm says sales followed policy."  The article quoted noted experts finding the sales very suspicious:

> Although trading plans usually protect executives against allegations that they traded on inside information, experts say Mozilo may have weakened his defense by making changes in a relatively short period of time.
>
> "***This raises a slew of red flags***," said Andrew Stoltmann, a Chicago-based securities lawyer.  "Anytime you have revisions or modified plans . . . ***it is extremely suspicious.***"
>
>          *        *        *
>
> Thom F. Carroll, a financial planner with the Baltimore wealth management firm Carroll, Frank & Plotkin, said revising such a plan puts an executive "on a slippery slope."
>
> "There are circumstances where the plans could be amended, but you better have a good reason because ***it's defeating the basis of the rule***," Carroll said.  "***If a guy is changing his plan around, I would think that would send up a red flag.***  I wouldn't allow my clients to do it."

296.   The following diagram, published in an article titled "Mozilo's stock trades questioned," by *The Los Angeles Times*, on October 12, 2007, illustrates Mozilo's repeated amendments of his supposedly "passive" stock sales program just before the collapse of Countrywide's stock price:



**Mozilo's trading plans**

Angelo Mozilo adopted a stock trading plan Oct. 27, when the share price was $38.30. He filed a new plan Dec. 12 and revised it Feb. 2. Most executives avoid making changes quickly, experts say.

Countrywide's share price, daily closes

Feb. 2, 2007: **$45.03**

Dec. 12, 2006: **$40.50**

Oct. 27 2006: **$38.30**

Friday: **$19.01**

**Oct. 27, 2006:** New plan allows Mozilo to sell 350,000 shares a month.

**Dec. 12, 2006:** Mozilo files trading plan to sell an additional 115,000 shares a month.

**Feb. 2, 2007:** Mozilo amends plan, can now sell 580,000 shares a month. Countrywide stock trades at an all-time high.

Sources: Bloomberg News, Countrywide, regulatory filings, Times research

297.   As Judge Pfaelzer recognized in denying defendants' motion to dismiss in the related derivative action, Mozilo's repeated amendments to his trading plans to multiply the number of shares he was selling at the peak of Countrywide's stock price "defeat the very purpose of 10b5-1 plans, which were created to allow corporate insiders to 'passively' sell their stock based on triggers."

## VII.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

298.   During the Relevant Period, Defendants made many untrue statements of material fact and many material omissions necessary to make their statements not misleading.   These statements generally fall within three broad categories. First, Defendants issued false statements regarding the Company's underwriting practices.   In fact, at the same time Countrywide loosened and abandoned its loan origination and underwriting standards, it falsely assured investors and analysts that the Company's policies and procedures for underwriting loans were tightly

controlled, conservative, superior, disciplined and "designed to produce high quality loans."   Second, Defendants issued false statements regarding the Company's exposure to the subprime market.   Third, Defendants issued false financial results.

**A.** **The Company's False**
**Statements Regarding 2003 Results**

**1.** **2003 Form 10-K**

299.   The Relevant Period begins on March 12, 2004, when Countrywide filed its Annual Report for 2003 with the SEC on Form 10-K ("2003 Form 10-K"). The report was signed by Defendant Mozilo and others.

300.   The 2003 Form 10-K reported consolidated loan production by loan type. Specifically, prime first mortgage loans equaled $396,934,000,000, prime home equity loans equaled $18,103,000,000, and subprime mortgage loans equaled $19,827,000,000.  Subprime mortgages produced equaled 4.6% of the total dollar amount of loans produced at year end.

301.   The Company also reported Mortgage Banking loan production by loan type in the 2003 Form 10-K.  Mortgage Banking produced $12,268,000,000 in prime home equity loans and $15,525,000,000 in subprime loans at year end. Prime home equity loans and subprime loans equaled 7.0% of the total Mortgage Banking loans originated at year end.

302.   Furthermore, the Company reported that prime and prime home equity loans held for investment ("LHI") equaled $22.0 billion at year end.

303.   In a section of the 2003 Form 10-K titled "Secondary Mortgage Market," the Company stated that:

[w]e ensure our ongoing access to the secondary mortgage market by **consistently producing quality mortgages** . . .  As described elsewhere in this document, **we have a major focus on ensuring the quality of our mortgage loan production**. . . .

---

COMPLAINT

304.   In a section of the 2003 Form 10-K titled "Mortgage Credit Risk," the Company described its Credit Policy, portraying it as a tightly controlled and supervised process "designed to produce high quality loans" through a rigorous pre-loan screening procedure and post-loan auditing and appraisal and underwriting reviews:

**Mortgage Credit Risk**

**Overview**

In our mortgage lending activities, ***we manage our credit risk by producing high quality loans*** . . . .

* * *

**Loan Quality**

Our Credit Policy establishes standards for the determination of acceptable credit risks.   Those standards encompass borrower and collateral quality, underwriting guidelines, and loan origination standards and procedures.

Borrower quality includes consideration of the borrower's credit and capacity to pay.   We assess credit and capacity to pay through . . . manual or automated underwriting of additional credit characteristics.

* * *

***Our loan origination standards and procedures are designed to produce high quality loans***.   These standards and procedures encompass underwriter qualifications and authority levels, appraisal review requirements, fraud prevention, funds disbursement controls, training of our employees and on-going review of their work. . . .   In addition, we employ proprietary underwriting systems in our loan origination process that improve the consistency of underwriting standards, assess collateral adequacy, and help to prevent fraud, while at the same time increasing productivity.

COMPLAINT

In addition to our pre-funding controls and procedures, ***we employ an extensive post funding quality control process.*** Our quality control department, under the direction of the Chief Credit Officer, is responsible for completing comprehensive loan audits that consist of a re-verification of loan documentation, an in depth underwriting and appraisal review, and if necessary, a fraud investigation. We also employ a post-funding proprietary loan performance evaluation system. This system identifies fraud and poor performance of individuals and business entities associated with the origination of our loans. The combination of this system and our audit results ***allows us to evaluate and measure adherence to prescribed underwriting guidelines and compliance to laws and regulations to ensure that current loan production represents acceptable credit risk, as defined by the Board of Directors.***

305. Further assuring investors of the veracity of the information contained in the 2003 Form 10-K, the report included the Sarbanes-Oxley Act certifications signed by Mozilo. The certifications falsely stated, in part, that: (a) the Form 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading"; (b) the financial statements "fairly present in all material respects the financial condition, results of operations and cash flows" of Countrywide; and (c) "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect [Countrywide's] ability to record, process, summarize and report financial information" were "disclosed."

306. The statements referenced above in the 2003 Form 10-K were materially false and misleading when made. As set forth herein, management's statements relating to the volume of loans produced, the amount of revenues from

the sale of prime loans and the value of prime LHI were false and misleading because Countrywide misclassified subprime loans as prime loans. *See* Section V.F. Countrywide's statements that it "consistently produce[d] quality mortgages" and that its "loan origination standards and procedures are designed to produce high quality loans" were false and misleading because Countrywide loosened and abandoned its underwriting guidelines beginning in 2003 and through the period alleged in this Complaint, to increase loan volume without regard to loan quality and to increase earnings and market share, and also for the reasons set forth in Sections V.C. and V.G. Moreover, the Sarbanes-Oxley Act certifications signed by Mozilo were false and misleading because the 2003 Form 10-K contained untrue statements of material fact or omitted to state material facts necessary to make the statements made not misleading. *See* Sections V.C. and V.F.

307. Analysts reacted positively to the materially false and misleading statements made in the 2003 Form 10-K. For example, on March 26, 2004, Lehman Brothers issued a report in which it reiterated an overweight rating for Countrywide. "Despite the unlikel[i]hood of any net MSR recovery during the quarter, we expect CFC to earn MORE, which again demonstrates the resiliency of its business model. We reiterate our 1-Overweight rating."

308. On March 26, 2004, Piper Jaffray reiterated its:

Outperform rating and [stated that they] are raising . . . [the] target price to $135 from $134. . . . We believe CFC is fundamentally well positioned to deliver double-digit long-term earnings growth.

**B. The Company's False Statements Regarding 2004 Results**

**1. First Quarter 2004 Form 8-K**

309. On April 21, 2004, Countrywide filed a Form 8-K, signed by then-President Kurland, attaching a press release that announced the Company's financial results for the first quarter of 2004. In the press release, Countrywide

reported gain-on-sale of loans and securities of $1,358,667,000, revenues of $2,214,903,000, net earnings of $690,972,000, and diluted earnings per share of $2.22 for the quarter.  The Company also reported net LHI of $29,940,700,000, allowance for loan losses of $93,054,000, net MSR of $6,406,491,000, total assets of $100,279,813,000, total liabilities of $91,493,807,000, and total shareholders' equity of $8,786,006,000.

310.   These figures in the Form 8-K were materially false and misleading when made as detailed in Section VIII.A. and because the Company overstated the fair value of its RIs, LHI and MSR, understated ALL, understated liabilities related to R&Ws, and overstated net earnings and total shareholders' equity.

### 2. First Quarter 2004 Conference Call

311.   After issuing the press release on April 21, 2004, the Company hosted a conference call for investors and analysts (the "April 21, 2004 Conference Call"), and made a number of false and misleading statements consistent with the Company's press release.

312.   During the April 21, 2004 Conference Call an analyst from Basswood Partners asked Mozilo to explain the functionalities of an ARM.  In response, Mozilo asserted that an ARM product is *"a great product, a prime product for the bank,* as long as it fits within the regulatory bounds that are set for the bank."

313.   On the same conference call, Mozilo responded to an analyst's concern about the Company's subprime lending by representing that Countrywide understood the subprime business better than its competitors:

> I think using what our competitors do as barometer will put you down the wrong path.  *We are a very different, focused company that understands this product very well, how to originate it, how to manage it, how to underwrite, how to service it.  And so we look at - the short answer to your question is - we look at this sub-prime business as a - one that has to be carefully manage[d]* . . . .

314.   On the same conference call, Mozilo, responding to an analyst's question about the potential risks from originating nontraditional, riskier loans, such as subprime loans, falsely stated that Countrywide had taken a more disciplined approach than its competitors, that it was not involved in the "frothy business" that others engaged in and that it was properly monitoring subprime risks:

> There is very, very good solid sub-prime business and there is this frothy business that you relate to.  And you have to - when you're doing [your] analysis, what is the average FICO scored [sic] of these. Because you can get so deep into this marginal credit that you can have serious problems where you are taking 400 FICOs with no documentation; that is dangerous [stuff].  So think it is very important that you understand the disciplines that the Company had, particularly that Countrywide has, which are very strong disciplines in the origination of sub-prime loans.  And maintaining that discipline is critically important to us.  I don't think, when you look at sub-prime, you have to look at it in various tranches, and we are at the high end of that tranche.

315.   When an analyst asked if subprime mortgages would ever be held for investment on Countrywide's books, Kurland responded that Countrywide did not plan to ever hold subprime mortgages as an investment on its books.  Specifically, Kurland stated that:

> We don't intend to maintain as an investment sub-prime mortgages on our balance sheet. . . .  [T]here is no intention at all to ha[ve] a permanent investment in a pool of sub-prime loans.

316.   The statements made during the April 21, 2004 Conference Call were false and misleading when made.  None of the Officer Defendants issued any corrections to Kurland's statements, thereby ratifying these false public statements.

The statement by Mozilo that Countrywide's ARM loans were "prime product[s]" was false and misleading because Countrywide's underwriting policies treated as prime many loans that should have been classified as subprime by mortgage industry standards, and Countrywide loosened and abandoned its underwriting guidelines to increase loan volume without regard to loan quality, and for the reasons set forth in Sections V.C., V.D., V.F., and V.G. Furthermore, Mozilo's statements that Countrywide's ARM loans were prime products, "that the Company had . . . very strong disciplines in the origination of subprime loans"; that "we are a very different focused company that understands this [subprime] product"; and that Countrywide's subprime originations were "at the high end" of the subprime tranche; were false and misleading because Countrywide loosened and abandoned its underwriting practices to increase loan volume without regard to loan quality. *See* Sections V.C. and V.G. Further, Mozilo knew that the Company's underwriting policies treated as prime many loans that should have been classified as subprime by mortgage industry standards. *See* Section V.F. Moreover, Kurland's statement that "[w]e don't intend to maintain as an investment sub-prime mortgages on our balance sheet" was misleading because Countrywide assumed subprime risk both on and off its balance sheet since a large amount of its asset residuals were derived from subprime loans. Countrywide also maintained off-balance sheet subprime risk through its representations and warranties ("R&Ws") of subprime loans. *See* Section V.C.

317. Several analysts raised their recommendations, and earnings estimates for Countrywide as a result of these misrepresentations, including: (1) Raymond James, which reported on April 22, 2004, that "[w]e continue to rate the shares Strong Buy based on their modest valuation. . . ."; and (2) Piper Jaffray, which reported on April 22, 2004, that "[w]e reiterate our Outperform rating and are raising our price target to $96 from $90." In addition, analysts described

Countrywide as a company that produced "loans [that] are primarily prime credit quality first-lien mortgage loans secured by single-family residences."

### 3.   First Quarter 2004 Form 10-Q

318.   On May 7, 2004, Countrywide filed its quarterly report on Form 10-Q for the first quarter of 2004 ("2004 Form 10-Q"), signed by Kurland.   The Company reported financial results as follows.

319.   In the "Off-Balance Sheet Arrangements and Guarantees" section, Countrywide described the R&Ws exposure associated with the securitization of its loans as follows: "[m]anagement does not believe that any of its off-balance sheet arrangements have or are reasonably likely to have a current or future material effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources."

320.   The Company reported the volume of Mortgage Banking prime home equity and subprime loans produced (which was included in Countrywide's total volume of loans produced).   Specifically, Mortgage Banking prime home equity loans produced during the quarter equaled $3,729,000,000.   Mortgage Banking subprime loans produced during the quarter equaled $6,048,000,000, and were 8.9% of total Mortgage Banking loan production for the quarter.

321.   Kurland described the Company's management of credit risk in the following terms: "[w]e manage mortgage credit risk principally by . . . ***only retaining high credit quality mortgages in our loan portfolio.***"

322.   In the section entitled "Controls and Procedures," Countrywide described the adequacy of its internal controls: "There has been no change in our internal control over financial reporting during the quarter ended March 31, 2004 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

323.    Further assuring investors of the veracity of the information contained in the 2004 Form 10-Q, the report included Sarbanes-Oxley Act certifications signed by Mozilo, representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide.

324.    The statements referenced above in Countrywide's first quarter 2004 Form 10-Q were materially false and misleading for the reasons provided in ¶326 below.

### 4.    Amended First Quarter 2004 Form 10-Q/A

325.    On April 25, 2005, the Company filed its amended quarterly report on Form 10-Q/A for the first quarter of 2004 ("2004 Form 10-Q/A"), signed by Defendant Sieracki, among others.  The Company reported gain-on-sale of loans and securities of $1,117,390,000, revenues of $1,973,626,000, net earnings of $543,189,000 and diluted earnings per share of $1.75 for the quarter.  The Company also reported net LHI of $29,940,700,000, allowances for loan losses ("ALL") of $93,054,000, net mortgage servicing rights ("MSR") of $6,369,646,000, total assets of $110,747,452,000, total liabilities of $102,109,229,000, and total shareholders' equity of $8,638,223,000.

326.    The Company's statements regarding financial results as referenced in ¶¶320 and 325 were materially false and misleading when made as detailed in Section VIII.A. and because the Company overstated the fair value of its RIs, LHI, and MSR, understated ALL, understated liabilities related to R&Ws, and overstated net earnings and total shareholders' equity.  Also, management's statements regarding the quality and volume of prime home equity and subprime loans originated during the quarter were false and misleading because Countrywide misclassified subprime loans as prime loans.  *See* Section V.F.  Moreover, management's representation that Countrywide "only retain[ed] high credit quality

mortgages in our loan portfolio" was false because Countrywide loosened its underwriting guidelines to increase loan volume without regard to loan quality. *See* Sections V.C. and V.G. Moreover, the Sarbanes-Oxley Act certifications signed by Mozilo were false and misleading because the financial statements issued during the Relevant Period were materially misstated and violated Generally Accepted Accounting Principles ("GAAP"). *See* Section VIII.A.

### 5. Second Quarter 2004 Form 8-K

327. On July 26, 2004, Countrywide filed a Form 8-K signed by Kurland, attaching a press release that announced the Company's financial results for the second quarter of 2004. In the press release, Defendant Mozilo noted that these results were achieved in a tough environment and that Countrywide's impressive performance demonstrated its ability to "prudently manage risk." In the press release, Countrywide reported gain-on-sale of loans and securities of $1,277,331,000, revenues of $2,333,104,000, net earnings of $699,623,000 and diluted EPS of $2.24 for the quarter. The Company also reported net LHI of $33,895,452,000, ALL of $105,839,000, net MSR of $8,334,826,000, total assets of $103,753,435,000, total liabilities of $94,308,638,000, and total shareholders' equity of $9,444,797,000.

328. These figures in the Form 8-K were materially false and misleading when made because the Company's reported value for gain-on-sale loans and securities overstated the fair value of its RIs and MSRs, and also for the reasons detailed in Section VIII.A. The statements made by Mozilo and Kurland in the July 22, 2004 press release were false and misleading. Defendant Mozilo's statements regarding management's ability to "prudently manage risk" were false and misleading because Countrywide loosened its underwriting guidelines over the Relevant Period to increase loan volume without regard to loan quality, engaged in widespread predatory and fraudulent loan origination practices, and failed to

account for the increased risk of its mortgage loans.  *See*  Sections V.C., V.G., and X.

### 6.      Second Quarter 2004 Conference Call

329.   On a conference call held later that day ("July 22, 2004 Conference Call") to discuss the Company's second quarter 2004 results, Mozilo, responding to a question from an analyst at Lehman Brothers regarding Countrywide's provision for loan loss reserves, insisted that Company's reserves were adequate based upon its high credit quality loans:

> First of all, the - in terms of loan losses, the loan losses are far below what you would expect to experience in a - in this type of a bank, simply because we - as a de novo institution, from both our viewpoint and the regulatory viewpoint, *we have focused on FICOs well above the 700 - the average FICO in that portfolio is around 740*, so our delinquencies and foreclosures - I think foreclosures are nonexistent. Delinquencies are very, very low in that entity. And I would expect that that - because of *the quality of that portfolio and the type of loans that are in there*, which are mortgage loans, assets that we understand very well and know how to service, that *we can expect the performance that we're seeing today to continue at a very high level*.

330.   During the call Mozilo described the controls that Countrywide had in place at its bank as "very significant" and "extraordinary":

> There's *very significant controls in place*, and I think that, you know, it's just too - you know, to any extent it gives you comfort, we are regulated by the Fed.  This is a deep area of their concern, as it is ours, *so we have extraordinary compliance and controls in place there*.

331.   Mozilo's statements made during the July 22, 2004 Conference Call were materially false and misleading when made.  Specifically, Mozilo's statement that the Company's loan loss reserves were adequate because the Company's

portfolio purportedly contained high credit quality loans was false and misleading because Defendants failed to account for the increased risk of its mortgage loans. *See* Section VIII.A.2.   Additionally, Mozilo's statements touting Countrywide's very significant and extraordinary compliance and internal controls were false and misleading because Countrywide substantially deviated from its underwriting guidelines. *See* Section VIII.A.6.

332.   These materially false and misleading statements by Countrywide and the Officer Defendants prompted positive reactions from analysts, including: (1) Raymond James, which reported on July 23, 2004, that "[w]e continue to rate the shares Strong Buy based on their modest valuation . . . ."; and (2) Piper Jaffray, which reported on July 23, 2004 ("2Q 2004 10-Q"), that "we continue to recommend that investors purchase shares of Countrywide, which we view as the strongest player in the country's largest consumer market."

### 7.   **Second Quarter 2004 Form 10-Q**

333.   On August 6, 2004, Countrywide filed its quarterly report on Form 10-Q for the second quarter of 2004, signed by Kurland.   The Company reported financial results as detailed below.

334.   The Company stated in the 2Q 2004 10-Q that the impairment of the fair value of its other RIs equaled $178,424,000.

335.   In the "Off-Balance Sheet Arrangements and Guarantees" section of the 2Q 2004 10-Q, Countrywide described the R&Ws exposure associated with the securitization of its loans as follows:

> Management does not believe that any of its off balance sheet arrangements have had or are reasonably likely to have a current or future material effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources.

336.   In the 2Q 2004 10-Q, the Company reported the volume of Mortgage Banking prime home equity and subprime loans produced (which was included in Countrywide's total volume of loans produced).   Specifically, Mortgage Banking prime home equity loans originated during the quarter equaled $5,239,000,000.

337.   Mortgage Banking subprime loans originated during the quarter equaled $8,132,000,000, and were 9.2% of total Mortgage Banking loan production.

338.   Countrywide reported consolidated prime mortgage loans, prime home equity loans and subprime LHI in the amount of $14,015,330,000, $14,818,056,000, and $137,679,000, respectively. Subprime mortgages equaled less than 1% of total mortgage LHI.

339.   In the 2Q 2004 10-Q, the Company described its management of credit risk in the following terms: "[w]e manage mortgage credit risk . . . *by only retaining high credit quality mortgages in our loan portfolio*."

340.   The Company concluded that there was no change in its internal controls that would affect its financial reporting: "There has been no change in our internal control over financial reporting during the quarter ended June 30, 2004 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

341.   Further assuring investors of the veracity of the information contained in the 2Q 2004 10-Q, the report included Sarbanes-Oxley Act certifications signed by Mozilo, representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide.

342.   The statements referenced above in Countrywide's second quarter 2004 Form 10-Q were materially false and misleading for the reasons provided in ¶345 below.

### 8.    Amended Second Quarter 2004 Form 10-Q/A

343.    On May 16, 2005, Countrywide filed its amended quarterly report on Form 10-Q/A for the second quarter of 2004 ("2Q 2004 10-Q/A"), signed by Sieracki and others.

344.    In the accompanying press release, Countrywide reported gain-on-sale of loans and securities of $1,418,973,000, revenues of $2,474,746,000, net earnings of $786,479,000, and diluted earnings per share of $2.52 for the quarter. The Company also reported net LHI of $33,895,452,000, ALL of $105,839,000, net MSR of $8,286,597,000, total assets of $116,210,789,000, total liabilities of $106,826,919,000 and total shareholders' equity of $116,210,789,000.

345.    The Company's statements regarding financial results as referenced in ¶¶334-338, 344 were materially false and misleading when made as detailed in Section VIII.A. and because the Company overstated the fair value of its RIs, LHI and MSR, understated ALL, understated liabilities related to R&Ws, and overstated net earnings and total shareholders' equity.  The statements made by Mozilo in the July 22, 2004 press release were false and misleading. Mozilo's statements regarding management's ability to "prudently manage risk" were false and misleading because Countrywide loosened its underwriting guidelines over the Relevant Period to increase loan volume without regard to loan quality, engaged in widespread predatory and fraudulent loan origination practices, and failed to account for the increased risk of its mortgage loans.  *See*  Sections V.C., V.G., and X.  Also, the statements in the 2Q 2004 10-Q/A regarding the volume of prime home equity and subprime loans originated during the quarter and the quality of LHI were false and misleading because Countrywide misclassified subprime loans as prime loans, and also for the reasons set forth in Section V.F.  Moreover, the representation that Countrywide "only retain[ed] high credit quality mortgages in our loan portfolio" was false because Countrywide loosened its underwriting guidelines to increase the volume of loans produced without regard to loan quality.

*See* Sections V.C. and V.G.  The statements in the 2Q 2004 10-Q/A relating to internal controls were false and misleading for the same reasons set forth in Section VIII.A.6.  Moreover, the Sarbanes-Oxley Act certifications signed by Mozilo were false and misleading because the financial statements issued by Countrywide were materially misstated and violated GAAP, and for the same reasons stated in Section VIII.A.

### 9.    Third Quarter 2004 Form 8-K

346.   On October 20, 2004, Countrywide filed a Form 8-K, signed by Laura Milleman ("Milleman"), Managing Director and Chief Accounting Officer, which attached a press release that announced the Company's financial results for the third quarter of 2004.  In the press release, Countrywide reported gain-on-sale of loans and securities of $1,188,812,000, revenues of $2,245,607,000, net earnings of $582,241,000 and diluted earnings per share of $0.94 for the quarter.  The Company also reported net LHI of $34,928,215,000, ALL of $107,765,000, net MSR of $8,153,203,000, total assets of $104,388,452,000, total liabilities of $94,366,589,000, and total shareholders' equity of $10,021,863,000.

347.   In the press release, Mozilo again highlighted Countrywide's ability to deliver strong results in a tough environment in which interest rates rose by 50 basis points: "Countrywide's financial results for the quarter - highlighted by diluted earnings per share of $0.94 - once again demonstrate the strength and resilience of our business model."

348.   These figures in the Form 8-K were materially false and misleading when made because the Company's reported value for gain-on-sale loans and securities overstated the fair value of its RIs and MSRs, and also for the reasons detailed in Section VIII.A.  The statements contained in the October 20, 2004 Form 8-K and press release were materially false and misleading when made.  Mozilo's statement that the third quarter financial results "demonstrate the strength and resilience of our business model" was false and misleading because Countrywide

loosened its underwriting policies and substantially increased its exception processing. *See* Sections V.C., V.G., and VIII.A.

### 10.   Third Quarter 2004 Conference Call

349.   On a conference call held later that same day ("October 20, 2004 Conference Call") to discuss the third quarter financial results, in which Mozilo participated, the Company's senior management discussed the third quarter 2004 financial results and fourth quarter 2004 financial outlook. Mozilo touted the high quality loans held in Countrywide's Bank portfolio: "The bank *continues to focus on portfolio quality as the average FICO is now . . . 732 and the weighted average LTV stands at 80%*."

350.   During the call, an analyst with the Bank of Montreal, Jaime Weiss, asked Mozilo to comment on "insider trading" of Countrywide's stock. Mozilo defended his sales, claiming they were all performed in conformity with a 10b5-1 trading plan:

> My decision has been that *since I'm 65 years old to exercise and [sell] on done on a schedule, irrespective of the market, stock up or stock down*. So, I would attach no meaning to it whatsoever, those in the past that attached a meaning to it, is a big loser . . . The sale by myself, I think I can speak for Stan, is one of a personal nature and has nothing to do with the Company.

351.   Mozilo's statements on the October 20, 2004 Conference Call were materially false and misleading when made. Specifically, his statement regarding the Company's purported high credit quality loans with an average "FICO [of] . . . 732, and . . . [a] weighted average of LTV . . . at 80%" was false and misleading for the same reasons set forth in Sections V.C. and V.G. Mozilo's statement that he traded his shares of Countrywide stock "irrespective of the markets" was false and misleading for the same reasons set forth in Section VI.B. discussing his insider sales of Countrywide stock.

352.   Analysts reacted positively to Mozilo's materially false and misleading statements.   For example, on October 21, 2004, Credit Suisse First Boston issued a report that reiterated its "Outperform" rating.   ABN AMRO analysts reiterated on October 21, 2004, their "Overweight" rating with good credit quality.   In fact, the analysts rated CFC, SLM Corp. and CIT Group Inc. an "A" for credit quality, with Countrywide ranking first.   Moreover, ABN AMRO pointed out that Countrywide originated more loans during the quarter than any of the top three mortgage originators.   Specifically, Countrywide's mortgage production volume was $92 billion, Wells Fargo Home Mortgage was $68 billion, and Washington Mutual was $61 billion for the quarter.

353.   Several other analysts either raised or maintained their stellar recommendations and earnings estimates for Countrywide as a result of Defendants' false and misleading misrepresentations, including: (1) Prudential Equity Group LLC, which maintained an "Overweight" rating for Countrywide's stock; and (2) Raymond James, which issued a report on October 21, 2004, that "[w]e are increasing our 2005 estimate, though, to $4.00.   We believe the downslide in the stock Wednesday was understandable but overdone, and we rate shares Strong Buy."

## 11.   Third Quarter 2004 Form 10-Q

354.   On November 8, 2004, Countrywide filed its quarterly report on Form 10-Q for the third quarter of 2004 ("3Q 2004 10-Q"), signed by Kurland.   The Company reported financial results as follows.

355.   The Company reported that the recovery of the fair value of its other retained interests equaled $162,000.

356.   In the "Off-Balance Sheet Arrangements and Guarantees" section, Countrywide described its exposure associated with the securitization of its loans as follows: "[w]e do not believe that any of our off-balance sheet arrangements have had or are reasonably likely to have a current or future material effect on our

financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources."

357.   The Company reported the volume of Mortgage Banking prime home equity and subprime loans produced (which was included in Countrywide's total volume of loans produced).   Specifically, Mortgage Banking prime home equity loans originated during the quarter purportedly equaled $6,421,000,000. Mortgage Banking subprime loans produced during the quarter equaled $9,591,000,000, and were 12.45% of total Mortgage Banking loans originated during the quarter.

358.   Further, Countrywide's portfolio of mortgage LHI as of September 30, 2004, consisted of prime mortgages, prime home equity loans and subprime loans, and   were   reported   to   amount   to   $18,821,053,000,   $11,113,845,000   and $124,768,000, respectively.   Subprime mortgage loans equaled less than 1% of total mortgage LHI.

359.   The Company described its management of credit risk in the following terms: "[w]e manage mortgage credit risk principally . . . by ***only retaining high credit quality mortgages in our loan portfolio***."

360.   The Company also reported that management's review of the Company's disclosure controls and internal controls was "effective": "There has been no change in our internal control over financial reporting during the quarter ended September 30, 2004 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

361.   Further assuring investors of the veracity of the information contained in the 3Q 2004 10-Q, the report included Sarbanes-Oxley Act certifications signed by Mozilo, representing that the "report does not contain any untrue statement of a material   fact"   and   "the   financial   statements,   and   other   financial   information included   in   this   report,   fairly   present   in   all   material   respects   the   financial condition" of Countrywide.

362.   The statements referenced above in Countrywide's third quarter 2004 Form 10-Q were materially false and misleading for the reasons provided in ¶364 below.

### 12.   Amended Third Quarter 2004 Form 10-Q/A

363.   On May 16, 2005, Countrywide filed its amended quarterly report on Form 10-Q/A ("3Q 2004 10-Q/A") for the third quarter of 2004, signed by Defendant Sieracki and others.  In its 3Q 2004 10-Q/A, Countrywide reported gain-on-sale of loans and securities of $1,017,697,000, revenues of $2,109,503,000, net earnings of $498,071,000 and diluted EPS of $0.80 for the quarter.  The Company also reported net LHI of $34,928,215,000, ALL of $107,765,000, net MSR of $8,105,081,000, total assets of $118,712,487,000, total liabilities of $108,835,721,000, and total shareholders' equity of $9,876,766,000.

364.   The Company's statements regarding financial results as referenced in ¶¶355-358, 363 were materially false and misleading when made as detailed in Section VIII.A. and because the Company overstated the fair value of its RIs, LHI and MSR, understated ALL, understated liabilities related to R&Ws, and overstated net earnings and total shareholders' equity.  Also, the statements regarding the quality and volume of prime home equity and subprime loans originating during the quarter and the quality of LHI were false because the Company misclassified subprime loans as prime loans, and also for the reasons set forth in Section V.F.  Moreover, the representation that Countrywide "only retain[ed] high credit quality mortgages in our loan portfolio" was false because Countrywide loosened its underwriting guidelines to increase loan volume without regard to loan quality.  *See* Sections V.C. and V.G.  The statements relating to internal controls were false and misleading because Countrywide's internal controls were ineffective, and for the same reasons set forth in Section VIII.A.6.  Moreover, the Sarbanes-Oxley Act certifications signed by Mozilo were false and misleading because the financial statements issued by Countrywide were

materially misstated and violated GAAP, and for the same reasons stated in Section VIII.A.

### 13.  Year End 2004 Form 8-K

365.  On February 2, 2005, Countrywide filed a Form 8-K, signed by Milleman, attaching a press release announcing the Company's financial results for the fourth quarter and year ended December 31, 2004.  In the press release, Countrywide reported gain-on-sale of loans and securities of $1,243,964,000, revenues of $1,977,069,000, net earnings of $343,105,000, and diluted earnings per share of $0.56 for the quarter.  The Company also reported net LHI of $39,660,086,000, ALL of $125,046,000, net MSR of $8,787,284,000, total assets of $111,464,131,000, total liabilities of $101,035,688,000, and total shareholders' equity of $10,428,443,000.

366.  These figures in the Form 8-K were materially false and misleading when made because the Company's reported value for gain-on-sale loans and securities overstated the fair value of its RIs and MSRs, and also for the reasons detailed in Section VIII.A.

### 14.  Year End 2004 Conference Call

367.  On the conference call held the same day ("February 2, 2005 Conference Call"), in which Mozilo and Kurland participated, the Company's senior management discussed the fourth quarter and year-end 2004 financial results and first quarter 2005 outlook.  Kurland and Defendant Mozilo responded to questions from a Piper Jaffray analyst, Robert Napoli, by emphasizing that Countrywide's strategy had not changed to take on more risk:

> Kurland: ***Our strategy is pretty much the same*** as we've been operating it . . . [T]he base strategy we believe is solid and has had, you know, excellent results over the years that we've employed it.
>
> Napoli: So the answer is, no, there has been no real change –
>
> Mozilo: No

Napoli: - to take more risk or - Mozilo: *No. No, no, no.*

368.   The statements made on the February 2, 2005 Conference Call were materially false and misleading when made.   The statements that there was no change to Countrywide's strategy to take on more risk were false and misleading because Countrywide loosened its underwriting guidelines to increase loan volume without regard to loan quality.  *See* Sections V.B. and V.C.

369.   Analysts reacted positively to these materially false and misleading statements. For example, on February 2, 2005, Piper Jaffray analysts issued a report that reiterated its "Outperform" rating and top pick for 2005 in mortgage finance.  An analyst stated:

[Even though] CFC's stock declined 5.5% following its 4Q04 earnings miss, which was caused by an unexpected net hedging loss  . . . [W]e believe CFC's . . . management . . . *[uses] consistent low risk strategies.*  We feel the fundamental strength to the quarter was very strong as CFC exceeded our expectations on production income, bank income and capital markets, and the company continued to gain market share.

370.  Several other analysts either raised or maintained their stellar recommendations and earnings estimates for Countrywide as a result of Defendants' fraudulent misrepresentations, including:  (1) Morgan Stanley, which reported on February 2, 2005, that they "[r]emain Overweight [on Countrywide] with a new price target of $44"; and (2) Bernstein Research, which reported on February 3, 2005, that "[w]hile reported EPS were far below expectations, the shortfall was due to volatility of its servicing hedge, rather than any serious operating weakness, such as weakness in loan pricing, or a swollen G&A ratio . . . We rate CFC outperform."

### 15.   <u>2004 Form 10-K</u>

371.   On March 15, 2005, Countrywide filed its Annual Report for 2004 with the SEC on Form 10-K ("2004 Form 10-K").   The report was signed by Mozilo and others.   In its 2004 Form 10-K, Countrywide reported gain-on-sale of loans and securities of $4,836,945,000, revenues of $8,566,627,000, net earnings of $2,197,574,000, and diluted earnings per share of $0.80 for the quarter.   The Company also reported net LHI of $39,660,086,000, ALL of $125,046,000, net MSR of $8,729,929,000, total assets of $128,495,705,000, total liabilities of $118,185,629,000, and total shareholders' equity of $10,310,076,000.

372.   The Company reported, in a section entitled "Valuation of MSRs and other retained interests," that the fair value of the RIs on the Company's balance sheet as of December 31, 2004, was $1,908,504,000.   In addition, the reported impairment of "Other Retained Interests" as of year-end 2004 equaled $368,295,000.

373.   In the "Off-Balance Sheet Arrangements and Guarantees" section, Countrywide described the R&Ws exposure associated with the securitization of its loans as follows: "[w]e do not believe that any of our off-balance sheet arrangements have had or are reasonably likely to have a current or future material effect on our financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity, capital expenditures or capital resources."

374.   In a section titled "Securitization," the Company also stated the liabilities associated with the risk of R&Ws "total[ed] $139.9 million"; and that the fair value of its MSRs as of December 31, 2004, was $8,882,917,000, in comparison to December 31, 2003, when fair value of MSRs was reported as $6,909,167,000.

375.   The Company also reported the volume of loans it originated at year-end: prime mortgage loans equaled $292,672,000,000, prime home equity loans equaled $30,893,000,000, and nonprime mortgage loans equaled $39,441,000,000.

376.   The Company reported the volume of Mortgage Banking prime home equity and subprime loans produced during the year (which was included in Countrywide's total volume of Mortgage Banking Loans produced).   Specifically, Mortgage Banking prime home equity loans originated during the year equaled $23,351,000,000.   Mortgage Banking nonprime mortgage loans originated during the year equaled $33,481,000,000, and were 10.5% of total Mortgage Banking loans originated for the year-end.

377.   Countrywide also reported that prime mortgage LHI equaled $22,587,246,000, prime home equity LHI equaled $11,435,792,000, and nonprime LHI equaled $171,592,000, or less than 1% of the total value of prime LHI.

378.   The 2004 Form 10-K stated that "[t]he majority of our loan production consists of Prime Mortgage Loans."   Specifically, the Company highlighted the quality mortgages that it securitizes and sells to the secondary market:

> We ensure our ongoing access to the secondary mortgage market by ***consistently producing quality mortgages*** . . . . As described elsewhere in this document, ***we have a major focus on ensuring the quality of our mortgage loan production*** . . .

379.   In a section of the 2004 Form 10-K titled "Mortgage Credit Risk," the Company described its Credit Policy, portraying it as a tightly controlled and supervised process "designed to produce high quality loans" through a rigorous pre-loan screening procedure and post-loan auditing and appraisal and underwriting reviews:

> **Loan Quality**
>
> Our Credit Policy establishes standards for the determination of acceptable credit risks.   Those standards encompass borrower and collateral quality, underwriting guidelines and loan origination standards and procedures.

Borrower quality includes consideration of the borrower's credit and capacity to pay. We assess credit and capacity to pay through . . . manual or automated underwriting of additional credit characteristics.

\* \* \*

***Our loan origination standards and procedures are designed to produce high quality loans.*** These standards and procedures encompass underwriter qualifications and authority levels, appraisal review requirements, fraud prevention, funds disbursement controls, training of our employees and ongoing review of their work. . . . In addition, we employ proprietary underwriting systems in our loan origination process that improve the consistency of underwriting standards, assess collateral adequacy and help to prevent fraud, while at the same time increasing productivity.

In addition to our pre-funding controls and procedures, we employ an extensive post-funding quality control process. Our Quality Control Department, under the direction of the Chief Credit Officer, is responsible for completing comprehensive loan audits that consist of a re-verification of loan documentation, an in-depth underwriting and appraisal review, and if necessary, a fraud investigation.

380.   Assuring investors of the veracity of the information contained in the 2004 Form 10-K, the report included Sarbanes-Oxley Act certifications signed by Mozilo, representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide and that the Company employed internal disclosure controls and procedures that detect "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting" and "[a]ny fraud, whether or not material, that involves management."

381.   The Company's statements regarding financial results as referenced in ¶¶371-374, 377 above were materially false and misleading when made as detailed in Section VIII.A. and because the Company overstated the fair value of its RIs, LHI and MSR, understated ALL, understated liabilities related to R&Ws, and overstated net earnings and total shareholders' equity.   Furthermore, statements relating to the volume of prime and nonprime loans originated and the value of prime LHI were false and misleading because Countrywide misclassified its subprime loans as prime loans and also for the same reasons set forth in Section V.F.   Moreover, Countrywide's statements that it "consistently produce[d] quality mortgages" and that its "loan origination standards and procedures are designed to produce high quality loans" were false and misleading because Countrywide loosened its underwriting guidelines to increase loan volumes without regard to loan quality.   *See* Sections V.C. and V.G.   Moreover, the Sarbanes-Oxley Act certifications signed by Mozilo were false and misleading because the financial statements issued by Countrywide were materially misstated and violated GAAP, and for the same reasons stated in Section VIII.A.

### C.   The Company's False Statements Regarding 2005 Results

#### 1.   March 15, 2005 Piper Jaffray Conference

382.   On March 15, 2005, Mozilo spoke at a financial conference sponsored by Piper Jaffray (the "March 15, 2005 Conference").   On the issue of the credit quality of Countrywide's loans, Mozilo made a statement emphasizing his concern about credit quality in the mortgage industry, generally, but then falsely distinguished Countrywide from the many lenders whose credit practices were beginning to make analysts and investors uneasy:

> The general statement is that I'm deeply concerned about credit quality in the overall industry.   I think that the amount of capacity that's been developed for subprime is much greater than the quality of

subprime loans available.  ***And so they're pushing further down − as I observe it, they're pushing further down the credit chain into the 500 FICOs and below 550, 540, 530.  And as you get down to those levels, it becomes very problematic and I don't think there's any amount of money you can charge upfront to cover your losses on those type of loans.***

***So I'm deeply concerned about everybody going into subprime.***

\*\*\*

***So we've had to remain very disciplined in our subprime efforts. And that's why you don't see massive growth for Countrywide [in] subprime.  We're trying to stay within a category of subprime loans that we know how to manage and manage effectively.***

So I have to separate it.  ***The overall industry in trouble; Countrywide I'm not, because we have remained very disciplined in our origination of subprime loans***.

383.   Also, during the March 15, 2005 Conference, Mozilo touted the Company's performance results for 2004 and 2005 as having been accomplished with minimal risk: "Countrywide Bank has grown substantially since its acquisition in May of 2001, leveraging off synergies with the production and servicing sectors to generate assets and liabilities at a very low-cost, ***while producing competitive financial returns at a minimal risk.***"

384.   Moreover, during the March 15, 2005 Conference, Mozilo responded to an analyst's question regarding the 30% market growth goal that was set by management to be achieved by 2008.   Mozilo highlighted that this goal was realistic and Countrywide would not sacrifice its "sound lending" practices to achieve it:

Your question is 30%, is that realistic, the 30% goal that we set for ourselves in 2008?  It is realistic, and let me give you the genesis of it

so you don't think it just comes out of nowhere.  We went through a very extensive study with the help of the Anderson School at UCLA as to what happens to businesses as they mature. And if you look at every mature business in this country, you'll find that the leader of that industry, that particular industry, has about a 25% to 35% market share in every single case.  So once Countrywide starts off with the premise that we are - our role is to dominate - ***our objective is to dominate our industry***, and clearly the industry is maturing very rapidly through this consolidation.  If you look at it, there's only five or six players that you could really name in the mortgage banking business today of any significan[ce] - that once we are mature and we want to dominate, we need about a 30% market share to do that. Is it achievable?  Absolutely. . . ***But I will say this to you, that under no circumstances, will Countrywide ever sacrifice sound lending and margins for the sake of getting to that 30% market share.***

385.   Further, Mozilo again emphasized the Company's management of its subprime business, stating that management was very "concerned about the loan-to-value ratio" because those type of loans would be affected first if there is a downturn in the economy and, therefore, the Company must manage them properly:

***Obviously, when you're dealing in subprime, you have got to be concerned about the loan-to-value ratio because that's the bottom end of the strata and in the event of a bump in the economy or a burp in the economy, they are affected first***. . . . Subprime is a business we have been in for over 10 years.  We have been through various cycles in those 10 years, and ***I think we have got it properly managed and surrounded.***

386.   Mozilo's above statements, made at the March 15, 2005 Conference, were materially false and misleading when made.  Specifically, Mozilo's statement that "we have to remain very disciplined in our subprime efforts, and that's why you don't see massive growth for Countrywide in subprime" was false and misleading because Countrywide misclassified its subprime loans as prime loans. *See* Section V.F.  Mozilo's statements criticizing the Company's peers for "pushing further down the credit chain into the 500 FICOs and below; 550, 540, 530" to originate loans, but claiming that Countrywide's practices were different, more conservative and relatively safe as opposed to high risk, were also misleading because Countrywide loosened its underwriting practices to increase its loan volume without regard to loan quality.  *See* Sections V.C. and V.G.  Moreover, Mozilo's statement that Countrywide was "[l]everaging off synergies from the - with the production and servicing sectors to generate assets and liabilities at a very low cost, while producing competitive financial returns at a minimal risk" was false and misleading for the same reasons set forth in Section V.G.  Mozilo's statement that "under no circumstances, will Countrywide ever sacrifice sound lending and margins for the sake of getting to that 30% market share" was also false and misleading because Countrywide loosened and abandoned its underwriting guidelines to boost loan volumes to reach the 30% market share goal. Mozilo's statement regarding the prudent management of Countrywide's subprime loan-to-value ratio was false and misleading for the same reasons set forth in Sections V.C and V.G.

## 2.   **First Quarter 2005 Form 8-K**

387.   On April 26, 2005, Countrywide filed a Form 8-K, signed by Milleman, attaching a press release that announced the Company's financial results for the first quarter of 2005, ended March 31, 2005.  In the press release, Countrywide reported gain-on-sale of loans and securities of $1,361,788,000, revenues of $2,404,885,000, net earnings of $688,852,000, and diluted earnings

per share of $1.13 for the quarter. The Company also reported net LHI of $47,698,472,000, ALL of $134,916,000, net MSR of $9,746,957,000, total assets of $137,033,041,000, total liabilities of $126,080,994,000, and total shareholders' equity of $10,952,047,000.

388. These figures in the Form 8-K were materially false and misleading when made because the Company's reported value for gain-on-sale loans and securities overstated the fair value of its RIs and MSRs, and also for the reasons detailed in Section VIII.A.

### 3. First Quarter 2005 Conference Call

389. Later the same day, Countrywide held a conference call ("April 26, 2005 Conference Call") in which Kurland and Defendants Mozilo and Sieracki discussed the Company's financial results for the first quarter of 2005. Mozilo responded to a question from an analyst at NWQ Investment Management, Mark Patterson, regarding changes in underwriting policies at Countrywide:

Patterson: Right. Okay. That makes sense. One final question, on the quality of the assets going into the Bank, you guys have been very high-quality assets, prime quality assets going into the bank, I assume that continues. But has there been any changes in the underwriting metrics with the current origination levels or you[r] expected origination during 2005? In terms of FICO or combined loaned-to-value or debt-to-income or any of those kind of underwriting metrics?

Mozilo: I think they will remain serious consistent with the first quarter and most of what we did in 2004. *We don't see any change in our protocol relative to the volume of loans that we're originating.*

390. Further, during the April 26, 2005 Conference Call, as transcribed by Thomson Financial, Kurland and Sieracki responded to a question from a KBW

analyst, Frederick Cannon, indicating that Countrywide and its bank originated only high quality Pay-Option ARMs:

> Cannon: Okay. And are you originating a lot of the pay options ARMs for the Bank portfolio at this point in time?
>
> Sieracki: A combination. Most of it is not going into the bank. But, we're trying to develop the protocol and [a] process for delivering greater levels to meet the bank['s] growth need.
>
> Kurland: ***These [Pay-Option ARMs] are all high FICO.***

391. The above statements made on the April 26, 2005 Conference Call were materially false and misleading when made. Specifically, Mozilo's statement that Countrywide's "protocol" or "underwriting metric" relative to the volume of loans originated "will remain . . . consistent" was false and misleading because Countrywide loosened its underwriting guidelines to increase the volume of loans originated without regard to loan quality. *See* Sections V.C. and V.G. Additionally, Kurland's statement that Countrywide's Pay-Option ARMs were "all high FICO" was false and misleading for the same reasons set forth in Sections V.C. and V.D. None of the Officer Defendants issued any corrections to Kurland's statement, thereby ratifying these false public statements.

392. Several analysts raised or maintained their stellar recommendations and earnings estimates for Countrywide based upon Countrywide's false and misleading statements. For example, on April 27, 2005, analysts at Piper Jaffray maintained their "Outperform" rating and described Countrywide as a mortgage corporation with loans that "are primarily prime credit quality first-lien mortgage loans secured by single-family residences."

393. In addition, several other analysts raised or maintained their stellar recommendations and earnings estimates for Countrywide, including: (1) Deutsche Bank, which reported on April 26, 2005, that "[w]e are reiterating our Buy rating

and our $43 target price"; and (2) Morgan Stanley, which reported on April 27, 2005, that we "[r]eiterate Overweight on [s]trong 1Q05 [r]esults."

### 4.   First Quarter 2005 Form 10-Q

394.   On May 9, 2005, Countrywide filed its Form 10-Q for the first quarter of 2005 ("1Q 2005 10-Q"), signed by Defendant Sieracki and others.   The Company reported financial results as follows.

395.   In the "Off-Balance Sheet Arrangements and Guarantees" section, Countrywide described the R&Ws exposure associated with the securitization of its loans as follows: "[w]e do not believe that any of our off-balance sheet arrangements have had or are reasonably likely to have a current or future material effect on our financial condition, results of operations, liquidity, capital expenditures or capital resources."

396.   The Company also reported the volume of Mortgage Banking prime home equity and subprime loans produced (which was included in the total volume of loans produced). Specifically, Mortgage Banking prime home equity loans originated during the quarter equaled $6,619,000,000.   Mortgage Banking nonprime mortgage loans originated during the quarter equaled $8,187,000,000 and were 10.4% of total Mortgage Banking loans originated during the quarter.

397.   The Company described its management of credit risk in the following terms: "[w]e manage mortgage credit risk principally . . . *by retaining high credit quality mortgages in our loan portfolio*."

398.   The Company also reported management's review of the Company's disclosure controls and internal controls:

> There has been no change in our internal control over financial reporting during the quarter ended March 31, 2005 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting . . . .

COMPLAINT

399.   Further assuring investors of the veracity of the information contained in the 1Q 2005 10-Q, the report included Sarbanes-Oxley Act certifications signed by Defendants Mozilo and Sieracki, representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide.

400.   The Company's statements regarding financial results as referenced in ¶395 were materially false and misleading when made as detailed in Section VIII.A. and because the Company overstated the fair value of its RIs, LHI and MSR, understated ALL, understated liabilities related to R&Ws, and overstated net earnings and total shareholders' equity.  Also, the statements regarding the quality of the volume of loans produced and LHI were false and misleading because Countrywide misclassified its subprime loans as prime loans, and also for the reasons set forth in Section V.F.  Moreover, the representation that Countrywide "only retain[ed] high credit quality mortgages in our loan portfolio" was false and misleading because Countrywide loosened its underwriting guidelines to increase loan volume without regard to loan quality.  *See* Sections V.C. and V.G.  The statements relating to internal controls were false and misleading because Countrywide's internal controls were ineffective, and for the same reasons set forth in Section VIII.A.6.  Moreover, the Sarbanes-Oxley Act certifications signed by Defendants Mozilo and Sieracki were false and misleading because the financial statements issued by Countrywide were materially misstated and violated GAAP, and for the same reasons stated in Section VIII.A.

### 5.   May 24, 2005 Countrywide Analyst Meeting

401.  On May 24, 2005, Mozilo, Sambol, Kurland and McMurray participated in the Countrywide Financial Corporation Analyst Meeting ("May 24, 2005 Meeting").   At the meeting, McMurray stated, without correction or

explanation by Defendants Mozilo, Sambol or Kurland, that the Company originated loans that met its credit standards:

> [q]uality control . . . is a series of controls that we have post-closing. So what we are looking for there, is to ensure that the loans that we originate have **both met our credit standards and we[re] underwritten according to those standards.**

402. During the meeting, an unidentified Countrywide representative touted that Countrywide's loans held for investment are "first rate mortgages" and "high quality loans" and, accordingly, the Company's allowance for loan losses were adequate:

> Well, you know, first of all the bank is investing in . . . **prime mortgages, primarily HELOCs and some first rate mortgages** . . . . So, not much on the interest rate risk side. But again, **very high quality loans** that have performed historically and we have you know, default models that provide conservative reserves against that book of business.

403. Likewise, during the meeting, Sambol remarked that credit risks associated with ARM loans were mitigated:

> These risks [associated with ARM loans] are **mitigated or addressed in part by the different underwriting criteria** which are applied to these loans relative to those used for traditional fixed-rate agency product such as maybe higher credit scores or lower loan to value ratios, and also importantly, the paradigm in the mortgage market today and with Countrywide in particular, is that the increased risk is priced for in a very granular way.

404. Further, at the meeting, an unidentified Countrywide representative stated that Countrywide had an efficient control environment that allowed the

Company to distinguish itself from its peers by having the lowest cost and most effective governance program:

> And I think it's the hallmark for Countrywide [that] . . . we have *a culture of concern about our operations* and the enterprise that produces and [has an] *efficiently control[led] environment* and we are going to continue to build on that and look at the environment that we are in today as one that we can produce a value of proposition.  We can distinguish ourselves as having the lowest cost and most effective governance program and that's what we are working to.

405.   During the May 24, 2005 Meeting, Sambol remarked that credit risks associated with ARMs were mitigated:

> These risks are mitigated or addressed in part by the different underwriting criteria which are applied to these loans relative to those used for traditional fixed-rate agency product *such as maybe higher credit scores or lower loan to value ratios* . . . .

406.   Countrywide's above statements at the May 24, 2005 Meeting were materially false and misleading when made.  Specifically, McMurray's statement that Countrywide "ensure[s] that the loans . . . originate[d] have both met our credit standards and we[re] underwritten according to those standards" was false because Countrywide materially loosened its underwriting standards to increase loan volume without regard to loan quality.  *See* Section V.C.  The Countrywide representative's statements relating to "conservative" loan loss reserves were false and misleading for the same reasons set forth in Section VIII.A.2.  Further, in an effort to distinguish Countrywide from its peers in the mortgage industry, the statement made by a Countrywide representative that "we have a culture of concern about our operations and the enterprise that produces and [has an] efficient . . . control environment" was false and misleading because the Officer Defendants' assessment of internal controls over financial reporting was ineffective for the

reasons set forth in Section VIII.A.6.   Moreover, Sambol's statement that credit risks associated with ARMs were mitigated because underwriting guidelines were tightened was false and misleading for the same reasons set forth in Sections V.C., V.D., and V.G.

### 6.   June 2, 2005 Sanford Bernstein & Co. Strategic Decisions Conference

407.   On June 2, 2005, Mozilo appeared on behalf of Countrywide at the Sanford Bernstein & Co. Strategic Decisions Conference ("June 2, 2005 Conference").   At the conference, Mozilo touted the Company's operational results for 2005 and acknowledged that while Countrywide had some high risk mortgage products, Countrywide also had elevated credit requirements for these high risk loans:

> We acknowledge that some of the products offered today carry higher credit risks than traditional GSE 30-year fixed-rate loans.   However, it is important [to] note that ***Countrywide mitigates these risks or addresses them in part by utilizing different underwriting criteria than that is used for traditional fixed-rate product, such as the requirement for higher credit scores and lower loan to value ratios.***

408.   Also at the June 2, 2005 Conference, Mozilo once again touted the quality of LHI at Countrywide:

> Credit quality of the portfolio remains outstanding with a weighted average ***FICO score that exceeded 730 and a weighted average CLTV loan to value of 80%***.

409. Also at the June 2, 2005 Conference, although he extended Countrywide's 30% market share origination goal to 2010, Mozilo once again assured investors that Countrywide's profitability would not suffer as a result of the Company's aggressive goal: "Questions always asked by you people - are you

going to sacrifice profitability to gain market share?  ***The answer you can see for our plans is absolutely not***."

410.  Moreover, at the June 2, 2005 Conference, Mozilo responded to a question from an unidentified speaker regarding the potential loss exposure to mortgage lenders in the event of a correction in the appreciation of housing prices:

> And I can tell you - ***values going down do not force people out of their homes and does not force people into - never has forced them into delinquency ever. It's the loss of jobs***.

411.  Mozilo's statements made during the June 2, 2005 Conference were materially false and misleading when made.  Specifically, Mozilo's statement that "Countrywide mitigates . . . risks or addresses them in part by utilizing different underwriting criteria [for ARM loans] than that is used for traditional fixed-rate product, such as the requirement for higher credit scores and lower loan to value ratios" was false and misleading for the same reasons set forth in Sections V.C., V.G., and X.  Mozilo's statement that the "credit quality of the portfolio remains outstanding with a weighted average FICO score that exceeded 730 and a weighted average CLTV loan to value of 80%" was false and misleading for the reasons set forth in Sections V.C. and V.G.  Mozilo's statement that Countrywide's profitability would not suffer as a result of its aggressive goal to reach 30% market share by 2010 was false and misleading because Countrywide loosened its underwriting guidelines to increase loan volume without regard to loan quality.  *See* Sections V.C. and X.

### 7.    Second Quarter 2005 Form 8-K

412.  On July 26, 2005, the Company filed a Form 8-K, signed by Milleman, attaching a press release that announced the Company's financial results for the second quarter of 2005.  In the press release, Countrywide reported gain-on-sale of loans and securities of $1,145,409,000, revenues of $2,307,943,000, net earnings of $566,458,000, and diluted earnings per share of $0.92 for the quarter.

COMPLAINT

The Company also reported net LHI of $62,528,327,000, ALL of $155,962,000, net MSR of $9,367,666,000, total assets of $158,617,821,000, total liabilities of $146,962,187,000, and total shareholders' equity of $11,655,634,000.

413.   These figures in the Form 8-K were materially false and misleading when made because the Company's reported value for gain-on-sale loans and securities overstated the fair value of its RIs and MSRs, and also for the reasons detailed in Section VIII.A.

### 8.   Second Quarter 2005 Conference Call

414.   On a conference call held later that day (the July 26, 2005 Conference Call), in which Mozilo, Kurland, and Sieracki participated, the Company's senior management discussed the second quarter 2005 financial results and the third quarter 2005 financial outlook.  Kurland commented on the quality of loans with prepayment penalties, such as Pay-Option ARMs.  Kurland reported a "significantly improved level of loans with prepayment penalties," and added "I think another important point with our pay option portfolio is that [it] actually enjoys one of the lowest levels of delinquency in our entire portfolio, just over a 1% delinquency rate, and so *it is a very high-quality product*."

415.   Also during the July 26, 2005 Conference Call, Mozilo echoed Kurland's claims about the purported high quality of Countrywide's Pay-Option ARMs.  In response to a question from analyst Ken Posner of Morgan Stanley, regarding a recent survey which showed that less-educated and lower-income people were more easily convinced to take out ARM loans without understanding the terms, Mozilo responded:

> I think that Stan pointed that out.  First of all, I can't speak for other lenders, and I won't speak for other lenders; I can only speak for Countrywide.  That product has a FICO score exceeding 700.  You don't see the lower end of the economic spectrum with an unsophisticated people with that kind of FICO score.  *So the people*

> *that Countrywide is accepting under this program, generally*
> *speaking, are of much higher quality and they're not of the of the ilk*
> *that you may be seeing someplace else in the country or [from] some*
> *other lender.*

416.   Also during the call, Kurland and Mozilo responded to a question from a Fox-Pitt Kelton analyst about whether Countrywide's lending practices were loosening, given that Countrywide was originating hybrid ARMs and Pay-Option ARMs:

> Mozilo:  .  .  .  I am not aware of any change of substance in underwriting policies . . . .  *I'm not aware of any loosening of underwriting standards that creates a less of a quality of loan than we did in the past.*  Stan?
>
> Kurland: . . . *[We] have not loosened our standards* relative to what the bank acquires to the extent that we have standards that reflect and pricing that reflects where we are able to deliver loans into the secondary market.

417.   Also, when asked whether Countrywide was loosening its underwriting standards, Mozilo said, "I'm not aware of any change of substance in underwriting policies."  In response to a follow-up question, Mozilo added: "[w]e don't view that we have taken any steps to reduce the quality of our underwriting regimen at all."

418.   On the same July 26, 2005 Conference Call, Kurland reiterated the high quality of the Pay-Option ARMs: "[t]he product itself tends to be highest FICO, very good LTV product . . . ."  Also, Sieracki touted the credit quality of the home equity mortgages that Countrywide originates:

> The credit quality of our home equities should be emphasized here as well.  We are 730 FICO on these home equities, and that's extraordinary throughout the industry.

419.   Similarly, Mozilo and Sieracki stated on the call that the Company retained only high credit quality loans, and there had been no deterioration of the quality of loans originated at Countrywide.  In response to a question from analyst Barry Cohen of Glenview Capital about whether the credit quality in the nonprime mortgage sector was stable or worsening, Mozilo and Sieracki responded:

> Mozilo:  I think it's stable. . . .  I do participate every day in originations myself, and it keeps me apprised of what's happening.  I think that that situation has stabilized.  ***I don't see any deterioration in the quality of those loans being originated.***
>
> Sieracki:  ***I would echo those sentiments.  We are running over 80% premier in A-.  We operate at the very top end of the nonprime credit spectrum.  The FICO scores have remained very steady, just over 600.***

420.   The statements made during the July 26, 2005 Conference Call were materially false and misleading when made.  None of the Officer Defendants issued any corrections to Kurland's statements, thereby ratifying these false public statements.  Specifically, Kurland's statements that Pay-Option ARMs are "a very high-quality product" and "highest FICO, very good LTV product" were false and misleading for the same reasons set forth in Sections V.C. and V.D.  Mozilo's statement that "the people that Countrywide is accepting under this program [for Pay-Option ARMs] . . . are of much higher quality" was false and misleading for the same reasons stated in Sections V.D. and V.G.  Sieracki's statements that Countrywide "operate[s] at the very top end of the nonprime credit spectrum and that the FICO scores have remained very steady, just over 600" were false and misleading for the same reasons set forth above and in Sections V.C. and V.F.  Mozilo's statement that he was "not aware of any loosening of underwriting standards that creates a less . . . quality . . . loan than we did in the past" was also false and misleading because Mozilo knew or was reckless in not knowing that

Countrywide severely loosened its underwriting guidelines to originate high risk, poor quality loans. *See* Section V.C.  Mozilo's statements that he was "not aware of any change of substance in underwriting policies" and that he did not view that the Company had "taken any steps to reduce the quality of our underwriting regimen at all" and Kurland's statement that "we have not loosened our standards" were all false and misleading for the same reasons set forth above and in Sections V.C. and V.G.

421.  Analysts reacted positively to these materially false and misleading statements. For example, on July 26, 2005, analysts at Deutsche Bank "continue[d] to believe that prospects for CFC are bright over the next 12-18 months.  We are reiterating our **Buy** rating[s] and $43 target price."  Deutsche Bank based its views on the representations of the management that "[t]he company has no intention of keeping subprime production on CFC's balance sheet or holding it at Countrywide Bank."

422.  Several other analysts either raised or maintained their recommendations and earnings estimates for Countrywide as a result of Defendants' fraudulent misrepresentations, including:  (1) Piper Jaffray, which reported on July 27, 2005, that "[w]e are maintaining our 2005 and 2006 EPS estimates at $4.15 and $4.50, respectively." "Reiterate Outperform."  The Piper Jaffray analysts described Countrywide as a mortgage lender with loans that are "primarily prime credit quality first-lien mortgage loans secured by single-family residences"; and (2) Lehman Brothers, which reiterated its Overweight rating for Countrywide on July 27, 2005.

### 9.   Second Quarter 2005 Form 10-Q

423.  On August 8, 2005, Countrywide filed its quarterly report on Form 10-Q for the second quarter of 2005 ("2Q 2005 10-Q"), signed by Sieracki and others.  The Company reported financial results as detailed below.

424.   The Company reported that the impairment of the fair value of its other RIs equaled $97,629,000.

425.   In the "Off-Balance Sheet Arrangements and Guarantees" section of the 2Q 2005 10-Q, Countrywide described the R&Ws exposure associated with the securitization of its loans as follows: "[w]e do not believe that any of our off-balance sheet arrangements have had or are reasonably likely to have a current or future material effect on our financial condition, changes in financial condition, results of operations, liquidity, capital expenditures or capital resources."

426.   Countrywide reported consolidated mortgage LHI for the quarter ended June 30, 2005, as follows: prime mortgage loans equaled $40,071,009,000, prime home equity loans equaled $15,890,115,000, and "nonprime" loans equaled $235,838,000 or less than 1% of total mortgage LHI.

427.   The Company also reported the volume of Mortgage Banking nonprime mortgage and prime home equity loans produced (which was included in Countrywide's total volume of Mortgage Banking loans produced).   Specifically, Mortgage Banking prime home equity loans originated during the quarter equaled $6,875,000,000.   Mortgage Banking nonprime mortgage loans originated during the quarter equaled $9,670,000,000, and were 9.5% of the total Mortgage Banking loans produced for the quarter.

428.   The Company described its management of credit risk in the following terms: "[w]e manage mortgage credit risk . . . by retaining high credit quality mortgages in our loan portfolio."

429.   The Company also reported in management's review of the Company's disclosure controls and internal controls: "There has been no change in our internal control over financial reporting during the quarter ended June 30, 2005 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

COMPLAINT

430.   Further assuring investors of the veracity of the information contained in the 2Q 2005 10-Q, the report included Sarbanes-Oxley Act certifications signed by Mozilo and Sieracki, representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide.

431.   The Company's statements regarding financial results as referenced in ¶¶424-26 were materially false and misleading when made as detailed in Section VIII.A. and because the Company overstated the fair value of its RIs, LHI and MSR, understated ALL, understated liabilities related to R&Ws, and overstated net earnings and total shareholders' equity.   Moreover, the representation that Countrywide "only retain[ed] high credit quality mortgages in our loan portfolio" was false and misleading because Countrywide severely loosened its underwriting guidelines during the Relevant Period to increase loan volume without regard to loan quality.   *See* Sections V.C. and V.G.   The statements relating to internal controls were false and misleading because Countrywide's internal controls were ineffective, and for the same reasons set forth in Section VIII.A.6.   The Sarbanes-Oxley Act certifications signed by Mozilo were false and misleading because the financial statements issued by Countrywide were materially misstated and violated GAAP, and for the same reasons stated in Section VIII.A.

### 10.   September 13, 2005 Lehman Brothers Financial Services Conference

432.   Mozilo participated in a conference call with analysts held at Lehman Brothers Financial Services on September 13, 2005 ("September 13, 2005 Conference Call").   During that call, Mozilo praised the Company for its ongoing success, which he attributed to diligent credit risk management and conservative underwriting:

[A]ll business activities are managed with ongoing safety and soundness of Countrywide as our primary concern - focused, managed growth remains our mandate. . . .  With all business lines the majority of credit risk is sold or transferred to third parties with exposure primarily limited to three areas - number one, the bank loan portfolio, while sizable at 56 billion, is *limited to prime quality residential mortgage loans only . . . . Conservative underwriting standards are evidenced by the quality of the portfolio*. . . . Credit risk is also retained primarily from the securitization of prime home equity and nonprime loans.  As a matter of policy we seek to minimize this exposure, which adds 1.4 billion [and] accounts for less than 1% of total company assets - th[is] represents only 2% of the total amount of loans that have been originated and securitized by Countrywide and are still outstanding.  *Last is our exposure to reps and warranties and all loans originated and sold which are primarily prime quality*.

433.  Similarly, during the September 13, 2005 Conference Call, Mozilo again touted the high quality of its loans and the conservative underwriting guidelines at the Company:

From a risk management perspective, *loan underwriting guidelines are conservative and under constant review.  In addition, the bank has made significant advances in automated underwriting technology, which helps to effectively manage risk . . . In regard to pay option loans and interest only loans, each comprise 27% of the portfolio and have an average FICO score above 700*.

434.  Mozilo's statements on the September 13, 2005 Conference Call were materially false and misleading when made.  Specifically, Mozilo's statement that Countrywide's "conservative underwriting standards are evidenced by the quality of the portfolio" was false and misleading because Countrywide classified its

subprime loans as prime loans, and loosened and abandoned its underwriting standards over the Relevant Period to increase loan volume without regard to loan quality, and also for the same reasons set forth in Sections V.C. and V.F. Mozilo's statement that Pay-Option ARMs have an "average FICO score above 700" was false and misleading for the reasons set forth in Sections V.C. and V.D.

### 11.   Third Quarter 2005 Form 8-K

435.   On October 27, 2005, Countrywide filed a Form 8-K, signed by Milleman, that attached a press release announcing strong growth in the Company's financial results for the third quarter of 2005. In the press release, Countrywide reported gain-on-sale of loans and securities of $1,284,992,000, revenues of $2,711,618,000, net earnings of $633,885,000, and diluted earnings per share of $1.03 for the quarter. The Company also reported net LHI of $67,775,774,000, ALL of $184,784,000, net MSR of $11,428,404,000, total assets of $171,293,035,000, total liabilities of $159,053,919,000, and total shareholders' equity of $12,239,116,000.

436.   These figures in the Form 8-K were materially false and misleading when made because the Company's reported value for gain-on-sale loans and securities overstated the fair value of its RIs and MSRs, and also for the reasons detailed in Section VIII.A.

### 12.   Third Quarter 2005 Conference Call

437.   During a conference call held later the same day hosted by Mozilo and Sieracki, among others, the Company's senior management discussed the third quarter 2005 financial results. Mozilo touted the "high quality" of Countrywide's Pay-Option ARMs, stating:

> Pay option ARMs have recently been portrayed negatively. ***But we view this product as enabling us to better serve qualified customers*** looking for a more efficient and flexible way to manage their obligations. It is also an excellent asset for our portfolio, given our

mortgage loan origination, servicing and ***risk management competencies.   And the prime quality of our pay option borrowers . . . .   Our pay option portfolios have very high credit quality, characterized by high FICO scores, solid loan-to-value ratios, and a low debt-to-income ratios.***

438.   Mozilo's statements that Pay-Option ARMs are "prime quality," "have very high credit quality characterized by high FICO scores, solid loan-to-value ratios" and "enabl[e] us to better serve qualified customers" were materially false and misleading when made because Pay-Option ARMs were very risky products that were not used to serve "qualified" customers, but rather high risk borrowers. *See* Sections V.E. and V.C.

439.   Analysts reacted positively to these materially false and misleading statements.   Several analysts either raised or maintained their stellar recommendations and earnings estimates for Countrywide as a result of Defendants' fraudulent misrepresentations, including:   (1) Piper Jaffray, which reported on October 27, 2005, that they reiterated an "Outperform" rating for Countrywide's stock; (2) Credit Suisse First Boston, which reported on November 8, 2005, "Outperform" for Countrywide; and (3) Morgan Stanley, which reported on October 27, 2005, "Overweight" for Countrywide.

### 13.   **Third Quarter 2005 Form 10-Q**

440.   On November 8, 2005, Countrywide filed its quarterly report on Form 10-Q for the third fiscal quarter of 2005, ended September 30, 2005 ("3Q 2005 10-Q"), signed by Sieracki and others.   The Company reported financial results as follows.

441.   In the "Off-Balance Sheet Arrangements and Guarantees" section, Countrywide described its R&Ws exposure associated with the securitization of its loans as follows: "[w]e do not believe that any of our off-balance sheet arrangements have or are reasonably likely to have a current or future material

effect on our financial condition, results of operations, liquidity, capital expenditures or capital resources."

442. Countrywide represented that it had "a portfolio of mortgage LHI, consisting primarily of Prime Mortgage and Prime Home Equity Loans, which totaled $62.2 billion at September 30, 2005." Specifically, Countrywide reported prime mortgage and prime home equity LHI that equaled $45,664,924,000, and $15,314,508,000, respectively, and nonprime mortgage LHI were reported at $263,973,000, or less than 1% of total mortgage LHI.

443. Countrywide also reported the volume of Mortgage Banking nonprime and prime home equity loans produced (which was included in Countrywide's total volume of Mortgage Banking loans produced). Specifically, Mortgage Banking prime home equity loans originated during the quarter equaled $10,344,000,000. Mortgage Banking nonprime loans originated during the quarter equaled $11,399,000,000 and were 8.7% of total Mortgage Banking loans originated during the quarter.

444. Moreover, the Company boasted in its 3Q 2005 10-Q as to the high quality of its loans: The Company "retain[s] high credit quality mortgages in [its] loan portfolio[ ]" and "[o]ur Pay Option loan portfolio has [a] very high initial loan quality, with original average credit rating . . . of 720 and original loan-to value and combined loan-to-values of 74% and 78%, respectively."

445. The Company also reported management's review of the Company's disclosure controls and internal controls: "There has been no change in our internal control over financial reporting during the quarter ended September 30, 2005 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

446. Further assuring investors of the veracity of the information contained in its 3Q 2005 10-Q, the report included Sarbanes-Oxley Act certifications signed by Defendants Mozilo and Sieracki, representing that the "report does not contain

any untrue statement of a material fact" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide.

447.   The Company's statements regarding financial results as referenced in ¶¶441-42 were materially false and misleading when made as detailed in Section VIII.A. and because the Company overstated the fair value of its RIs, LHI and MSR, understated ALL, understated liabilities related to R&Ws, and overstated net earnings and total shareholders' equity.  Also, the statements regarding the quality of the volume of loans produced and LHI were false and misleading because Countrywide misclassified its subprime loans as prime loans, and also for the same reasons set forth in Section V.F.  Moreover, the representations that Countrywide "retain[s] high credit quality mortgages in [its] loan portfolio[]" and "[o]ur Pay Option loan portfolio has [a] very high initial loan quality, with original average credit rating . . . of 720" were false and misleading because Countrywide severely loosened its underwriting guidelines to increase loan volume without regard to loan quality.  *See* Sections V.D. and V.C.  The statements relating to internal controls were false and misleading because Countrywide's internal controls were ineffective, and for the same reasons set forth in Section VIII.A.6.  The Sarbanes-Oxley Act certifications signed by Defendants Mozilo and Sieracki were false and misleading because the financial statements issued by Countrywide were materially misstated and violated GAAP, and for the same reasons stated in Section VIII.A.

### 14.   <u>Year End 2005 Form 8-K</u>

448.   On January 31, 2006, Countrywide filed a Form 8-K, signed by Milleman, attaching a press release that announced the Company's financial results for the fourth quarter and year ended December 31, 2005.  In the press release, Countrywide reported gain-on-sale of loans and securities of $1,069,628,000, revenues of $2,592,262,000, net earnings of $638,895,000, and diluted earnings

per share of $1.03 for the quarter.   The Company also reported net LHI of $70,071,152,000, ALL of $189,201,000, net MSR of $12,610,839,000, total assets of $175,085,370,000, total liabilities of $162,269,510,000, and total shareholders' equity of $12,815,860,000.

449.   These figures in the Form 8-K were materially false and misleading when made because the Company's reported value for gain-on-sale loans and securities overstated the fair value of its RIs and MSRs, and also for the reasons detailed in Section VIII.A.

### 15.   Year End 2005 Conference Call

450.   Defendants Mozilo and Sieracki participated on a conference call held later that same day ("January 31, 2006 Conference Call") to discuss the Company's 2005 financial results.   During the call, Mozilo highlighted the Company's purported "high quality" assets:

> The amount of pay option loans in the Bank's portfolio now stands at 26 billion, up from 22 billion last quarter. . . . It's important to note that our *loan quality remains extremely high*.

451.   Mozilo's statement on the January 31, 2006 Conference Call was materially false and misleading when made because Countrywide loosened and abandoned its underwriting standards to increase the volume of loans originated without regard to quality.  *See* Sections V.C. and V.G.

452.   Analysts reacted positively to Mozilo's materially false and misleading statements above.   For example, on February 1, 2006, AG Edwards reported that "[w]e are maintaining our 2006 EPS estimate of $4.15 and reiterating our Buy rating and $41 price objective."

453.   Several other analysts either raised or maintained their stellar recommendations and earnings estimates for Countrywide as a result of Defendants' fraudulent misrepresentations, including:   (1) Citigroup, which reported on February 3, 2006, that "[w]e continue to view CFC as a cheap growth

company which is well positioned during the current 'inflection period' in mortgage finance." In part, Citigroup's decision was based upon Countrywide's representations that "the company has experienced immaterial credit losses over its 35 years in the mortgage banking business"; and (2) Credit Suisse, which reported on February 8, 2006, that it rated Countrywide as "Outperform."

### 16.   2005 Form 10-K

454.   On March 1, 2006, Countrywide filed its Annual Report for 2005 with the SEC on Form 10-K ("2005 Form 10-K"). The report was signed by Mozilo, Sieracki, and others. Countrywide reported gain-on-sale of loans and securities of $4,861,780,000, revenues of $10,016,708,000, net earnings of $2,528,090,000, and diluted earnings per share of $4.11 for the quarter. The Company also reported net LHI of $70,071,152,000, ALL of $189,201,000, net MSR of $12,610,839,000, total assets of $175,085,370,000, total liabilities of $162,269,510,000, and total shareholders' equity of $12,815,860,000.

455.   In a section of the 2005 Form 10-K titled "Valuation of MSRs and Other Retained Interests," the Company reported that the fair value of the RIs on the Company's balance sheet as of December 31, 2005, was $2,675,461,000. Further, the Company reported impairment in the fair value of its other RIs that equaled $364,506,000.

456.   In the "Off-Balance Sheet Arrangements and Guarantees" section, Countrywide described the R&Ws exposure associated with the securitization of its loans as follows: "[w]e do not believe that any of our off-balance sheet arrangements have or are reasonably likely to have a current or future material effect on our financial condition, changes in financial condition, results of operations, liquidity, capital expenditures or capital resources."

457.   In a section titled "Credit Risk Management," the Company also reported that the liabilities associated with the risk of R&Ws "total[ed] $169.8 million."

458.   Countrywide reported in its 2005 Form 10-K that prime mortgages and prime home equity LHI equaled $48,619,590,000 and $14,991,351,000, respectively, and nonprime mortgage LHI equaled $255,677,000, or less than 1% of total mortgage LHI.

459.   The Company also reported the volume of Mortgage Banking nonprime and prime home equity loans produced (which was included in the total volume of loans produced). Specifically, Mortgage Banking prime home equity loans originated during the year equaled $33,334,000,000.   Mortgage Banking nonprime mortgage loans originating during the year equaled $40,089,000,000, and were 9.3% of the total Mortgage Banking loans originated for the year ended.

460.   Moreover, the Company stated the following as to the purported high quality of its loans:

> The majority of our loan production consists of Prime Mortgage loans[;] . . . [o]ur Pay Option loan portfolio has a relatively high initial loan quality, with original average FICO scores . . . of 720 and original loan-to-value and combined loan-to-values of 75% and 78%, respectively.

461.   In a section of the 2005 Form 10-K titled "Mortgage Credit Risk," the Company described its Credit Policy, portraying it as a tightly controlled and supervised process designed to produce "loans [that] are salable in the secondary mortgage market" through a rigorous pre-loan screening procedure and post-loan auditing and appraisal and underwriting reviews:

> **Loan Quality**
>
> Our credit policy establishes standards for the determination of acceptable credit risks.   Those standards encompass borrower and collateral quality, underwriting guidelines and loan origination standards and procedures.   Borrower quality includes consideration of the borrower's credit and capacity to pay.   We assess credit and

capacity to pay through . . . manual or automated underwriting. . . . Our underwriting guidelines for non-conforming mortgage loans, Prime Home Equity Loans, and Nonprime Mortgage Loans have been designed so that these loans are salable in the secondary mortgage market. We developed these guidelines to meet the requirements of private investors, rating agencies and third-party credit enhancement providers.

These standards and procedures encompass underwriter qualifications and authority levels, appraisal review requirements, fraud controls, funds disbursement controls, training of our employees and ongoing review of their work. . . . We also employ proprietary underwriting systems in our loan origination process that improve the consistency of underwriting standards, assess collateral adequacy and help to prevent fraud, while at the same time increasing productivity.

We supplement our loan origination standards and procedures with a post-funding quality control process. Our Quality Control Department, under the direction of the Chief Credit Officer, is responsible for completing loan audits that may consist of a re-verification of loan documentation, an underwriting and appraisal review, and if necessary, a fraud investigation.

462. Further, Countrywide represented in its 2005 Form 10-K that it managed its credit risk by retaining high credit quality mortgages: "[w]e manage mortgage credit risk . . . *by retaining high credit quality mortgages in our loan portfolio*."

463. Assuring investors of the veracity of the information contained in the 2005 Form 10-K, the report included Sarbanes-Oxley Act certifications signed by Defendants Mozilo and Sieracki, representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other

financial information included in this report, fairly present in all material respects the financial condition" of Countrywide and that the Company employed internal disclosure controls and procedures that detect "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting" and "[a]ny fraud, whether or not material, that involves management."

464.   The Company's statements regarding financial results as referenced in ¶¶454-58 were materially false and misleading when made as detailed in Section VIII.A. and because the Company overstated the fair value of its RIs, LHI and MSR, understated ALL, understated liabilities related to R&Ws, and overstated net earnings and total shareholders' equity.   Further, the statements relating to the volume of prime home equity and nonprime loans produced and the value of prime LHI were false and misleading because Countrywide misclassified subprime loans as prime loans to inflate volumes of prime loans, and for the same reasons set forth in Section V.F.   Moreover, the statements that Countrywide "retain[ed] high credit quality mortgages in our loan portfolio" and that its loan origination standards and procedures were designed to produce "loans [that] are salable in the secondary mortgage market" and "[o]ur Pay Option loan portfolio has a relatively high initial loan quality, with original average FICO scores . . . of 720" were false and misleading because Countrywide severely loosened and abandoned its underwriting practices to boost loan volume without regard for loan quality, and for the reasons set forth in Sections V.C.,V.D., V.G., and X.   Moreover, the Sarbanes-Oxley Act certifications signed by Defendants Mozilo and Sieracki were false and misleading because the financial statements issued by Countrywide were materially misstated and violated GAAP, the Company's internal controls were ineffective, and for the same reasons stated in Section VIII.A.

**D.    The Company's False Statements Regarding 2006 Results**

**1.    March 21, 2006 Piper Jaffray Conference**

465.   On March 21, 2006, Sieracki spoke at a Financial Services Conference hosted by Bob Napoli of Piper Jaffray ("March 21, 2006 Conference"). During the conference, Sieracki falsely described the loan portfolio held by Countrywide:

> Touch real briefly on our bank.  Basically, our strategy here is to move . . . towards a portfolio strategy, stabilizing our earnings growth and converting that gain on sale into portfolio spread income.  And the key driver here is the portfolio.  You can see back in December of '01, the portfolio was basically at zero.  By December 31, it was up to $64 billion.  In terms of composition, it is roughly 40% pay option ARMs . . . hybrids, that is about 30%; HELOCs . . . about 20%; and then fixed-rate which is mostly seconds, very short duration seconds, would be about 10%.  Over on the far right, we show you some credit stats which show the ***extreme conservative nature of the investments that we're making here***.  The total loan portfolio $63 billion.  The original CLTV, now this would include any seconds, thirds, any junior liens, 78%; very, very low.  The FICO, 725, very very hi(gh), and of course the delinquencies as a result on this relatively unseasoned portfolio, only 40 basis points.  ***Very, very little risk taken in this portfolio***, strictly residential mortgages, no construction loans, no commercial loans, ***nothing exotic; very, very conservative lending strategy***.

466.   The statements made during the March 21, 2006 Conference were materially false and misleading when made.  Specifically, Sieracki's statements regarding Countrywide's "conservative lending strategy" were false and

misleading because Countrywide loosened and abandoned its underwriting guidelines to increase loan volume without regard to loan quality and because Countrywide relied on fraudulent appraisals to boost loan production. *See* Sections V.C. and V.G. Further, the statements relating to the classification of loans in Countrywide's loan portfolio were false and misleading because Countrywide misclassified subprime loans as prime loans to inflate volumes of prime loans, and for the same reasons set forth in Section V.F.

### 2. March 30, 2006 Financial Equity Investor's Forum

467. Countrywide hosted a Financial Equity Investors Forum on March 30, 2006 ("March 30, 2006 Conference"), attended by Mozilo, Kurland, Sambol, Sieracki and Carlos Garcia ("Garcia"), Countrywide's Executive Managing Director for Banking and Insurance. During the conference, in response to a question about how Countrywide expected to maintain the Company's culture in a period of growth, Sambol responded:

> We're extremely competitive in terms of our desire to win, and we have a particular focus on offense, which at the same time is supplemented by a strong defense as well, meaning that we have an intense and ongoing focus on share growth while at the same time maintaining a very strong internal control environment and what we believe is best-of-class governance. . . . *[O]ur culture is also characterized by a very high degree of ethics and integrity in everything that we do.*

468. In response to a question about whether there was any truth to criticism that Countrywide was under-reserving for its loan portfolio, Garcia noted that Countrywide's reserves were more than sufficient because Countrywide fully understood the risk and because the loans that Countrywide originated were very high quality:

I would like to start off by commenting on the quality of the loans and the portfolio, although you're right that we have a growing portfolio of pay options, the pay options that we're originating are very high-quality pay options, both in terms of FICO and LTV, as well as other credit attributes that we look at . . . . Also, our pay option reduction is originated through the Countrywide channels and is a ***beneficiary of strong underwriting*** . . . . So we think we understand the risk very well . . . . In the area of delinquency, they are outperforming the other first-lien products by a long shot. . . . In terms of our reserves and charge-offs, I would have you look at our charge-off experience and relate it to our reserves.  Our reserves are around 18 basis points and our charge-off experience is something like in the neighborhood of two to three basis points.  And so there's a multiples of the charge-off experience in the reserve, ***we have reserved not based on our historical experience,*** because we've been growing a new book, so we've looked at all of these different scenarios and ***made many conservative assumptions and based on our [loan loss] reserves on that.***

469.   Mozilo also spoke during the conference about his ownership and sales of Countrywide's stock.  Mozilo claimed that he sold his Countrywide stock pursuant to a 10b5-l plan and "had no control over it":

Lisa Riordan - Countrywide Financial - EVP Investor Relations: Great. Some people feel that insider ownership is a little low.  Can you comment on this?

Mozilo: . . . Now, in my case, I own about a quarter of a [billion] [shares].  I don't know what the scope of what you think is wealthy, but I own about 250 some-odd [m]illion, 260 [m]illion, if I can read that right, between the stock and options that I hold and [a] small

amount of incentive stock, which I just think has just vested. And the only thing ~ I've not sold any shares for years. . . . ***But in recent years I've sold no stock and I have no intention of selling any stock.***

The only thing I've sold are options that are expiring.  And I have a group that you've seen, those of you that follow, have seen me sell a certain amount of shares every week that's under a [10b5-1 plan] ***so I have no control over it.***  And I think the last exploration [sic] is either May or June of this year and I have options in the outer years. So ***I've only sold those that I've been compelled to sell because I really believe in this company***, I believe we're just at the threshold of our greatness.

470.   The statements made during the March 30, 2006 Conference were materially false and misleading when made.   None of the Officer Defendants issued any corrections to Garcia's statements, thereby ratifying these false public statements.   Specifically, Sambol's statements about Countrywide's "very strong internal controls" and "high degree of ethics" were false and misleading because Countrywide loosened and abandoned its underwriting guidelines to increase loan volume without regard to loan quality and because Countrywide relied on fraudulent appraisals to boost loan production.  *See* Sections V.C., and V.G.  The statements that the Company's loan loss reserves were adequate because the Company's portfolio purportedly contained high credit quality loans was false and misleading because Defendants failed to account for the increased risk of its mortgage loans.  *See* Sections V.C., VIII.A., and X.  Mozilo's statement he sold his Countryside stock pursuant to a 10b5-1 plan and "had no control over it" was false for the reasons set forth in Section VI.B.

471.   Analysts reacted positively to Countrywide's materially false and misleading statements.   For example, on March 31, 2006, Citigroup analysts reiterated a "Buy" rating for Countrywide's shares based in part on management's

false "upbeat assessment of CFC's positioning & growth prospects during the current mortgage downturn [at the investor forum]."

### 3. First Quarter 2006 Form 8-K

472. On April 27, 2006, Countrywide filed a Form 8-K, signed by Milleman, attaching a press release that announced the Company's financial results for the first quarter of 2006. The Company reported a slight decrease in year-over-year earnings. In the press release, Mozilo attributed the decrease to an increasingly challenging environment. In the press release, Countrywide reported gain-on-sale of loans and securities of $1,361,178,000, revenues of $2,835,948,000, net earnings of $683,511,000, and diluted earnings per share of $1.03 for the quarter. The Company also reported net LHI of $74,107,611,000, ALL of $172,271,000, fair value MSR of $14,171,804,000, total assets of $177,592,056,000, total liabilities of $164,085,803,000, and total shareholders' equity of $13,506,253,000.

473. These figures in the Form 8-K were materially false and misleading when made because the Company's reported value for gain-on-sale loans and securities overstated the fair value of its RIs and MSRs, and also for the reasons detailed in Section VIII.A. Mozilo's statement in the attached press release that the decrease in the Company's earnings was due to a "challenging environment" was false and misleading for the reasons set forth in Sections V.C. and V.G.

### 4. First Quarter 2006 Conference Call

474. On a conference call held later that same day in which Mozilo and Sieracki participated ("April 27, 2006 Conference Call"), the Company's senior management discussed the first quarter 2006 financial results and the financial outlook for the second quarter of 2006. During the call, Mozilo falsely stated that the reason for a $44 million increase in the Company's consolidated provision for loan losses "*was primarily a result of growth and seasoning of the investment loan portfolio*."

475.   Also during the call, Mozilo highlighted the purported quality of the Company's Pay-Option ARM loans, which had increased from the previous quarter:

> It's important to note that ***our pay option loan quality remains extremely high***. Original CLTVs and original loan to values are 78% and 75% respectively. Average FICO scores on the pay option portfolio are over 720.

476.   The statements made during the April 27, 2006 Conference Call were materially false and misleading when made.   Specifically, Mozilo's statement regarding the reasons why Countrywide increased its loan loss provision by $44 million was false and misleading for the reasons set forth in Section VIII.A.2. Mozilo's statements that Countrywide's "pay option loan quality remains extremely high" and its "[a]verage FICO scores on the pay option portfolio are over 720" were false and misleading for the same reasons set forth in Sections V.C., V.D., and V.G.

477.   Analysts reacted positively to these materially false and misleading statements.   For example, on April 27, 2006, AG Edwards reported that "[w]e are raising our 2006 and 2007 EPS estimates by $0.20 each to $4.50 and $4.90, respectively.  We remain bullish on CFC . . . ."

478.   Several other analysts either raised or maintained their stellar recommendations and earnings estimates for Countrywide as a result of Countrywide's misrepresentations, including: (1) Credit Suisse First Boston, which rated Countrywide "Outperform" on May 3, 2006; and (2) Morgan Stanley, which rated Countrywide as "Overweight" on May 11, 2006.

### 5.   First Quarter 2006 Form 10-Q

479.   On May 10, 2006, Countrywide filed its quarterly report on Form 10-Q for the first quarter of 2006 ("1Q 2006 10-Q"), signed by Sieracki and others. The Company reported financial results as follows.

480.   The Company reported that the impairment of RIs for the quarter equaled $120,654,000.

481.   In the "Off-Balance Sheet Arrangements and Guarantees" section, Countrywide described the R&Ws exposure associated with the securitization of its loans, as follows: "We do not believe that any of our off-balance sheet arrangements have, or are reasonably likely to have, a current or future material effect on our financial condition, results of operations, liquidity, capital expenditures or capital resources."

482.   In a section titled "Credit Risk Management," the Company reported the liabilities associated with the risk of R&Ws that "totaled $271.9 million at March 31, 2006."

483.   Countrywide also reported LHI, as follows: prime mortgages and prime home equity LHI equaled $53,463,593,000 and $14,963,131,000, respectively.  Nonprime mortgage LHI equaled $324,040,000, or less than 1% of total mortgage LHI.

484.   The Company also reported the volume of Mortgage Banking nonprime and prime home equity loans produced (which was included in the total Mortgage Banking volume of loans produced for the quarter ended).  Mortgage Banking prime home equity loans originated during the quarter equaled $9,528,000,000.  Mortgage Banking nonprime mortgage loans originated during the quarter equaled $8,099,000,000, and were 8.7% of the total Mortgage Banking loans originated.

485.   The Company also touted the high quality of its loans:

[W]e have a portfolio of mortgage loans held for investment, consisting **primarily of Prime Mortgage and Prime Home Equity Loans** . . . .

\*\*\*

> We view [pay option adjustable rate] loans as a profitable product that does not create disproportionate credit risk. ***Our Pay Option loan portfolio has very high initial loan quality, with original average FICO scores (a measure of credit rating) of 721 and original loan-to-value and combined loan-to-values of 75% and 78%, respectively***.

486.   With respect to management's review of the Company's disclosure controls and internal controls, the 1Q 2006 10-Q reported: "There has been no change in our internal control over financial reporting during the quarter ended March 31, 2006 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

487.   Further assuring investors of the veracity of the information contained in the 1Q 2006 10-Q, the report included Sarbanes-Oxley Act certifications signed by Defendants Mozilo and Sieracki, representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide.

488.   The Company's statements regarding financial results as referenced in ¶¶480-83 were materially false and misleading when made as detailed in Section VIII.A., and because the Company overstated the fair value of its RIs, LHI and MSR, understated ALL, understated liabilities related to R&Ws, and overstated net earnings and total shareholders' equity. Also, management's statements regarding the quality of the volume of loans produced and LHI were false and misleading because the Company misclassified subprime loans as prime loans, and also for the reasons set forth in Section V.F. Moreover, the representations that Countrywide "view[s] [Pay Option ARM] loans as a profitable product [with] very high initial loan quality" and "portfolio of mortgage loans held for investment, consisting primarily of Prime Mortgage and Prime Home Equity Loans" were false and misleading because Countrywide loosened and abandoned its underwriting

guidelines to increase loan volume without regard to loan quality, and misled investors about the creditworthiness of Pay-Option ARM borrowers.  *See* Sections V.B., V.D., and V.G.  The statements relating to internal controls were false and misleading because Countrywide's internal controls over financial reporting were ineffective.  *See* Section VIII.A.6.  The Sarbanes-Oxley Act certifications signed by Defendants Mozilo and Sieracki were false and misleading because the financial statements issued by Countrywide were materially misstated and violated GAAP, and for the same reasons stated in Section VIII.A.

### 6.   May 17, 2006 American Financial Services Association Finance Industry Conference For Fixed Income Investors

489.   On May 17, 2006, Countrywide participated in the American Financial Services Association's Finance Industry Conference for Fixed Income Investors ("May 17, 2006 Conference").   At the conference, Countrywide's Managing Director of Treasury Finance, Vincent Breitenbach ("Breitenbach"), discussed the Company's credit risk management and emphasized that Countrywide limited its credit risk by underwriting loans with "strong FICO scores," high down payments or low LTV's:

[W]e do have a very healthy conservative approach to credit. . . . We talked about some of the metrics that we look at while underwriting credit.  ***We want strong FICO scores, we want high down payments or low LT[V]s***.

490.   Breitenbach also described the type of borrowers that Countrywide targeted for ARM loans in order to maintain high credit quality:

In our view the most important risk associated with this [Pay Option ARM] product in negative amortization is to ensure that the borrower is not using that optionality just get in the house.  Said another way, if the only way you can own that house is by making a minimum payment, we don't want that loan.  The type of customer we're

looking for is someone who is a salesperson who may have some variability in their monthly pay, an investment banker who has 11 months of reasonably good pay and then hopefully has one really good month when he gets a bonus.  We have a lot of *fairly rich people* in there who are looking at this product as an arbitrage opportunity.  If you can borrow money against a $2 or $3 million house at 3, 4, 5%, then you can go out and invest in the market at a significantly greater rate.  People we use - *some rich people at least* - will use this as an arbitrage type of a vehicle.  So these are the type of customers that we're looking for.

491.   Breitenbach also falsely stated that Countrywide had safe-guards against subprime loans in its portfolio:

The way that we guard against not having sub-prime people in our portfolio is a couple of different things.  First of all the FICO scores would indicate to us that from a historical perspective, this guy has shown the ability and the propensity to pay on time, *with a 727 average FICO score.  And by the way, the dispersion around that mean is pretty tight.  Again, we're not trying to fool you and we're certainly not going to fool ourselves by putting in a bunch of lower quality borrowers into the portfolio*.

492.   The statements referenced above during the May 17, 2006 Conference were materially false and misleading when made.  Moreover, none of the Officer Defendants issued any corrections to Breitenbach's statements, thereby ratifying these false public statements.  Specifically, Breitenbach's statements that the Company has "a very healthy conservative approach to credit" and that the Company wanted "strong FICO scores," "high down payments" and "low LT[V]s" were false and misleading because Countrywide severely loosened and eventually abandoned its underwriting standards to increase loan volume without regard to

loan quality.  *See* Section V.C.  In addition, Breitenbach's statements relating to borrowers who are "fairly rich" and sophisticated for the Company's Pay-Option ARMs were misleading for the same reasons set forth in Sections V.C. and V.D. Lastly, Breitenbach's statement that Countrywide "guards against not having subprime people in our portfolio" at the bank was false and misleading for the same reasons set forth in Sections V.C., V.F., and V.G.

### 7.  May 31, 2006 Sanford C. Bernstein Strategic Decisions Conference

493.  On May 31, 2006, Mozilo spoke at the Sanford C. Bernstein Strategic Decisions Conference ("May 31, 2006 Conference"), at which he falsely reassured investors the Pay-Option ARMs were a sound, well-understood loan product:

> [T]he amount of pay option loans in the bank's portfolio now stands at $31 billion, up 19% from $26 billion in the last quarter.  Despite recent scrutiny to pay option loans, and there's been plenty, Countrywide views the product as ***a sound investment for our Bank*** and a sound financial management tool for consumers.  Pay Option loans represent the best whole loan type available for portfolio investment from an overall risk and return perspective.

494.  Although acknowledging that Pay-Option ARMs carry more risk than other loans, Mozilo represented that "the margin on this product more than compensates for the additional credit risk" and that Countrywide actively managed this increased risk with "prudent program guidelines" and "sound underwriting":

> The performance profile of this product ***is well understood*** because of its 20-year history, which includes stress tests in very difficult environments.
>
> ***Moreover,*** Countrywide actively manages credit risk through prudent program guidelines including [negative] amortization limits and sound underwriting.

COMPLAINT

495.   Mozilo also downplayed the impacts of any deterioration in housing prices:

> I failed to cover in that first question, you asked what's the impact of Countrywide if you had deterioration [in home] values?  ***Very little*** because these loans are insured mostly, a Fannie, Freddie or private mortgage insurance.   So you see the bank, [has] very substantial [equity] in the loan [to] valuation ratio.   ***So the impact [to] Countrywide through any of these cycles has been de minimis in terms of what happens when values go lower.***

496.   During the May 31, 2006 Conference, Mozilo again held himself out as personally involved in day-to-day loan originations at Countrywide as he touted Countrywide's expanding Pay-Option ARM portfolio: "***I originate loans every day just so I stay close to the ground and I try to continue to understand what's happening in the field.***"

497.   The statements made during the May 31, 2006 Conference were materially false and misleading when made.   Specifically, Mozilo's statements about the soundness of Countrywide's Pay-Option ARMs portfolio and its active management of credit risk for this portfolio through "prudent program guidelines" and "sound underwriting" were false and misleading because Countrywide loosened and abandoned its underwriting guidelines to increase loan volume without regard to loan quality and because Countrywide relied on fraudulent appraisals to boost loan production.   *See* Sections V.C. and V.G.

### 8.   <u>Second Quarter 2006 Form 8-K</u>

498.   On July 25, 2006, Countrywide filed a Form 8-K ("2Q 2006 8-K"), signed by Milleman, attaching a press release that announced the Company's financial results for the second quarter of 2006.   In the press release, Countrywide reported gain-on-sale of loans and securities of $1,527,450,000, revenues of $3,000,216,000, net earnings of $722,190,000, and diluted earnings per share of

$1.15 for the quarter.  The Company also reported net LHI of $79,807,599,000, ALL of $183,581,000, fair value MSR of $15,320,575,000, total assets of $194,984,463,000, total liabilities of $180,687,506,000, and total shareholders' equity of $14,296,957,000.

499.   These figures in the 2Q 2006 8-K were materially false and misleading when made because the Company's reported value for gain-on-sale loans and securities overstated the fair value of its RIs and MSRs, and also for the reasons detailed in Section VIII.A.

## 9.   Second Quarter 2006 Conference Call

500.   There was a conference call held later the same day ("July 25, 2006 Conference Call"), hosted by Defendants Mozilo and Sieracki, among others, during which the Company's senior management discussed the second quarter 2006 financial results.  In response to a question from a Bear Stearns analyst about real estate appraisal values and whether Countrywide used internal or external appraisers, Mozilo touted the quality of the Company's appraisers, stating that Countrywide had very high quality internal and external appraisers:

> [W]e have a panel of appraisers, approved appraisers, that work through LandSafe.  Each one of these appraisers throughout the country are approved by us.  We do have internal appraisers to review the work of outside appraisers.  So the answer to both is yes.  ***Again, we'll only use our own approved appraisers, and that panel is screened very carefully from time to time to make sure that we are getting rid of the bad ones and we're only putting in good ones.***

501.   Mozilo's statement that Countrywide was "getting rid of the bad [appraisers]" and "only putting in good ones" was materially false and misleading when made for the reasons set forth in Section V.G.

502.   Analysts reacted positively to the Company's materially false and misleading statements.  For example, on July 25, 2006, analysts at Citigroup rated

Countrywide's stock a "Buy" with "Medium risk," and on July 26, 2006, Piper Jaffray, reiterated their Outperform rating on Countrywide stock.

### 10.   Second Quarter 2006 Form 10-Q

503.   On August 7, 2006, Countrywide filed its quarterly report on Form 10-Q for the second quarter of 2006 ("2Q 2006 10-Q") signed by Sieracki and others.  The Company reported financial results as detailed below.

504.   The Company reported that the recovery of its RIs equaled $51,498,000.

505.   In the "Off-Balance Sheet Arrangements and Guarantees" section, Countrywide described the R&Ws exposure associated with the securitization of its loans, as follows: "We do not believe that any of our off-balance sheet arrangements have had, or are reasonably likely to have, a current or future material effect on our financial condition, results of operations, liquidity, capital expenditures or capital resources."

506.   Countrywide also represented that it assumed risk with its R&Ws when it underwrote loans to the secondary market.  Management stated that: "[t]he liability associated with this risk totaled $307.6 million at June 30, 2006 and $169.8 million at December 31, 2005."

507.   Countrywide reported mortgages held for investment in its 2Q 2006 10-Q.   Prime mortgage loans and prime home equity loans equaled $55,433,612,000 and $19,081,303,000, respectively.   Nonprime mortgage LHI equaled $9,290,000, or less than 1% of total mortgage LHI.

508.   The volume of Mortgage Banking loans originated for the quarter by mortgage loan type, was reported as follows: prime, prime home equity and nonprime loans amounted to $82,229,000,000, $11,235,000,000, and $10,171,000,000, respectively.

509.   Moreover, the Company made a representation in its 2Q 2006 10-Q as to the purported high quality of its loans:

[W]e have a portfolio of mortgage loans held for investment, consisting **_primarily of Prime Mortgage and Prime Home Equity Loans . . . ._**

\*\*\*

Our Pay Option investment loan portfolio borrowers had, at the time the loans were originated, average FICO scores (a measure of borrower creditworthiness) of 721 and original loan-to value and combined loan-to-values of 75% and 78%, respectively.

510.   The Company also reported management's review of the Company's disclosure controls and internal controls: "There has been no change in our internal control over financial reporting during the quarter ended June 30, 2006 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

511.   Further assuring investors of the veracity of the information contained in its 2Q 2006 10-Q, the report included Sarbanes-Oxley Act certifications signed by Defendants Mozilo and Sieracki representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide.

512.   The Company's statements regarding financial results as referenced in ¶¶504-507 were materially false and misleading when made as detailed in Section VIII.A. and because the Company overstated the fair value of its RIs, LHI and MSR, understated ALL, understated liabilities related to R&Ws, and overstated net earnings and total shareholders' equity.  Also, management's statements regarding the quality of the volume of loans produced and LHI were also false and misleading because Countrywide misclassified its subprime loans as prime loans, and also for the reasons set forth in Section V.F.  Moreover, the representations that "[o]ur Pay Option investment loan portfolio borrowers [had] . . . average FICO

scores . . . of 721" and "[our] portfolio of mortgage loans held for investment, consist[ed] primarily of Prime Mortgage and Prime Home Equity Loans" were false and misleading because the Company loosened and abandoned its underwriting practices to increase loan volume without regard to loan quality. *See* Sections V.C.–V.G. The statements relating to internal controls were false and misleading because the Company's internal controls over financial reporting were ineffective. *See* Section VIII.A.6. The Sarbanes-Oxley Act certifications signed by Defendants Mozilo and Sieracki were false and misleading because the financial statements issued by Countrywide were materially misstated and violated GAAP, and for the same reasons stated in Section VIII.A.

### 11. September 12, 2006 Equity Investor's Forum

513. On September 12, 2006, Countrywide held an Equity Investor's Forum near its California headquarters in which Mozilo, Sambol and Sieracki participated ("September 12, 2006 Conference"). Jim Furash ("Furash"), Countrywide's Senior Managing Director and President of Countrywide Bank, emphasized numerous times during the conference, without correction or explanation by Mozilo, Sambol or Sieracki, the "high quality" of loans held by Countrywide's Bank:

> [W]e have built a very large, fast growing, and very efficient deposit franchise that has enabled Countrywide to invest in a ***top quality mortgage origination***. . . . ***But essentially our model is investing in very low-risk assets today***, and a very low net interest margin.
>
> * * *
>
> ***[I]incredibly strong asset quality at the bank. I'd like to emphasize again the large, tangible, high quality balance sheet that we build*** . . . . ***A very strong portfolio***. . . . So we're very pleased with the credit decisions that we're making and the returns that we are receiving as a result of those decisions.

514.   Furash also touted that the Company's loan loss reserves sufficiently anticipated any potential threats in its loan portfolio:

> Obviously the bank's total footings and earnings have been growing substantially over the last years, ***but we've been able to match that growth with our growth and our loan loss reserve.  So even though we are growing our balance sheet very quickly, we continue to build our reserves in anticipation of any potential threats that we see in the portfolio.  And again I'm very proud of that ability to maintain this loan loss reserve growth while maintaining our earnings productivity*** that I mentioned earlier.   Again today our loan loss reserve's about $163 million dollars, 21 basis points on assets and that's up three basis points over the last quarter alone I believe.

515.   The statements by Furash referenced above during the September 12, 2006 Conference, which were ratified and approved by the Officer Defendants, were materially false and misleading when made.  Specifically, Furash's statement that "Countrywide invests in [ ] top quality mortgage origination . . . in low risk assets" was false and misleading because Countrywide loosened and abandoned its underwriting guidelines during the Relevant Period.  *See* Section V.C.   Further, Furash's statement that "we continue to build our [loan loss] reserves in anticipation of any potential threats" was false and misleading because Countrywide understated its ALL, overstated LHI on its balance sheet and overstated revenues.  *See* Section VIII.A.

### 12.   September 13, 2006 Fixed Income Investor Forum

516.   On September 13, 2006, Countrywide hosted a Fixed Income Investor Forum ("September 13, 2006 Conference") in which Mozilo, Sambol and Sieracki participated.  At the conference, Mozilo touted the Company as an industry role model for prudent lending:

Not only did we drive efficiency in the marketplace, but as an industry leader **we served as a role model to others in terms of responsible lending**.  We take seriously the role of a responsible lender for all of our constituencies. . . .  **To help protect our bond holder customers, we engage in prudent underwriting guidelines** . . . .

517.  Mozilo further assured investors that Countrywide was **different** from other, irresponsible lenders; that it was well-equipped to handle the "cooling housing market," and that its proprietary systems would allow it to "manage" issues regarding consumer leverage, the proliferation of non-traditional mortgage products, and potential for increases in delinquencies:

As an industry leader we are in a unique position to capitalize on these economic and competitive issues.  That may not be the case for everyone, but let me illustrate how it is the case for Countrywide . . . .  Our macro hedge strategy is designed to help us manage through a cooling of the housing market and declining production.  To help manage issues related to consumer leverage, proliferation of non-traditional mortgage products and the potential for increase in delinquencies, we have built comprehensive methodologies, much of which you will see today, that include proprietary technology and surveillance systems, together with communicate [sic] strategies and customer Outreach. . . .  For all loans in our Servicing portfolio, we have surveillance methodologies to detect credit problems at an early stage and hopefully cure them.

518.  Mozilo continued:

As I mentioned previously, Countrywide's macro hedge strategy is designed to mitigate the cooling of the housing market. Because of our time tested knowledge in this business, we know that [] low and declining interest rates usual[ly] fuel production earnings and rising

interest rates fuel servicing earnings. That's the macro hedge. The long-term survivors in this business are those who have both a sizeable production and servicing operation. Those companies that you're involved with that are strong in either originations and weak in servicing or reverse, will not survive.

519.   Mozilo also falsely classified Countrywide's position in nonprime loans as "minor":

> Similarly if the pricing gets tough in a particular product category, we can back off just as we did with non-prime. **It's only 9% of our production today**, at one point 30%, whereas for monoline non-prime lenders irrational pricing limits their options.

520.   At the September 13, 2006 Conference, Sambol responded to a question regarding the growth of prime and subprime mortgage loans at Countrywide, by downplaying Countrywide's participation in the origination of subprime loans and falsely claiming that the Company did not heavily participate in subprime loans:

> **Our profile in the subprime market has been one where we have, for the most part, been on the sidelines**. . . . And subprime however, particularly in the third-party channels, the wholesale channel we are in the bottom half of the top 10.  And the reason for that is that - is that that market we view to have been subject to some irrational conduct. So, we view the pricing to be somewhat irrational.  We view what's happened on the credit front to be very liberal.  **And so, we opted not to fully participate, and it's for that reason you haven't seen growth in subprime volume** as maybe the subprime industry has grown.

521.   At the same conference, an audience member asked if Countrywide should consider reducing its capital because the Company's high growth rate was

likely to be unsustainable.  Sieracki responded by emphasizing that the growth rate at Countrywide was not synonymous with an increase in risk and that Countrywide had not assumed high risk assets:

> *We're the last ones to think that we should be aggressive and take high risk, there's no change in our risk appetite here*, we're simply perfecting and refining our capital structure and making sure the excess capital doesn't get out of line. We're talking about equity neutral transactions with hybrid securities, so it's really a matter of refining, perfecting and optimizing our capital structure. . . . *So I don't want anybody to get the impression that there's been a change in our risk appetite or that we're going to do anything aggressive here.*

522.   At the same conference, Furash touted the adequacy of Countrywide's loan loss reserves:

> Despite the significant asset growth we've been able to outpace that growth in our loan portfolio with the growth in our reserve.  So again I want to emphasize that *we reserve a very conservative amount based on our expected losses*, and we've been able to outpace our asset growth with our growth in our loan loss reserve provision.  *So management and myself feel very comfortable that we are well reserved for all sorts of economic cycles that we can be*.

523.   The statements referenced above, made during the September 13, 2006 Conference, were materially false and misleading when made.  Mozilo's statements that "we served as a role model to others in terms of responsible lending," and that "we engage in prudent underwriting guidelines," were false and misleading because Countrywide loosened and abandoned its underwriting guidelines during the Relevant Period, and engaged in widespread predatory and fraudulent loan origination practices.  *See* Sections V.C. and V.G.  Further, Mozilo's

statement that subprime loans only consist of "9% of [Countrywide's] production today" was false and misleading because Countrywide misclassified subprime loans as prime loans due to a combination of weakening underwriting standards, exception processing of its loans, and managerial policies that encourage quantity of loans, not quality.  This resulted in a deterioration in the creditworthiness of Countrywide's portfolio over the Relevant Period and an increase in subprime loans.  *See* Sections V.C., V.F., and V.G.  Sambol's statement that "[o]ur profile in the subprime market has been one where . . . [we are] on the sidelines" and we "opted not to fully participate . . . in subprime" were false and misleading for the reasons set forth in Sections V.C. and V.F.  Sieracki's statements that there has been no "change in our risk appetite" and "that we're [not] going to do anything aggressive here" were false for the same reasons set forth in Sections V.C. and V.G.  Likewise, Furash's statement, which was adopted and ratified by the Officer Defendants, that "we reserve a very conservative amount [for loan losses] based upon our expected loss" was false and misleading because the Company manipulated its earnings by taking inadequate allowances for loan losses.  *See* Section VIII.A.2.

524.  Analysts reacted positively to Countrywide's materially false and misleading statements above.  For example, on September 13, 2006, analysts at Credit Suisse rated Countrywide's stock "Outperform."  Analysts at Credit Suisse based their opinion upon management's false assurances and concluded that

> [c]redit quality remains sound at Countrywide, generally better than management's initial expectations. CLTVs, FICOs and delinquency trends of its $34.2 billion Option ARM portfolio have remained stable over the past three years.  Countrywide has been selling subprime residuals to further reduce credit risk.

525.   In additon, Fox-Pitt Kelton analysts retained a positive outlook on Countrywide's stock.  Fox-Pitt analysts reported on September 13, 2006, that "[w]e [r]emain [p]ositive [o]n CFC [d]espite [t]he [c]hallenging [e]nvironment[.]"

### 13.   Third Quarter 2006 Form 8-K

526.   On October 24, 2006, Countrywide filed a Form 8-K ("3Q 2006 8-K"), signed by Milleman, attaching a press release which announced the Company's financial results for the third quarter of 2006.  In the press release, Countrywide reported gain-on-sale of loans and securities of $1,373,901,000, revenues of $2,822,495,000, net earnings of $647,564,000, and diluted earnings per share of $1.03 for the quarter.  The Company also reported net LHI of $80,796,708,000, ALL of $207,987,000, fair value MSR of $15,018,415,000, total assets of $193,194,572,000, total liabilities of $178,095,424,000, and total shareholders' equity of $15,099,148,000.

527.   These figures in the 3Q 2006 8-K were materially false and misleading when made because the Company's reported value for gain-on-sale loans and securities overstated the fair value of its RIs and MSRs, and also for the reasons detailed in Section VIII.A.

### 14.   Third Quarter 2006 Conference Call

528.   Later the same day, Mozilo, Sambol and Sieracki participated in a conference call in which they discussed the Company's financial results for the third quarter of 2006 and the fourth quarter and year-end outlook ("October 24, 2006 Conference Call").  During the call, Mozilo falsely stated that the Company's asset valuation reserves and loan loss reserves were appropriate in light of the increase in delinquencies that had occurred:

> ***The year-over-year increase in delinquencies and foreclosures are primarily the result of portfolio seasoning, product mix, and changing economic and housing market conditions***. . . . The

Company believes its asset valuation reserves [for] credit losses are appropriate for the increases in delinquencies.

* * *

The loan loss provision was $28 million in the third quarter of 2006, a decrease of $45 million in the third quarter of 2005. . . . The allowance for loan losses was $180 million at September 30, 2006, as compared to $107 million at September 30, 2005. . . . **The increase in delinquencies was in line with manager's expectations** and primarily reflects the seasoning of the bank's loan portfolio.

529.   Mozilo's statements that "the Company's asset valuation reserves [for] credit losses are appropriate" and that "the increase in delinquencies was in line with management's expectations" were false and misleading for the reasons set forth in Section VIII.A.

530.   Analysts reacted positively to these materially false and misleading statements above.  For example, on October 24, 2006, analysts at Piper Jaffray rated Countrywide's stock "Outperform" with low volatility.  Their opinion was based, in part, on Countrywide's "credit quality [being] . . . in line with expectations. . . ."

531.   Further, several other analysts either raised or maintained their stellar recommendations and earnings estimates for Countrywide as a result of Defendants' fraudulent misrepresentations, including:  (1) Fox-Pitt Kelton, which reported on October 24, 2006, that "[w]e rate CFC at Outperform and expect this company to be one of the best equipped to weather the housing storm of competition, shrinking market and regulatory scrutiny"; (2) Morgan Stanley, which rated Countrywide "Overweight" on October 24, 2006; and (3) Citigroup, which rated Countrywide as a "Buy" and stated on October 25, 2006, that "[c]redit was fine-in-line w/mgmt exp[ectations] as the portfolio seasons."

### 15.   Third Quarter 2006 Form 10-Q

532.   On November 7, 2006, Countrywide filed its quarterly report on Form 10-Q for the third quarter of 2006 ("3Q 2006 10-Q"), signed by Sambol and Sieracki.  The Company reported financial results as follows.

533.   The Company reported in its 3Q 2006 10-Q that the impairment of its RIs equaled $141,857,000.

534.   In the "Off-Balance Sheet Arrangements and Guarantees" section, Countrywide described the R&Ws exposure associated with the securitization of its loans as follows: "We do not believe that any of our off-balance sheet arrangements have had, or are reasonably likely to have, a current or future material effect on our financial condition, results of operations, liquidity, capital expenditures or capital resources."

535.   The Company also reported the amount of credit risk it assumed as a result of its R&Ws of its mortgage loans: "The liability associated with this risk totaled $303.5 million at September 30, 2006. . . ."

536.   The Company reported allowance for loan losses of $207,987,000, having increased its provision for loan losses by $37,996,000 during the quarter.

537.   Countrywide reported prime mortgage and prime home equity LHI that amounted to $55,486,886,000 and $19,625,354,000, respectively.  In addition, nonprime mortgage LHI equaled $25,823,000, or less than 1% of total mortgage LHI.

538.   The volume of Mortgage Banking prime, prime home equity and nonprime loans originated during the quarter equaled $87,713,000,000, $9,203,000,000 and $9,336,000,000, respectively.

539.   Moreover, the Company represented as to the high quality of its loans, "we have a portfolio of mortgage loans held for investment, consisting *primarily of Prime Mortgage and Prime Home Equity Loans*" and "*[o]ur Pay Option investment loan portfolio borrowers had, at the time the loans were originated,*

*average FICO scores (a measure of borrower creditworthiness) of 721 and original loan-to-value and combined loan-to-values of 75% and 78%, respectively.*"

540.   The Company described its management of credit risk in the following terms:

> We manage mortgage credit risk by underwriting our mortgage loan production to secondary market standards and by limiting credit recourse to Countrywide in our loan sales and securitization transactions. *We also manage credit risk in our investment loan portfolio by retaining high credit quality loans*, through pricing strategies designed to compensate for the risk. . . .

541.   The Company also reported management's review of the Company's disclosure controls and internal controls: "There has been no change in our internal control over financial reporting during the quarter ended September 30, 2006 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

542.   Further assuring investors of the veracity of the information contained in its 3Q 2006 10-Q, the report included Sarbanes-Oxley Act certifications signed by Defendants Mozilo and Sieracki, which represented that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide.

543.   The Company's statements regarding financial results as referenced in ¶¶533-37 were materially false and misleading when made as detailed in Section VIII.A., and because the Company overstated the fair value of its RIs, LHI and MSR, understated ALL, understated liabilities related to R&Ws, and overstated net earnings and total shareholders' equity.  Also, the statements regarding the quality of the volume of loans originated and LHI were false and misleading because

Countrywide misclassified subprime loans as prime loans, and also for the same reasons set forth in Section V.F and V.G.  Moreover, the representations that "[o]ur Pay Option investment loan portfolio [had an] . . . average FICO score[] . . . of 721," "[the Company's] portfolio of mortgage loans held for investment consist[s] primarily of Prime Mortgage and Prime Home Equity Loans" and "[w]e also manage credit risk in our investment loan portfolio by retaining high credit quality loans" were false and misleading because Countrywide loosened its underwriting standards to increase loan volume without regard to loan quality.  *See* Sections V.C., V.D., V.F., and V.G.  The statements relating to internal controls were false and misleading because the Company's internal controls over financial reporting were ineffective.  *See* Section VIII.A.6.  The Sarbanes-Oxley Act certifications signed by Defendants Mozilo and Sieracki were false and misleading because the financial statements issued by Countrywide were materially misstated and violated GAAP.  *See* Section VIII.A.

### 16.   Year-End 2006 Form 8-K

544.  On January 30, 2007, Countrywide filed a Form 8-K, signed by Milleman, attaching a press release that announced "record" earnings for 2006, driven by strong fourth quarter results.  In the press release, Countrywide reported gain-on-sale of loans and securities of $1,419,318,000, revenues of $2,758,469,000, net earnings of $621,581,000, and diluted earnings per share of $1.01 for the quarter.  The Company also reported net LHI of $78,085,757,000, ALL of $261,054,000, fair value MSR of $16,172,064,000, total assets of $199,946,230,000, total liabilities of $185,628,384,000, and total shareholders' equity of $114,317,846,000.

545.  These figures in the Form 8-K were materially false and misleading when made because the Company's reported value for gain-on-sale loans and securities overstated the fair value of its RIs and MSRs, and also for the reasons detailed in Section VIII.A.

## 17.   **Year-End 2006 Conference Call**

546.   Later that same day, Countrywide held a conference call discussing the fourth quarter and year-end 2006 financial and operational results ("January 30, 2007 Conference Call") in which Mozilo, Sambol and Sieracki participated.  A Merrill Lynch analyst, Ken Bruce, questioned Mozilo about whether the addition of so many credit enhancements to the bank's portfolio was a reflection of a cautious approach to credit.  In response, Mozilo stated:

> Yes, GAAP has its limitations on that issue and we are doing our best to expand our reserves in one form or another.  And obviously you have cash reserves and the other is that you discount the assets and the third is that you can get pool insurance or MI insurance on the assets. We've I think, exercised ourselves to the maximum in that regard and will continue to do so, by the way, throughout 2007.

547.   During the January 30, 2007 Conference Call, in response to a question from an analyst at Piper Jaffray regarding current trends in the subprime market, Mozilo stated that the subprime industry was going to be severely hit because of the decreased quality of borrowers.  Mozilo added that this would not have a material impact on Countrywide because the Company had backed away from the subprime area due to its focus on credit quality:

> You notice that in both the wholesale channel as well as our consumer channel that our volumes were lower on a market share basis.  We picked it up on the correspondent.  ***And it was because we backed away from the sub prime area because of our concern over credit quality. And I think you're seeing the results of that with those competitors who took that product when we backed away***.
> So I think there's a couple - one is you're seeing two or three a day, there's probably 40 or 50 a day throughout the country going down in one form or another.  And I expect that to continue throughout the

year.  I think that subprime is going to be severely hit primarily because the sub prime business was a business of you take inferior credit but you'd have, you'd require superior equity. And so people had to make a substantial down payment or if they had marginal credit.

Well, that all disappeared in the last couple of years and you get a 100% loan with marginal credit and that doesn't work and so - particularly if they have any kind of bumps like we have now in the deterioration of real estate values because people can't get out.

548.  The statements referenced above during the January 30, 2007 Conference Call were materially false and misleading when made.  Mozilo's statements that the Company was adding additional insurance to protect against loan default to "exercise[ ] ourselves to the maximum" and that "GAAP has its limitations . . . [reserving for loan losses] and we are doing our best to expand our reserves in one form or another" above what GAAP requires were false and misleading for the same reasons set forth in Section VIII.A.  Also, Mozilo's statement that Countrywide "backed away from the subprime area because of our concern over credit quality" was false and misleading because Countrywide was misclassifying subprime loans as prime loans, and also for the reasons set forth in Sections V.C., V.D., and V.F.

549.  Analysts reacted positively to the Company's materially false and misleading statements above.  For example, on February 2, 2007, analysts at Citigroup rated Countrywide's shares a "Buy" with "Medium Risk."

550.  Several other analysts either raised or maintained their stellar recommendations and earnings estimates for Countrywide as a result of the Company's fraudulent misrepresentations, including:  (1) Piper Jaffray, which on January 31, 2007, maintained its "Outperform" rating for Countrywide.  Piper Jaffrey analysts stated that "[c]redit quality, while weakening, is still very

respectable"; and (2) Rapid Rating, which reported on January 31, 2007, that Countrywide's credit outlook is positive. "[T]he company is a moderate to low risk and somewhat subject to fluctuations in market conditions, and that its assets are of very good quality."

### 18.   **2006 Form 10-K**

551.   On March 1, 2007, Countrywide filed its Annual Report for 2006 with the SEC on Form 10-K ("2006 Form 10-K").  The report was signed by Mozilo, Sieracki, and others.  Countrywide reported gain-on-sale of loans and securities of $5,681,847,000, revenues of $11,417,128,000, net earnings of $2,674,846,000, and diluted earnings per share of $4.30 for the quarter.  The Company also reported net LHI of $78,085,757,000, ALL of $261,054,000, fair value MSR of $16,172,064,000, total assets of $199,946,230,000, total liabilities of $185,628,384,000, and total shareholders' equity of $12,317,846,000.

552.   In a section titled "Valuation of MSRs and Other Retained Interests," the Company reported that the fair value of the RIs on its balance sheet as of December 31, 2006, was $3,040,575,000.  Further, the Company reported that the impairment in the fair value of its RIs equaled $73,677,000 for the fourth quarter and $284,700,000 for the year.

553.   In the "Off-Balance Sheet Arrangements and Guarantees" section, Countrywide described the R&Ws exposure associated with the securitization of its loans, as follows: "[w]e do not believe that any of our off-balance sheet arrangements have had, or are reasonably likely to have, a current or future material effect on our financial condition, results of operations, liquidity, capital expenditures or capital resources."

554.   In a section titled "Credit Risk Management," the Company also reported the liabilities associated with the risk of representation and warranties totaled $390,200,000.

555.   Moreover, the 2006 Form 10-K stated that "contractual liability arises only when . . . representations and warranties are breached."   Countrywide also stated that it "attempt[s] to limit our risk of incurring these losses by structuring our operations *to ensure consistent production of quality mortgages*."

556.   The Company reported allowance for loan losses of $261,054,000 as of the end of 2006.  The Company also had net charge-offs of $156,841,000.  The Company stated that "allowances and provisions for credit losses are adequate pursuant to generally accepted accounting principles."

557.   Countrywide also made representations concerning the purportedly high quality of its portfolio and the purportedly sufficient allowances and provision for loan losses:

The increase in [the Company's] . . . allowance for loan losses reflects prevailing real estate market and economic conditions and the seasoning of the Bank's investment loan portfolio.  We expect the allowance for loan losses to increase, both in absolute terms and as a percentage of our loan portfolio as our loan portfolio continues to season and as current market conditions develop.   However, *we believe that our investment criteria have provided us with a high quality investment portfolio and that our credit losses should stay within acceptable levels.   We also believe our allowances and provisions for credit losses are adequate pursuant to generally accepted accounting principles*.

558.   Countrywide reported prime mortgages and prime home equity LHI in the amounts of $230,139,000 and $56,029,000, respectively.  Nonprime mortgage LHI amounted to $55,262,000, or less than 1% of total mortgage banking LHI.

559.   The Company reported that the volume of Mortgage Banking nonprime, prime home equity and prime loans originated during the year equaled $36,752,000,000, $39,962,000,000 and $344,370,000,000, respectively.

COMPLAINT

560.   Countrywide also reported in its 2006 Form 10-K its high credit rating and strategy to continue to produce high quality mortgages to the secondary market, "Our strategy is to ensure our ongoing access to the secondary mortgage market by consistently producing quality mortgages and servicing those mortgages at levels that meet or exceed secondary mortgage market standards."

561.   Moreover, the Company represented in its 2006 Form 10-K as to the purported high quality of its loans: "[t]he majority of our loan production consists of Prime Mortgage loans."

562.   In a section titled "Mortgage Credit Risk," the Company described its Credit Policy, portraying it as a tightly controlled and supervised process with a rigorous pre-loan screening procedure, post-loan auditing, appraisal and underwriting reviews:

**Loan Quality**

Our credit policy establishes standards for the determination of acceptable credit risks.  Those standards encompass borrower and collateral quality, underwriting guidelines and loan origination standards and procedures.

Borrower quality includes consideration of the borrower's credit and capacity to pay.  We assess credit and capacity to pay through . . . manual or automated underwriting.

\*\*\*

Our underwriting guidelines for non-conforming mortgage loans, Prime Home Equity Loans, and Nonprime Mortgage Loans have been designed so that these loans are salable in the secondary mortgage market.  We developed these guidelines to meet the requirements of private investors, rating agencies and third-party credit enhancement providers.  These standards and procedures encompass underwriter qualifications and authority levels, appraisal review requirements,

fraud controls, funds disbursement controls, training of our employees and ongoing review of their work.

\*\*\*

We supplement our loan origination standards and procedures with a post-funding quality control process.

\*\*\*

Our Quality Control Department is responsible for completing loan audits that may consist of a re-verification of loan documentation, an underwriting and appraisal review, and, if necessary, a fraud investigation.

563.   In its 2006 Form 10-K, Countrywide dropped its claim that Pay-Option ARMs had "relatively high initial loan quality," but stated that the average original FICO score for such loans as of December 31, 2006, was 718.

564.   Assuring investors of the veracity of the information contained in the 2006 Form 10-K, the report included Sarbanes-Oxley Act certifications signed by Defendants Mozilo and Sieracki, representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide and that the Company employed internal disclosure controls and procedures that detect "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting" and "[a]ny fraud, whether or not material, that involves management."

565.   The Company's statements regarding financial results as referenced in ¶¶551-58 were materially false and misleading when made as detailed in Section VIII.A. and because the Company overstated the fair value of its RIs, LHI and MSR, understated ALL, understated liabilities related to R&Ws, and overstated net earnings and total shareholders' equity.  Furthermore, the statements relating to the volume of prime loans produced and the value of prime LHI were all false and

misleading because Countrywide misclassified subprime loans as prime loans, and also for the same reasons stated in Section V.F.  Moreover, Countrywide's statements that it "consistently produc[ed] quality mortgages," that its loan origination standards and procedures are designed to produce "loans [that] are salable in the secondary mortgage market" and "[t]he majority of our loan production consists of Prime Mortgage loans" were false and misleading because Countrywide loosened and abandoned its underwriting practices to increase loan volume without regard to loan quality and engaged in widespread predatory and fraudulent loan origination practices.  *See* Sections V.C.,  V.G., and X  Moreover, the Sarbanes-Oxley Act certifications signed by Defendants Mozilo and Sieracki were false and misleading because the financial statements issued by Countrywide were materially misstated and violated GAAP, the Company's internal controls were ineffective, and for the same reasons stated in Section VIII.A.

### E.   The Company's False Statements Regarding 2007 Results

#### 1.   March 6, 2007 Raymond James Institutional Investor Conference

566.  On March 6, 2007, Sieracki, speaking at a Raymond James Institutional Investor Conference, made further false and misleading statements about Countrywide's access to liquidity.   Around this time, several of Countrywide's competitors had begun having problems because of their lending practices.  Sieracki acknowledged the critical importance of liquidity in light of these recent problems.  In particular, he noted that "[l]iquidity is a huge issue.  Not all of [Countrywide's competitors] models are going to be able to fund themselves and you are going to see some of these companies go out of business."

567.  Later during the same conference, Sieracki stated:

*[w]e're very well positioned at Countrywide due to* experience in these cycles, expertise, operating controls and *our liquidity position*.  Let's face it this is a pain phase of a healthy process.  We're a top

---

COMPLAINT

conditioned athlete and I would suggest that the future present value of this outcome, of this pain felt today is greater than stumbling along at the status quo here.

568. The statements referenced above were materially false and misleading. Specifically, Sieracki's statements that "[w]e're very well positioned at Countrywide due to . . . our liquidity position" and "[w]e're a top conditioned athlete" were false and misleading because Countrywide was not well positioned with respect to its liquidity position. *See* Sections V.C. and X.

### 2. March 13, 2007 CNBC Interview And March 22, 2007 "Mad Money" Interview

569. On March 13, 2007, CNBC reporter Maria Bartiromo ("Bartiromo") interviewed Mozilo. During the interview, Mozilo falsely told the marketplace that Countrywide was not like other mono-line subprime lenders because the Company's subprime loans purportedly constituted 7% of its loan originations:

Mozilo: [T]he [lenders] . . . that you see exposed [from the subprime market] at the moment would be the New Centuries, the NovaStars, and the Accredited Home Loans, and those are monocline companies, subprime companies, that did well in the housing boom, in the bubble, but once the tide went out, you can see what's happened. *I think it's a mistake to apply what's happening to them to the more diversified financial services companies such as Countrywide,* Wells Fargo and others. Certainly, a percentage of our business is subprime. *We had 7 percent of our* [loan originations in subprime] . . . .

Bartiromo: Seven percent? Angelo, so you've got seven percent of originations coming from the subprime area:

Mozilo: That's correct. And about .2 percent of our assets are in subprime. So I think it's very important that this be kept in perspective. So, for us, what our concern is, Maria, is not so much for

Countrywide *because we'll be fine.  In fact, this will be great for Countrywide at the end of the day because all the irrational competitors will be gone.*

570.   On March 22, 2007, Mozilo appeared on the popular CNBC program "Mad Money," hosted by Jim Cramer.   Mozilo, once again, was very positive regarding the Company's prospects.  He falsely assured investors that Countrywide was essentially a prime lender, and that subprime loans represented only 7-9% of the Company's business.   He again differentiated Countrywide from subprime lenders, asserting their business model was fundamentally flawed in a way Countrywide's was not.

571.   Thereafter, on August 26, 2007, in an article titled, "Inside the Countrywide Lending Spree," *The New York Times* reported why Mozilo's statements during the CNBC interview on March 13, 2007, were materially false and misleading:

> Countrywide documents show that it, too, was a lax lender.   For example, it wasn't until March 16 that Countrywide eliminated so-called piggyback loans from its product list, loans that permitted borrowers to buy a house without putting down any of their own money.   And Countrywide waited until Feb. 23 to stop peddling another risky product, loans that were worth more than 95 percent of a home's appraised value and required no documentation of a borrower's income.
>
> [In addition] . . . Countrywide's product list showed that it would lend $500,000 to a borrower rated C-minus, the second-riskiest grade.  As long as the loan represented no more than 70 percent of the underlying property's value, Countrywide would lend to a borrower even if the person had a credit score as low as 500.

COMPLAINT

572.   In addition to the reasons set forth in the August 26, 2007 *New York Times* article, Mozilo's statements above that "[w]e had 7 percent of [our business in subprime]" and that "Countrywide was essentially a prime lender" were false and misleading because Countrywide abandoned its underwriting practices to boost loan volume without regard for loan quality, misclassified subprime loans as prime loans, and engaged in widespread predatory and fraudulent loan origination practices, and also for the same reasons set forth in Sections V.C., V.F., and V.G.

### 3.   <u>First Quarter 2007 Form 8-K</u>

573.   On April 26, 2007, Countrywide filed a Form 8-K ("1Q 2007 8-K") attaching a press release that announced its financial results for the first quarter of 2007.   Countrywide reported gain-on-sale of loans and securities of $1,234,104,000, revenues of $2,405,776,000, net earnings of $433,981,000 and diluted earnings per share of $0.72 for the quarter.  The Company also reported net LHI of $75,177,094,000, ALL of $374,367,000, fair value MSR of $17,441,860,000, total assets of $207,950,603,000, total liabilities of $193,132,154,000 and total shareholders' equity of $14,818,449,000.

574.   These figures in the 1Q 2007 8-K were materially false and misleading when made because the Company's reported value for gain-on-sale loans and securities overstated the fair value of its RIs and MSRs, and also for the reasons detailed in Section VIII.A.

### 4.   <u>First Quarter 2007 Conference Call</u>

575.   On a conference call held later that day in which Mozilo, Sambol and Sieracki participated ("April 26, 2007 Conference Call"), senior management discussed the first quarter 2007 financial results and the financial outlook for the second quarter of 2007.  During the call, Mozilo touted the Company's growing pipeline of "prime" loans, claiming that Countrywide was poised to capitalize on the implosion of irresponsible lenders in the mortgage-lending industry:

As a result, you have less competition and as Dave pointed out, rational competition. So when you have that, one is your margins are going to improve. There is no question that there are many players who have entered the business over the last five years that had to some degree or another irresponsible behavior, conducted themselves irresponsibly, and that impacted everybody, Gresham's Law.

576. Sambol reiterated that Countrywide's prime business would continue to grow and that Countrywide had gained a competitive advantage in the subprime area now that other lenders had exited that business:

And as it relates to top-line pricing margins, there was the absence of competitive worsening in pricing. ***So the outlook is very good for our prime business and prime margins.*** As it relates to subprimes, as I mentioned in my presentation, we are now pricing our rate sheets to provide for profitability in each of our channels, where I would tell you that in '06, for much of '06 and part of '05, ***competitive conditions were such that in certain of our segments, we were pricing to breakeven***.

577. Moreover, on the same call, Mozilo insisted that there was no spillover from the subprime debacle to prime mortgages:

[T]here has been a lot of talk about contagion or spillover from subprime to Alt-A and so we thought we would comment a little bit on that market and Countrywide's views and exposure to Alt-A. First of all, by way of description, ***Alt-A generally consists of loans to prime credit borrowers unlike subprime***. FICOs generally in excess of 700 who don't qualify for traditional prime programs due to a variety of things; reduced documentation most notably and/or other layering of risk factors, maybe higher LTVs and higher loan amounts.

*  *  *

*As it relates to Alt-A, the conclusion there is that, at least for Countrywide, there has not been any material impact or spillover into Alt-A or for that matter into our prime business.*

578.   Also during the April 26, 2007 Conference Call, Sambol falsely declared that "of course Countrywide has the liquidity and the capital and the infrastructure to take advantage of the structural changes that are taking place in this market."

579.   The statements referenced above during the April 26, 2007 Conference Call were materially false and misleading when made.   Mozilo's statement that Countrywide would benefit from other mortgage companies' irresponsible conduct was false and misleading.   In truth, Countrywide was not different from the companies heavily involved in irresponsible lending.   Moreover, Sambol's statement that "the outlook is very good for our prime business and prime margins" was false and misleading because Countrywide abandoned its underwriting practices to boost loan volume without regard for loan quality, misclassified subprime loans as prime loans, and engaged in widespread predatory and fraudulent loan origination practices, and also for the same reasons set forth in Sections V.C., V.F., and V.G.   In addition, Sambol's statement that management was pricing the loans to the secondary market "to breakeven" was false and misleading for the reasons set forth in Section VIII.A.   Further, Mozilo's statement that "there has not been any material impact or spillover [from the subprime fallout] into Alt-A or . . . prime business" was false and misleading for the same reasons set forth above and in Section V.F.   Sambol's statement that "Countrywide has the liquidity and the capital and the infrastructure to take advantage of the structural changes that are taking place in this market" was false and misleading because Countrywide was not well positioned with respect to its liquidity position and overstated its capital.   *See* Sections VIIIA. and X.

**5.      April 26, 2007 AFSA 7th
Finance Industry Conference**

580.    On April 26, 2007, Countrywide participated at the AFSA 7th Finance Industry Conference for International Fixed-Income Investors ("April 26, 2007 Fixed Income Conference").   Jennifer Sandefur ("Sandefur"), Senior Managing Director and Treasurer, attended the conference on behalf of Countrywide.   At the conference, Sandefur attempted to distinguish Countrywide from its peer mortgage lenders by stating that the Company was not heavily involved in the subprime mortgage industry.   In particular, Sandefur described Countrywide's portfolio as "very high quality" and consisting primarily of prime mortgages:

> There's been a significant amount of turmoil in the market recently as a result of the nonprime mortgage sector.   We strategically manage that.  ***We're essentially a prime mortgage originator***.   We have $400 million in residual investments on our balance sheet.   We have a very conservative liquidity profile which insulates us from market events like the subprime origination market events.
>
> * * *
>
> [D]uring the time that we acquired the bank in 2006, we originated over $2 trillion in mortgages in the United States, prime ***and a small amount of subprime and we put about $73 billion of very prime mortgages on our own balance sheet***.

581.   Sandefur   repeatedly   emphasized   Countrywide's   high   quality mortgages:

> ***Again, over 90% of Countrywide loan origination volume is prime quality. Less than 9% of our production is subprime. . . . The nonprime loans are all held for investment and sold into securitizations with none of those going on our bank's balance sheet.***

* * *

A little bit more about the bank.  Again, and the **high credit quality of that portfolio that we selected.  Very low interest rate risk.**

582.  At the April 26, 2007 Fixed Income Conference, Sandefur also addressed the increased rate of delinquencies in the subprime mortgage industry and the loosened underwriting standards for subprime loans.  However, she made a point of distinguishing Countrywide from its competition:

> [M]any of the players that originated [subprime] loans and loosened these standards as they were kind of gasping for breath at the very end of the run in the refi boom, I think lowered a lot of the underwriting standards which caused a lot of these delinquency problems.  A lot of these smaller players are exiting the business willingly in many cases and unwillingly in some cases.
>
> **. . . I'd like to differentiate Countrywide here.**  And from a lot of competitors we've seen come and go in the past, you're talking about a kind of one-trick pony, if you will, some of these subprime lenders who all they did was originate subprime loans, enjoyed the wide margins, they weren't properly capitalized. They weren't properly balanced.  They didn't have diversified businesses.  They didn't have 38 years of technology.  They didn't have the intellectual capital, the hedging capabilities, the ability to price.  They did one thing. They originated subprime loans.
>
> **Versus a Countrywide who originates a very small component of subprime loans** so that they have a full menu of products to offer through the various diversified channels, retail, correspondent, wholesale, through brokers. . . . They underestimated the impact of early payment defaults through the whole loan type of risk

COMPLAINT

transference that they were using *unlike the Countrywide who uses a securitization, who has a reputation for high quality originations*.

583.   At the same conference, Sandefur commented on the adequacy of Countrywide's allowance account for loan losses due to the pristine nature of its portfolio:

> Allowances for loan losses which are really a 12 month perspective look at potential losses, we've booked at $229 million for '06.  Actual net charge-offs for the bank portfolio were only $34 million.  *So very conservative allowances for loan losses at very small actual charge offs given the very pristine nature of this portfolio. . . .  So, again, the point here, not subprime.  Very, very prime.  Kind of the opposite of subprime.*

584.   The statements referenced above and made at the April 26, 2007 Fixed Income Conference were materially false and misleading when made.  None of the Officer Defendants issued any corrections to Sandefur's statements, thereby ratifying these false public statements. Specifically, Sandefur's statements that "[w]e're essentially a prime mortgage originator," emphasizing the point with phrases such as "very, very prime," were false and misleading for the same reasons set forth in Section V.F.   Moreover, Sandefur's statements that "over 90% of Countrywide['s] loan origination volume is prime quality" and "[l]ess than 9% of our production is subprime" were false and misleading because Countrywide improperly classified subprime mortgage loans as prime loans, and also for the same reasons set forth in Section V.F.  In an attempt to distinguish Countrywide from its peers, Sandefur's statements that Countrywide "originate[d] a very small component of subprime loans" and "has a reputation for high quality loans" were also materially false and misleading for the same reasons set forth in Sections V.C., V.F., and V.G.   Moreover, Sandefur's statement that Countrywide had "very conservative allowances for loan losses . . . given the very pristine nature of this

portfolio" was false and misleading because Countywide manipulated its earnings by taking inadequate allowances for loan losses, and for the same reasons set forth above in Section VIII.A.2.

585.  Analysts continued to be deceived by management's false and misleading statements as set forth above.  For example, on April 26, 2007, Citigroup analysts rated Countrywide's shares a "Buy" with "Medium Risk." Citigroup analysts based their opinion in part on Countrywide's senior management's false assurances that after industry consolidation the Company would be well positioned to grow market share and earnings and that Countrywide's "core business" of prime loans was "solid."

586.  Several other analysts either raised or maintained their stellar recommendations and earnings estimates for Countrywide as a result of the Company's fraudulent misrepresentations, including:  (1) Piper Jaffray, which maintained its "Outperform" rating for Countrywide on April 27, 2007; (2) Morgan Stanley, which reiterated "Overweight" for Countrywide's stock on April 29, 2007; and (3) Rapid Rating, which reported on April 26, 2007, that Countrywide's credit outlook is positive.  "[T]he company is a moderate to low risk and somewhat subject to fluctuations in market conditions, and *that its assets are of very good quality.*"

### 6.   First Quarter 2007 Form 10-Q

587.  On May 9, 2007, Countrywide filed its quarterly report on Form 10-Q for the first quarter of 2007 ("1Q 2007 10-Q"), signed by Sambol and Sieracki. The Company reported financial results as follows.

588.  In the section titled "Impairment of Retained Interests," the Company noted that "we recognized impairment of RIs of $429.6 million.  Impairment charges of $231.0 million were related to nonprime and related residual interests and $135.3 million were related to subordinated interests on prime home equity lines of credit securitizations."

COMPLAINT

589.   In the "Off-Balance Sheet Arrangements and Guarantees" section, Countrywide described the R&Ws exposure associated with the securitization of its loans as follows: "We do not believe that any of our off-balance sheet arrangements have had, or are reasonably likely to have, a current or future material effect on our financial condition, results of operations, liquidity, capital expenditures or capital resources."

590.   The Company described its management of credit risk in the following terms: "We attempt to limit our risk of incurring . . . [representation and warranty] losses by structuring our operations *to ensure consistent production of quality mortgages*."

591.   In a section titled "Credit Risk Management," the Company also reported that the liabilities associated with the risk of representation and warranties totaled $365.3 million.

592.   In a section titled "Securitizations," the Company reported that the fair value of its MSRs at March 31, 2007, was $17,441,860,000.  The Company reported allowance for loan losses of $374,367,000, having increased its provision for loan losses by $151,962,000 during the quarter.  The Company also had net charge-offs of $38,649,000.

593.   Countrywide reported in its 1Q 2007 10-Q that prime mortgage and prime home equity LHI equaled $68,908,462,000, and nonprime mortgage LHI equaled $1,144,184,000.

594.   The volume of Mortgage Banking nonprime, prime home equity and prime loans produced during the quarter equaled $7,500,000,000, $9,234,000,000 and $93,833,000,000, respectively.

595.   With respect to Countrywide's liquidity and capital resources, the 1Q 2007 10-Q stated that:

. . . nonprime loans and related securities became much less liquid.

However, such assets represent *only a small portion* of our total

assets.  The substantial majority of our assets continue to experience ample liquidity in the marketplace. ***As such, we do not expect the reduction in liquidity for nonprime loans to have a significant adverse effect on our ability to effectively meet our financing requirements.***

\* \* \*

We establish reliable sources of liquidity sized to meet a range of potential future funding requirements.   We currently have $94.4 billion in available sources of short-term liquidity, which represents a decrease of $2.0 billion from December 31, 2006.  ***We believe we have adequate financing capacity to meet our currently foreseeable needs.***

596.   The Company also reported in management's review of the Company's disclosure controls and internal controls: "There has been no change in our internal control over financial reporting during the quarter ended March 31, 2007 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

597.   Further assuring investors of the veracity of the information contained in its 1Q 2007 10-Q, the report included Sarbanes-Oxley Act certifications signed by Defendants Mozilo and Sieracki, representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide.

598.   The Company's statements regarding financial results as referenced in ¶¶588-93 were materially false and misleading when made as detailed in Section VIII.A. and because the Company overstated the fair value of its RIs, LHI and MSR, understated ALL, understated liabilities related to R&Ws, and overstated net earnings and total shareholders' equity.  Also, the statements regarding the quality

of the volume of loans produced and LHI were false and misleading because Countrywide improperly classified subprime loans as prime loans, and also for the reasons set forth in Section V.F.  Moreover, the representation that we "ensure consistent production of quality mortgages" was false and misleading because Countrywide loosened and abandoned its underwriting guidelines when originating loans.  *See* Sections V.C. and V.G.  Moreover, Countrywide's statements regarding liquidity were false and misleading for the same reasons stated in Section X.  The statements relating to internal controls were false and misleading because the Company's internal controls over financial reporting were ineffective.  *See* Section VIII.A.6.  The Sarbanes-Oxley Act certifications signed by Defendants Mozilo and Sieracki were false and misleading because the financial statements issued by Countrywide were materially misstated and violated GAAP, and for the same reasons stated in Section VIII.A.

### F.  The Company's False Registration Statements And Prospectuses For Countrywide's Offerings Of Debt And Preferred Securities

599.  During the Relevant Period, Countrywide offered certain debt securities – including Series B Medium-Term Notes and 6.25% Subordinated Notes Due May 15, 2016 – pursuant to a materially untrue and misleading registration statement that it filed with the SEC and prospectuses and prospectus supplements issued thereunder and incorporated therein by reference, as discussed in greater detail below.  Countrywide and CCV also offered and sold a hybrid debt-equity security – *viz*. 7% Capital Securities – pursuant to a materially untrue and misleading registration statement that Countrywide and CCV filed with the SEC and a prospectus and prospectus supplement issued thereunder and incorporated therein by reference, also as discussed in greater detail below.

### 1.  Series B Medium-Term Notes

600.  On or about February 15, 2006, Countrywide commenced a public offering of Series B Medium-Term Notes to be offered on a continuous basis.  Net

proceeds from this offering to Countrywide, after deducting offering expenses, were approximately $10,700,000,000.

601.   The Series B Medium-Term Notes were offered and sold pursuant to a shelf registration statement on Form S-3ASR and prospectus dated February 9, 2006, signed by Mozilo, Sambol, Sieracki, and other Countrywide officers and directors; a prospectus supplement filed February 15, 2006; and 153 successive pricing supplements and free writing prospectuses dated between February 22, 2006, and August 6, 2007 (collectively, the "Series B Medium-Term Notes Prospectus"), all of which Countrywide filed with the SEC (collectively, the "Series B Medium-Term Notes Registration Statement").

602.   The Series B Medium-Term Notes Registration Statement expressly incorporated by reference documents filed by Countrywide with the SEC, including its Annual Report on Form 10-K for the year ended December 31, 2004; Quarterly Reports on Forms 10-Q for the quarters ended March 31, 2005, June 30, 2005, and September 30, 2005; and Current Reports on Forms 8-K dated September 30, 2005, and October 27, 2005. The Series B Medium-Term Notes Registration Statement also expressly incorporated by reference Countrywide's consolidated financial statements as audited by KPMG.

603.   KPMG consented to the use and incorporation of its reports with respect to the consolidated financial statements and all related financial statement schedules, management's assessment of the effectiveness of internal control over financial reporting and the effectiveness of internal controls over financial reporting in the Series B Medium-Term Notes Registration Statement and to the reference to its firm under the heading of "Experts" in the relevant prospectuses. KPMG's reports on Countrywide's consolidated financial statements for the year ended December 31, 2004, and management's assessment of the effectiveness of internal control over financial reporting as of December 31, 2004, as audited by

KPMG, were incorporated by reference into the Series B Medium-Term Notes Registration Statement.

604.   As alleged in detail above, Countrywide's Form 10-K for the year ended December 31, 2004, Countrywide's consolidated financial statements for the year ended December 31, 2004, and other SEC filings noted above as incorporated by reference in the Series B Medium-Term Notes Registration Statement were materially false and misleading. Accordingly, the Series B Medium-Term Notes Registration Statement and documents incorporated therein by reference, pursuant to which certain Plaintiffs were induced to purchase Series B Medium-Term Notes, contained untrue statements of material fact and omitted to state material facts required therein to be stated or necessary to make the statements contained therein not misleading.

### 2.   6.25% Subordinated Notes Due May 15, 2016

605.   On or about May 15, 2006, Countrywide publicly issued $1,000,000,000 of 6.25% Subordinated Notes Due May 15, 2016 ("6.25% Notes"). Net proceeds to the Company from the offering of 6.25% Notes, after deducting offering expenses, were approximately $992,790,000.

606.   The 6.25% Notes were offered and sold pursuant to the shelf registration statement on Form S-3ASR and prospectus dated February 9, 2006, signed by Defendants Mozilo, Sambol, Sieracki and other Countrywide officers and directors; a prospectus supplement dated May 11, 2006 and filed May 15, 2006; and a free writing prospectus dated May 11, 2006 (collectively, the "6.25% Notes Prospectus"); all of which Countrywide filed with the SEC (collectively, the "6.25% Notes Registration Statement").

607.   The 6.25% Notes Registration Statement expressly incorporated by reference the documents filed by Countrywide with the SEC, including its Annual Report on Form 10-K for the year ended December 31, 2004; Quarterly Reports on Forms 10-Q for the quarters ended March 31, 2005, June 30, 2005, and

September 30, 2005; and Current Reports on Forms 8-K dated September 30, 2005, and October 27, 2005. The 6.25% Notes Registration Statement also expressly incorporated by reference Countrywide's consolidated financial statements as audited by KPMG for the years 2004 and 2005.

608.   KPMG consented to the use and incorporation of its reports with respect to the consolidated financial statements and all related financial statement schedules, management's assessment of the effectiveness of internal control over financial reporting and the effectiveness of internal controls over financial reporting in the 6.25% Notes Registration Statement and to the reference to its firm under the heading of "Experts" in the relevant prospectuses.  The consolidated financial statements of Countrywide as of December 31, 2005, and 2004 and management's assessment of the effectiveness of internal control over financial reporting as of December 31, 2005, were incorporated by reference in the 6.25% Notes Registration Statement in reliance upon the reports by KPMG and upon the authority of KPMG as experts.

609.   As alleged in detail above, Countrywide's Form 10-K for the year ended December 31, 2004, Countrywide's consolidated financial statements for the years ended December 31, 2004, and 2005, and other SEC filings noted above as incorporated by reference in the 6.25% Notes Registration Statement were materially false and misleading. Accordingly, the 6.25% Notes Registration Statement and documents incorporated therein by reference, pursuant to which the 6.25% Plaintiffs (defined below) were induced to purchase 6.25% Notes, contained untrue statements of material fact and omitted to state material facts required therein to be stated or necessary to make the statements contained therein not misleading.

### 3.    7% Capital Securities

610.   On or about November 3, 2006, CCV commenced a public offering of 52,000,000 7% Capital Securities at $25 per share, with a total value of $1.3

billion.

611.   The 7% Capital Securities were offered and sold pursuant to a Post-Effective Amendment, dated October 27, 2006, to the registration statement on Form S-3ASR dated February 9, 2006, signed by Mozilo, Sambol, Sieracki and other Countrywide officers and directors; and a prospectus supplement dated November 1, 2006 (collectively, the "7% Capital Securities Prospectus"); all of which were filed by Countrywide and CCV with the SEC (collectively, the "7% Capital Securities Registration Statement").

612.   The 7% Capital Securities Registration Statement expressly incorporated by reference documents filed by Countrywide with the SEC, including its Annual Report on Form 10-K for the year ended December 31, 2005; Quarterly Reports on Forms 10-Q for the quarters ended March 31, 2006, and June 30, 2006; and Current Report on Form 8-K filed October 24, 2006.  The 7% Capital Securities Registration Statement also expressly incorporated by reference Countrywide's consolidated financial statements for the years 2004 and 2005 as audited by KPMG.

613.   KPMG consented to being named in the 7% Capital Securities Registration Statement as a party that certified the Company's financial statements for the years ended December 31, 2004, and 2005 and management's assessment of the effectiveness of internal controls for the year ended December 31, 2005.

614.   As alleged in detail above, Countrywide's Form 10-K for the year ended December 31, 2005, Countrywide's consolidated financial statements for the years ended December 31, 2004, and 2005, and other SEC filings noted above as incorporated by reference in the 7% Capital Securities Registration Statement were materially false and misleading. Accordingly, the 7% Capital Securities Registration Statement and documents incorporated therein by reference, pursuant to which certain Plaintiffs were induced to purchase 7% Capital Securities, contained untrue statements of material fact and omitted to state material facts

required therein to be stated or necessary to make the statements contained therein not misleading.

## VIII.   COUNTRYWIDE'S FINANCIAL STATEMENTS WERE MATERIALLY MISSTATED IN VIOLATION OF GAAP

### A.   Countrywide's Financial Statements Were Materially Misstated In Violation Of GAAP

615.   Generally Accepted Accounting Principles ("GAAP") constitutes those standards recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time.   The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board (the "FASB").   SEC Regulation S-X, 17 C.F.R. § 210.4-01(a)(1) provides that financial statements filed with the SEC that are not presented in conformity with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

616.   During the Relevant Period, Countrywide made numerous untrue statements of material fact and omitted to state material facts necessary to make its reported financial results not misleading.   Countrywide violated GAAP in connection with its (1) allowances for loan losses ("ALL") on loans held for investment ("LHI"), (2) valuation of retained interests ("RIs"), (3) valuation of MSRs, and (4) accruals for breaches of representations and warranties ("R&W reserves") in connection with loan securitizations.   In addition, Countrywide and the Officer Defendants falsely represented to investors that the Company's internal controls over financial reporting were effective.

617.   Given the Company's core business, delinquency and nonaccrual loans were key metrics for determining the Company's ALL, valuation of MSR, accruals for breaches of R&Ws and valuation of RI.   Delinquent loans and nonaccrual loans aid management in determining whether a loan default is probable.   Countrywide's regulatory filings reported delinquencies beginning when

a loan was past due for at least thirty days. Countrywide also reported in its regulatory filings that it characterized nonaccrual loans as those delinquent for at least ninety days. Once a loan was placed in nonaccrual status, Countrywide recorded interest income as payments were collected, as opposed to when the payments became due. In many cases, a borrower that is considered to be in default will have its mortgage foreclosed. Therefore, for Countrywide, the number and trend of delinquencies and nonaccrual loans should have been key metrics to use in determining default rates for loans, and, as explained below, for the determination of ALL, valuation of MSRs, accruals for breaches in R&Ws, and valuation of RIs.

618. The principles described in Statement of Financial Accounting Standards ("SFAS") No. 5, *Accounting for Contingencies,* set forth the standards of financial accounting and reporting for loss contingencies that Countrywide was required to adhere to in order to properly accrue liabilities for ALL and breaches in R&Ws. The principles described in the following guidance also set forth the standards of financial accounting and reporting for the ALL: SFAS No. 114, *Accounting for Creditors for Impairment of a Loan, an Amendment of FASB Statements No. 5 and 15*; EITF D-80, *Application of FASB Statements No. 5 and No. 114 to a Loan Portfolio*; and the SEC's Staff Accounting Bulletin ("SAB 102"), *Selected Loan Loss Allowance Methodology and Documentation Issues.*

619. SFAS No. 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities*, was issued in September 2000 by the FASB, and later amended by SFAS No. 156, *Accounting for Servicing of Financial Assets.* The principles described in SFAS No. 140 set forth "the standards for accounting for securitizations and other transfers of financial assets and collateral." In particular, SFAS No. 140 sets forth the standards to properly assess the fair value for RI and MSR. Both RI and MSR are components of the income statement revenue line item gain-on-sale. SFAS No. 140, ¶11.

---

COMPLAINT

620.   The American Institute of Certified Public Accountants ("AICPA") issues industry-specific Audit & Accounting Guides ("AAG") to provide guidance in preparing financial statements in accordance with GAAP.   The AAG for Depository and Lending Institutions was applicable to Countrywide and interpreted GAAP pronouncements on the proper methods to assess fair value for RI and MSR and accrue liabilities for ALL and R&Ws.

621.   The AICPA also issues industry-specific Audit Risk Alerts ("ARA"), including financial institutions.  The ARA are used by industry participants, such as Countrywide and its auditor, KPMG, to address areas of concern and identify the significant business risks that may result in the material misstatement of the financial statements.   As evidence of their broad application, each year, representatives of each industry participate in the development of the ARA.  The ARA are included in the AICPA's annual Audit and Accounting Manual ("AAM").

### 1.   Risk Factors

622.   Set forth below are the risk factors set forth in the Relevant Period ARAs relating to lending institutions.

### a)   Risk Factors In 2004

623.   The 2004 ARA stated that financial institutions that emphasized subprime lending were beginning to show credit quality weakness.  AAM 8050.07.  Credit risk is an important factor when management estimates ALL and R&Ws as well as RI and MSR valuation.  SFAS No. 5, SAB 102, SFAS No. 140, AAG Chs. 9 & 10.

### b)   Risk Factors In 2005

624.   The 2005 ARA elaborated on the 2004 ARA and focused on several significant risks confronting lending institutions.  The first area of emphasis was the valuation of MBS and related assets such as MSR and RI derived from ARM. The 2005 ARA noted that the combination of continued interest rate increases and a market that was "flooded" with MBS "may be impairing these assets."  AAM

8050.10.  Countrywide faced a liquidity risk because there was an increasing risk that it would not be able to find a buyer for its securities at a desirable price.  Thus, the increased risk of illiquidity should have been incorporated in Countrywide's valuation models and related accounting estimates.

625.  The 2005 ARA cautioned that when the valuation of MBS or MSR represents a material component of an entity's financial statements, as they did on Countrywide's financial statements, that entity must have a robust methodology in place to evaluate all of the critical variables in the pricing model.  AAM 8050.11.  This caution was augmented by a rising fear among analysts that a reversal in credit quality could occur if interest rates continued to rise.  That is, under those conditions, payments would become more difficult for borrowers who would ultimately experience problems refinancing their mortgages if their ARM loans reset at higher interest rates.  AAM 8050.17.  These risks were particularly attributable to borrowers who "met only the threshold debt service coverage ratios."  AAM 8050.19.  In other words, as higher interest rates took effect, ARM borrowers who had low FICO scores, high debt-to-income ratios, or high loan-to-value ratios would present significantly greater risk to mortgage lenders.  As a result, Countrywide should have adjusted its assumptions to include these increased risks from such loans.

626.  The 2005 ARA also cited to the findings of the OCC, which warned that financial institutions with significant holdings of financial instruments such as MBS "need to focus on the economic value of their equity."  For Countrywide, this would have included RI.  AAM 8050.14.

627.  Another important risk factor articulated in the 2005 ARA was "The Housing Bubble's Overstated Collateral Values."  This section of the ARA noted certain issues that were increasingly present at Countrywide, including the extension of credit to customers based upon inflated collateral values.

> Customers holding adjustable rate mortgages may not be able to make payments if interest rates rise significantly.  Upon foreclosure, these financial institutions may not be able to liquidate underlying assets without absorbing significant losses and may be stuck with the asset if the economy lessens housing demand in the marketplace.

AAM 8050.22.

628.   Due at least in part to the continued rise in interest rates, this risk directly impacted Countrywide.  SAB 102 notes that:

> [i]t is critical that loan loss allowance methodologies incorporate management's current judgments about the credit quality of the loan portfolio through a disciplined and consistently applied process. . . .  A registrant's loan loss allowance methodology generally should . . . [c]onsider the particular risks inherent in different kinds of lending . . . [and] *[c]onsider current collateral values*.

As a result, Countrywide's increasing exposure to ARMs, in addition to its borrowers' tendency to make less than full payments on "pay option" loans with decreasing collateral values, exposed Countrywide to a risk of understating its ALL.

### c)   Risk Factors In 2006

629.   The 2006 ARA focused on many of the same significant risks that confronted mortgage lenders in 2005.  Such relevant risk areas included the increase in originations of risky loan products, such as ARMs and Pay-Option ARMs, which posed particular risks for entities that had not "developed appropriate risk management policies (such as avoidance of negative amortization)." AAM 8050.35.  The 2006 ARA raised the specific concern that the value of these products were often predicated on an assumption that home prices would continue to rise, which it observed was an assumption unlikely to be sustainable: "[S]ome of these [ARM] products assume a continued rise in home

prices that may not continue." AAM 8050.35. As a result, Countrywide should have ensured that it was reflecting the increased credit risk of such products in its valuation model and assumptions used to prepare the financial statements.

630. The 2006 ARA noted increased concerns regarding home equity lending and related mortgages in terms of the easing of underwriting standards. AAM 8050.36. In particular, the ARA continued to emphasize that if an institution elected to change its underwriting standards to issue riskier loans, the effect of such loans must be considered in evaluating the ALL. AAM 8050.36.

### d) Risk Factors In 2007

631. During 2007, the AAG listed fraud risk factors applicable to mortgage lenders. Each of these factors should have been considered by management in assessing whether the Company's reserves and fair value assumptions were appropriate (AAG Chs. 9-10). These risk factors included (AAG Ch. 5, Ex. 5-1):

    (a)    significant volatility in financial markets where the institution is exposed to loss of revenue;

    (b)    deteriorating economic conditions (for example, real estate prices) within industries or geographic regions in which the institution has significant credit concentrations; and

    (c)    decline in asset quality due to borrowers affected by recessionary declines.

### 2. Countrywide Inflated Earnings By Recording An Inadequate Allowance For Loan Losses

632. Countrywide classified LHI when management intended to hold the loans for the foreseeable future or to maturity. LHI were reflected on its balance sheet at amortized cost (primarily the total unpaid principal balance) reduced by an ALL, also known as a reserve, valuation, or contra-asset account. GAAP required the Company to establish such a reserve for probable credit losses related to borrowers who were expected to default on their obligations to make monthly

mortgage payments. Specifically, during the Relevant Period, GAAP required the Company to: (1) record an ALL representing the estimated probable loan losses residing in its LHI portfolio as of the end of each reporting period, and (2) maintain an effective ALL methodology that results in an ALL that is estimated in accordance with GAAP.

633. Countrywide's ALL was a critical metric for investors because it indicated the expected level of loss the Company was reasonably likely to incur on LHI on its balance sheet. Further, the provision for loan losses, a component of the ALL, had a direct impact on net earnings, which was also a critical metric for investors. To increase ALL for the current period, Countrywide was required to record a provision for loan losses. Under GAAP, recording a provision for loan losses is an expense and reduces pre-tax earnings on a dollar-for-dollar basis.

634. As stated above, SFAS No. 5 sets forth the standards of financial accounting and reporting for loss contingencies. SFAS No. 5 establishes that the uncertainty related to the collectability of receivables is an example of a loss contingency that requires the accrual of a related loss reserve when certain conditions are met (SFAS No. 5, ¶¶4, 8). With respect to Countrywide's LHI portfolio, the uncertainty involved the risk that Countrywide would not collect contractual principal and interest due from borrowers as of the due date.

635. Specifically, SFAS No. 5 provides in paragraph 8:

An estimated loss from a loss contingency . . . shall be accrued by a charge to income [*e.g.*, provision for loan losses] if **both** of the following conditions are met:

(a)     Information available prior to issuance of the financial statements indicates that it is probable[19] that an asset

---

[19]  SFAS No. 5 defines "probable" as "the future event or events are likely to occur." ¶3.

[such as LHI] had been impaired or a liability had been incurred at the date of the financial statements.   It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.

(b)    The amount of loss can be reasonably estimated.

[Emphasis in original.]

636.   SFAS No. 114 addresses the accounting by creditors for impairment of certain loans by specifying how allowances for credit losses related to certain loans should be determined. SFAS No. 114 applied to Countrywide's loans that were "impaired." Specifically, SFAS No. 114 provides guidance as to when certain loans are to be evaluated for impairment.   "A loan is impaired when, based on current information and events, it is probable that a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement." "Contractual terms" means both the contractual principal and interest will be collected, over the life of the loan, as scheduled in the loan agreement (SFAS No. 114, ¶8).

637.   When a loan is impaired, as defined above, the creditor is required to measure impairment based on one of the following: (a) the present value of expected future cash flows discounted at the loan's effective interest rate or at the loan's observable market price, or (b) the fair value of the collateral if the loan is collateral dependent (SFAS No. 114, ¶13).

638.   Further, Countrywide's regulator, the OCC invoked SFAS No. 114: "Under FAS 114, a loan is impaired when it is probable that the bank will be unable to collect all amounts due (including both interest and principal) according to the contractual terms of the loan agreement.   Generally, a loan is impaired for purposes of FAS 114 if it exhibits the same level of weaknesses and probability of

COMPLAINT

loss as loans (or portions of loans) classified doubtful or loss." (OCC Handbook for Allowance for Loan and Lease Losses, p. 6. ("OCC Handbook")).

639. The AAG provided reporting entities specific guidance on what comprise an effective ALL methodology: "[T]here are certain common elements that **should be included** in any methodology for it to be effective. The method should [shown in part] (AAG Ch. 9):

- Consider all known relevant internal and external factors that may affect collectability;
- Be based on current and reliable data; and
- Consider the particular risks inherent in the different kinds of lending.

640. Importantly, the AAG emphasized the necessity for the Company to adjust assumptions in its ALL methodology that are based on historical loss experience so that current economic conditions are reflected in the current estimated ALL. The AAG stated that management should generally consider historical rates of default when evaluating ALL reserves but "[c]hanges in facts, circumstances or institution's procedures may cause factors different from those considered in the past to become significant to the estimate of the allowance at the balance sheet date." AAG Ch. 9, "Credit Losses." The AAG further stated: The focus on the pool approach is generally on the loss experience for the pool. Loss experience, which is usually determined by reviewing the historical loss (charge-off) rate for each pool over a designated time period, **is adjusted for changes in trends and conditions**. Trends and conditions (*i.e.*, relevant internal and external factors that may affect collectibility) that the institution should consider in determining how historical loss rates should be adjusted include, in part:

- Levels of and trends in delinquencies and impaired loans;
- Trends in volume and terms of loans;

- Effects of any changes in lending policies and procedures;
- National and local economic trends and conditions; and
- Credit concentrations (AAG Ch. 9).

641.   Countrywide employed an ineffective ALL methodology in estimating the ALL during the Relevant Period as its methodology lacked the required elements for an effective methodology as set forth by the AAG and the SEC. Consequently, it failed to estimate the ALL in accordance with SFAS No. 5 and SFAS No. 114 during the Relevant Periods.

642.   Countrywide's ALL methodology failed to consider all known relevant internal and external factors that may affect collectability.   Countrywide's ALL was estimated to purportedly comply with SFAS No. 5.   Countrywide's ALL methodology used pools of its LHI and applied a formula that utilized the following three components:   (1) probability of default within one year ("PD"); (2) projected exposure on the defaulted loan ("EAD")[20]; and (3) percent loss expected on a defaulted loan ("LGD/Severity")[21].   The formula was PD x EAD x LGD = ALL.   Countrywide failed to adjust the assumptions fed into each component to reflect certain factors Countrywide knew would impact collectability of its LHI.

643.   For example, a *The Wall Street Journal* article published on December 5, 2006, titled "More Borrowers with Risky Loans Falling Behind" stated that, according to investment bank UBS AG, "Based on current performance, 2006 is on track to be the worst ever for subprime loans."   The article also stated that "delinquency rates have been rising steadily since the middle of 2005.   But the trend has accelerated sharply in the past two to three months."   In addition:

---

[20]   EAD stands for "exposure at default," and is typically the loan's unpaid principal balance ("UPB").

[21]   LGD stands for "loss given default," and represents the loan's UPB less amounts recovered through sale of the underlying collateral.

subprime loans made in 2006 are going into foreclosure at a faster pace than loans made in previous years.  In many cases, these loans are 'so bad right off the bat' and so far beyond the borrower's ability to pay that giving the borrower more time to pay or restructuring the loan wouldn't help. . . .

This article prompted Mozilo to circulate a Memorandum dated December 7, 2006, addressed to Countrywide's Board of Directors and others in the Company.  In this Memorandum, Mozilo confirmed that he and Countrywide knew of the significant credit risks as described in the *WSJ* article which arose from the subprime loans Countrywide had originated.  He also admitted that Countrywide engaged in loosened underwriting practices and acknowledged that the worsening economic environment is directly correlated to rising delinquencies.  The information in this *WSJ* article and Mozilo's agreement with the conclusions represent internal and external factors that impacted the PD and LGD components of the ALL formula.  Rising delinquencies impacted the PD, and declining collateral values impacted the LGD.  Nevertheless, Countrywide's methodology used PD and LGD rates that were not based on appropriately adjusted historical data, and failed to prompt Countrywide to adjust the PD and LGD rates to reflect the current adverse but directly relevant factors present during the Relevant Period.  Mozilo and his senior management knew that: (1) delinquencies were rising and were expected to continue to rise; (2) housing/collateral values were declining and will continue to decline; (3) Countrywide had changed its lending and underwriting practices such that the borrowers would likely experience payment shock; and (4) the increased concentration of Pay-Option ARMs in its LHI will likely exacerbate the probable credit losses.  Mozilo and his senior management also knew that the lethal combination were significant factors that impacted the collectability of the LHI.  Nevertheless, in violation of GAAP, Countrywide did not adjust the historical loss rates and related assumptions reflected in the PD and LGD to reflect the ongoing

and worsening negative trends and conditions, which Countrywide was aware of and knew impacted the collectability of the LHI.

644.   Another example of the ALL methodology ignoring known relevant factors is Countrywide's disregard for the fact that the ALL as a percentage of non-performing assets had been declining during the Relevant Period.   Since Q4 2005, Countrywide Bank ignored the fact that its ALL as a percentage of its non-performing assets had steadily declined, indicating it was significantly under-reserved.   The ALL as a percentage of NPAs within Countrywide Bank, which held the vast majority of Countrywide's LHI, was 65% as of Q4 2005, and declined to 39.6% as of Q1 2007.   Given Countrywide's loosened underwriting guidelines, along with the deteriorating economic trends since Q4 2005, it was reasonable to expect the ALL to NPA ratio to increase, not decrease.   It was unreasonable to expect the ALL to NPA ratio to decline, especially during periods when the NPAs are increasing by significant amounts, and the originations of subprime loans had simultaneously increased.   In one of its regulatory examination/reviews, the OCC appears to have "commented" on the disproportionate rate of increase between NPAs and ALL on or around early January, 2007.   Nevertheless, Countrywide failed to adjust the PD upward to reflect current negative economic trends impacting the collectability of the LHI.

645.   Another example of the ALL's methodology's disregard for known relevant factors impacting collectability is evidenced by Countrywide's lack of reaction to adjust the ALL despite the pointed January 2, 2007 email, from McMurray to Sieracki, discussed in detail above.   In the email, McMurray outlines "why delinquencies will increase" and the impact this increase will have on "our financial results."   Specifically, McMurray expressed that he expected delinquencies to rise due to, among other factors, the current state of unfavorable real estate market conditions and Countrywide's "widened guidelines."   He concludes that "rising delinquencies will increase the reserve [ALL] requirement."

However, Countrywide did not increase the ALL to a level adequate to absorb probable losses.

646.   Countrywide's ALL methodology was not based on current and reliable data.  For example, the assumptions reflected in the PD component of the ALL formula were not updated to reflect current and reliable data.  Consequently, the PD component consistently under-predicted the probabilities of default that were fed into the formula during the Relevant Period.  Countrywide knew of this consistent under-prediction, and knew that it was consistently resulting in an understated ALL.  To purportedly repair the consistent under-prediction of the PD, Countrywide would use a "PD multiplier" when it determined that the PD may be inaccurate.  The PD multiplier increases the PD rate to supposedly correct for the inaccuracy of the PD.  However, the PD multiplier was too low and did not raise the PD rate to a level that resulted in an adequate ALL.  In an internal email from Don White ("White"), Executive Vice President-Loan and Credit Administration, to Dave Walker, Executive Vice President-Portfolio Management, and others, dated January 29, 2007, produced by Countrywide in the SEC Action and examined by Plaintiffs' counsel, Mr. White conveys the OCC's concern that the PD multipliers were inadequate and "too backwards-looking . . . [the PD multipliers do] not fully incorporate the [credit] risks we are facing going foreward (*sic*) (*i.e.* potentially depreciating housing market."

647.   Countrywide also reduced the LGD (percent loss expected on defaulted loan) during Q1 2007, even though housing values had been precipitously declining, further reducing the calculated ALL in relation to the growth in LHI.  This reduction in LGD suggests that Countrywide miraculously expected the loan losses from defaults to decrease due to an increase in the underlying collateral values.  This expectation and reduction in LGD is illogical and unsupportable as collateral values had been declining and were expected to continue to decline.  Therefore, there was no internal or external factor or

information that would lead Countrywide to expect the loss recovered through sale of underlying collateral to be mitigated by higher proceeds from sale of the collateral.

648.   Countrywide's ALL methodology did not consider the particular risks inherent in the different kinds of lending.   Countrywide's Pay-Option ARMs represented significant credit risk due to the expected payment shock arising from negative amortization.   Coupled with declining housing/collateral values, Pay-Option ARM borrowers represented the greatest credit risk to Countrywide. Even though Countrywide's Pay-Option ARMs represented a far greater credit risk than its conforming or First Lien loans, Countrywide comingled its Pay-Option ARMs with its conforming or First Lien loans into the same pool when estimating the ALL and applied the SFAS No. 5 pooling approach.   In other words, despite the vastly disparate creditworthiness of the Pay-Option ARM borrowers and First Lien borrowers, Countrywide applied similar PD rates (probability of default) to both kinds of borrowers.   Such methodology resulted in an understated ALL.

649.   The SEC also provided explicit guidance on the proper accounting for loan losses which reiterated the AAG's guidance that Countrywide should have followed but did not.   SAB 102 states in pertinent part:

It is critical that loan loss allowance methodologies incorporate management's current judgments about the credit quality of the loan portfolio through a disciplined and consistently applied process. . . . A registrant's loan loss allowance methodology generally should . . . [c]onsider all known relevant internal and external factors that may affect loan collectability . . . [and] [b]e based on current and reliable data[.]

650.   SAB 102 also provides:

Factors that should be considered in developing loss measurements include . . . [l]evels of and trends in delinquencies and impaired loans

. . . [and] [e]ffects of any changes in risk selection and underwriting standards, and other changes in lending policies, procedures, and practices . . . .

651.   The SEC further stated in SAB 102 that:

[f]or many entities engaged in lending activities, the allowance and provision for loan losses are significant elements of the financial statements.   Therefore, the staff believes it is appropriate for an entity's management to review, on a periodic basis, its methodology for determining its allowance for loan losses.

652.   Countrywide claimed it was determining its ALL consistent with SAB 102.  It stated that its ALL was evaluated "on a periodic basis by management" and any adjustments were purportedly reflected in the Company's earnings.   For example, Countrywide stated in its 2006 Form 10-K that "we continually assess the credit quality of our portfolios for loans held for investment to identify and provide for losses incurred."   This 2006 Form 10-K also stated that "[o]ur allowance estimation process benefits from the extensive history and experience we have developed in our mortgage loan servicing activities," and that while "this process is subject to risks and uncertainties:"

[W]e address this risk by actively monitoring the delinquency and default experience of our homogenous pools by considering current economic and market conditions.   Based on our assessments of current conditions, we make appropriate adjustments to our historically developed assumptions when necessary to adjust historical factors to account for present conditions.   Our senior management is actively involved in the review and approval of our allowance for loan losses.

COMPLAINT

As explained above, however, Countrywide's disclosure is false and misleading as it failed to consider current economic and market conditions in estimating its ALL by not making reasonable and appropriate adjustments to the PD and LGD rates.

653. The AAG also provided guidance on when loans could be considered impaired. In particular, Chapter 9 states that under SFAS No. 5 "a loan would be impaired at origination . . . if a faulty credit granting decision has been made or loan credit review procedures are inadequate or overly aggressive, in which case, the loss should be recognized at the date of the loan origination."

654. GAAP, including SFAS No. 5 and SAB 102, as emphasized in AAG Chapter 9, required Countrywide to adjust historical trends and increase ALL for each reporting period based on both the increased probability of impairment and actual impairment at origination. The Company did not do so, in violation of SFAS No. 5 and SAB 102, which specifically ties loan underwriting standards and changes in risk to the setting of loan loss reserves. Rather, the Company kept ALL relatively constant during the Relevant Period before management finally began to institute some changes in 2007.

655. Further in violation of GAAP, Countrywide failed to apply the provisions of SFAS No. 114 to loans it classified as "doubtful" and to impaired loans. GAAP and the OCC required Countrywide to apply SFAS No. 114 in specific circumstances, such as loans deemed "doubtful," and certain loans deemed "impaired." Specifically, Countrywide's LHI portfolio contained groups of Pay-Option ARMs that were impaired during the Relevant Period, yet Countrywide failed to test for impairment over the life of those loans.

656. The OCC Handbook sets forth that:

if full payment of principal and interest is not expected, it may be necessary to reconsider the classification of the loan and take the loan off accrual status. Further, the loan should probably be considered to be impaired and subject to the requirements of SFAS 114.

It further states that "[g]enerally, a loan is impaired for purposes of SFAS 114 if it exhibits the same level of weaknesses and probability of loss as loans (or portions of loans) classified doubtful or loss."

657.   Countrywide had internally identified and classified certain of its loans as "doubtful."  Therefore, Countrywide itself had recognized that these loans were impaired and should have been accounted for under SFAS No. 114, but Countrywide did not even apply SFAS No. 114 to any of its LHI portfolio. Pursuant to SFAS No. 114, Countrywide was required to determine the estimated ALL or impairment for these loans using either: (a) the present value of expected future cash flows discounted at the loan's effective interest rate or at the loan's observable market price; or (b) the fair value of the collateral if the loan is collateral dependent (SFAS No. 114, ¶13).  Since these were mortgage loans, these were collateral-dependent and the fair value of the underlying collateral was required to be estimated to determine the appropriate ALL and related provision for these impaired loans.  Given the visibly deteriorating housing/collateral values, the fair values of the underlying collateral were likely declining during the Relevant Period, resulting in greater impairment and related increase to provision for loan losses.  In violation of GAAP, Countrywide included the "doubtful" loans in its SFAS No. 5 pools, resulting in a lower ALL for these doubtful loans and underestimated total ALL during the Relevant Period (as explained above, the methodology for the SFAS No. 5 pools was also flawed and resulted in an understated ALL).

658.   In addition, portions of Countrywide's Pay-Option ARMs were impaired during the Relevant Period.  Countrywide's senior management knew that "payment shock" was inevitable for many of the Pay-Option ARMs in its LHI.  For example, 89% of the Pay-Option ARMs as of Q3 2006 had been underwritten under Stated Income, whereby no documentation supporting borrower's income was obtained by Countrywide.  In fact, Countrywide had identified such reduced

documentation as a factor of additional risk. Countrywide knew that when such loans experience negative amortization, ultimately the monthly payments would be "recast" to a monthly payment amount far greater than what the borrower had qualified for, and the risk for collection on that loan would worsen, especially if the borrower was already a credit risk upon origination or if the stated income was inflated. This was further compounded by another layer of collection risk, which was the decline in the collateral value. Because the decline in the value of property collateralizing the loan was such that it decreased below the unpaid principal balance, the risk of collection on these loans worsened further.

659.   On June 1, 2006, Mozilo sent an internal email, discussed in detail above, making clear his knowledge that present conditions required an adequately increased ALL for the Pay-Option ARM loans.    In this email, Mozilo acknowledged the following that impacted the collectability of the Pay-Option ARMs due to negative amortization:    (a) the majority of Pay-Option ARMs originated by Countrywide were based on Stated Income, and there was evidence that the borrowers were providing income that "does not match up with IRS records"; (b) due to rising interest rates, the time of reset of the loan will accelerate and reset payments will be higher than what the borrowers qualified for at origination; (c) the lower FICO score borrowers (at least 20% at this time) will experience payment shock, "which is going to be difficult if not impossible for them to manage"; and (d) "we know or can reliably predict what's going to happen in the next couple of years . . . we should take a careful look at our reserves and begin to assume the worst." Another email by Mozilo, dated August 19, 2006, makes it clear that Mozilo knew that the ALL had to be increased to reflect the high credit risk presented by the Pay-Option ARMs. However, Countrywide failed to do so.  In this email, Mozilo "remain[ed] concerned" about the Pay-Options ARM loans and essentially described the effects of payment shock.  He acknowledged that: (a) over 75% of the Pay-Option borrowers were opting to

make only minimum payments, creating negative amortization, an issue that was compounded by increasing interest rates; (b) these loans are expected to reset faster and payments will be higher than what borrowers anticipated, and the "only out is to refinance these loans before reset"; (c) it "might prove" to be difficult to refinance the Pay-Option ARMs because housing values have decreased because "in all cases the loan could be above the current value"; and (d) to minimize payment shock, house values would have to rise significantly and/or interest rates would have to drop.  Mozilo knew along with the rest of the country that such conditions were not likely to occur.

660.   Therefore, certain of the Pay-Option ARM loans were impaired and Mozilo and Countrywide knew during the Relevant Period that these loans were impaired.  Countrywide knew that the ALL had to be increased accordingly to adequately cover the probable losses from the Pay-Option ARMs, but Countrywide did not.  Countrywide should have applied the provisions of SFAS No. 114 to determine the ALL based upon the fair values of the underlying collateral, but it did not.  In fact, in violation of GAAP, Countrywide's ALL methodology did not even prescribe a way to identify loans that should be assessed for collectability under SFAS No. 114.  Applying SFAS No. 114 to the impaired Pay-Option ARMs would have resulted in a higher ALL for these loans.  Instead, Countrywide included the impaired Pay-Option ARMs in its SFAS No. 5 pool, which, as described above, was subjected to an ALL methodology that was flawed.  Consequently, the total ALL and related provision for loan losses during the Relevant Period was understated.

661.   The comparison of ALL as a percent of LHI measures portfolio credit risk coverage.  If loan products are increasing in risk, the ALL as a percent of LHI should increase as well.  A review of the Company's ALL demonstrates that during the Relevant Period − when the Company's exposure to and volume of non-traditional, riskier loans, such as its Pay-Option ARMs were increasing

dramatically – ALL increased steadily in dollar amount but remained relatively constant (and in fact *decreased* from 1Q 2005 to 3Q 2006) as a percentage of the Company's portfolio of LHI. Indeed, LHI increased from only 10% of Countrywide's total assets in 2002 to 27%, 31%, and 40% in 2003, 2004, and 2005, respectively. Thus, while Countrywide assumed increasing amounts of credit risk as the Relevant Period progressed, it also was unable to securitize many of the loans carrying that risk, holding them instead on its financial statements but failing to appropriately account for that risk in its ALL.

662. Beginning in 2003, Countrywide systematically increased its origination of nontraditional and "nonprime" loans, including Pay-Option ARMs, which increased its risks. Countrywide also loosened its underwriting and appraisal standards further increasing its risks. Because of these increased risks, AAG (Ch. 9), the AAMs (8050.07, 8050.33) and SAB 102 required that estimates for ALL reflect the "effects of [these] changes in risk selections and underwriting standards." However, the Company did not change estimates until the latter half of 2007.

663. In 2003, Countrywide produced approximately $20 billion in "nonprime" loans, which was 4.6% of the total mortgage loans produced. In 2004, Countrywide increased its production of nonprime loans to more than $39 billion, which was 10.9% of total mortgage loans produced. Thus, production of nonprime loans increased almost 99% during 2004 alone, illustrating that Countrywide was assuming more credit risk. Also during 2004, Countrywide increased the dollar value of ARM loans that it produced by 108%, and increased HELOC loans by 70.7%. By 2004, it was clear that Countrywide was incurring substantially more risk, even as the Company wrote fewer mortgages. According to the 2004 ARA, federal banking agencies noted that possibly half of United States family mortgages were subprime, and that delinquencies on subprime mortgages continued to rise. AAM 8050.33.

664.   These figures should have created a presumption within management that the changing mix of Countrywide's loans held for investment warranted increasingly conservative accounting estimates.  But Countrywide did not properly account for the increased production of nonprime and nontraditional loans in 2004. Countrywide's pervasive improper lending practices, loans to borrowers with high loan-to-value ratios, high debt-to-income ratios, low FICO scores and decreased due diligence leading to increased risk of false appraisals and other frauds in loan applications, resulted in loans that were impaired at origination as contemplated in AAG Chapter 9. As a result, historical default rates, used by the Company to calculate ALL, were flawed, reported net value of the Company's LHI was overstated, revenue was overstated and net income was overstated.

665.   This trend continued throughout the Relevant Period.  For example, in 2005, Countrywide originated $45 billion in "nonprime" loans, which comprised 8.9% of total mortgage loans produced. Countrywide's production of nonprime loans increased 13.2% during 2005 as compared to 2004, reflecting Countrywide's continued assumption of increased credit risk.  Notably, during 2005, Countrywide increased originations of Pay-Option ARM loans by 335%.  Originations of ARMs increased 37.7% and HELOC originations increased 45.2%.

666.   Countrywide's failure to properly account for increased risk in accordance with SAB 102 during 2005 is illustrated by among other things, the fact that it decreased its ALL as a percent of LHI from 0.31% to 0.27%.  This shows, again, Countrywide's failure to adjust its historical rates of default to include the known increased risk from nontraditional loan products, nonprime loans and faulty credit-granting decisions resulting from its changed business practices and model.

667.   In light of the fact that a material number of loans were impaired at origination, Countrywide's historical "default rate" as reflected in the PD (in the

ALL formula) was an inaccurate measure for use in calculating ALL. As a result, Countrywide's financial statements failed to comply with GAAP.

668. In 2006, Countrywide again understated its ALL. Countrywide produced approximately $41 billion in "nonprime" loans that year, which was 8.7% of total mortgage loans produced. Although there was a decrease in mortgage loans produced by Countrywide in 2006, resulting in an attendant decrease in nonprime and nontraditional mortgage loans, the origination of such loans as a percentage of the total dollar value of mortgage loans originated that year remained strong and continued to be a central focus of Countrywide's business. Thus, 45.3% of the total dollar value of mortgage loans produced during 2006 were ARM loans, 14% were Pay-Option ARMs, 10.2% were HELOCs, and 8.7% were nonprime loans.

669. The 2006 ALL as a percentage of LHI stayed essentially flat as compared to 2005, at a rate of 0.33%. This lack of change again illustrates Countrywide's failure to adjust its historical rate of default to include the Company's increased risk, not just from 2006, but also from 2003 to 2006.

670. Countrywide also failed to adjust its ALL based upon the increased risk caused by material underlying qualitative considerations. Countrywide's financial statements were materially false and misleading because the Company improperly characterized a substantial number of its subprime loans as prime loans. This misrepresentation further demonstrates that the static levels of Countrywide's ALL clearly failed to accommodate increasing nonprime risk. An analysis of aggregate FICO scores associated with securitized loans shows a substantial discrepancy between the percentage of loans Countrywide claimed were nonprime and its actual lending practices. Given that Countrywide's concealed flexible definition of "prime" was applied without distinction to whether loans were securitized and sold or held in the LHI portfolio, there is a strong

inference that there was also a lower percentage of prime loans in the LHI portfolio.

671. In order to properly account for risk when estimating ALL, Countrywide had to utilize estimates based on a correct determination of which loans were prime and which were nonprime.  Wrongly minimizing the percentage of nonprime loans would have materially worsened the understatement of ALL.  For example, at the end of 2006, nonprime mortgages had a delinquency rate of 19.03%, whereas conventional mortgages had a delinquency rate of 2.76%.  Accordingly, the nonprime mortgages that were improperly classified as prime or conventional mortgages for purposes of estimating the ALL would be under-reserved as of the balance sheet date.

672.  Other evidence of Countrywide's under-accrual for its ALL involved Countrywide's loans that were 30-89 days past due.  An important component of data that was reported by Countrywide was the information on its call reports for 30-89 days past due on first mortgages.  A call report is a quarterly financial report that banks must file with bank regulators, collected by the Federal Financial Institutions Examination Council ("FFIEC").  Any rise in loans that were 30-89 days overdue provided an early warning signal to Countrywide of both rising credit risks and the inaccuracy of its ALL assumptions.  Data concerning loans 30-89 days past due are important because they provide a signal to the financial institution of the volume of loans that is likely to enter non-accrual status and ultimately default, and accordingly provide an important indicator of probability of impairment in the determination of ALL.

673. Countrywide experienced a significant increasing trend of delinquencies as early as the second quarter of 2004, one that continued throughout 2005.  For example, the call reports indicate that for the second quarter of 2004, loans that were 30-89 days past due represented approximately 0.25% of the

median value of mortgages.  By the end of 2005, however, this rate had quadrupled to 1.00%.

674.  While delinquencies of 30-89 days remained relatively constant for both the industry as a whole and those large banks between the first quarter of 2003 and the fourth quarter of 2005, Countrywide's delinquencies grew.  This growth trend, which began in the first quarter of 2004, should have resulted in modifications to Countrywide's historical loss assumptions.  By the second quarter of 2005, when Countrywide's delinquency rate for 30-89 day loans surpassed the banking industry median for such loans, there should have been no doubt that the application of historical assumptions would have resulted in inadequate provisions to ALL.  Throughout the remainder of 2005 and through the second quarter of 2006, the industry remained steady with rates between 0.63% and 0.71%, while the rate of Countrywide loans that were 30-89 days past due shot up from 0.77% to 1.25%.  Again, this evolution of the delinquency trend provided a clear signal that Countrywide should have been increasing its ALL as a percentage of total loans held for investment.

675.  Increases in originations of risky loans, particularly ARMs and Pay-Option ARMs, posed particular risks for lenders that had not "developed appropriate risk management policies (such as avoidance of negative amortization)."  AAM 8050.35.  Accordingly, Countrywide's ALL should have been increased to reflect such increased credit risk. AAM 8050.35.  Delinquencies in Pay-Option ARMs and HELOCs, the loans that presented the greatest risk of default, increased substantially during the Relevant Period.  During this time, many borrowers only made the minimum payments on Pay-Option ARMs, meaning that they were not even paying the currently due interest.  Thus, during the Relevant Period, Countrywide recorded substantial amounts of negative amortization from Pay-Option ARMs as deferred revenue.  While booking this deferred revenue presented a current impression that the Company's results were improving, in fact,

the accumulated negative amortization signaled a high likelihood of delinquencies and defaults, as mentioned in AAG Chapter 8, "Loans." As soon as borrowers reached the specified, pre-set negative amortization caps, which forced them to start repaying the loan, not only would they be delinquent, but their loans would also have experienced meaningful deterioration in the applicable loan-to-value ratios, given that unpaid interest, according to the terms of the mortgages, was added to principal. That deterioration would have also decreased the borrower's motivation to make further payments. 2005 AAM 8050.17.

676. The amount of accumulated negative amortization on Countrywide's Pay-Option ARMs held for investment grew dramatically during the Relevant Period. During 2005, accumulated negative amortization ballooned by more than 250,000%, and grew another 775% during 2006 and another 86% during 2007. Despite the increasing risk from accumulating negative amortization, ALL remained relatively flat as a percentage of LHI until the third quarter of 2007.

677. On July 24, 2007, Countrywide's volume-driven, exception-ridden underwriting standards and reckless lending practices manifested themselves in a sharp but belated increase in loan loss provisions of $293 million for the second quarter of 2007. Approximately 62% of this increase was derived from an increase in loan loss provisions of HELOCs of $181 million.

678. The July 24, 2007, increase in loan loss provisions was insufficient to cover the deterioration in the Company's loans held for investment. The Company's third quarter 2007 results, announced on October 27, 2007, included another large provision for loan losses of $934 million, more than triple any provision previously recorded by the Company. Nearly 24% of the Company's subprime loans were delinquent, up from 20% in the second quarter of 2007 and 16% in the third quarter of 2006. As stated in the Company's press release, the increase in loan loss provisions was "primarily relate[d] to additional reserves

COMPLAINT

provided for the Company's junior lien home equity [HELOCs] and pay option loans in the Banking Operations HFI [held for investment] portfolio."

679.   This $934 million provision represented 43%, 37%, and 35% of Countrywide's net earnings for 2004, 2005 and 2006, respectively, and was the single largest contributor to the Company's $1.2 billion loss for the third quarter of 2007.  However, the majority of these larger provisions for loan losses in Q2 and Q3 2007 should have been recorded by Countrywide in the preceding periods.  The information comprising negative trends and conditions impacting collectability of the LHI that were present in Q2, Q3 and Q4 2007 were already present and known as early as prior to the issuance of Countrywide's Q3 2006 financial statements.  Nevertheless, Countrywide chose to ignore the internal and external factors it knew to adversely impact the ALL during the Relevant Period, and chose to delay recognition of probable loan losses to Q2, Q3 and Q4 2007 in violation of GAAP.

680.   Because provisions for loan losses have a dollar-for-dollar impact on pre-tax income under GAAP, Countrywide's materially understated ALL caused its pre-tax income to be materially overstated by approximately $349 million cumulatively for the years 2004-2006 and the first half of 2007.

681.   In sum, during the Relevant Period, the Company's ALL was materially understated in violation of GAAP.  Countrywide's ineffective ALL methodology did not take into consideration the following risk factors when estimating its ALL:

        (a)   The percent of loans that Countrywide held for investment increased each year, demonstrating that Countrywide's loans were riskier and the secondary market was becoming less willing to purchase them;

        (b)   The reported amount of "nonprime" loans increased through 2005 and remained a central focus of Countrywide's loan production;

(c)     The actual amount of nonprime loans produced by Countrywide was much higher than the reported amount of "nonprime" loans;

(d)     The nonaccrual ARM delinquencies continued to rise at a significant rate;

(e)     Increasing HELOCs delinquencies;

(f)     Delinquent loans 30-89 days past due increased substantially;

(g)     Delinquent loans 30-89 days past due were increasing at a rapid pace and surpassed the median value for all bank loans that were 30-89 days overdue in the mortgage industry; and

(h)     Deterioration in Countrywide's underwriting practices.

In addition, Countrywide failed to apply the provisions of SFAS No. 114 to loans it acknowledged to be "doubtful" and its impaired Pay-Option ARMs.  Rather than increase the Company's ALL in a manner sufficient to account for the adverse internal and external factors impacting the collectability of the LHI, Countrywide failed to record adequate loan loss provisions as a result of employing an ineffective ALL methodology throughout the Relevant Period.  As a result of this failure, Countrywide's ALL during the Relevant Period was materially understated.  Had Countrywide complied with GAAP, it would have estimated significantly higher provisions for loan losses during the Relevant Period, but it did not, causing its earnings to be overstated during the Relevant Period.

### 3.     Countrywide Inflated Earnings By Overvaluing Its Retained Interests From Securitizations

682.   As a result of the Company's increased credit risk and failure to adhere to GAAP, Countrywide overstated the reported amounts of its RIs from securitizations and related revenue in violation of SFAS No. 140, SFAS No. 115, *Accounting for Certain Investments in Debt and Equity Securities* and EITF 99-20, *Recognition of Interest Income and Impairment on Purchased Beneficial Interests*

*and Beneficial Interests That Continue to Be Held by a Transferor in Securitized Financial Assets*.  When Countrywide securitized mortgage loans it had originated, Countrywide retained certain financial interests in these loans, called RI.  RI were assets that included interest-only, principal-only and residual securities that arise from the securitization of mortgage loans, primarily Nonprime Mortgage and Prime Home Equity Loans (2006 Form 10-K, p. 72).  GAAP requires an entity to report RIs at fair value.  In simple terms, the purpose for reporting RIs is similar to LHI net of an adequate ALL – the reported amount is to reflect the collectability of the cash flows from the RIs.

683.   According to its Forms 10-K reports, Countrywide "sells substantially all of the mortgage loans it produces in the secondary mortgage market, primarily in the form of securities."  Moreover, Countrywide's RI generally represented the riskiest tranches in these securities.  Because the valuation of RI was directly linked to the revenue line items "gain on sale of loans and securities" and "net loan servicing fees and other income (loss) from MSRs and retained interests," Countrywide's improper valuation of RI from securitizations resulted in an overstatement of total assets, revenues and net income.

684.  SFAS No. 140, paragraph 59 notes: "If the retained interests are subordinated to more senior interests held by others, that subordination may concentrate into the retained interests most of the risks inherent in the transferred assets and ***shall be taken into consideration in estimating the fair value of the retained interests***."  AAG Chapter 10, "Transfers of Loans and Mortgage Banking Activities"; 2005 AAM 8050.14.  SFAS No. 140, ¶70 further requires that fair value is based on "reasonable and supportable assumptions and projections," and that "all available evidence" is to be considered in "developing estimates expected of future cash flows."

685.  Management stated in the Company's Forms 10-K filings that it "estimate[s] fair value [of RI] through the use of discounted cash flow models."

The Company further said that "[t]he key assumptions used in the valuation of RI include mortgage prepayment speeds, discount rates, and . . . the net lifetime credit losses."  Moreover, Countrywide "develop[s] cash flow, prepayment and net lifetime credit loss assumptions based on *the historical performance of the loans underlying our retained interests* . . . ."

686.   The values of an entity's RI as estimated in accordance with GAAP are impacted by the quality of the underlying loans.  For Countrywide, given that a substantial portion of the underlying loans in the securitizations beginning in 2003 and during the Relevant Period were originated based upon increasingly loosened underwriting practices, there was an increased risk that those loans would not perform in accordance with their contractual terms and, consequently, the securitizations would not perform as expected.

687. Countrywide's SEC filings explain the direct correlation between defaults (which are preceded by delinquencies), the value of its RIs and the significant credit risk in those RIs:

> While we sell most of the loans we produce, we retain credit risk in the form of credit-subordinated securities [*i.e.*, RIs] and loans held for investment, and through the representations and warranties we make to the investors in the loans we sell and through the issuance of corporate guarantees.  Our credit-subordinated securities are the *first beneficial interests in loan sales to absorb any credit losses*, and the buyers of our loans will make more claims against our corporate guarantees and representations and warranties if more of our borrowers default on their loans.  While we estimate and provide for credit losses accruing to our credit-subordinated securities and for the corporate guarantees and representations and warranties, worsening economic and real estate market conditions could negatively impact the value of the credit subordinated securities we retain and increase

1   our liabilities under our corporate guarantees and representations and

2   warranties.

3   2006 Form 10-K, p. 37.

4   688.   Because the RIs were the riskiest tranches of the securitizations,

5   Countrywide's loosened underwriting practices significantly and adversely

6   impacted the fair value of RI.  To estimate the fair value of RI in accordance with

7   GAAP, Countrywide was required to adjust all assumptions in its RI valuation

8   model that were previously based upon historical rates, to recognize and reflect the

9   increased credit risk of the underlying loans included in its securitizations.

10   689.   Once RI was initially recorded, Countrywide was required to

11   determine and report the fair value of RI for each subsequent reporting period.

12   SFAS No. 140 provided guidance on how to determine the fair value of RI:

13   Valuation techniques for measuring financial assets and liabilities and

14   servicing assets and liabilities shall be consistent with the objective of

15   measuring fair value. Those techniques shall incorporate assumptions

16   that market participants would use in their estimates of values, future

17   revenues, and future expenses, including assumptions about interest

18   rates, default, prepayment, and volatility.

19   690.   Subsequent to initial recognition of RIs, Countrywide was required to

20   apply the accounting guidance in SFAS No. 115 and EITF 99-20.  SFAS No. 115

21   states "fair value portrays the market's estimate of the present value of the net

22   future cash flows of those securities, discounted to reflect both the current interest

23   rate and the market's estimate of the risk that the cash flows will not occur."

24   SFAS No. 115, ¶40.  EITF 99-20 emphasizes the risk of RIs to Countrywide as

25   "the risks present in the transferred assets are concentrated in the interest that

26   continues to be held by a transferor [*i.e.*, Countrywide] or subordinated beneficial

27   interest [*i.e.*, such as those retained by Countrywide]."

28

691.   In violation of GAAP, Countrywide failed to use assumptions in its RI valuation model that were reasonable and supportable.   The key assumptions Countrywide used, mortgage prepayment speed, discount rates, and lifetime credit loss expectations, did not reflect significant and relevant evidence known to Countrywide, which evidence should have caused Countrywide to adjust the assumptions in place and to reduce the reported fair value of the RIs during the Relevant Period.

692.   Similar to the valuation of its MSRs, an assumption Countrywide used to assess the fair value of RI was the delinquencies, which was encompassed in the key assumption for lifetime credit loss expectation.   Lifetime credit loss is determined by estimating when and how many loans will default and multiplying that amount by the percentage of the loan balance that will be uncollectible. Another assumption used within the lifetime credit loss assumption was house price appreciation ("HPA").   The combination of rising delinquencies and declining housing values adversely impacts the receipt of the cash flows from RIs. However, Countrywide failed to adjust its delinquency and HPA assumptions within the RI valuation model during the Relevant Period, even though it possessed the information that should have prompted it to make such adjustments.

693.   For example, on January 12, 2006, Jeffrey K. Speakes, Countrywide's Chief Economist, informed Countrywide's management that it should expect a slowdown in the housing market over the next year.   On March 14, 2006, Mr. Speakes informed Countrywide's management that The Office of Federal Housing Enterprise Oversight ("OFHEO") concluded that housing values had peaked in Q4 2005 (*i.e.*, no further appreciation of housing values was expected).   And on April 11, 2006, Mr. Speakes concluded that the slowdown in housing prices was now widely expected, and one out of eight ARM originations in 2004 to 2005 would default.   Despite this highly relevant information impacting the delinquency and HPA assumptions within the RI valuation model, Countrywide disregarded this

information and, instead, used optimistic assumptions in its RI valuation model, causing the RI to be overvalued and related revenue to be overstated during the Relevant Period.

694.   Another important assumption used to assess the fair value of RI is "weighted average life."  This assumption refers to the period of time during which the benefit of RI is expected to be received; in other words, the length of time that Countrywide will get paid on its RI, if any.  This is influenced by prepayment rates and credit risk.  SFAS No. 140, ¶17. Countrywide's shift toward nonprime and nontraditional lending beginning in 2003 should have decreased the weighted average life of RI, instead of allowing weighted average life to remain constant or increase.  This is because the "life" of a loan ends when the borrower defaults, resulting in a lower life for that loan.  As Countrywide increased the number of loans it made to less creditworthy borrowers under loosened underwriting standards and weak (if any) due diligence, defaults would be expected to increase and the weighted average life of such loans would be expected to decrease.  These consequences are expected to adversely impact the fair value of the RI.

695.   An email from McMurray to Sieracki on January 2, 2007, described in detail above, outlines "why delinquencies will increase and the impact this increase will have on our financial results."  Specifically, McMurray expressed that he expected delinquencies to rise due to, among other factors, the current state of unfavorable real estate market conditions and Countrywide's "widened guidelines."   He concludes that "increasing delinquencies will manifest through . . . impairments of residual values [i.e., RIs] . . . ."  He further concludes that impairments of residual values are the result of, among other factors, "higher current losses (we take first-loss) driven [by] higher defaults and higher severities." These factors directly related to assumptions used in the RI valuation model.

696. However, Countrywide did not adequately adjust its historical delinquency assumptions to encompass the riskier loans the Company was

producing at a rapid pace; nor did it include the increased credit risk from the Company's loosened underwriting practices. The failure to adjust historical delinquency assumptions, in turn, adversely impacted the reasonableness of the weighted average life assumption because the latter assumption reflects less dire delinquency rates. Countrywide failed to correct the assumptions even though financial institutions with significant holdings of financial instruments like MBS "need[ed] to focus on the economic value of their equity," which, for Countrywide, would have included RI. 2005 AAM 8050.14. The Company failed to appropriately include in its assumptions for weighted average life and net credit losses the likelihood that there had been and would continue to be an increase in defaults.

697. Under legitimate risk assumptions, Countrywide's intentional lowering of underwriting standards and the resulting increased delinquencies would have resulted in proportionally reduced the fair value of RI throughout the Relevant Period. As a result, the fair value of Countrywide's RI was materially overstated in each of the years from 2004 through the first half of 2007, as Countrywide failed to employ fair value assumptions to RI to reflect the increased risk from the underlying loans it originated in violation of SFAS Nos. 140 and 115.

### 4. Countrywide Inflated Earnings By Overvaluing Its Mortgage Servicing Rights

698. As a consequence of its loosened underwriting standards and its failure to adhere to GAAP, Countrywide overstated the reported amount of its MSRs and related revenues throughout the Relevant Period. Accordingly, the Officer Defendants also falsely and materially inflated Countrywide's assets, total revenues and reported net income.

699. Upon reselling mortgage loans it had originated to the secondary market, Countrywide typically retained the right to service those mortgage loans. To a lesser extent, Countrywide also purchased servicing rights from other loan

originators and recorded them at fair value at the time of their purchase. Countrywide's 2007 Form 10-K described its loan servicing activities as follows:

> When we sell or securitize mortgage loans, we generally retain the rights to service these loans. In servicing mortgage loans, we collect and remit loan payments, respond to customer inquiries, account for principal and interest, hold custodial (impound) funds for payment of property taxes and insurance premiums, counsel delinquent mortgagors and supervise foreclosures and property dispositions. We receive servicing fees and other remuneration in return for performing these functions.

2007 Form 10-K, p. 7. For Countrywide, MSRs is the present value of estimated future net servicing income (*i.e.*, servicing income less servicing costs) arising from such servicing contracts.

700. MSRs is the asset created as a consequence of the aforementioned activities as Countrywide expected to receive servicing compensation or income for providing certain servicing functions under its servicing contracts. As long as a borrower made payments, Countrywide could reasonably expect future servicing income from servicing that loan. However, Countrywide's receipt of servicing income became at risk, and servicing costs were likely to increase, whenever there was a risk that borrowers would be unable to make payments.

701. The valuation of Countrywide's MSRs was a critical metric for investors because it purported to indicate the fair value of Countrywide's MSRs, and the valuation of MSRs was directly linked to the revenue line items "gain on sale of loans and securities" and "net loan servicing fees and other income (loss) from MSRs and retained interests." However, during the Relevant Period, Countrywide did not properly estimate the fair value when it initially recorded MSRs, impacting gain on sale of loans and securities, nor did it do so when it valued MSRs in subsequent reporting periods, impacting net loan servicing fees

and other income (loss) from MSRs.  This practice was in violation of SFAS No. 140 and SFAS No. 156, and caused Countrywide to improperly inflate its MSRs on its balance sheet and reported revenues.

702.  Until January 1, 2006, Countrywide's valuation of MSRs was governed by SFAS No. 140.  According to Countrywide's Forms 10-K filings, MSRs were initially recorded at fair value and then:

> were carried at the lower of amortized cost or estimated fair value. . . . The adjusted cost basis value of the MSR was then assessed for impairment.  If MSRs were impaired, the impairment was recognized in current period earnings and the carrying value of the MSRs was adjusted through a valuation allowance."

A valuation allowance serves a purpose similar to ALL relative to LHI.  For reporting periods prior to 2006, when MSRs is impaired, the valuation allowance account should be used to reduce the reported value of MSRs on the balance sheet (*i.e.,* amortized cost), and reduce revenue on the income statement for the current period.

703.  Countrywide maintained a valuation model to estimate the fair value of its MSRs. According to Countrywide's 2005 Form 10-K, in periods prior to 2006, this valuation model was used to gauge the adequacy of the valuation allowance:

> Our MSR valuation process combines the use of a sophisticated discounted cash flow model . . . The cash flow assumptions and prepayment assumptions used in our discounted cash flow model are based on our empirical data drawn from the historical performance of our MSRs, which we believe are consistent with assumptions used by market participants valuing similar MSRs.

704.  Statement of Financial Accounting Standards No. 156, *Accounting for Servicing of Financial Assets* ("SFAS No. 156"), amended SFAS No. 140 as of

January 1, 2006, and provided reporting entities a choice of methods to use when valuing MSRs.  SFAS No. 156 changed the accounting for, and reporting of, the recognition and measurement of separately recognized servicing assets and liabilities.  Like SFAS No. 140, SFAS No. 156 requires MSRs to be initially recorded at fair value.  However, SFAS No. 156 allows MSRs to be carried on the books at fair value in subsequent periods (without the need to subsequently value them at amortized cost).  If the Company elects to subsequently measure MSRs using the fair value method, it is required to measure MSRs at fair value at the end of each reporting period with changes in fair value recognized in current period earnings.  Therefore, a current period decline in the reported fair value of MSRs reduces current period earnings by the amount of the decline.  In implementing SFAS No. 156, Countrywide elected to record MSRs at fair value (as opposed to amortized cost) in subsequent quarters.  In accordance with this election, the Company identified MSRs relating to all existing residential mortgage loans as a class of servicing rights and elected to apply fair value accounting to these MSRs.

705.   In 2006 and thereafter, the fair values that Countrywide assigned its MSRs were determined by a discounted cash flow model.   According to Countrywide's 3Q 2007 10-Q, "[t]he discounted cash flow models incorporate cash flow and prepayment projections based on data drawn from the historical performance of the loans underlying the Company's MSRs  .  .  .  in determining the assets' fair value."

706.   Moreover, Countrywide's 2007 Form 10-K stated that any calculated change in the fair value of its MSRs was based upon two primary components − (1) a reduction in fair value due to the realization of expected cash flows; and (2) a change in fair value resulting from "changes in valuation inputs or assumptions in valuation model," such as discount rates and prepayment speed assumptions.  The latter component constitutes management assumptions which GAAP requires to be reasonable and supportable.  In other words, Countrywide would reduce the fair

value of the Company's MSRs when it received principal and interest payments from borrowers on any of the underlying loans because the receipt of such payments (which include servicing fees) reduced the total amount receivable for the life of the loan.  Such decrease is appropriate and does not require the use of assumptions.   However, Countrywide would use assumptions in the second component of its MSRs' fair value.  Countrywide would either increase or decrease the fair value of the MSRs by making changes in assumptions fed into the valuation model.

707.  As noted above, management stated in Countrywide's Forms 10-K that it used "discounted cash flow models that incorporate cash flow and prepayment projections based on data drawn from the historical performance of the loans underlying the Company's MSRs" to determine changes in fair value due to management's assumptions.   The Company further stated that "[t]he key assumptions used in the valuation of MSRs [in the cash flow model] include mortgage prepayment speeds, the discount rate (projected London Inter Bank Offering Rate (LIBOR) plus option-adjusted spread)" and the weighted average life of the loans.

708.  Countrywide's MSRs and the related revenue line items were overstated because the Company failed to adjust its "key" assumptions to reflect the dramatic loosening in the Company's underwriting and lending practices.  As higher interest rates took effect, it became increasingly likely that higher delinquencies and foreclosures would ensue.   These consequences presented significantly increasing risk to Countrywide's receipt of the expected future cash flows from net servicing income, especially with respect to the net servicing income attributable to Pay-Option ARM borrowers subject to payment shock, and/or ARM borrowers that had low FICO scores, high debt-to-income ratios or high loan-to-value ratios.  Nevertheless, Countrywide failed to adjust delinquency and foreclosure data used as inputs in its cash flow assumptions by using historical

delinquency data and actual cash collected without regard for known potential payment shock arising from negative amortization of its Pay-Option ARMs, a consequence which Countrywide created itself when it dramatically loosened its underwriting guidelines.  Consequently, Countrywide materially overstated the fair value estimates for its MSR and related revenues throughout the Relevant Period.

709.   For instance, as Countrywide increased originations of mortgages, and increased the percentage of mortgages granted to less creditworthy borrowers using loosened underwriting standards and without prudent due diligence, the gross value of Countrywide's MSRs as reported rose from $8.1 billion as of December 31, 2003, to $9.8 billion as of December 31, 2004.   Despite the significant increase in the gross value of its MSRs and the inherent risk of not collecting certain net servicing income due to potential negative amortization and payment shock, Countrywide actually decreased its valuation allowance for impairment of MSRs from $1.2 billion to $1.1 billion.  Thus, although the gross value of MSRs increased by 22% in 2004, the related valuation allowance decreased by less than 10%.  This inadequate increase in the valuation allowance was inconsistent with Countrywide's knowledge of potential payment shock arising from negative amortization of its Pay-Option ARMs, and illogical and unsupportable in light of the increased credit risk associated with the Company's loosening underwriting standards and failures to exercise prudent due diligence.  If credit risk increased, the risk of not receiving future servicing net income increased, and therefore, management's valuation allowance account for the MSRs should have also been increased, thus resulting in a reduction of the reported value of Countrywide's MSRs.  Instead, the valuation allowance *was decreased* during 2004, thus conveniently − and misleadingly − providing an increase to the reported value of net MSRs.

710. GAAP prescribes that MSRs should be continually evaluated to determine whether their valuation should change, including whether or not costs

expected to be incurred would cause MSRs to become a servicing liability rather than an asset. SFAS No. 140, ¶62. If the costs of servicing poor quality loans increase (due to, for example, the costs of sending delinquency notices, hiring collection agents, etc.) to a high enough level, they will offset the expected income to be derived from those MSRs. Thus, when loans became troubled (for example, as loans became 30 to 89 days delinquent), Countrywide should have anticipated those incrementally higher costs and factored them into the valuation of MSRs. Instead, while making riskier loans upon which it retained MSRs, Countrywide inappropriately maintained its historical approach to establishing the value of these assets.

711. The reported gross balance of MSRs rose again from $9.8 billion as of December 31, 2004, to $13.0 billion as of December 31, 2005. Yet, despite the continued significant increase in credit risk assumed by Countrywide during that year, the valuation allowance for impairment of MSRs was actually decreased by management from $1.1 billion to only $0.4 billion. Thus, although gross MSRs increased 33% in 2005, the related valuation allowance decreased over 60%. As explained above, it was illogical and unsupportable that the valuation allowance should be decreased in relative terms from 11% to only 3% of gross MSRs given the large exposure to increased credit risk known to Countrywide due to its loosening of underwriting and lending standards, failures to exercise prudent due diligence, and the downward effect of that risk on the value of MSRs.

712. As noted above, in 2006, Countrywide adopted SFAS No. 156 and began to report its MSRs at purported "fair value." Accordingly, the reported fair value of the MSRs were now exclusively dependent upon the fair value assumptions, such as assumptions used in the cash flow model, employed by management (*i.e.*, without regard for the first component, the realized servicing income for the current period). During 2006, despite the significant increase in the level of delinquency and foreclosure risks associated with the loans subject to

servicing contracts and originated using Countrywide's loosened underwriting and lending practices, the Company's reported balance of MSRs reflected a $432 million *increase* in fair value solely derived from assumptions applied in its valuation model.  However, based upon the growing delinquency and foreclosure risks present at Countrywide, there were no assumptions that could be reasonably expected to warrant such an increase in fair value.  The Company failed to incorporate the increased credit risk of its lending strategies implemented in 2003, and the steady loosening of underwriting standards and due diligence practices thereafter.  Specifically, Countrywide failed to adjust assumptions used in its cash flow model within the MSR valuation model to reflect the adverse effects of rising delinquencies and foreclosures, rising interest rates, declining house/collateral values, and the known effects of payment shock arising from its loosened underwriting and lending practices, such as Pay-Option ARMs it had originated.  At a minimum, to address the rising risk of delinquencies and foreclosure, Countrywide should have decreased the weighted average life of its MSRs, instead of increasing it from 5.6 to 5.8 between 2005 and 2006.

713.  The credit risk factors represented by rising delinquencies and foreclosures had implications beyond simply the revenue element of the MSRs. Countrywide's valuation models also failed to appropriately consider the probable increase in costs to service (*i.e.*, costs to restructure mortgages in default, bankruptcy costs and costs to collect late payments) that were inherent in the MSRs generated in 2003 and thereafter.  As these increases in costs to service increased during the Relevant Period and were expected to compound due to Countrywide's increased origination of Pay-Option ARMs, Countrywide should have caused changes to the relevant model-based fair value assumptions, or, in the alternative, introduced new factors, that resulted in higher costs-to-service assumptions, and consequently, reasonable fair values for its MSRs during the Relevant Period.

714.   It was not until the fourth quarter 2007 that Countrywide's management used valuation inputs or assumptions that actually resulted in an incremental decrease to the reported fair value of its MSRs.  (The **total** fair value of MSRs increased as of Q4 2007 due to the addition of new servicing contracts during the period.  This "addition" more than offset the decrease to the fair value of the MSRs attributable to changes in management's assumptions and inputs to the model.)  In that quarter, Countrywide recorded a reduction of $1.1 billion in the fair value of the MSRs due to "changes in valuation inputs or assumptions in valuation model."  2007 Form 10-K, Note 10, p. F-52.  Based on the 2007 Form 10-K disclosure, it did not appear that Countrywide made any changes to the valuation model, specifically the cash flow model within the valuation model, even though the severe cash flow risk present in Q4 2007 was present in prior periods.  This indicates that the inputs and assumptions used prior to Q4 2007 were unreasonable and continued to be unreasonable, resulting in inflated fair values for those preceding quarters.

715.   Additional evidence of management's use of unreasonable assumptions and/or assumptions inconsistent with the then current lending environment is reflected in the Company's own SEC filings.  Countrywide disclosed in its 2007 Form 10-K that "[w]e recorded a decrease in the fair value of the MSRs in 2007 of $1,085.4 million, primarily as a result of decreasing mortgage rates during the last half of the year which **increased expected future prepayment speeds** of our agency servicing portfolio."  However, as stated in the RI section above, the assumption for the weighted average prepayment speed for both MSRs and RIs **was decreased** by the Company in its fair value estimates as of December 31, 2007.  While Countrywide provides some disclosure that the market deterioration moderated the impact of prepayments, there is no disclosure reconciling these conflicting conclusions.

716.   Consequently, the Company's valuation of its MSRs during the Relevant Period was materially overstated because the cash flow model within its MSR valuation model ignored: (a) the Company's change in lending practices beginning in 2003 to offer non-traditional, high-risk loans; (b) the Company's significant increasing production of subprime loans; (c) the Company's continued exceptions from its underwriting guidelines; (d) the drastic increase in loan delinquencies and foreclosures; (e) payment shock, which was a known consequence of negative amortization arising from the Company's Pay-Option ARMs; and (f) the increased expected costs associated with servicing delinquent and foreclosed loans.   Under proper risk assumptions, Countrywide's lending strategy shift, the simultaneously deteriorating housing market, and the known, continued and dramatically rising delinquencies would have caused Countrywide to proportionally reduce the fair value of its MSRs throughout the Relevant Period as the related cash flows are shortened by the aforementioned factors.   Rather than decrease the Company's MSRs in a manner sufficient to reflect the negative impact of these adverse facts and circumstances, Countrywide used its MSRs to inflate its assets, revenues and, ultimately, its net income during the Relevant Period.

**5.   Countrywide Inflated Earnings By Failing To Properly Reserve For Representations And Warranties**

717.   Countrywide's R&W reserve represented a liability that arose from its loan sales and securitization activities, and was required to be reported at fair value.   When Countrywide sold or securitized loans, it made certain guarantees, which, if breached by Countrywide, would entitle the counterparties to demand repurchase by Countrywide of the related loans, or some other form of compensation.   These guarantees included representations, such as: (a) none of the loans included in the sale or securitization were delinquent by a specified number of days; (b) the loans included in the sale or securitization were selected in a manner that adversely affected the financial interests of the investors; and (c)

missed first payments on sold loans was cause for repurchase.  During the Relevant Period, GAAP required Countrywide to estimate and report the liability arising from the R&W reserve in accordance with GAAP.

718.   Countrywide's SEC filings explain the direct correlation between the increased liability arising from its R&Ws, worsening economic conditions, and the significant credit risk in the loans subject to the R&Ws:

> While we sell most of the loans we produce, we retain credit risk in the form of credit-subordinated securities [*i.e.*, RIs] and loans held for investment, ***and through the representations and warranties*** we make to the investors in the loans we sell and through the issuance of corporate guarantees.  Our credit-subordinated securities are the first beneficial interests in loan sales to absorb any credit losses, ***and the buyers of our loans will make more claims against our corporate guarantees and representations and warranties if more of our borrowers default on their loans.***  While we estimate and provide for credit losses accruing to our credit-subordinated securities and for the corporate guarantees and representations and warranties, worsening economic and real estate market conditions could negatively impact the value of the credit subordinated securities we retain and increase our liabilities under our corporate guarantees and representations and warranties.

2006 Form 10-K, p. 37.

719.   The Company retained credit risk for all R&Ws offered in a securitization. Countrywide defined "credit risk" in its 2007 Form 10-K as follows: "credit risk . . . is the risk that a borrower ***will not repay*** the [underlying] loans' balance as agreed and the risk that the proceeds from liquidation of the collateral securing the loan will not be adequate to repay the loan's balance."  Countrywide

COMPLAINT

reported its R&W reserves within "accounts payable and accrued liabilities" in Countrywide's balance sheet.

720.   As a result of its failure to adhere to GAAP and its failure to employ an effective methodology using correct assumptions, Countrywide failed to properly accrue an adequate level of R&W reserve throughout the Relevant Period. Accordingly, Countrywide and the Officer Defendants materially understated Countrywide's liabilities and overstated its gain-on-sale revenues and net income.

721.   Countrywide was required to apply the accounting guidance in SFAS No. 140 when initially recording the R&W reserve.   In subsequent reporting periods, Countrywide was required to apply the accounting guidance in SFAS No. 5 and FASB Interpretation No. 45 ("FIN 45"), *Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others.*

722.   SFAS No. 140 states "liabilities incurred in a transfer of financial assets [*e.g.*, securitization or sale of loans] . . . should be initially measured at fair value."   As previously stated, GAAP requires that fair value be estimated using reasonable and supportable assumptions and all known information affecting the asset or liability to be fair-valued.   SFAS No. 5 confirms that a guarantee liability is a loss contingency, and an accrual creating or increasing the liability is required if such amount is estimable and the event, such as a default, is probable.   FIN 45 requires an entity to record at the inception of the guarantee, the liability of that guarantee.   The initial liability is to be recorded at fair value.   FIN 45 provides guidance on estimating fair values using expected future cash flows measured in accordance with FASB Concepts Statement No. 7.

723.   During the Relevant Period, Countrywide understated its loss accrual for R&Ws because it ignored the high credit risk and poor quality of loans securitized and/or sold to third parties.   Countrywide knew that its own

underwriting practices contributed to that high credit risk and weak loan quality, but failed to record an adequate R&W reserve during the Relevant Period.

724. Similar to failures in valuing its MSRs and RIs, Countrywide failed to use reasonable and supportable assumptions in its R&W reserve model by failing to update or adjust the stale assumptions in that model. Such adjustment or update to the assumptions was critical given that the loans originated by Countrywide during the Relevant Period had progressively become riskier due to layered credit risks upon origination and the deteriorating economic environment. Countrywide's assumptions in its R&W reserve model included, among others: (a) default rate; (b) repurchase rate; (c) loss severity factor; and (d) discount rate.

725. In Q1 2006, Countrywide was required by HSBC to repurchase approximately $210 million subprime loans, claiming a failure by Countrywide to adhere to specified underwriting standards. Countrywide had not recorded the initial liability upon the inception of the guarantee to HSBC, in violation of FIN 45. Importantly, the HSBC repurchase should have caused Countrywide to immediately correct its methodology for estimating the R&W reserve, but Countrywide did not.

726. Even prior to the HSBC repurchase, Countrywide knew that the probability for future repurchases was increasing, and the current R&W reserve levels were inadequate. In an email from McMurray to Sambol on May 22, 2005, described in detail above, McMurray addressed the R&W reserve, confirming the rising exposure in R&W breach claims:

> we will see higher rates of default on the riskier transactions and third parties coming back to us seeking a repurchase or indemnification based on an alleged R&W breach as the rationale. While Credit has taken steps to prepare for this situation, I'm not sure various parts of the company are sufficiently aware or aligned.

One year later, McMurray echoes his concerns:

. . . . Exposure Concerns: Defaults are a key driver of repurchase exposure and I believe we are moving to an economic environment where we'll see more defaults, perhaps substantially more.  Combine a tough economic environment and more defaults with a more permissive approach to repurchases and we could have a very large exposure on our hands.

727.  Another email from McMurray, this time to Sieracki on January 2, 2007, described in detail above, outlines "why delinquencies will increase and the impact this increase will have on our financial results."  Specifically, McMurray expressed that he expected delinquencies to rise due to, among other factors, the current state of unfavorable real estate market conditions and Countrywide's "widened guidelines."  He concludes that "increasing delinquencies will manifest through . . . increased repurchase requests as a result of increased defaults."  He explains that higher defaults trigger higher repurchase demands from third parties because "investors and credit enhancers tend to put back [*i.e.*, return to Countrywide] only defaulted loans."

728.  Despite relevant internal information impacting the R&W reserves and known to Countrywide during the Relevant Period, Countrywide did not increase its R&W reserves to reflect that information, in violation of GAAP. Instead, in 1Q 2007, Countrywide reduced its R&W reserve attributable to subprime loans, claiming a reduction in the repurchase rate assumption. Countrywide knew that such assumption could not be reasonable as it reflected historical data, and disregarded the increasing probabilities of repurchases arising from the same underwriting business model that has resulted in actual claims of R&W breaches.

729.  In the third quarter of 2007, Countrywide was forced to admit that the amount of its reserves for R&Ws had been wrong.  At that time, the Company increased its allowance for R&Ws by a startling $291.5 million, or 611%, from the

$41.0 million reported twelve months earlier in the third quarter of 2006. The Company reported that $177.3 million or 60% of this increased allowance related to prime loans and $67.1 million related to the nonprime loans, demonstrating the true extent of the Company's exposure to losses in its purported "prime" loan portfolio as a result of (a) its improper lending practice; and (b) its improper internal definition of "prime."

730. Countrywide's reserves for R&Ws were materially understated and in violation of GAAP during the Relevant Period because Countrywide failed to use reasonable and supportable assumptions in its R&W reserve model, and failed to update the stale assumptions in the model, even though: (a) the Company changed its lending practices beginning in 2003 to offer nontraditional, high-risk loans, including to borrowers incapable of repaying the loans; (b) the increased origination of high-risk loans to unqualified borrowers with little or no supporting documentation; (c) the Company's continued origination of loans through exceptions from its underwriting guidelines; and (d) the increased probability that borrowers would default.

731. Consequently, Countrywide violated GAAP by understating its liabilities and overstating its reported net income.

### 6. Countrywide's Internal Controls Over Financial Reporting Were Ineffective

732. The SEC and the Public Company Accounting Oversight Board ("PCAOB") define a material weakness as a deficiency that causes a "reasonable possibility that a material misstatement of the registrant's annual or interim financial statements will not be prevented or detected on a timely basis." In turn, a deficiency in internal control over financial reporting is deemed to exist when the design or operation of a control does not allow the company's management or employees, in the normal course of performing their assigned duties, to prevent or detect misstatements on a timely basis. A deficiency is deemed "significant" when

it is reasonably possible that a reasonable person would conclude that a misstatement arising from the deficiency was consequential.

733.  The Officer Defendants concealed the ineffectiveness of Countrywide's internal control over financial reporting during the Relevant Period by falsely representing that "internal control over financial reporting" was effective.  Countrywide was allowed to make such representation only if there was not a single "material weakness" in its internal control over financial reporting.  However, Countrywide's internal control over financial reporting contained material weaknesses, as evidenced by Countrywide's inability to prevent or detect the material misstatements in its ALL, MSRs, RIs and R&W reserves as described above.

734.  Countrywide knew that in its 2004 audit, its external auditors concluded there were a number of significant deficiencies in its internal control over financial reporting of its MSRs, RIs, R&W reserves.  In its 2005 audit, Countrywide's external auditors identified significant deficiencies in its valuation models that was impacting the fair value of MSRs and RIs and the ALL.  In its 2006 audit, the external auditors again identified significant deficiencies pertaining to Countrywide's valuation models for MSRs, RIs and the ALL methodology.  Because the misstatements in the ALL, MSRs, RIs and R&W reserves as described above were material, and Countrywide failed to prevent or detect such misstatements, the underlying internal control deficiencies were indeed material weaknesses in Countrywide's internal controls over financial reporting.  Nevertheless, Countrywide represented that its internal controls over financial reporting were effective during 2004, 2005 and 2006.

735.  The absence of an effective internal control over financial reporting enabled the Company to delay recognition of provisions for loan losses, R&W reserves and valuation allowances relating to declines in fair value even though it had lowered its underwriting standards to such a point that it issued inherently

risky loans, such as Pay-Option ARMs, 100% financing loans, and Stated Income/Stated Asset Mortgage ("SISA") and No Income No Asset ("NINA") loans to non-creditworthy borrowers, notwithstanding representations by the Officer Defendants that they carefully managed those risks. Such lending practices caused the default rate of Countrywide's loans to increase at an accelerated pace throughout the Relevant Period. The ineffectiveness of Countrywide's internal control over financial reporting also allowed the Officer Defendants to inappropriately classify sub-prime loans as prime loans further masking the failing financial health of the Company without causing the financial statements to reflect the corrected information.

736. As a result of Countrywide's failure to install an effective internal control over its financial reporting, the Officer Defendants were able to manipulate the timing of when they recorded provisions for loan losses, R&W reserves and valuation allowances relating to declines in fair value. Countrywide's ineffective internal control over financial reporting allowed the Officer Defendants to materially misstate the financial statements during the Relevant Period.

737. Countrywide's 2007 Form 10-K filing asserts management's responsibility over internal controls:

> Management is responsible for establishing and maintaining adequate internal control over financial reporting for the Company. . . . In making its assessment of internal control over financial reporting, management [claimed to] use[ ] the criteria established in 'Internal Control-Integrated Framework' issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO").

738. COSO defines "internal controls" in Chapter 1 of its Framework as follows:

> Internal control is a process, effected by an entity's board of directors, management and other personnel, designed to provide reasonable

assurance regarding the achievement of objectives in the following categories: (i) Effectiveness and efficiency of operations; (ii) Reliability of financial reporting; (iii) Compliance with applicable laws and regulations.

739.   Moreover, COSO emphasizes the importance of a strong control environment, which sets a positive "tone at the top" and then flows down through the Company.  The COSO Framework Executive Summary identifies the pervasive influence that the control environment has on the Company, as follows:

> The control environment sets the tone of an organization, influencing the control consciousness of its people.  It is the foundation for all other components of internal control, providing discipline and structure.  Control environment factors include the integrity, ethical values and competence of the entity's people; management's philosophy and operating style; the way management assigns authority and responsibility, and organizes and develops its people; and the attention and direction provided by the board of directors.

740.   In addition, the COSO Framework, Chapter 2, establishes that management's philosophy and operating style directly affects the manner in which the company is managed, the amount of risk that the company accepts and ultimately the success of the company.  Chapter 2 of the COSO Framework states:

> Management's philosophy and operating style affect the way the enterprise is managed, including the kinds of business risks accepted.
>
> .  .  .  Other elements of management's philosophy and operating style include attitudes toward financial reporting, conservative or aggressive selection from available alternative accounting principles, conscientiousness and conservatism with which accounting estimates are developed, and attitudes toward data processing and accounting functions and personnel.  .  .  .  The impact of an ineffective control

environment could be far reaching, possibly resulting in a financial loss, a tarnished public image or a business failure.

741.   Specifically, Chapter 8 of the COSO Framework establishes the Chief Executive Officer's responsibility over internal control.   Chapter 8 states as follows:

> [The chief executive] has ultimate ownership responsibility for the internal control system.  One of the most important aspects of carrying out this responsibility is to ensure the existence of a positive control environment.   More than any other individual or function, the chief executive sets the "tone at the top" that affects control environment factors and other components of internal control.

742.   Section 404 of the Sarbanes-Oxley Act requires management to assess the effectiveness of the internal control structure and the financial reporting for procedures.   Management is responsible for performing this assessment in the context of a top-down risk assessment, which requires management to base both the scope of its assessment and the evidence gathered on risk.   Management's conclusion, as a result of that assessment, about whether the Company's internal control is effective must be included in the Company's annual report.

743.   Further, SEC Release No. 33-8238 requires management to report publicly all material weaknesses in the Company's internal controls.

744.   Beginning in 2002, the Officer Defendants were required under Rule 302 of the Sarbanes-Oxley Act to provide assurances relating to the Company's "internal control over financial reporting."  Rule 302 states as follows:

> [E]ach annual report . . . [should] contain an internal control report, which shall: (1) state the responsibility of management for ***establishing and maintaining an adequate internal control structure and procedures for financial reporting***; and (2) contain an assessment, as of the end of the most recent fiscal year of the issuer,

***of the effectiveness of the internal control structure*** and procedures of the issuer for financial reporting.

745.   As explained above and in the Company's regulatory filings, the Officer Defendants represented to the marketplace that their assessment of internal control over financial reporting was based upon the framework established by COSO.   Also, the Officer Defendants represented in the Company's Forms 10-K filings that "management concluded that the Company's internal control over financial reporting was effective" as of the years ended December 31, 2004,[22] December 31, 2005, and December 31, 2006.   These statements were false because Countrywide's internal control over financial reporting contained material weaknesses which allowed the concealment or delay of the financial statement impact of its lax underwriting standards and extensive approval of exception loans. As a result, management's reports on internal control over financial reporting, required by Rule 302 of the Sarbanes-Oxley Act, were materially false and misleading because Countrywide's internal control over financial reporting was, in fact, ineffective during the Relevant Period.

746.   Management's assessment of internal control over financial reporting was a critical metric for investors because it provided assurance that the Company's financial statements were reliable and in compliance with applicable laws.   However, during the Relevant Period, as alleged herein, Countrywide did not properly assess its internal control over financial reporting, thus it violated the "Internal Control-Integrated Framework" issued by COSO and various other requirements found in the SEC regulations and the Sarbanes-Oxley Act.

---

[22]   In the Company's 2004 Form 10-K, management noted a material weakness regarding recognizing gains on sale of mortgage backed securities with embedded derivatives.   Importantly, management did not recognize a material weakness with regard to its lax underwriting practices over the Relevant Period.

COMPLAINT

## IX.   KPMG'S NEGLIGENT OR RECKLESS FAILURE TO CONDUCT AUDITS IN ACCORDANCE WITH GAAS

747.   KPMG violated Generally Accepted Accounting Standards ("GAAS") and acted with deliberate recklessness in conducting its audits of Countrywide's financial statements and in issuing unqualified or "clean" audit opinions thereon. Countrywide's audited financial statements for 2004, 2005 and 2006, as alleged herein, violated GAAP because those financial statements were materially misstated as a result of:  (a) overstated RI and MSRs; (b) understated ALL and R&W reserves; and (c) management's failure to implement effective internal control over financial reporting.

748.   As Countrywide's independent registered public accounting firm, KPMG signed off on the Company's financial statements attesting that the consolidated financial statements present fairly, in all material respects, the financial position of Countrywide in conformity with GAAP.  In order to make such an attestation, KPMG was required to plan and perform its audits of Countrywide's financial statements to obtain reasonable assurance about whether Countrywide's financial statements were free of material misstatements, whether caused by error or fraud.  *See* AU 316.01.  As alleged in detail below, KPMG failed to plan and perform its audits for the Relevant Period as set forth in GAAS, and consequently, failed to obtain reasonable assurance about whether Countrywide's financial statements for the Relevant Period were free of material misstatements arising from error or fraud.  Therefore, KPMG issued false and untrue statements when it issued an unqualified or "clean" audit opinion on those financial statements.

749.   KPMG was required by GAAS to be familiar with the many industry, business and economic factors ("risk factors") that impacted Countrywide's and other lenders' preparation of  their financial statements in accordance with GAAP.  These risk factors were addressed in ARA for entities such as Countrywide and

their auditors.   Risk factors are events and conditions that constitute significant risks that the financial statements might be materially misstated.   KPMG had the responsibility to consider these risks in planning and performing the audit pursuant to GAAS.   Nevertheless, for the Relevant Period, KPMG failed to appropriately consider or simply ignored relevant risk factors, including fraud risk factors described below, and those related to deficiencies in the Company's internal control over financial reporting, in auditing Countrywide's financial statements.

750.   Fraud risk factors, when present in a reporting entity, indicate a risk of material misstatement due to fraud.  Fraud risk factors come to the attention of the auditor by performing audit procedures in accordance with GAAS and throughout the audit, and place a prudent auditor on notice that its audit client could potentially be engaged in wrongdoing.   As alleged below, during the Relevant Period, various fraud risk factors and other risk factors signifying a risk of material misstatement ("red flags") were apparent to KPMG, but KPMG either failed to identify the existence of obvious fraud risk factors and red flags, or knew they existed but failed to adjust its planned audit procedures, essentially ignoring them outright.   Either way, KPMG violated GAAS and allowed the Company to materially overstate its earnings for fiscal years 2004, 2005 and 2006, in violation of GAAP.

**A.   The Standards Of GAAS And The AICPA Audit & Accounting Guide**

751.   The PCAOB, established by the Sarbanes-Oxley Act, is responsible for the development of auditing and related professional practice standards that must be followed by registered public accounting firms. On April 16, 2003, the PCAOB adopted GAAS as its interim standards as described by the AICPA Auditing Standards Board's SAS No. 95, *Generally Accepted Auditing Standards,* and related interpretations in existence on that date. Accordingly, an auditor's reference to "the standards of the Public Company Accounting Oversight Board

(United States)" includes a reference to GAAS in existence as of April 16, 2003. For clarity, all references to GAAS herein include the standards of the PCAOB.

752.   GAAS is comprised of ten standards that establish the quality of an auditor's performance and the overall objectives to be achieved in a financial statement audit. Auditors are required to follow these standards in each and every audit they conduct. GAAS are further interpreted in Statements on Auditing Standards ("SAS") issued by the Auditing Standards Board ("ASB") of the AICPA, which are codified in *AICPA Professional Standards* under the prefix "AU."

753.   The GAAS standards fall into three basic categories: General Standards, Fieldwork Standards and Reporting Standards. The General Standards provide guidance to the auditor on the exercise of due professional care in the performance of the audit. The Fieldwork Standards provide guidance on audit planning, proper evaluation of internal control and the collection of sufficient and appropriate evidential matter in order to be able to form a reasonable basis for the auditor's opinion regarding the financial statements under audit. The Reporting Standards provide guidance to the auditor on the content of the audit report and the auditor's responsibility contained therein.  *See* AU 150.02.

754.   The AICPA's AAG for lending institutions is designed to provide guidance for independent accountants primarily on the application of the standards of fieldwork. Specifically, it provides guidance on the risk assessment process and the design of audit procedures, as well as general audit considerations for deposit and lending institutions like Countrywide. The AAG is approved by both the FASB, which promulgates SFASs, as well as the ASB, which issues SASs.

755.   The AICPA issues ARA, which are addressed to and used by industry participants such as Countrywide and its auditor, KPMG, to publicize general and specific areas of concern relevant to the preparation of the financial statements pursuant to GAAP and the audits of those financial statements.   These ARA identify the significant risk factors that may result in the material misstatement of

the financial statements and alert auditors to pay close attention to those areas. These ARA also provide auditors with an overview of recent economic, industry, regulatory and professional development and, in particular, those that may affect audit engagements. Therefore, these ARA alerted the KPMG audit team to those specific aspects of Countrywide's financial statements where an increased level of risk of material misstatement was present and, thus, additional audit considerations and appropriate audit procedures were warranted.

**B.      KPMG's Responsibility To Plan And Perform The Audits Of Countrywide's Financial Statements As It Relates To Fraud**

756.    Pursuant to AU 316, "Consideration of Fraud in a Financial Statement Audit," KPMG had the responsibility to plan and perform its audits of Countrywide's consolidated financial statements for the Relevant Period to obtain reasonable assurance about whether those financial statements were free of material misstatement, whether caused by error or fraud.  AU 316.01.  In fulfilling their responsibility as it relates to fraud, KPMG was required to exercise professional skepticism, which is "an attitude that includes a questioning mind and a critical assessment of audit evidence" throughout the audit.  AAG Ch. 5, AU 230.07.   Importantly, because of the characteristics of fraud, GAAS required KPMG to perform their audit procedures "with a mind-set that recognizes the possibility that a material misstatement due to fraud could be present, regardless of any past experience with the entity and regardless of the auditor's belief about management's honesty and integrity."  AAG Ch. 5.

757.    GAAS states "[a]lthough *fraud* is a broad legal concept, the auditor's interest specifically relates to fraudulent acts that cause a misstatement of financial statements."  AU 312.07.  GAAS defines misstatements arising from fraudulent financial reporting as "intentional misstatements or omissions of amounts or disclosures in financial statements designed to deceive financial statement users where the effect causes the financial statements not to be presented, in all material

respects, in conformity with generally accepted accounting principles (GAAP)." Fraudulent financial reporting may be accomplished by the "Manipulation, falsification, or alteration of accounting records or supporting documents from which financial statements are prepared; Misrepresentation in or intentional omission from the financial statements of events, transactions, or other significant information; Intentional misapplication of accounting principles relating to amounts, classification, manner of presentation, or disclosure." AU 316.6.

758.   Pursuant to AU 316, KPMG was required to consider the existence of "fraud risk factors" at Countrywide during its audits.  Fraud risk factors are events and conditions that indicate: (a) incentives/pressures to perpetrate fraud; (b) opportunities to carry out the fraud; or (c) attitudes/rationalizations to justify a fraudulent action.  These elements are widely known in the accounting profession as the "fraud triangle."

759.   To address fraud risk factors at Countrywide pursuant to GAAS, KPMG was required to perform several significant procedures, with the ultimate goal of determining whether planned audit procedures should be adjusted or expanded based upon whether fraud has occurred or was likely to occur and their impact on the financial statements.  Without performing these procedures, that goal could not be achieved and the audit would not comply with GAAS.

760.   KPMG was required to: (a) have a specific discussion among audit team members regarding the risks of material misstatement due to fraud; (b) identify fraud risk factors at Countrywide that may result in a material misstatement due to fraud (see specific relevant fraud risk factors below); (c) consider the risk of management override of controls; (d) assess the identified fraud risk factors after taking into account compensating or mitigating controls; (e) respond to the results of the assessment by designing appropriate substantive tests; (f) evaluate audit evidence for implausible or conflicting information; and (g) expand audit procedures to determine whether fraud has occurred or is likely to

COMPLAINT

have occurred and, if so, the impact on the financial statements. AAG Ch. 5. Items (c) through (g) are follow-up procedures performed in response to the auditor's identification of the relevant fraud risk factors. GAAS advised "[a]n emphasis on the importance of maintaining the proper state of mind throughout the audit regarding the potential for material misstatement due to fraud." AU 316.14. Communication among the KPMG audit team members about the risks of material misstatement due to fraud should have continued ***throughout*** the audit. AAG Ch. 5.

761. While fraud risk factors do not necessarily indicate the existence of fraud, they often are present in circumstances where fraud exists, highlighting the need and requirement that the auditor determine whether they existed at the reporting entity. AU 316.31. Identifying fraud risk factors was not a complicated procedure. GAAS, in fact, provided concrete examples of fraud risk factors; KPMG was to compare the examples set forth in AU 316 to events and conditions at Countrywide, identify events and conditions that were consistent with the examples, and conduct follow up procedures prescribed in AU 316 (*i.e.*, items (c) through (g) above.

762. Specifically, based on its knowledge about Countrywide, KPMG was required to identify whether any of the following fraud risk factors pertaining to *incentives or pressures* were present at Countrywide during the Relevant Period: (a) deteriorating economic conditions, such as declining real estate prices, within geographic regions in which the bank had significant credit concentrations; (b) rapid growth or unusual profitability, especially compared to that of other peer financial institutions; for example, unusually large growth in the loan portfolio without a commensurate increase in the size of the allowance for loan and lease losses; (c) decline in asset quality due to borrowers affected by recessionary declines and layoffs;  and (d) excessive pressure on management or operating personnel to meet financial targets set up by the board of directors or management,

including incentive goals that result in (i) unrealistically aggressive loan goals and lucrative incentive programs for loan originations; (ii) relaxation of credit standards; (iii) excessive extension of credit standards with approved deviation from policy; (iv) excessive concentration of lending (particularly new lending); and (v) excessive lending in new products.  AAG Ch. 5.

763.  KPMG should have known that the fraud risk factors relating to incentives and pressures set forth in GAAS were consistent with events and conditions  at Countrywide during the Relevant Period.  Therefore, KPMG should have performed the follow-up audit procedures required in GAAS as set forth in items (c) through (g) in ¶760 above with respect to these fraud risk factors. Specifically: (a) in 2006, economic conditions surrounding the real estate market and lending industry had deteriorated substantially, especially in California where Countrywide had significant credit concentrations; (b) from 2004 to 2006, there was rapid growth in Countrywide's subprime lending, without a corresponding increase in the related ALL; (c) a decline in asset quality due to borrowers affected by the housing market meltdown beginning in 2006; and (d) from 2004 to 2006, there was excessive pressure on management or operating personnel to meet financial targets resulting in aggressive loan production targets, widening of underwriting guidelines, and excessive concentration in subprime loans.

764.  Based on its knowledge about Countrywide, KPMG was required to identify whether any of the following fraud risk factors pertaining to *opportunities* to commit fraud and which were consistent with those examples set forth in GAAS above were present at Countrywide during the Relevant Period: (a) certain types of lending practices, such as subprime and predatory lending by banks in an effort to obtain better yields; (b) assets, liabilities, revenues, or expenses based on significant estimates that involve subjective judgments or uncertainties that are difficult to corroborate [such as the ALL and fair value measurements]; (c) significant, unusual, or highly complex transactions, especially those close to year

end that pose difficult "substance over form" questions, such material amounts of complex financial instruments; (d) loan sales that result in retained beneficial interests; (e) deficient internal control components due to: (i) inadequate monitoring of controls and controls over financial reporting; (ii) ineffective internal audit function; and (iii) lack of independent processes for the establishment and review of allowance for loan losses and for the evaluation of other than temporary impairments. AAG Ch. 5.

765.   KPMG should have known that the fraud risk factors relating to opportunities to commit fraud set forth in GAAS were consistent with events and conditions  at Countrywide during the Relevant Period.  Therefore, KPMG should have performed the follow-up audit procedures required in GAAS as set forth in items (c) through (g) in ¶760 above with respect to these fraud risk factors. Specifically:  (a) from 2004 to 2006, Countrywide's LHI, RIs, MSRs and R&W reserves related to underlying mortgages that were "nontraditional" or subprime; (b) Countrywide's LHI required an ALL which was a significant estimate, and Countrywide's RIs and MSRs required fair value measurements that involved subjective assumptions; (c) the MSRs and RIs were financial instruments arising from significant, unusual, or highly complex transactions; (d) the RIs resulted in retained beneficial interests; and (e) KPMG knew that Countrywide had deficient internal controls based on its own audits.

766.   Based on its knowledge about Countrywide, KPMG was required to identify whether there were fraud risk factors pertaining to *attitudes and rationalizations* by board members, management or employees at Countrywide during the Relevant Period.  An example set forth in GAAS is management's disregard of control-related recommendations from internal and/or external auditors.  AAG Ch. 5.

767.   KPMG should have known that  during the Relevant Period, there was a blatant disregard for control-related recommendations from KPMG itself, its

internal auditors and regulators.  As discussed herein, a significant internal control deficiency identified by KPMG in 2005 remained uncorrected in 2006.  Therefore, KPMG should have performed the follow-up audit procedures required in GAAS as set forth in items (c) through (g) in ¶760 above with respect to this fraud risk factor.

768.  After determining the fraud risk factors present at Countrywide, KPMG was required to "evaluate all controls specifically intended to address the risks of fraud that have at least a reasonably possible likelihood" of materially impacting the financial statements.  PCAOB AS No. 2.24.  KPMG was required to evaluate whether those controls mitigated the risks, or specific control deficiencies exacerbate those risks.  AAG Ch. 5.  KPMG was required to alter the nature, timing or extent of audit procedures when it identified deficiencies in controls purportedly designed specifically to prevent and detect fraud.  PCAOB AS No. 2.26.  After evaluating controls specific to addressing the fraud risk factors identified by KPMG, assuming there were any, and especially if there were no such controls, KPMG was required to respond accordingly by: (a)  adjusting the planned general conduct of the audit; (b) adjusting the nature, timing and extent of auditing procedures to address identified fraud risks; and (c) performing further auditing procedures to address management override of controls, if any.  AAG Ch. 5.

769.  KPMG failed to comply with GAAS because it failed to possess the "mind-set" and requisite professional skepticism.  Despite the presence of the numerous fraud risk factors at Countrywide that were clearly consistent with the examples set forth in GAAS, KPMG failed to exercise heightened professional skepticism and failed to identify or ignored these fraud risk factors.  Consequently, KPMG  failed to appropriately respond to specific fraud risk factors that existed at Countrywide that GAAS had prescribed as indicators of a risk of intentional misstatements in Countrywide's financial statements for the Relevant Period.  A prudent auditor would have identified the fraud risk factors present at Countrywide

as enumerated above.  Because KPMG failed to identify or it ignored the relevant fraud risk factors present at Countrywide, it failed to perform the follow up procedures set forth in GAAS.  Consequently, KPMG failed to design or alter the nature, timing and extent of its substantive audit procedures to respond to the existing fraud risk factors enumerated above.  Instead, in violation of GAAS, KPMG concluded that Countrywide's internal control over financial reporting was effective in 2005 and 2006, and failed to adjust its audit procedures for the Relevant Period to ascertain that Countrywide's ALL, RIs, MSRs, R&W reserves were not intentionally misstated.

770.  Even if KPMG identified some of the fraud risk factors enumerated above as being present at Countrywide during the Relevant Period, KPMG failed to assess whether there were compensating controls at Countrywide which were designed to mitigate the presence of those fraud risk factors, and if these compensating controls were operating effectively.  Ultimately, KPMG failed to expand its audit procedures to determine whether financial statement fraud had occurred or was likely to have occurred, and failed to determine the impact on Countrywide's financial statements.  Consequently, KPMG allowed Countrywide to misstate its ALL, RIs, MSRs, and R&W reserves, and issued unqualified opinions on Countrywide's consolidated financial statements for the Relevant Periods even though they were materially misstated.

## C.   Financial Statement Misstatement Risk Factors ("Red Flags") In 2004

771.  In addition to fraud risk factors set forth in GAAS for entities like Countrywide, the ARA for 2004 cautioned auditors that competition to increase loan origination volume had contributed to the softening of credit criteria, which increased credit risk (AAM 8050.12). KPMG knew that such credit risk directly impacted the adequacy of Countrywide's ALL for 2004.

772.   During its audit of Countrywide in 2004, in addition to ignoring fraud risk factors present at Countrywide, KPMG ignored various red flags that impacted the preparation of Countrywide's financial statements in accordance with GAAP due to the associated risks of financial statement misstatement.   KPMG was required to evaluate the financial statement effects of these red flags and perform appropriate audit procedures to obtain reasonable assurance that the financial statements were free of material misstatements that could arise from these red flags.

### 1.   Red Flag: Implementation Of Aggressive Goal To Capture 30% Market Share

773.   During their 2004 audit, in order to comply with AU 311, "Planning and Supervision," KPMG was required to perform specific audit procedures to obtain an understanding of Countrywide and its environment. Accordingly, KPMG should have learned that Countrywide had publicly announced and implemented a very aggressive firm-wide goal of capturing 30% of the residential mortgage market share by 2008. In order to achieve this goal, Countrywide was likely to compromise its lending standards.   KPMG knew that such change in business strategy caused significant changes in Countrywide's internal control processes. KPMG also knew that the new business strategy would directly impact the quality of its lending and underwriting process, which in turn could impact certain significant financial statement accounts, including the ALL, RIs, MSRs and R&W reserves (AAM 8050.12).

774.   In light of Countrywide's aggressive goal and in accordance with AU 319, "Consideration of Internal Control in a Financial Statement Audit," KPMG's testing of Countrywide's internal controls should have included a review of Countrywide's underwriting guidelines. KPMG should have also tested the operating effectiveness of internal controls over loan file information; in other words, whether management was approving and granting loans in accordance with

its written underwriting standards. These routine tests would have enabled KPMG to understand the procedures by which loan originations were processed, if the loans were being processed in accordance with the Company's policies, and if there was any change from the prior year.  KPMG should have also tested Countrywide's internal control over financial reporting to determine what controls were in place to ascertain that the ALL, R&W reserves, RIs and MSRs were being reported in accordance with GAAP especially given the change in business strategy, and if those controls were operating effectively.  As alleged below, KPMG failed to perform the aforementioned procedures in violation of GAAS.

### 2.  Red Flag: Improper Documentation For Loans, Misclassification Of Subprime Loans As Prime Loans And Management Overrides

775.  Testing of Countrywide's internal controls, in accordance with AU 319 and AU 316, "Consideration of Fraud in a Financial Statement Audit," also required a detailed testing of the Company's loan files. For example, KPMG should have tested whether Countrywide's loans were being approved in accordance with the Company's written lending policies, whether credit investigations were being performed, whether credit limits were adhered to,[23] whether Countrywide's procedure for capturing all required loan documentation was functioning and whether the information recorded in Countrywide's data processing system and used for management reporting was being tested by personnel independent of the preparer and was accurate. Had KPMG tested Countrywide's internal controls over loan origination process by testing Countrywide's loan files, KPMG would have discovered that Countrywide routinely originated high-risk loans to borrowers with the weakest credit.

---

[23]  AAG Chapter 5 observes that "[e]xcessive extension of credit standards" is a fraud risk factor.

776. Had KPMG performed Countrywide's audit in accordance with GAAS, KPMG would have discovered that Countrywide was not performing appropriate levels of due diligence on its loans. Through its testing of Countrywide's loan files, KPMG would have learned that Countrywide classified loans that were subprime loans as "prime" loans, even though internally, these loans were known to Countrywide to be subprime loans. KPMG knew that this condition was an internal control deficiency. KPMG also would have seen that loans were being granted without verification of borrower income, employment or net worth, and that loans were being granted with appraisals and other important documents missing from the loan files. KPMG knew that such behavior was an internal control deficiency. Further, this pattern of management's override of its own internal controls, which, as noted above, was a pervasive fraud risk factor indicative of potential financial statement misstatements arising from fraud. AU 316.08, AU 319.22. Moreover, the failure to appropriately document these loans should have raised serious concerns to KPMG about whether the borrowers had the financial capacity or income source to re-pay their loans, the impact to the collectability of those loan during worsening economic conditions, and whether the value of the underlying collateral was sufficient. AU 328, "Auditing Fair Value Measurements and Disclosures"; AAG Ch. 9. KPMG should have known that these internal control deficiencies and fraud risk factors presented significant risks of misstatements of Countrywide's ALL and R&W reserves, and the fair values of its MSRs and RIs, because while Countrywide originated these loans through flawed and fraudulent lending practices, these same loans had to be given accounting recognition in Countrywide's financial statements. As discussed above, Countrywide either: (1) sold these loans with representations and warranties, servicing and retained interests that were to be accounted for pursuant to GAAP; or (2) invested in these loans (LHI) that were to be reported net of an adequate ALL pursuant to GAAP. However, in violation of GAAS, KPMG failed to respond with

the requisite professional skepticism, due professional care, and appropriate audit procedures to obtain reasonable assurance that Countrywide accounted for these transactions in accordance with GAAP.

### 3. Red Flag: 99% Increase In Nonprime Loans, 108% Increase In ARM Loans, 71% Increase In HELOC Loans

777. AU 329, "Analytical Procedures," sets forth why the auditor's performance of analytical procedures is an important part of the audit process. More importantly, GAAS explains why it is important to use the information derived from performing analytical procedures:

> A basic premise underlying the application of analytical procedures is that plausible relationships among data may reasonably be expected to exist and continue in the absence of known conditions to the contrary. Particular conditions that can cause variations in these relationships include, for example, specific unusual transactions or events, accounting changes, business changes, random fluctuations, or *misstatements*.

AU 329.02.

778. In conducting analytical procedures to determine whether Countrywide was aggressively originating high-risk loans and, if so, whether the additional risks of those loans were appropriately reflected in its financial statements, KPMG, pursuant to 2004 AAM 8050.12 and AU 329, should have examined the percentage of each loan type produced in comparison to the total loans produced. This determination should have been made with respect to the number of each type of loan produced compared to the total number of loans produced, as well as the total dollar amount of each type of loan produced compared to the total dollar amount of loans produced. These ratios measure the composition of the loan portfolio, lending strategy and corresponding level of risk. AAG Ch. 5. In response to performing these analytical procedures, KPMG should have learned that the subprime loans have vastly increased in proportion to total

loans, which, in turn, should have prompted KPMG to pay particular attention to whether accounts impacted by this increase, which include the ALL, R&W reserve, RIs and MSRs, may be misstated.

779.   In response to this red flag, in accordance with AU 316 and 2004 AAM 8050.12, KPMG also should have undertaken appropriate audit procedures to understand Countrywide's methods of classifying its loan portfolio (prime versus nonprime loans) and to verify that Countrywide applied and disclosed these methods appropriately and consistently.

780.   KPMG should have approached its audit of Countrywide with increased professional skepticism. *See* AU 230, "Due Professional Care in the Performance of Work."   In particular, KPMG should have expanded its audit testing of Countrywide's accounts that had a high risk of misstatement, such as those requiring fair value measurements and management estimates in accordance with AU 328, "Auditing Fair Value Measurements and Disclosures," and AU 342, "Auditing Accounting Estimates," to ensure that the increased risk of delinquencies and defaults that could have been identified were adequately incorporated into Countrywide's accounting estimates. KPMG should have conducted procedures such as those described below, to ensure that Countrywide's accounts for ALL and R&Ws reflected an appropriately increased loss accrual rate commensurate with the increased credit risk referred to above, and that, for the same reason, the valuations of MSRs and RI had been corrected by means of applying reasonable and supportable fair value assumptions.

### 4.     Red Flag: ALL As A Percentage Of LHI Remained Flat Despite Increase In Higher Risk Loans

781.   In accordance with AU 329 and AU 342, KPMG should have compared the total ALL with the total reported amount of LHI as part of its assessment the reasonableness of the ALL. Had KPMG properly performed this simple analytical procedure, it would have discovered that Countrywide's ALL as a

percentage of LHI stayed flat from 0.30% to 0.31%, despite the fact that the Company was rapidly producing higher risk loans.  In response, a prudent auditor exercising professional skepticism would have determined that the increased credit risk from the origination of subprime loans was a risk not likely reflected in the disproportionately flat ALL.  However, KPMG failed to exercise an appropriate degree of professional skepticism by failing to challenge the unchanged level of ALL relative to the growth in LHI, along with the outdated and unreliable assumptions employed by management in its ALL methodology. AU 230, 316 and 342.09.

782.  KPMG knew that it was required to obtain and evaluate sufficient competent evidential matter to support the ALL.  AU 342.01.  GAAS set forth three approaches that KPMG was to perform in auditing the ALL, and required KPMG to use one or a combination of the three approaches.  KPMG knew that it was required to (a) review and test the process used by Countrywide to develop the ALL; (b) develop an independent expectation of the ALL to corroborate the reasonableness of Countrywide's estimated ALL; or (c) review subsequent events or transactions occurring prior to completion of fieldwork.  AU 342.10.

783.  Further, GAAS states that, with respect to accounting estimates, "methods that rely solely on mathematical calculations, such as a percentage of total loans based on historical experience . . . generally fail to contain the essential elements because they do not involve a detailed analysis of an institution's particular transactions or consider the current economic environment." AAG Ch. 9.  Similarly, GAAS requires accounting estimates to include "effects of any changes in lending policies and procedures" and that management should avoid "old, incomplete, or inconsistent data to assess operating performance or financial capacity." AAG Ch. 9.

784.  KPMG failed to perform any of the three approaches pursuant to GAAS as set forth in AU 342.   Specifically, KPMG should have tested

management's ALL methodology and key assumptions used for calculating ALL, including components of the ALL formula.  AU 342.09 and AAG Ch. 9.  Had KPMG performed such a test, KPMG would have determined that Countrywide was using an unreliable model that failed to incorporate the required elements for an effective ALL methodology as set forth in the GAAP section above. Specifically, KPMG would have determined that Countrywide's ALL methodology (a) relied heavily on historical losses that were not adequately adjusted for current economic conditions; (b) failed to account for the changes Countrywide had implemented as to its lending practices; (c) failed to incorporate the deteriorating collateral values in California; (d) failed to adjust probabilities of default to reflect the dramatic increase in subprime lending, especially Pay-Option ARMs which were expected to result in payment shock; and (e) failed to apply the provisions of SFAS No. 114 to Countrywide's doubtful loans and impaired loans.

785.   Further, KPMG failed to develop its own independent expectation of what the ALL should be, and therefore failed to corroborate the reasonableness of Countrywide's reported ALL.  KPMG merely accepted Countrywide's estimate.  A prudent auditor would have developed its own expectation using current and reliable data and assumptions, and would have arrived at a much higher estimated ALL than Countrywide's reported amounts during the Relevant Period.  KPMG also failed to perform the third recommended approach as it did not review subsequent events or transactions occurring prior to completion of fieldwork.  Had KPMG performed the third approach, it would have determined that current delinquencies and defaults were occurring at a higher rate or faster speed than reflected in the ALL methodology and related formula.

### 5.   Red Flag: Increase In MSR Balance, But Decrease In Valuation Allowance

786.  KPMG failed to exercise professional skepticism related to Countrywide's reported valuation of MSRs and RI.  The historical rates of

delinquency and foreclosure data were key assumptions Countrywide used to estimate the fair value of MSRs and RI. Had KPMG properly assessed Countrywide's fair value measurements and the models used by Countrywide to estimate fair value, it would have made a determination that management did not adjust the historical delinquency rates and foreclosure data to factor in the increased cash flow risk that the Company was assuming through its aggressive production of subprime or nonconforming loans, loosening underwriting practices and increased credit risk.

787. GAAS, including AU 328 and AU 342, required KPMG to compare the value of Countrywide's MSRs from year-to-year to identify changes in the assumptions underlying fair value determinations. In performing this analytical procedure, KPMG would have determined that the value of MSRs increased by 22% from 2003 to 2004. A valuation allowance is established to track and account for the impairment risk related to MSRs, and as such is recorded as an offset to the gross balance of MSRs. SFAS No. 140. Yet, despite this significant increase in the balance of MSRs, Countrywide *decreased* its valuation allowance for impairment of MSRs from approximately 15% of MSRs in 2003 to only 11% in 2004. A prudent auditor responding with professional skepticism would have concluded that the decrease in the valuation allowance was illogical and presented yet another red flag because, as the risk of nonpayment by borrowers increases, the risk of receiving the expected future cash flows from net servicing income and retained interests also increases. Hence, the valuation allowance for impairment should be increased to reflect the aforementioned increased risks, not decreased. In the absence of evidence that Countrywide's loan portfolio was becoming less risky rather than more risky, AU 316, 326 and 329 required KPMG to seek evidence to determine why Countrywide was decreasing its valuation allowance and thereby increasing the value of its MSRs. AU 329.02 ("A basic premise underlying the application of analytical procedures is that plausible relationships among data may

reasonably be expected to exist and continue in the absence of known conditions to the contrary."). Additionally, Countrywide was using an outdated model to calculate the fair value of its MSRs, which focused on historical trends. KPMG failed to appropriately consider GAAS, which stated that "historical information might not be representative of future conditions . . . if management intends to engage in new activities or circumstances change." AU 328.37.

**6.    Red Flag: Based On Credit Risk Increases, Flawed Assumptions Used To Value RI**

788.   Pursuant to AU 328, KPMG was also required to assess management's key assumptions used to value its RI to ascertain that the assumptions are reasonable. KPMG knew that GAAS required it to "obtain sufficient appropriate audit evidence to provide reasonable assurance that fair value measurements and disclosures are in conformity with GAAP." AU 328.03. KPMG also knew that GAAP required fair value estimates "to be based on the best information available in the circumstances." AU 328.03. For the assumptions in valuing RI (and MSRs) to be reasonable, GAAS set forth that the assumptions "need to be realistic and consistent with (a) [t]he general economic environment, the economic environment of the specific industry, and the entity's economic circumstances; (b) [e]xisting market information . . . ; and (g) [t]he risk associated with cash flows. . . .including the potential variability in the amount and timing of the cash flows. . . ." AU 328.36.

789.   KPMG should have reviewed the reasonableness of the assumptions used to calculate Countrywide's net lifetime credit losses, a key assumption in estimating the fair value of RI. Despite the increasing origination of nonprime loans, the assumption for net lifetime credit losses in 2003 was 1.9% and was only raised to 2.0% in 2004. Countrywide increased the fair value of RI from 2003 to 2004 because it made and used the unreasonable assumption that the weighted average life of securitized loans increased from 2.0 years to 2.5 years. A prudent

auditor would have been skeptical of this unexpected or implausible increase in the RI because when credit risk increases, net lifetime credit losses are expected to increase accordingly and the weighted average life of the underlying loans is, therefore, expected to decrease.  This red flag should have prompted KPMG to inquire further into the relevant assumptions by testing, for example, the underlying data supporting the assumption for net lifetime credit losses. In doing so, KPMG would have determined that Countrywide's RI was overstated because changes in the Company's credit risk strategy and loosened underwriting practices were not appropriately included in the assumptions for weighted average life and net lifetime credit losses that were used to value RI.

790.  If, in 2004, the audit procedures set forth above had been properly performed, KPMG would have determined that a "clean" audit opinion on Countrywide's financial statements would have been false and misleading. Thus, KPMG acted with deliberate recklessness, or, in the alternative, with negligence, in conducting its 2004 audit of Countrywide's financial statements and failed to conduct its audit in accordance with GAAS.

### D.   Financial Statement Misstatement Risk Factors ("Red Flags") In 2005

791.  The risk factors present in 2004 were equally relevant for 2005. Additionally, the AAG (Chs. 5, 8 and 9) and the ARA highlighted the following risk factors signifying a risk of financial statement misstatements, which were present at Countrywide and which KPMG should have considered:

> (a)   aggressive measures undertaken to increase market share in nonprime markets;
>
> (b)   inadequate documentation supporting loan origination decisions;
>
> (c)   inappropriate classification of nonprime transactions as prime transactions;

(d)  unusual or inadequate review of the valuation of underlying collateral and associated appraisals;

(e)  increasing interest rates (AAM 8050.10); and

(f)  "housing bubble effects." This was a caution that the calculation of risk should include consideration of the possibility that the "housing bubble" would burst. AAM 8050.22. For Countrywide, the appropriate considerations would have been the potential effects of such a housing bubble burst on valuations of its ALL, LHI, MSRs and RIs, as well as the proper reserves for breaches of R&W.

792.  During its 2005 audit, KPMG encountered the same red flags that were apparent in 2004, and was required, in the face of those red flags, to perform the same audit procedures it was required to perform in 2004. Further, depending on its findings from initial audit procedures, KPMG was required to perform expanded audit procedures until it had obtained sufficient competent evidential matter to support its audit opinion.

### 1.  Red Flag: Implementation Of Countrywide's Exception Processing System

793.  AU 319 and AAG Ch. 5 required KPMG to test the adequacy of internal control over financial reporting and the operating effectiveness of those internal controls. KPMG was required to have continuing discussions with management and IT personnel to determine the types of IT systems used at Countrywide in 2005. AU 319.59. Accordingly, KPMG should have been aware of the implementation of EPS in 2005.

794.  Being aware of EPS, KPMG should have performed audit procedures to test the types of transactions processed by EPS because those transactions had a

greater risk of misstatement.  AU 319.30. [24] GAAS recognizes that risks related to the processing and recording of financial data increase when "[n]ew or revamped information systems" are introduced.  AU 319.38.  Additionally, KPMG's procedures to test EPS should have included the assessment of how EPS differed from Countrywide's routine loan processing system.

795.   The existence of EPS by itself should have been a signal to KPMG of the continued rising risk of fraud at Countrywide. Specifically, the AAG observed that "frequent or unusual exceptions to credit policy" is a fraud risk factor. AAG Ch. 5. Here, the very name of the system "EPS" explicitly coincided with the fraud risk factors highlighted by GAAS.

796.   In accordance with AU 319 and AU 316, KPMG was required to inquire further with Countrywide's employees and expand the nature, timing and extent of its testing on EPS. KPMG was required to ascertain that computer controls over the EPS were in place and consistent with the intended goals of an effective internal control over financial reporting as set forth by GAAS.  KPMG should have determined that EPS had been set up by management to override the Company's underwriting standards rather than adhere to them. An effective control environment includes a well-defined lending approval and review system that includes *established credit limits,* as well as limits and controls over the types of loans made. AAG Ch. 8. Moreover, applicable GAAS instructs that "[e]ffective internal control over financial reporting . . . should provide reasonable assurance that errors or fraud in management's financial statement assertions about the loan portfolio - *including those due to the failure to execute lending transactions in*

---

[24]   AU 319.30 ("As an entity's operations and systems become more complex and sophisticated, it becomes more likely that the auditor would need to increase his or her understanding of the internal control components to obtain the understanding necessary to design tests of controls, when applicable, and substantive tests.").

*accordance with management's written lending policies - are prevented or detected*." AAG Ch. 8.

797.   KPMG should have also discovered that the transactions authorized by EPS created a high degree of risk of material misstatement because numerous loans were granted to borrowers that did not qualify under Countrywide's already loosened written underwriting standards. AU 312, "Audit Risk and Materiality in Conducting an Audit," AU 312.16 ("The auditor's understanding of internal control may heighten or mitigate the auditor's concern about the risk of misstatement."). Moreover, the implementation of this system demonstrated the Officer Defendants' commitment to achieving financial objectives at any cost and without regard to preexisting internal controls.  This is another fraud risk factor, as this behavior demonstrates a disregard for effective internal control over financial reporting.

### 2.   Red Flag: Shocking 335% Increase In Pay-Option ARM Loan Origination

798.   As part of ensuring the effectiveness of internal control over financial reporting, Countrywide was required to review loan files.  KPMG, in turn, was required to determine that the controls purportedly in place requiring the review of loan files is operationally effective:

> Loan file contents should be reviewed as part of the institution's internal  loan review process to determine if credit reports, appraisals, and other third-party information existed before the credit or renewal was granted and if the quality of such information supported, and continues to support, the credit decision. . . . Also, the value of collateral should be estimated at the review date to identify deficiencies in collateral margins. . . .  Loan review may identify weaknesses in the lending process or in the lending officers' skill in originating, supervising, and collecting loans. . . . In addition, loan review may reveal the need for a loss accrual, as discussed in Chapter

COMPLAINT

9, "Credit Losses" . . . . Complete and accurate loan files are an element of internal control over financial reporting of loans. . . . An inspection of the files supporting loans originated in prior audit periods, as well as new loans (including some of the loans still in the process of disbursement), generally ***permits the independent accountant to understand the institution's internal control in this area as a basis for planning substantive tests***. AAG Ch. 8.

799.   During its 2005 audit, KPMG failed to inspect Countrywide's loan files.   Had KPMG performed such review, KPMG would have learned that Countrywide was issuing increasing numbers of Pay-Option ARMs to less creditworthy borrowers, without proper documentation of income or assets or adequate appraisals.

800.   Through detailed loan testing in accordance with AU 319 and the AAG, KPMG would have determined whether appraisals were included in Countrywide's files and were supportive of a reasonable collateral value, a significant factor during a declining economic environment. Specifically, "an inspection of loan documentation should include tests of the adequacy of both the current value of collateral in relation to the outstanding loan balance and, if needed, insurance coverage on the loan collateral." AAG Ch. 8. This red flag should have alerted KPMG that Countrywide was exposed to significantly increased credit risk and as a result, the ALL, R&W reserve, MSRs and RIs were at a high risk of material misstatement.

801.   In testing the composition of the loan portfolio in 2005, KPMG would have encountered evidence similar to that presented in Section VIII.A.2. above, which compared loans originated in 2004 to 2005. In making this comparison, the auditors would have determined that approximately 56% of loans originated by Countrywide in 2005 were nonconforming loans, up from 50% in 2004. This was a red flag to KPMG that Countrywide was increasing its rate of origination of high-

risk loans at a rapid pace. Also, KPMG would have detected that origination of Pay-Option ARMs had increased at the alarming rate of 335% over the prior year. This was also a red flag.

802.   In response to these red flags, and in accordance with AU 316 and 2004 AAM 8050.12, KPMG should have once again reviewed methods of classifying its loan portfolio (prime versus nonprime loans) and to verify that Countrywide applied and disclosed these methods appropriately and consistently. Had KPMG properly performed such procedures, it would have determined that Countrywide was classifying a substantial number of loans with FICO scores below 660, below 620 and indeed sometimes as low as 500 as prime loans.  A prudent auditor would have paid particular attention to the impact of this red flag on the affected accounts and the related disclosures made by Countrywide, but KPMG did not.

### 3.     Red Flag: 99% Increase In HELOC Delinquencies

803.   As a result of the red flags listed above, KPMG was required to perform additional testing of Countrywide's loans, including loan files, to determine if delinquencies were rising related to high risk loans. AU 316, 326 and 329; AAG Chs. 5 and 9. For example, KPMG would have seen, as the chart below illustrates, that delinquencies at Countrywide were increasing at a rapid pace. In particular, HELOC delinquencies nearly doubled in 2005, and nonprime delinquencies rose substantially to 15.20%. KPMG was required to perform additional testing to determine the reasons for increasing delinquencies, including whether the rise in delinquencies was a function of external economic conditions or whether the nature of Countrywide's loosened lending policies directly contributed to the increased delinquencies.

|  | 2004 | 2005 | % Increase |
|---|---|---|---|
| Total Delinquencies | 3.83% | 4.61% | 20.4% |
| Nonprime Delinquencies | 11.29 % | 15.20 % | 34.6% |
| Prime Home Equity Delinquencies | 0.79% | 1.57% | 98.7% |

### 4.    Red Flag: Despite Increased Credit Risks, ALL As A Percentage Of LHI Decreased

804.    As in 2004, the risk factors highlighted above, in conjunction with the red flags that should have become apparent, required KPMG to approach its audit of Countrywide with increased professional skepticism, and hence, appropriate substantive audit procedures. Accordingly, KPMG was required to perform audit procedures similar to those it should have performed in 2004. Under increasingly implausible relationships resulting from analytical procedures, KPMG was required to expand its audit procedures until it had obtained sufficient competent evidential matter supporting the reported amount of ALL.  Among other things, KPMG would have learned that Countrywide's ALL as a percentage of LHI continued to inexplicably decrease from 0.31% in 2004 to 0.27% in 2005. KPMG knew this decrease for 2005 was implausible given the significant increase in total loans and compounded increase in subprime loans.   As in its 2004 audit, KPMG failed to exercise the requisite professional skepticism and due care, failed to perform the three approaches pursuant to GAAS, accepted Countrywide's flawed ALL methodology based upon outdated assumptions and unreliable information, and consequently failed to adjust its audit procedures to obtain sufficient competent evidence supporting the reported ALL for 2005.

### 5.    Red Flag: Increase In Prime Rate From 2004

805.    By the end of 2005, the prime rate of interest increased to 7.25% from 5.25% at the end of 2004. This external economic factor posed risks to

Countrywide that KPMG should have considered due to the difficulty that borrowers would face in refinancing their ARM loans. KPMG knew that, with narrowing alternatives for borrowers to refinance, there was an increased likelihood for higher delinquency, default and foreclosure rates, thus affecting the accounting estimates underlying Countrywide's ALL and R&W and its valuation of MSRs and RI. KPMG knew that Countrywide's valuation models and ALL methodology failed to incorporate assumptions reflecting current economic conditions and data. Nevertheless, KPMG accepted the reported but misstated amounts for Countrywide's ALL, R&W reserve, RIs and MSRs, even though these amounts were generated using flawed methods, outdated or unreasonable assumptions and unreliable information.

**6.  Red Flag: Valuation Allowance For Impairment Of Countrywide's MSRs Dropped From 11% To Only 3% Of Gross MSRs**

806. Despite the significant increase in credit risk assumed by Countrywide, the valuation allowance for impairment of Countrywide's MSRs *dropped* from 11% to only 3% of gross MSRs. KPMG should have determined that such relationship was implausible given the facts and circumstances KPMG knew to exist at Countrywide and the increase in the prime rate. KPMG knew that such valuation allowance was inadequate in light of the rising credit risk, which in turn would result in increases in delinquency and foreclosure rates, and that the Officer Defendants failed to incorporate expected increasing operating costs to service these loans. AU 230, 316, 328 and 342; and AAG Chs. 9 and 10. Nevertheless, KPMG accepted Countrywide's reported MSRs, even though it knew that the valuation model failed to incorporate assumptions reflecting current economic conditions and data and, thus, systematically resulted in an overstated MSR.

**7.  Red Flag: Decrease In Net Lifetime Credit Losses And Unreasonable Weighted Average Life Of Retained Interests**

807. In performing required analytical procedures, KPMG should have

learned that the net lifetime credit losses rate inexplicably dropped 15%, from 2.0% in 2004 to 1.7% in 2005. Once again, this was an implausible relationship between an assumption and internal and external facts and circumstances.  Such implausible decrease to the net lifetime credit losses rate was a red flag to KPMG that management's assumptions were unreasonable and unsupportable because, as delinquencies and credit risk increased, net credit losses should have also increased accordingly.  KPMG knew that GAAS required it to evaluate the reasonableness of this assumption, but KPMG failed to do so.

808.   KPMG should have also examined Countrywide's weighted average life assumption by reviewing the underlying assumptions and data. Had KPMG done so, KPMG would have determined that Countrywide continued to maintain a highly aggressive position with respect to the expected weighted average life of the RIs that it had initially raised in 2004. KPMG knew that, in consideration of the expected rise in defaults driven by Countrywide's new strategy, it was unreasonable to assume that the weighted average life of RI (2.4 years) in 2005 was appropriately greater than the weighted average life of RI (2.0 years) in 2003 when there was substantially less credit risk.  KPMG continued to accept Countrywide's reported RIs even though it knew that the assumptions used by Countrywide were outdated and conflicted with current economic conditions.  As such, KPMG failed to adhere to applicable GAAS, including AU 230, 316 and 328, and AAG Chs. 5 and 10.

### 8.   Red Flag: 27% Drop In New R&W Provisions As A Percentage Of Relevant Securitizations

809.   KPMG knew that even though Countrywide substantially increased the nature and extent of the credit risk associated with the loans it originated, it did not appropriately increase its accruals for breaches in R&Ws. Countrywide increased securitizations of prime home equity and nonprime loans from $57.8 billion in 2004 to $61.4 billion in 2005, a growth rate of 6%. However, in 2005,

Countrywide actually decreased its provisions for new R&W by 22%, from $85 million in 2004 to $66 million in 2005. This year-over-year change in 2005 represented an inexplicable 27% drop in new R&W provisions as a percentage of relevant securitizations. This simple analytical procedure provided KPMG with a red flag that the R&W reserve was likely understated, and KPMG should have adhered to GAAS by performing the procedures set forth in AU 342.

810.   KPMG knew that it was required to obtain and evaluate sufficient competent evidential matter to support the R&W reserve.  AU 342.01. For the assumptions in valuing RI (and MSRs) to be reasonable, GAAS set forth that the assumptions "need to be realistic and consistent with: (a) [t]he general economic environment, the economic environment of the specific industry, and the entity's economic circumstances; (b) [e]xisting market information . . . ; (g) [t]he risk associated with cash flows. . . . including the potential variability in the amount and timing of the cash flows. . . ." AU 328.36.

811.   GAAS set forth three approaches that KPMG was to perform in auditing the R&W reserve, and required KPMG to use one or a combination of the three approaches.  KPMG knew that it was required to (a) review and test the process used by Countrywide to develop the R&W reserve; (b) develop an independent expectation of the R&W reserve to corroborate the reasonableness of Countrywide's estimated ALL; or (c) review subsequent events or transactions occurring prior to completion of fieldwork.  AU 342.10.  KPMG failed to correctly perform the procedures for the first approach as set forth in GAAS, and failed to perform the other two approaches altogether.  Consequently, Countrywide's R&W reserve as reported in its 2005 financial statements was misstated.

812.   If, in 2005, KPMG had performed the audit procedures set forth above, KPMG would have determined that a "clean opinion" on Countrywide's financial statements would have been false and misleading. Thus, KPMG acted with deliberate recklessness, or, in the alternative, with negligence, in conducting

its 2005 audit of Countrywide's financial statements and failed to conduct its audit in accordance with GAAS.

**E.    Financial Statement Misstatement**
       **Risk Factors ("Red Flags") In 2006**

813.   In 2006, all of the risk factors that were present in 2004 and 2005 were equally relevant. In 2006, the risk of the "housing bubble effects" was noted in AAM 8050.37.

814.   In 2006, KPMG should have been aware of the same fraud risk factors and risks of material misstatements that were relevant in 2004 and 2005. AAG Ex. 5-1, Chs. 8 and 9. However, because there was a substantial increase in the production of Pay-Option ARMs (an increase of 335%) and HELOCs (an increase of 45%) in 2005, KPMG should have been aware as well of a risk factor that was raised in the 2006 AAG. This AAG stated that a risk of material misstatement can arise from "[s]ignificant concentrations of loan products with terms that give rise to credit risk, *such as negative amortization loans,* loans with high loan-to-value ratios, *multiple loans on the same collateral* that when combined result in a high loan-to-value ratio, and interest-only loans." AAG Ch. 8.

815.   In 2006, KPMG encountered the same red flags as were present in 2005 and 2004, and was required, in the face of those red flags, to perform the same audit procedures it was required to perform in 2005 and 2004.  Further, KPMG was required to perform expanded substantive audit procedures if its planned audit procedures failed to elicit sufficient competent evidential matter, including when KPMG encountered audit evidence that conflicted with another piece of audit evidence.

**1.    Red Flag: Accumulated Negative**
       **Amortization On Pay-Option ARMS Increased 775%**

816.   Accumulated negative amortization on Pay-Option ARMs grew nearly eight-fold during 2006, from $74.7 million in 2005 to $654 million in 2006. This

775% increase was a glaring red flag which provided further evidence of the increasingly poor quality of such loans and an increase in the risk of material misstatement in Countrywide's financial statements. AAG Ch. 5 specifically observed that a risk of material misstatement can arise from "negative amortization loans."

817.   Based upon the continued increase in the origination of Pay-Option ARMs and 2006 AAM 8050.35, KPMG should have determined whether Countrywide had developed an appropriate risk management policy to avoid negative amortization.  Importantly, KPMG knew that negative amortization had a direct impact on the ALL and MSRs.  Further, KPMG knew that if Countrywide included Pay-Option ARMs in its securitized or sold loans, negative amortization also had a direct impact on Countrywide's RIs and R&W reserves.  Therefore, KPMG was required to evaluate the risk of material misstatement arising from increased level negative amortization in 2006.

818.   KPMG knew it was required to test Countrywide's methodologies, models and assumptions for its ALL, R&W reserve, RIs, and MSRs, to determine that the assumptions used in 2006 reflect the significant financial statement misstatement risks arising from negative amortization in 2006.  AU 342, 328; AAG Chs. 5, 8, 9 and 10.  However, KPMG failed to test the reasonableness of those assumptions and failed to ensure that Countrywide included the impact of negative amortization in building its assumptions for 2006.

### 2.    Red Flag: 87% Increase In HELOC Delinquencies

819.   As a result of the red flags listed above, KPMG was required to perform additional testing of its loans, including loan files, to determine if delinquencies were rising related to high risk loans. AU 316, 326 and 329; AAG Chs. 5 and 9. For example, KPMG would have seen, as the chart below illustrates, that delinquencies at Countrywide continued to increase at a rapid pace. In

particular, HELOC delinquencies nearly doubled in 2006, and nonprime delinquencies rose substantially to 19.03%. KPMG was required to perform additional testing to determine the reasons for increasing delinquencies, including whether the rise in delinquencies was a function of external economic conditions or whether the nature of Countrywide's lending policies directly contributed to the increased delinquencies.

820.  Because the significant increases in delinquencies had significant financial statement implications, KPMG was required to perform appropriate audit procedures to test Countrywide's loans to determine if delinquency rates on such risky loans were increasing.  The table below shows the accelerating delinquency rates in 2006. Given the sheer volume of Countrywide's loan portfolio, even small increases in the delinquency rates indicated significant absolute dollar value changes in the amounts at risk:

|  | 2005 | 2006 | % Increase |
|---|---|---|---|
| Total Delinquencies | 4.61% | 5.02% | 8.9% |
| Nonprime Delinquencies | 15.20% | 19.03% | 25.2% |
| Prime Home Equity Delinquencies | 1.57% | 2.93% | 86.6% |

However, KPMG failed to test Countrywide's loan files, even though it was specifically required by GAAS.

### 3.    Red Flag: ALL As A Percentage Of LHI Remained Flat

821.  As in 2005, the risk factors highlighted above in conjunction with the red flags required KPMG to approach its audit of Countrywide with increased professional skepticism in the same manner as it was required to do in 2005 and 2004. KPMG should have performed audit procedures similar to, and at times, more expansive than those it should have performed in 2005. In performing analytical procedures, KPMG learned that Countrywide's ALL as a percentage of

loans held for investment stayed essentially flat as compared to 2005, at a rate of 0.33%, as discussed in Section VIII.A.2. above. This inexplicable static reserve rate was one of several obvious fraud risks exhibited by events and conditions at Countrywide throughout 2004, 2005 and 2006. AAG Ch. 5, Ex. 5-1 ("Rapid growth or unusual profitability, especially compared to that of other peer financial institutions; for example unusually large growth in the loan portfolio without a commensurate increase in the size of the [ALL].").

822.   As in 2004 and 2005, KPMG was required to perform one or a combination of approaches to test the reasonableness of Countrywide's ALL. KPMG was also required to test whether Countrywide's ALL methodology contained the essential elements for an effective methodology.  KPMG failed to perform appropriate audit procedures when it purportedly reviewed and tested the process used by Countrywide in developing the ALL estimate for 2006 (the first approach).  KPMG failed to test any of the assumptions used in the 2006 ALL estimate, even though it was even more implausible than in 2005 that the ALL would be adequate at a relatively unchanged level, given the layered credit risks from increased subprime lending, delinquencies, widened underwriting guidelines, increased negative amortization, and devalued housing prices.  KPMG also failed to perform any audit procedures for the other two approaches set forth in GAAS. Consequently, KPMG merely accepted Countrywide's reported ALL, which was understated and contributed to the material misstatement of Countrywide's financial statements for 2006.

### 4.   Red Flag: No Modification To Fair Value Assumptions Used In MSR Model

823.   Similarly, KPMG failed to exercise professional skepticism in auditing Countrywide's MSRs. Despite the significant increase in the level of credit risk that by then had been accumulated by Countrywide, the Company's reported balance of MSRs reflected a $432 million *increase* in fair value based

upon assumptions applied in its valuation model relating to SFAS No. 156.  Given the deteriorating economic environment, devalued collateral values, significant increases in negative amortization, the increased volume of subprime loans originated, and worsening underwriting practices, KPMG knew that these conditions in 2006 presented a significant and serious risk to Countrywide relating to its receipt of expected future cash flows from servicing the related loans (virtually all of which were originated by Countrywide).   A prudent auditor exercising professional skepticism would have concluded that an increase in the MSRs' fair value seemed implausible, and therefore, would have tested the assumptions and model used in arriving at the reported fair value of the MSRs in 2006.   KPMG knew that delinquency and foreclosure rates were part of the assumptions used in estimating the MSRs at Countrywide.   At a time when delinquencies and eventual foreclosures were known to be increasing, KPMG knew that these assumptions should be tested.  However, KPMG failed to test those assumptions.   Instead, KPMG accepted Countrywide's reported MSR in 2006, even though it was faced with conflicting evidence from internal and external factors surrounding Countrywide.

### 5.    Red Flag: Historical Performance Used To Calculate Fair Value Of Retained Interests

824.   KPMG failed to exercise professional skepticism when evaluating Countrywide's assumptions used in its fair value measurements related to its reported RI in 2006. KPMG knew that as of 3Q 2006, Countrywide had completed or "closed" 63 non-agency securitizations.  Countrywide also referred to these non-agency securitizations as "private-label" securitizations.  2006 Form 10-K, p. 102. By the end of 2006, Countrywide claimed it had been "ranked second among Non-Agency MBS Underwriters" by *Inside MBS & ABS*.   2006 Form 10-K, p. 13. KPMG knew that the underlying loans that had been pooled into these non-agency securitizations in 2006 and in years prior to 2006, contained significant volumes of

non-conforming, subprime and second lien loans.   KPMG also knew that Countrywide's RIs in these non-agency securitizations represented a "first loss position" in credit risk.  2006 Form 10-K, p. 102.  Therefore, KPMG knew that the fair value of Countrywide's RIs should reflect the aforementioned factors and resulting significant credit risk.  However, in violation of GAAS, KPMG failed to test the fair value assigned to Countrywide's RIs to ascertain that these factors and related credit risk were incorporated in the assumptions used in the RI valuation model.

825.   While Countrywide did increase its expectation of net lifetime credit loss from 1.7% in 2005 to 2.6% in 2006, this increase was inadequate as it did not reasonably capture total credit-related losses expected as of that time as evidenced by the continuing increase in the volume of riskier loans. KPMG knew that management was using an assumption largely based upon historical performance, which was inappropriate because the historical performance of Countrywide's loans was not a reliable indicator of future performance. Indeed, as alleged above, KPMG knew that in 2006 many relevant delinquency trends indicated that credit risk was increasing, and Countrywide was unlikely to avoid significant credit losses, particularly on the most subordinated of equity interests in its securitizations.

826. Moreover, KPMG should have tested the reasonableness of Countrywide's weighted average life assumption by reviewing underlying data and supporting information. KPMG knew that, in consideration of the expected rise in defaults driven by Countrywide's new strategy, it was unreasonable to assume that the weighted average life of RI (2.8 years) in 2006 was appropriately greater than the weighted average life of RI (2.4 years) in 2005 when credit risk was high but not as significant as 2006. KPMG continued to accept Countrywide's reported RIs even though it knew that the assumptions used by Countrywide were outdated and

conflicted with current economic conditions.  As such, KPMG failed to adhere to applicable GAAS, including AU 230, 316 and 328; and AAG Chs. 5 and 10.

### 6.   Red Flag: Insufficient R&W Reserve Relative To Skyrocketing Delinquency Rates

827.   In combination with KPMG's knowledge that the Company had embarked on a marketing strategy that significantly increased credit risk, KPMG should have concluded that Countrywide's liability for R&W continued to increase commensurately, particularly for 2006.  KPMG knew that, as Countrywide's non-agency securitizations and loan sales continued to rise, Countrywide was also proportionately increasing the representations and warranties it made.   KPMG knew that the adequacy of the R&W reserve was impacted by these increases, and yet failed to test the reported R&W reserve.

828.   In accordance with AU 342, KPMG was required to test management's assumptions used to reserve for breaches in R&W. As set forth above, KPMG was required to test the reasonableness of the R&W reserve by performing one or a combination of three approaches.   KPMG purportedly performed only one of the three approaches (the first approach, which was to review and test the process used by management), but it, again, failed to test the reasonableness of the assumptions used in arriving at the R&W reserve.

829.   Had KPMG properly tested management's assumptions, KPMG would have determined the assumptions used in 2006, including the default rate, were inconsistent with current economic events and conditions.  KPMG knew that the Company had assumed more risky loans and the delinquency rate on such loans was skyrocketing.  KPMG should have concluded, based upon this red flag, that while Countrywide increased its R&W reserve for 2006, that increase was insufficient in view of the Company's continued origination and securitization of large volumes of loans to less creditworthy borrowers with loosened underwriting

guidelines, lax or nonexistent due diligence and rising delinquencies in such high risk loans.

830.   Further, KPMG knew that Countrywide was required to record an initial liability pursuant to FIN 45 upon the inception of a guarantee.  When HSBC demanded a repurchase in 1Q 2006, KPMG learned that Countrywide had not recorded the initial liability.   This was another red flag to KPMG indicating Countrywide's noncompliance with GAAP with respect to the R&W reserve. Nevertheless, KPMG failed to exercise heightened professional skepticism and continued to accept Countrywide's representation that the R&W reserve was adequate, even though it was not.

831.   If, in 2006, KPMG had properly performed the procedures set forth above, KPMG would have determined that a "clean opinion" on Countrywide's financial statements would have been false and misleading. Thus, KPMG acted with deliberate recklessness, or, in the alternative, with negligence, in conducting its 2006 audit of Countrywide's financial statements and failed to conduct its audit in accordance with GAAS.

### F.   KPMG Failed To Require Countrywide To Correct Materially Misstated Disclosures

832.   KPMG's "clean" audit opinions for the Relevant Period included a statement that Countrywide's consolidated financial statements were, in all material respects, "fairly stated" in accordance with United States GAAP. However, KPMG's statement was untrue based upon the GAAP misstatements in the reported ALL, RIs, MSRs and R&W reserve, as alleged above.  In addition, Countrywide made certain disclosures pertaining to its ALL which KPMG knew to be untrue.   Nevertheless, KPMG allowed Countrywide to include those disclosures, which were inaccurate and misleading.

833.   Countrywide made the following disclosures regarding its ALL in its 2006 Form 10K. Similar disclosures were made in the 2004 and 2005 Forms 10K:

The Company provides for incurred losses on loans with an allowance for loan losses.  The allowance for loan losses is a valuation allowance established to provide for estimated incurred credit losses in the portfolio of loans held for investment as of the balance sheet date. The allowance for loan losses is evaluated on a periodic basis by management and is based on a variety of factors, including historical default and loss rates for similar loans originated by the Company *estimates of collateral value for individually evaluated loans and evaluations of the effect of current economic and market conditions* . . . . (2006 Form 10K, p. F13, Note, Credit Quality and Loan Impairment).

834.   KPMG knew that the disclosure above was untrue because it knew that Countrywide's ALL methodology and related formula failed to incorporate updated assumptions about the current economic and market conditions.  KPMG knew that, as alleged above, Countrywide's probability of default in its ALL formula was consistently under-predicting the probability of default in the next twelve months, and the multiplier, or correction factor, was inadequate to correct the under-prediction, systematically resulting in an understated ALL.  KPMG knew that the under-prediction of the probability of default was, in fact, caused by Countrywide's failure to incorporate the effects of current economic and market conditions.  KPMG also knew that Countrywide's ALL methodology was flawed and failed to contain the necessary elements for an effective methodology.  KPMG knew that Countrywide's ALL methodology, in particular the probability of default factors: (a) failed to consider all known relevant internal and external factors that may affect collectability; (b) was not based on current and reliable data; and (c) failed to consider the particular risks inherent in the different kinds of lending, particularly the Pay-Option ARM loans.  Nevertheless, KPMG allowed Countrywide to make the misleading disclosure above, in violation of GAAS.

Further, KPMG knew that, based on the ALL formula that generated the reported ALL, Countrywide's ALL methodology for the Relevant Period did not reflect an analysis of estimates of collateral value for individually evaluated loans.  In fact, KPMG gathered no audit evidence showing Countrywide even reviewed or evaluated individual loans in its LHI portfolio for purposes of estimating the ALL.

835.  Countrywide's 2006 Form 10-K included the following untrue statements in the MD&A section:

> The increase in our allowance for loan losses **reflects prevailing real estate market and economic conditions** and the seasoning of the Bank's investment loan portfolio.

> ***

> The provision for loan losses and the related allowance for loan losses **is impacted by many factors, including economic conditions (for example, housing prices, interest rates and unemployment rates), the borrower's credit profile, the loan's payment requirements, delinquency, loan seasoning and prepayments**.

2006 Form 10K, pp. 46, 63.

836.  KPMG knew that the disclosures above were inaccurate and misleading for the reasons set forth above.  KPMG knew that Countrywide's ALL methodology and related formula failed to use updated assumptions to reflect the factors enumerated in the disclosure above.  KPMG knew that current housing prices, interest rates, unemployment rates, the borrowers' credit profile, loan repayment requirements, delinquency, and prepayments were not incorporated into the ALL formula components during the Relevant Period.  KPMG was required by GAAS to require Countrywide to correct the inaccurate and misleading disclosures above, but it did not.

**G.   KPMG's Failure To Issue Adverse Opinions On Countrywide's Self-Assessment Of Internal Control Over Financial Reporting And On The Effectiveness Of Countrywide's Internal Control Over Financial Reporting Based On KPMG's Audits**

837.   For each of the years ended December 31, 2005, and 2006, KPMG issued an audit report on Countrywide management's assessment of its internal control over financial reporting and on the effectiveness of Countrywide's internal control over financial reporting based on its audits as required by the standards of the PCAOB (Auditing Standard No. 2, "An Audit of Internal Control Over Financial Reporting Performed in Conjunction with An Audit of Financial Statements," or AS 2).   For both years, KPMG issued unqualified opinions.   In a report dated February 28, 2007, KPMG stated:

> We have audited management's assessment, included in the accompanying Management's Report on Internal Control Over Financial Reporting, included in Item 9A(2), that Countrywide Financial Corporation (the Company) maintained effective internal control over financial reporting as of December 31, 2006, based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. ***Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of the Company's internal control over financial reporting based on our audit***.
>
> We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States).   Those standards require that we plan and perform the audit to obtain

reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements . . . .

***In our opinion, management's assessment that the Company maintained effective internal control over financial reporting as of December 31, 2006, is fairly stated, in all material respects, based on***

*criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Also, in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2006, based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).*

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Countrywide Financial Corporation and subsidiaries as of December 31, 2006 and 2005, and the related consolidated statements of earnings, changes in shareholders' equity and comprehensive income and cash flows for each of the years in the three-year period ended December 31, 2006, and our report dated February 28, 2007, expressed an unqualified opinion on those consolidated financial statements.

838.   KPMG issued the same opinion for the year ended December 31, 2005, in their report dated February 28, 2006.

839.   In violation of GAAS, KPMG issued unqualified opinions on management's assessment of internal control over financial reporting and on the effectiveness of internal control over financial reporting at Countrywide for the years ended December 31, 2005, and 2006, even though KPMG knew there was a material weakness in Countrywide's internal control over financial reporting during those reporting periods.

840.   As explained in the GAAP section above, a "material weakness" is defined as a "significant deficiency, or combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the annual

or interim financial statements will not be prevented or detected." AS 2, ¶10.  AS 2 states, "[t]he auditor may issue an unqualified opinion only when there are no identified material weaknesses and when there have been no restrictions on the scope of the auditor's work."

841.  For 2005 and 2006, Defendants Mozilo and Sieracki falsely represented that Countrywide had maintained effective internal control over financial reporting.  KPMG was required by AS 2 to issue an opinion on Defendant Mozilo's and Sieraki's conclusion (*i.e.*, the Company's assessment).  Specifically, KPMG was required to issue an adverse opinion and was precluded by AS 2 from issuing an unqualified opinion on management's assessment of internal control over financial reporting if management concludes that its internal control over financial reporting was effective while, in fact, there were "significant deficiencies that, individually or in combination, result in one or more material weaknesses." In violation of GAAS, KPMG concluded that Defendant Mozilo's and Sieracki's assessment was "fairly stated,"  even though KPMG encountered audit evidence during its audits for 2005 and 2006 that there were significant deficiencies that, either individually or in combination, created a material weaknesses in Countrywide's internal control over financial reporting for those years.  These significant deficiencies indeed resulted in the material misstatement of Countrywide's ALL, MSRs, RIs, and R&W reserves, thereby meeting the definition of a material weakness.  Equally reckless was KPMG's disregard for GAAS when it issued its opinion that Countrywide maintained effective internal control over financial reporting for 2005 and 2006.

842.  In its 2005 and 2006 audits, KPMG identified significant deficiencies in its internal control over financial reporting that directly impacted the fair value of MSRs and RIs and the estimation of the ALL and R&W reserve in accordance with GAAP.  Essentially, in 2006, Countrywide had not remediated the significant deficiencies brought to their attention by KPMG in 2005.  Because the

misstatements in the ALL, R&W reserve, MSRs, and RIs as described in the GAAP section above were material, and Countrywide failed to prevent or detect such misstatements, the underlying significant internal control deficiencies were equivalent to a material weakness in Countrywide's internal controls over financial reporting.  Further, AS 2 sets forth that that the following "should be regarded as at least a significant deficiency and as a ***strong indicator*** that a material weakness in internal control over financial reporting exists" (shown in part): (a) "significant deficiencies that have been communicated to management and the audit committee remain uncorrected after some reasonable period of time," and (b) "an ineffective control environment."

843.   However, in violation of GAAS, KPMG inexplicably failed to conclude that the aforementioned significant deficiencies in Countrywide's internal control over financial reporting comprised a material weakness in internal control over financial reporting at Countrywide for 2005 and 2006.

844.   Further, there were other deficiencies in internal control over financial reporting at Countrywide during the Relevant Period that came to KPMG's attention which KPMG deemed to be not significant, even though these deficiencies met the criteria for a significant deficiency.  In violation of GAAS, KPMG failed to evaluate whether these deficiencies were more serious, *i.e.*, whether they were significant deficiencies or, worse, material weaknesses.  For example, KPMG failed to determine whether Countrywide's continued under-prediction of the probability of default in its ALL model (as discussed in the GAAP section above) was a significant deficiency that contributed to a material weakness in internal control over financial reporting.  KPMG was required by AS 2 to evaluate the significance of an identified deficiency in internal control over financial reporting by determining:   (a) "the likelihood that a deficiency, or a combination of deficiencies, could result in a misstatement of an account balance or disclosure," and (b) "the magnitude of the potential misstatement resulting from

the deficiency or deficiencies." AS 2 confirms that "the significance of a deficiency in internal control over financial reporting depends on the ***potential*** for a misstatement, not on whether a misstatement actually occurred." KPMG was reckless in its failure to determine that the consistent under-predicting of the probability of default and the inadequate PD multiplier in the ALL formula, causing the ALL to be systematically understated, represented at least a potential for a misstatement. KPMG also failed to determine the magnitude of the potential misstatement resulting from the consistent under-predicting of the probability of default factor and PD multiplier. Worse, KPMG failed to evaluate whether this under-prediction of the probability of default in the ALL model, when combined with the significant deficiencies it had identified, contributed to a material weakness in internal control over financial reporting at Countrywide.

845. A prudent auditor would have concluded that the 2005 and 2006 deficiencies in internal control over financial reporting at Countrywide, which KPMG identified in the course of its 2005 and 2006 audits, were significant deficiencies that met the definition of a material weakness, but KPMG did not. Under these circumstances, AS 2 required KPMG to issue an adverse opinion on the 2005 and 2006 internal control over financial reporting, including a description of the material weakness that provided "the users of the audit report with specific information about the nature of the material weakness, and its actual and potential effect on the presentation of the company's financial statements issued during the existence of the weakness," but KPMG did not, in violation of GAAS. AS 2, ¶176.

**X.    COUNTRYWIDE'S UNDISCLOSED UNDERWRITING AND LOAN ORIGINATION PRACTICES EXPOSED IT TO UNDISCLOSED CREDIT RISKS AND LIQUIDITY RISK**

846. Countrywide's increasingly wide underwriting guidelines, excessive origination of exception loans, and reckless loan origination practices materially increased the Company's credit risk from 2003 through the end of 2007. In late

2007, Countrywide began to suffer extensive credit problems as the undisclosed credit risks materialized.

847.  As detailed above, Countrywide originated loans with the primary intent to sell them into the secondary mortgage market.  However, this model did not completely eliminate the credit risk to Countrywide.  First, Countrywide owned all of the credit risk associated with the loans in the Bank's Held for Investment portfolio.  Second, Countrywide typically retained risk in the form of a residual interest in the securitizations it sold, typically the lowest rated, or first loss, tranche of the securitization.[25]  Third, Countrywide had loss exposure due to the representations and warranties it made to MBS and other secondary market purchasers.  That representation and warranty liability caused Countrywide to suffer significant losses in the first quarter of 2006 related to repurchase requests from HSBC.  (As described herein, more recently, all of these credit risks have materialized into billions of dollars of alleged losses that are the subject of a myriad of lawsuits, settlements and claims against Bank of America, Countrywide's successor.)

848.  For example, in September 2005, Countrywide made several sales to HSBC of subprime second liens.  HSBC found serious deficiencies with the loans, both related to documentation and non-compliance with guidelines, and asked Countrywide to repurchase many of them.  The repurchases eventually caused

---

[25]  Retained interest holders receive interest payments from the securitized loan pools after all required regular interest has been paid to other investors in the higher priority securities tranches. This was done as a form of credit enhancement, because Countrywide's retained interests would take the first losses if any mortgage pool underperformed, giving the securitization investors limited default protection.  Countrywide typically maintained retained interests in the mortgage pools it securitized for non-prime mortgages and HELOCs.

COMPLAINT

losses to Countrywide in the tens of millions of dollars.[26]  As a result of this event, Mozilo wrote several emails to both Sambol and Sieracki decrying what he called the "serious lack of compliance" in Countrywide's underwriting of these loans and the disregard for guidelines that he had witnessed.  For example, in April 2006, Mozilo wrote of Countrywide's subprime 80/20 loans that he had "***personally observed a serious lack of compliance within [Countrywide's] origination system as it relates to documentation and generally a deterioration in the quality of the loans originated . . . .***"

849.  In addition to the credit risk associated with its underwriting, Countrywide ran the risk that if the loans Countrywide originated, packaged into MBS and then sold to investors performed badly, Countrywide's ability to continue accessing the capital markets could be frustrated.  Countrywide's CRO, McMurray, warned Sambol of just this eventuality, but this was not necessary – Sambol was aware of the issue.  In 2005, while he was still the head of loan production, Sambol urged the Company to take on more risk, because he was concerned that one effect of Countrywide's practice of cherry-picking higher quality loans to keep in its

---

[26]  Currently, Bank of America is facing billions of dollars in potential liabilities as a result of loans originated by Countrywide.  According to Bank of America's Form 10-K for 2010, it faces repurchase claims from private counterparties with an estimated range of loss at $7-10 billion.  As recently as April 15, 2011, Bank of America announced a settlement to pay monoline insurer Assured Guaranty a total of $1.6 billion (including $1.1 billion in cash) to make good on representations and warranties by Countrywide for loans that were packaged into twenty-nine MBS transactions insured by Assured Guaranty.  (In addition to the payout, Bank of America agreed to reimburse Assured Guaranty 80% of losses on the subject MBS until the losses on those deals reach $6.6 billion.)  On January 3, 2011, Bank of America announced a settlement to pay Fannie Mae and Freddie Mac a total of $2.8 billion to make good on R&Ws by Countrywide, who sold loans to these GSE's prior to the merger that turned out to be fraudulent or violated fair lending laws.  Bank of America continues to face a myriad of lawsuits and other disputes involving alleged breaches of R&Ws by Countrywide and/or its affiliates.

portfolio would be to cause the secondary markets to lose confidence in the quality of Countrywide's MBS securitizations:

> While it makes sense for us to be selective as to the loans which the Bank retains, we need to analyze the securitization implications on what remains if the bank is only cherry picking and what remains to be securitized/sold is overly concentrated with higher risk loans. This concern and issue gets magnified as we put a bigger percentage of our pay option production into the Bank because the remaining production then increasingly looks like an adversly [sic] selected pool.

850.   In addition, Mozilo was concerned that a "reputational event" could adversely affect Countrywide's ability to sell Pay-Option loans.  In September 2006, he wrote that he believed that Countrywide's ability to sell Pay-Option loans into the secondary market, a practice that was critical to Countrywide's liquidity, was at risk because the credit spread was likely to disappear.[27]

851.   Ultimately, Countrywide was forced to begin disclosing the serious problems caused by its lax underwriting.  After Countrywide's July 24, 2007 earnings call, where the Company made disclosures regarding its held for investment portfolio, Countrywide experienced a series of significant declines in stock price.  There was an 11% share price decline following Countrywide's July 24, 2007 earnings call when it provided investors with statistical information regarding its portfolio of loans held for investment that revealed that its definition of prime loans included loans to borrowers with FICO scores as low as 500, and

---

[27]   In March 2007 Countrywide eliminated "piggyback" loans that allowed borrowers to purchase a home with no money down.  According to *Reuters*, an internal email advised loan officers: "Please get in any deals over 95 LTV (loan-to-value) today! . . . Countrywide BC [subprime] will no longer be offering any 100 LTV products as of Monday, March 12."   According to published reports, Countrywide waited until February 23, 2007, to stop originating no-doc loans with more than 95% LTV.

that 80% of its Pay-Option loans were based upon reduced documentation. There was an additional decline of approximately 11% in Countrywide's share price on August 16, 2007, after Countrywide was forced to tap its entire $11.5 billion credit facility, an event it acknowledged was necessitated by the over 97% decline in Countrywide's revenue from mortgage securitizations from 2006 to 2007, and by Countrywide's inability to bridge the gap by selling commercial paper.

852.   Following those announcements, Countrywide's share price began a precipitous decline that decoupled it from other companies in the Dow Jones Financial Services Index, with which it had previously been closely aligned. By the end of November 2007, Countrywide had nearly exhausted its ability to borrow from the Federal Home Loan Bank of Atlanta, and faced the looming prospect of bankruptcy.

853.   Countrywide's explosive origination of nontraditional loans between 2003 and 2008 may have been highly lucrative for the Company in the short term but, as Defendants knew, this constituted a high-risk activity that threatened the Company's core business, especially when the secondary market dried up as a result of Countrywide's reckless loan origination and underwriting practices and the Company was forced to hold more risky loans for investment and retain more interests in Pay-Option ARM and HELOC securitizations.

**XI.   INVESTORS BEGIN TO LEARN THE TRUE FACTS ABOUT COUNTRYWIDE, CAUSING ITS SECURITIES PRICES TO PLUMMET DESPITE DEFENDANTS' EFFORTS TO CONCEAL THE TRUTH**

854.   Beginning on July 24, 2007, investors began to learn the truth about Countrywide, causing its securities prices to plummet despite Defendants' continued efforts to conceal the truth. In total, beginning with the first partial corrective disclosure on July 24, 2007, Countrywide's common stock share price experienced a total loss of $27.51 per share as demonstrated below:



855.  Plaintiffs' consulting expert conducted an event study – a widely recognized method for measuring the impact of new information on market prices. Using an appropriate Peer Group and an appropriate Control Period[28] that explicitly adjusts for the changing volatility (standard deviation) in Countrywide's stock price and the market indices during the Relevant Period, Plaintiffs' expert determined that statistically significant corrective disclosure events occurred on July 24, 2007, August 2, 2007, August 14-16, 2007 (mitigated for the rebound through August 21, 2007), October 24, 2007, January 8-9, 2008 (mitigated for the rebound through January 11, 2008), and March 8, 2008, as detailed below.  These stock price drops were the result of the market learning of and reacting to

---

[28]  For each trading day, Plaintiffs' expert constructed a regression using data from the past 120 trading days. This "rolling" estimation period ensures that the relationship between Countrywide's stock and the market factors, as well as the volatility of the stock, updates over time according to the data observed over the most recent 120 trading day (roughly six month) period (the "Control Period").

Defendants' fraudulent practices, and not to Countrywide's financial health generally.  Through these disclosures, the market came to understand that what Defendants previously said was materially false.

### A.    Corrective Disclosures

856.  No later than July 24, 2007, Countrywide and various Officer Defendants were forced to begin partially revealing the truth about matters concerning which Defendants previously had made materially false and misleading statements.  Those matters included Countrywide's lending practices, underwriting standards, financial reporting and accounting practices, lack of financial stability, lack of access to liquidity, and lack of business ethics and integrity.  Additional public revelations of the truth concerning these and other matters critical to Countrywide's business were issued by government agencies, including the FBI, the SEC, various United States Trustees, and a series of state attorneys general; the business media; and participants in the financial markets, including analysts and rating agencies.  As detailed below, the truth only gradually leaked out and was often coupled with further misrepresentations to blunt the disclosures' impact on the value of Countrywide securities.

857.  These revelations related to matters highly material to buyers of Countrywide's publicly traded securities, including Plaintiffs.  Between July 24, 2007 and March 10, 2008, the revelation of the truth concerning such material facts caused Plaintiffs to suffer substantial losses. Each new revelation caused an additional drop in the value of Countrywide's securities and additional losses to Plaintiffs.  Those losses were a direct result of the revelation of the truth about the materially false and misleading statements alleged herein and were dramatically larger, to a statistically significant degree, than any losses Plaintiffs would have sustained due to ordinary market forces.

COMPLAINT

## 1. **July 24, 2007 Partial Corrective Disclosure**

858.   On July 24, 2007, Countrywide filed its Form 8-K and issued a press release announcing its financial results for the second quarter of 2007.   *Reuters* reported that

> the largest U.S. mortgage lender, [Countrywide], posted a 33 percent decline in quarterly profit Tuesday and slashed its 2007 forecast as more homeowners fell behind on payments.   Countrywide set aside $292.9 million for bad loans, up from $61.9 million a year earlier and took a $388 million write-off for prime home equity loans.

Countrywide's quarterly release surprised the market with a series of revelations that partially corrected Defendants' earlier false and misleading statements, and that caused a sharp decline in Countrywide's stock price.   However, Countrywide and certain Officer Defendants, notably Mozilo, dampened the effect of Countrywide's July 24, 2007 partial corrective disclosures by making additional fraudulent statements that day in an effort to bolster the Company's stock price and blunt the impact of the corrective disclosures on the market.

859.   Significant revelations in Countrywide's second quarter release included the disclosure that delinquency rates had jumped sharply in a series of loan categories.   Countrywide disclosed, for example, that for subprime loans serviced by the Company, the delinquency rate in the second quarter had more than doubled to an extraordinary 23%, from just 9% as of March 31, 2007 (the end of the previous quarter).   Similarly, Countrywide disclosed that for "prime" home equity loans (HELOCs) serviced by the Company, the delinquency rate had also more than doubled in the second quarter to 4.5%, from 2.1% as of March 31, 2007.

860.   This report also included dramatic new charges and loan loss provisions, an additional revelation that the quality of Countrywide's loans, especially its "prime" loans, was weaker than had previously been represented. The report disclosed, for example, that Countrywide had reserved $293 million for

loan losses in the quarter, compared to just $61.9 million in comparable loan loss reserves a year earlier.  Countrywide earmarked $181 million of the increased loan loss reserve to "prime" HELOCs in the Company's held-for-investment portfolio. In addition, Countrywide disclosed that it took a $417 million impairment charge largely on retained interests in Countrywide MBS, including a $388 million write-down of residual securities collateralized by prime home equity loans as delinquencies spread to "prime" mortgages.  As a result of these charges and adjustments, Countrywide reported reduced second quarter earnings of 81 cents per share, down from $1.15 per share one year earlier.  It also reduced its earnings forecast for the remainder of the year.

861.   In response, Morgan Stanley analyst Kenneth Posner stated:

credit performance has surfaced as a bigger risk factor than we expected . . . .   The biggest drivers were $400 mm in write-downs for prime home equity residuals and a $246 mm provision in the bank.  Credit quality in the bank deteriorated sharply.

A Credit Suisse report wrote:

[t]he variance to our estimates resulted from continued residual interest impairments and a sizeable reserve build at the bank . . . . Coupled with rising delinquencies and [non-performing assets], these drove a reserve build of $184 million or another $0.19 per share.

An HSBC report titled "Still Profitable, But An Ominous Warning," stated:

We also know that there was probably more real estate speculation going on in the 'prime' space – fueled by easy availability of affordability products – than is imagined.  To that point, management acknowledged that the higher combined loan to value (CLTV) and reduced documentation higher CLTV products – classic speculator products – are accounting for a disproportionate share of credit costs.

COMPLAINT

862.   In a related disclosure during the July 24, 2007 Conference Call, Countrywide revealed for the first time that it had classified loans to borrowers with FICO scores as low as 500 as "prime" – far below the industry norm of requiring a borrow to have a minimum FICO score of 660 in order for a loan to the borrow to be classified as "prime."

863.   In particular, during the July 24, 2007 Conference Call, CRO McMurray claimed that the term "prime" is one that "covers a very vast spectrum," and referred to "a prime loan with FICOs in the low 500s," thereby disclosing that, contrary to industry norms, Countrywide might classify such a loan as "prime" for purposes of its SEC filings, financial reporting, and in other public disclosures.

864.   Later in the same July 24, 2007 Conference Call, McMurray declared that, "[t]here is a belief by many that prime FICOs stop at 620.  That is not the case."  This second, more explicit, remark by McMurray demonstrates that senior Countrywide officials were fully aware that it is a common understanding in the lending industry that loans to borrowers with FICO scores below a certain threshold cannot be classified as "prime" loans.  Nevertheless, Countrywide chose to secretly classify loans made to borrowers with dramatically lower FICO scores as "prime" without disclosing that its internal use of "prime" differed from the industry standard.

865.   In addition, with respect to Countrywide's origination and underwriting standards, and its internal controls, the following was disclosed on the July 24, 2007 Conference Call:

> (a)    As of the end of the second quarter of 2007, 80% of Countrywide's Pay-Option ARM loans, which Defendants persisted during the Relevant Period in referring to as a "prime" product offered mainly to high net worth borrowers, were actually low documentation loans; as McMurray noted at the same conference, "documentation matters.    The less

documentation, the higher the serious delinquency, all else equal";

(b)    Many of the charge-offs and delinquencies "stem from the higher concentration of piggyback financing that we did and that we have in the port[folio] . . . ."; as McMurray also stated at the conference, "leverage at origination matters. More leverage means more serious delinquencies"; and

(c)    Countrywide "made many changes to [its] product offerings, pricing, underwriting guidelines, and processes in order to improve the quality and secondary market execution of our production") (according to Chief Investment Officer Kevin Bartlett), notwithstanding repeated statements during the Relevant Period as to the conservative and careful manner in which the Company handled these matters, in contrast to its competitors, and McMurray said the Company's automated underwriting system needed to be "recalibrated."

866.  Countrywide's 2Q 2007 results disclosed: (a) the falsity of Defendants' prior statements regarding the stringency of Countrywide's loan origination and underwriting standards; (b) the falsity of Countrywide's financial reporting, especially Defendants' representations concerning Countrywide's loan loss reserves and concerning the value of loan-related assets reflected on Countrywide's balance sheet, such as LHI and RIs; and (c) Countrywide's practice of classifying loans made to borrowers with FICO scores ranging down to the low 500s as "prime." Indeed, one analyst concluded from this July 24, 2007 Conference Call that Countrywide management "made serious miscalculations (and possibly misrepresentations) about the quality of the loans added to the bank." Commenting on Countrywide's characterization of "prime" to include FICO scores "well below the bank regulator's definition of subprime, which has a 660 cutoff,"

                      COMPLAINT

an HSBC analyst report on July 24, 2007, added that "we do not believe we are seeing deterioration in the traditional prime customer base, for it simply does not pass a smell test, given the low rate of unemployment and the fact that the housing market is just beginning to deteriorate."  Likewise, as discussed above in ¶¶237-39, both Merrill Lynch and Stifel Nicolaus questioned Countrywide's newly disclosed definition of "prime," including through Merrill Lynch's July 27, 2007 analyst report entitled "**The Kimono comes off; Prime is not what it seems.**"

867.  Countrywide's stock price declined on July 24, 2007, by approximately 10.5%, from $34.06 to $30.50, on volume of 51,251,256 shares – over *four times* the volume of 12,731,891 shares during the prior trading day.  The loss, which was caused by the July 24, 2007 partial corrective disclosure, was materially larger, to a statistically significant extent, than any losses that would have occurred as a result of ordinary market forces.  Indeed, Countrywide stock was the worst performing stock in the S&P 500 Index on July 24, 2007.  By contrast, the S&P 500 fell by just 1.98%.  During intraday trading, Countrywide stock fell as low as $29.50, or 13%, the biggest intraday percentage drop for Countrywide stock since the market crash of October 1987.  The abnormal (company-specific) return for this event as calculated by Plaintiffs' expert using the event study methodology, which controls for market and industry returns, was -5.78%; the abnormal return t-statistic ("t-stat") was -3.66, which indicates statistical significance at well above the 99% confidence level, and the abnormal dollar movement was -$1.83 per share.

868.  Nonetheless, these losses were tempered by additional misrepresentations made by Defendants the same day.  On the July 24, 2007 Conference Call, in which Defendants Mozilo, Sambol, and Sieracki participated, Mozilo stated that the growing mortgage crisis would allow Countrywide to leverage its strong liquidity position.  Mozilo stated in his prepared remarks:

> [W]e believe that the Company is well positioned to capitalize on opportunities during this transitional period in the mortgage business, which we believe will enhance the Company's long-term earnings growth prospects. We expect to leverage the strength of Countrywide's capital liquidity positions . . . to emerge in a superior competitive position coming out of the current housing downcycle.

869. Similarly, on the July 24, 2007 Conference Call, Mozilo commented on Countrywide's strong liquidity position. Specifically, Mozilo stated that Countrywide had excess capital in terms of equity and plenty of sources to get through its current situation:

> [W]e are certainly not going to have any issues funding the Company . . . we have adequate diversified [and] reliable sources of liquidity available . . . we still have plenty of liquidity cushion. . . . So, we have abundant excess capital in terms of equity and we have tremendous[] liquidity sources to fund ourselves through this situation. And we feel very, very comfortable about our liquidity scenario overall.

870. Also on the July 24, 2007 Conference Call, Mozilo responded sharply to a question about his stock sales, asserting that they were made pursuant to a 10b5-1 Plan established "well over a year ago." Later on the same call, Mozilo returned to the question about his Countrywide stock sales and asserted:

> [T]he shares that I have, actual stock I have, I have retained for 39 and a half years. Not sold a share of the initial stock that I got when David and I started this Company – that I got, that I purchased. The only thing that is being sold under the 10b5-1 are options with expiration dates.

871. The statements referenced above during the July 24, 2007 Conference Call were materially false and misleading when made. Specifically, Mozilo's

reassuring statements, including: "we have abundant excess capital in terms of equity"; "we have tremendous[] liquidity sources to fund ourselves through this situation"; and "we have adequate diversified [and] reliable sources of liquidity available"; were false and misleading because Countrywide had serious problems with respect to its liquidity position and liquidity sources, and for the same reasons set forth in Section X.  Moreover, Mozilo's statements regarding his stock sales were false for the same reasons set forth in Section VI.B.

### 2.  <u>August 2, 2007 Partial Corrective Disclosure</u>

872.  Shortly thereafter, during the trading day on August 2, 2007, MBIA, one of nation's oldest and largest monoline insurers, which provides financial guarantee insurance and other forms of credit protection generally on financial obligations sold in the secondary market, announced that delinquencies on Countrywide subprime home loans were increasing.  Specifically, Carl Webb ("Webb"), a managing director and head of real estate and secondary markets at MBIA, said on a conference call that delinquencies for subprime second-lien mortgages and HELOCs serviced by Countrywide were rising, and that three Countrywide MBS offerings insured by MBIA were performing so poorly that they triggered credit enhancement mechanisms, meaning the deals were performing worse than expected.  When asked if MBIA's Countrywide deals were performing as expected, Webb responded by saying:

> We have seen increased delinquency in both the closed end seconds and HELOC pools.  Either excess spread trigger or linkages have tripped on three transactions.  We're closely monitoring the portfolio and we're in constant contact with Countrywide.

The August 2, 2007 disclosure served as a partial corrective disclosure with regard to Countrywide's false and misleading representations about the quality of its loan origination and underwriting standards.

873.  In response, on August 2, 2007, Morgan Stanley reported that "the near shut-down in mortgage securitization markets pose serious implications for the [Countrywide]."

874.  As a result of the August 2, 2007 partial corrective disclosure, Countrywide common stock declined following the disclosure by approximately 1.65% on heavy volume to close at $26.77 on August 2.  This loss, which was caused by the August 2, 2007 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses that would have occurred as a result of ordinary market forces.  By contrast, on August 2, 2007, the S&P 500 rose by 0.46%.  The abnormal return for this event as calculated by Plaintiffs' expert using the event study methodology, was -3.60%; the abnormal return t-stat was -2.15, which indicates statistical significance at above the 95% confidence level, and the abnormal dollar movement was -$0.91 per share.

875.  Nonetheless, these losses were tempered by additional misrepresentations and omissions by Defendants made on the same day.  Specifically, on August 2, 2007, Countrywide and Sieracki made a series of additional fraudulent statements in a further effort to deceive the investing public about Countrywide's liquidity and its net worth.  A Countrywide press release that day entitled "Countrywide Comments on Its Strong Funding Liquidity and Financial Condition" asserted that:

> Countrywide has longstanding and time-tested funding liquidity contingency planning," said Eric P. Sieracki, Chief Financial Officer.  "These planning protocols were designed to encompass a wide variety of conditions, including recent secondary market volatility.  Our liquidity planning proved highly effective earlier during 2007 when market concerns first arose about subprime lending, and remains so today.  We place major emphasis on the adequacy, reliability and diversity of our funding sources. . . .

COMPLAINT

Sieracki continued, "Our mortgage company has significant short-term funding liquidity cushions and is supplemented by the ample liquidity sources of our bank."

This statement was false and misleading for the reasons alleged in Section IX.

876.   In addition, the August 2, 2007 press release contained a false and misleading statement about Countrywide's net worth.   Specifically, quoting Sieracki, the press release stated that "Countrywide's financial condition remains strong, as evidenced by over $14 billion of net worth . . . ."   However, this "$14 billion" net worth figure was materially inflated for the reasons stated in Section VIII.A.   In stark contrast to what Sieracki told the investigating public on August 2, 2007, Countrywide senior executives knew the financial condition of the Company was much more serious.   For example, Mozilo told the FCIC, *"When we talk about [August 2] at Countrywide, that's our 9/11,"* he said.   "We worked seven days a week trying to figure this thing out and trying to work with the banks . . . . Our repurchase lines were coming due billions and billions of dollars."

877.   One week later, after the stock market closed on August 9, 2007, Countrywide filed with the SEC the Company's Form 10-Q quarterly report for the quarter ended June 30, 2007 ("2Q 2007 10-Q"), signed by Sambol and Sieracki. The 2Q 2007 10-Q noted the existence of "unprecedented market conditions" bearing on "Countrywide's liquidity," and by further noting that "[w]hile we believe we have adequate funding liquidity, the situation is rapidly evolving and the impact on the Company is unknown."   The Company also stated that its impairment of the fair value of its retained interests equaled $268,117,000.

878.   The 2Q 2007 10-Q contained several additional misrepresentations and omissions as follows.

879.   In the "Off-Balance Sheet Arrangements and Guarantees" section, Countrywide described the R&W exposure associated with the securitization of its loans as follows:   "We do not believe that any of our off-balance sheet

arrangements have had, or are reasonably likely to have, a current or future material effect on our financial condition, results of operations, liquidity, capital expenditures or capital resources."

880.   In a section titled "Financial Statements," the Company reported that the fair value of its MSRs for the quarter was $20,087,368,000.

881.   The Company also reported an allowance for loan losses of $512,904,000 as of the end of the quarter, having increased its provision for loan losses by $292,924,000 during the quarter, with net charge-offs of $154,387,000.

882.   The Company also claimed, again, in the 2Q 2007 10-Q that it had adequate funding liquidity to accommodate marketplace changes:

> We believe we have adequate funding liquidity to accommodate these marketplace changes in the near term . . . . We also believe that the challenges facing the industry should ultimately benefit Countrywide as the mortgage lending industry contuse to consolidate.

883.   Also, in the section titled "Controls and Procedures," Countrywide described the adequacy of its internal controls:

> There has been no change in our internal control over financial reporting during the quarter ended June 30, 2007 that was materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

884.   Further assuring investors of the veracity of the information contained in the 2Q 2007 10-Q, the report included a Sarbanes-Oxley Act certification signed by Defendants Mozilo and Sieracki representing that the "report does not contain any untrue statement of a material fact" and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide.

885.   The statements referenced above from Countrywide's 2Q 2007 10-Q were materially false and misleading when made because the Company overstated

the fair value of its RIs, LHI and MSR, understated ALL, understated liabilities related to R&Ws, and overstated net earnings and total shareholders' equity. Countrywide's statement that "[w]e believe we have adequate funding liquidity to accommodate these marketplace changes in the near term," its statements relating to its internal controls, and the Sarbanes-Oxley Act certifications, were false and misleading because Countrywide was not well-positioned with respect to its liquidity sources, the financial statements issued by Countrywide were materially misstated and violated GAAP and its internal controls were ineffective, and for the same reasons set forth in Sections X. and VIII.A.

886. Several analysts either raised or maintained their high recommendations and earnings estimates for Countrywide as a result of Defendants' reassuring misrepresentations. For example, on August 2, 2007, Morgan Stanley maintained an "Overweight" rating on Countrywide stock. Analysts reported "[w]ith capital markets volatility raising questions about the liquidity of securitization markets, the key issue in the short term for Countrywide is liquidity. We don't see any near-term liquidity challenges for the company . . ."

### 3. **August 14-16, 2007 Partial Corrective Disclosure**

887. On August 14, 2007, before the market opened, Countrywide issued a press release and filed a Form 8-K releasing its monthly operational data for July 2007. In this report, Countrywide disclosed that it was lending less but facing increased levels of foreclosures and homeowner delinquencies not seen in several years. For example, it disclosed that "tighter" underwriting caused monthly production to decline 14% – from June's $45.26 billion to July's $39.06 billion, and nonprime loans, including "subprime," were $1.8 billion, down 46 percent from a year earlier and down 3 percent from June. Defendant Sambol explained "Our tighter lending guidelines [have] significantly curtailed total production." The Company further disclosed that by the end of July 2007, its rate of delinquency as a percentage of unpaid principal balance had increased by

approximately 35% to 4.89%, compared to a 3.61% rate as of July 31, 2006. Countrywide also disclosed that, similarly, by the end of July 2007, its rate of pending foreclosures as a percentage of unpaid principal balance had more than doubled to 1.04%, compared to 0.46% as of July 31, 2006.

888.   In response, analysts and news reporters reflected the effects on Countrywide from the news about the increased riskiness of its loans and the tightening of its underwriting standards.  An August 14, 2007, a JP Morgan report commented on Countrywide and how its

> [p]ending foreclosures rose to 0.79% of loans serviced from 0.74% last month and 0.48% a year ago.  This is the highest level in the 14 years of monthly data we have back to 1993.  CFC generally does not have much credit recourse on these loans, but the cost of servicing is likely to increase.

Later, in the same JP Morgan report, the analyst commented on the overall Countrywide sentiment:

> S&P affirmed its ratings on CFC's ABCP conduits . . . which should provide some comfort to investors.  However, the markets remain very volatile, and we expect concerns over CFC's access to financing to remain a near-term overhang over the stock. . . .  Pipeline and applications fell, as they should have . . . CFC inexplicably grew headcount in July.

And an August 14, 2007 *Bloomberg* article wrote:

> Countrywide . . . led shares of home lenders lower on concern bankers will cut off cash as foreclosures and overdue payments surge nationwide . . . .  Concern about rising defaults has prompted bankers to reduce credit lines for home lenders.  Countrywide . . . said delinquencies rose for a fifth straight month.

And finally, an August 15, 2007 *Los Angeles Times* article about the July operating report commented:  "[i]n a grim report that helped send mortgage stocks reeling,

No. 1 home lender Countrywide Financial Corp. said Tuesday that foreclosures and delinquencies jumped in July to the highest levels in more than five years."

889.   Countrywide's August 14, 2007 disclosure of unexpectedly high rates of delinquencies and foreclosures, and lower monthly production from tighter underwriting, partially corrected Countrywide's prior misrepresentations about the quality of its loan origination and underwriting standards and served as a partial corrective disclosure with respect to aspects of Countrywide's financial reporting, including Countrywide's loan loss reserves and its reported assets.  For example, the "tighter" standards which caused the production decline were actually the standards that Countrywide had represented it was employing throughout the entire Relevant Period.  It also partially disclosed the falsity of Countrywide's prior misstatements that Countrywide's business was sound; that Countrywide was well-positioned to withstand the downturn in the housing market; and that Countrywide was poised to capture market share from weaker competitors.

890.   Countrywide's stock closed down on August 14, 2007, by 8.08%, from $26.61 to $24.46, on high volume of almost 36 million shares.  This loss, which was caused by the August 14, 2007 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses that would have occurred as a result of ordinary market forces.   By contrast, on August 14, 2007, the S&P 500 fell by just 1.8%.  The abnormal return for this event as calculated by Plaintiffs' expert using the event study methodology, was -5.84% after controlling for market and industry forces; the abnormal return t-stat was -3.53 which indicates statistical significance well above the 99% confidence level, and the abnormal dollar movement was -$1.46 per share.

891.  On August 15, 2007, Merrill Lynch surprised the markets by downgrading Countrywide from "buy" to "sell" based on serious perceived liquidity problems and bankruptcy concerns.  The report explained its reasons for the downgrade as follows:

concerns that liquidity in the mortgage sector could further erode the value of CFC's franchise.  We fear that the acceleration of margin calls and forced asset sales in the capital markets could lead to more problems for CFC to finance its mortgage operations.  Should a liquidity event occur, for which the likelihood is increasing, CFC shares would probably witness further selling pressure. . . .  The market is concerned that CFC could have difficulty with its credit facilities, which are critical to it operating in the near-term.  CFC currently has about $185B in available credit facilities, though the concern is that these facilities could be terminated or the terms changed meaningfully, thus impacting CFC's ability to operate normally.

892.  *Reuters* reported that "shares of Countrywide Financial dropped 6 percent to $23 before the bell on Wednesday" after *MarketWatch* reported that Merrill Lynch had downgraded its rating on the largest U.S. mortgage lender to "sell" from "buy."'

893.  An August 17, 2007 *The Wall Street Journal* article also summarized the impact of the August 15 Merrill Lynch analyst report on Countrywide's stock:

When Merrill Lynch & Co. analyst Kenneth Bruce put a surprise "sell" rating on Countrywide Financial Corp. this week, the stock fell 13%.  Many on Wall Street clearly felt he knew what he was talking about:  He used to work at the troubled mortgage lender.

Mr. Bruce, 40, follows mortgage companies in Merrill's San Francisco office.  But for 13 years before his arrival on Wall Street, he worked in the mortgage business in different capacities.  One of them was a two-year stint working for Countrywide's home-loans division in Pasadena, California.  His boss there was David Sambol, who is

now the firm's president and heir apparent to its embattled chief executive, Angelo Mozilo.

Mr. Bruce's Wednesday report, entitled "Liquidity is the Achilles Heel" came just two days after he had reiterated his longstanding "buy" rating on the company. Pointing out that "funding markets are deteriorating quickly," he suggested that Countrywide may even face bankruptcy. "Our view has changed, materially," he wrote on the first page of the report.

894. The August 15, 2007 Merrill Lynch analyst report further partially corrected Defendants' false statements that Countrywide was financially sound; that Countrywide was well-positioned to weather the downturn in the housing market; that Countrywide was poised to grow during the downturn and to capture market share from weaker competitors; and that Countrywide had secure access to ample sources of liquidity.

895. Countrywide common stock fell by approximately 13% that day, from $24.46 to $21.29, on volume of 118,552,432 shares – over three times the trading volume of 35,850,848 during the prior trading day. This loss, which was caused by the August 15, 2007 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses that would have occurred as a result of ordinary market forces. By contrast, on August 15, 2007, the S&P 500 fell by just 1.36%. The abnormal return for this event as calculated by Plaintiffs' expert using the event study methodology, was -10.89%, after controlling for market and industry forces; the abnormal return t-stat was -6.56, which indicates statistical significance at well above the 99% confidence level, and the abnormal dollar movement was -$2.50 per share.

896. Before the market opened on the next day, August 16, 2007, Countrywide announced that it drew its entire $11.5 billion credit facility to boost its cash position and said it would shift its mortgage lending business into its bank

unit.   As reported by DJ Corporate Filings Alert, these were "moves that acknowledge the sharp funding pressure on the largest U.S. mortgage lender."  As a result, all three major credit rating agencies – Standard & Poor's ("S&P"), Moody's Investors Service ("Moody's"), and Fitch Ratings ("Fitch") – issued downgrades with respect to Countrywide securities.  Moody's sharply downgraded Countrywide and CHL's senior debt rating to Baa3 from A3, just one notch above junk grade.   Fitch sharply downgraded Countrywide's long-term issuer default rating two notches to BBB+ from A, just two notches above junk grade, and also downgraded Countrywide's CCIV and CCV preferred securities to BBB- from A-.   S&P downgraded Countrywide to A- from A.

897.   An August 16, 2007 *Dow Jones Newswire* article quoted David Sylvester, an executive Vice President in San Francisco-based Wells Capital Management, on Countrywide's inability to receive cheaper funding who wrote:  "I don't think Countrywide can access the unsecured commercial paper market."  In addition, an August 16, 2007 Fox-Pitt Kelton report commented on Countrywide steps to protect its liquidity, however, it wrote:  "We are cutting our 2007 estimate to $2.10 from $2.55 and our 2008 estimate to $2.25 from $3.21 to take into account higher funding costs, lower gain-on-sale margins and a decline in non-agency conforming production."

898.   Countrywide's decision to access its $11.5 billion credit facility and the rating agency downgrades partially disclosed the falsity of Defendants' false and misleading statements, including with respect to:  the soundness and stability of Countrywide's business and finances; Countrywide's ability to weather the downturn in the housing market; Countrywide's ability to thrive and gain market share from weaker competitors during the housing market downturn; Countrywide's access to liquidity; and the poor inherent quality of the loan portfolio that formed the core of Countrywide's business.

899.   Countrywide's stock declined by approximately 11% on August 16, 2007, from $21.29 to $18.95, on extraordinary volume of 201,476,816 shares.  This loss, which was caused by the August 16, 2007 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses that would have occurred as a result of ordinary market forces.  By contrast, on August 16, 2007, the S&P 500 rose by 0.33%.  The abnormal return for this event as calculated by Plaintiffs' expert using the event study methodology, was -19.58%, after controlling for market and industry forces; the abnormal return t-stat was -11.74, which indicates statistical significance at well above the 99% confidence level, and the abnormal dollar movement was -$3.90 per share.

900.   One week later, on August 23, 2007, before the stock market opened, the media reported that Bank of America had announced a $2 billion investment in Countrywide.  In return for its investment, Bank of America received a non-voting convertible Countrywide preferred security yielding 7.25% annually and convertible to common stock at $18 per share.  Later, on January 11, 2008, as further discussed below, Bank of America announced that it was acquiring Countrywide in a stock-for-stock merger, in which Countrywide shareholders would receive 0.1822 shares of Bank of America stock for every share of Countrywide stock.

901.   Largely in response to the $2 billion Bank of America preferred security purchase announced on August 23, 2007, as well as the misrepresentations by Mozilo alleged below concerning the transaction and other material matters, Countrywide's stock price rose approximately 1% on August 23, 2007.

902.   In an August 23, 2007 article in *The Wall Street Journal,* Defendant Mozilo was quoted as saying that "Countrywide would have survived without help from Bank of America. . . ."

903.   That same day, August 23, 2007, Mozilo was again interviewed on CNBC by Maria Bartiromo.   During the interview, Mozilo falsely assured the marketplace that the Company was not at risk of suffering a bankruptcy:

> Well, first of all let me comment [on a] couple of things.   One is the, just the irresponsible behavior on part of that analyst from Merrill Lynch to, yell fire in a very crowded theater in [an] environment where you had panic already setting in the overall markets unrelated to Countrywide. Was totally irresponsible and baseless. . . .   Has no basis whatsoever.
>
> ***
>
> I can tell you there is no more chance for bankruptcy today for Countrywide than it was six months ago, two years ago, when the stock was $45 a share.  [We] are a very solid company.

904.   Moreover, Mozilo stated in an October 5, 2007 press release, that his stock sales were out of his hands and in line with investors' interests:

> The upcoming sales are driven by rules within the 10b5-1 plan that were established long ago, and should in no way be viewed as any indication of my future outlook for Countrywide. . . .   As one of Countrywide's largest individual shareholders, my interests are firmly aligned with those of our other investors.

905.   Also on August 23, 2007, Mozilo was interviewed by Neil Cavuto of Fox News.   Mozilo responded to a question regarding Countrywide's lending practices:

> We're lending the money.  It would be too foolhardy for us to lend money to someone, A, by duping them, and, secondly, to think that we wouldn't be paid back.  We never make a loan where we think that we're creating a situation where we couldn't be paid back.  We try to underwrite these loans prudently.

906. Mozilo's statements referenced above were materially false and misleading when made.   Specifically, Mozilo's reassuring statements that "Countrywide would have survived without help from Bank of America" and that the Company had "no more chance for bankruptcy today . . . than it was six months ago," and his statements that his "interest[s] are firmly aligned with those of our other investors" were false and misleading for the reasons set forth above in Section X.

907. Analysts still maintained their faith in the Company in reliance on management's false and misleading statements.  For example, on August 23, 2007, analysts at Piper Jaffray rated Countrywide's shares "Outperform."  Several other analysts also raised or maintained their high recommendations and earnings estimates for Countrywide as a result of Countrywide's fraudulent misrepresentations:

- On August 23, 2007, Citigroup rates Countrywide's stock a "Buy." Analysts stated that the Bank of America $2 billion infusion "should enable CFC to continue to play a leadership role during the U.S. mortgage market's return of normalcy."

- On August 23, 2007, Credit Suisse rated Countrywide's shares "Outperform."

908. The next day, on Wednesday August 24, 2007, Fitch downgraded Countrywide Home Loans, Inc.'s servicer ratings with respect to a series of loan categories and placed the ratings on "Rating Watch Evolving" status – a signal that the ratings could be cut again.  In its press release announcing the downgrades, Fitch noted "the continued pressure on CHL's liquidity position and financial flexibility" as well as "delinquency" challenges.

909. Fitch's downgrade constituted an additional partial corrective disclosure concerning prior false and misleading statements by Defendants with respect to Countrywide's access to liquidity, Countrywide's lax loan origination

COMPLAINT

and underwriting standards, the soundness and stability of Countrywide's business and finances, Countrywide's ability to weather the downturn in the housing market, and Countrywide's ability to thrive and gain marketshare from weaker competitors during the housing market downturn.

### 4.   October 24, 2007 Partial Corrective Disclosure

910.   Thereafter, on that same day, before the markets opened, *The Wall Street Journal* reported that Countrywide Pay-Option ARM loans that were classified as "prime" when they were originated are now "going bad at a rapid pace" and that the deteriorating performance is evidence of "lax underwriting."

911.   The *WSJ's* October 24 story began by explaining that:

Subprime mortgages aren't the only challenge facing Countrywide Financial Corp., the nation's biggest home-mortgage lender.   Some loans classified as prime when they were originated are now going bad at a rapid pace.

912.   The *WSJ* further revealed that, based on the analysis by UBS AG, losses ran above industry averages, including for "prime" loans:

An analysis prepared for *The Wall Street Journal* by UBS AG shows that 3.55% of option ARMs originated by Countrywide in 2006 and packaged into securities sold to investors are at least 60 days past due. That compares with an average option-ARM delinquency rate of 2.56% for the industry as a whole and is the highest of six companies analyzed by UBS.

913.   The *WSJ* also noted that:

Among option ARMs held in its own portfolio, 5.7% were at least 30 days past due as of June 30, the measure Countrywide uses.   That's up from 1.6% a year earlier.   Countrywide held $27.8 billion of option ARMs as of June 30, accounting for about 41% of the loans held as

investments by its savings bank.  An additional $122 billion have been packaged into securities sold to investors, according to UBS.

914.   The *WSJ* declared that "the deteriorating performance of option ARMs is evidence that lax underwriting that led to problems in subprime loans is showing up in the prime market, where defaults typically are minimal."   In addition, the *WSJ* quoted UBS analyst Shumin Li, who stated that "at Countrywide 'they were giving these loans to riskier and riskier borrowers.'"

915.   This article partially corrected prior materially false and misleading statements, including Countrywide's and Mozilo's repeated representations that Countrywide maintained conservative loan origination and underwriting standards, that Countrywide was well-positioned to endure the housing industry downturn, and that Countrywide would thrive during the downturn by capturing marketshare from weaker competitors.

916.   Also, on October 24, 2007, Countrywide's stock price fell by 8.1%, from $15.05 to $13.83 on volume of 66,182,840 shares, as compared to 29,945,110 shares the prior trading day.  This loss, which was caused by the October 24, 2007 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses that would have occurred as a result of ordinary market forces.  The same day, the S&P 500 fell only 0.24%.  The abnormal return for this event as calculated by Plaintiffs' expert using the event study methodology, was -6.32%, after controlling for market and industry forces; the abnormal return t-stat was -2.63, which indicates statistical significance at above a 95% confidence level, and the abnormal dollar movement was -$0.89 per share.

917.   On November 9, 2007, Countrywide filed its Form 10-Q report for the third quarter of 2007, ended September 30, 2007 ("3Q 2007 10-Q").   In the 3Q 2007 10-Q, which Defendants Sambol and Sieracki signed, Countrywide once again stated that during the industry downturn, "[w]e also believe that many opportunities will present themselves to the Company as a result of the market

transition taking place, and that Countrywide is well positioned to capitalize on these opportunities."

918.   In a section titled "Valuation of MSRs and Other Retained Interests," the Company reported that the fair value of the retained interests on its balance sheet as of September 30, 2007, was $2,463,528,000.  The impairment taken on the fair value of its retained interests equaled $716,658,000.

919.   In the "Off-Balance Sheet Arrangements and Guarantees" section, Countrywide described the representations and warranties exposure associated with the securitization of its loans as follows:  "We do not believe that any of our off-balance sheet arrangements have had, or are reasonably likely to have, a current or future material effect on our financial condition, result of operations, liquidity, capital expenditures or capital resources."

920.   In a section titled "Credit Risk Management," the Company also stated the liabilities associated with the risk of representation and warranties as "totaling $639,647,000."

921.   In a section titled "Securitizations," the Company reported that the fair value of MSRs as of September 30, 2007, was $20,068,153,000.

922.   Also, in the section titled "Controls and Procedures," Countrywide described the adequacy of its internal controls:

> There has been no change in our internal control over financial reporting, other than discussed above, during the quarter ended September 30, 2007 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

923.   Further assuring investors of the truthfulness of the information contained in the 3Q 2007 10-Q, the report included a Sarbanes-Oxley Act certification signed by Defendants Mozilo and Sieracki, representing that the "report does not contain any untrue statement of a material fact" and "the financial

statements, and other financial information included in this report, fairly present in all material respects the financial condition" of Countrywide.

924.   The statements referenced above in the 3Q 2007 10-Q were materially false and misleading when made.   Countrywide's statement that it "is well positioned to capitalize on . . . opportunities"; statement in the 3Q 2007 10-Q relating to the value of its retained interests and  MSRs; statements relating to its representations and warranties; statements relating to internal controls; and the Sarbanes-Oxley Act certifications signed by Defendants Mozilo and Sieracki, were false and misleading because (1) Countrywide had serious problems with respect to its liquidity position, (2) Countrywide overstated the fair value of its RIs and MSRs, and understated liabilities related to R&Ws, and (3) the financial statements issued by Countrywide were materially misstated and violated GAAP, and its internal controls were ineffective, and for the same reasons stated in Sections X. and VIII.A. above.

925.   Thereafter, on December 13, 2007, before the market opened, Countrywide issued a press release and filed a Form 8-K releasing its November 2007 operational data.  In this monthly operating report, Countrywide disclosed a further deterioration in its delinquency and foreclosure rates.   Among other matters, for example, Countrywide disclosed that, as of November 30, 2007, its rate of delinquency as a percentage of loans serviced had increased to 6.34%.

926.   In addition, also on December 13, 2007, a *New York Times* article reported that "[t]he Illinois attorney general is investigating the home loan unit of Countrywide Financial as part of the state's expanding inquiry into dubious lending practices that have trapped borrowers in high-cost mortgages they can no longer afford."   The *Times* further noted that "Lisa Madigan, the attorney general, has subpoenaed documents from Countrywide relating to its loan origination practices."   In addition, among other matters, the *Times* quoted Illinois Attorney General Madigan as saying about "a Chicago mortgage broker," for which

Countrywide was the primary lender, that "[t]his company's conduct is a prime example of unscrupulous mortgage brokers that has led to a foreclosure crisis for many Illinois homeowners."

927.   Also on December 13, 2007, Fitch Investment Research announced that it was downgrading 110 classes of residential mortgage-backed securities from 28 Countrywide transactions.

### 5.   January 8-9, 2008 Partial Corrective Disclosure

928.   Three weeks later, before the markets opened on January 8, 2008, *The New York Times* published an article that reported that Countrywide fabricated documents related to the bankruptcy case of a Pennsylvania homeowner, court records show, raising new questions about the business practices of the giant mortgage lender at the center of the subprime mess.  The *Times* noted that the fabricated documents, which it described as "three letters from Countrywide addressed to . . . [a] homeowner," were written in connection with "one of 300 bankruptcy cases in which Countrywide's practices have come under scrutiny in western Pennsylvania."   The *Times* quoted United States Bankruptcy Judge Thomas P. Agresti, who presides over the case in connection with which the letters were written as saying that "[t]hese letters are a smoking gun that something is not right in Denmark."

929.   Similarly, on January 8, 2008, *Bloomberg* published an article that reported that Countrywide "was ordered to provide documents and testimony to federal officials probing possible false mortgage claims against bankrupt Florida homeowners."  The *Bloomberg* article reported that this was "second such case in Florida and part of a national probe . . . in at least three other states" probing whether Countrywide and others were making false claims against bankrupt homeowners or using questionable proof to make them pay.

930.   On January 8, 2008, concerns that Countrywide would need to file bankruptcy increased due to Countrywide's need for cash to continue operating its

mortgage business, and Countrywide reported rising foreclosures and delinquencies – resulting in the halting of trading in Countrywide stock in order for Countrywide to respond.  As reported by *Bloomberg*, "Countrywide shares dropped 28 percent today, the most since October 1987 on the New York Stock Exchange as investors speculated that a cash shortage and a declining lending business would force the company to seek court protection."

931.   Countrywide stock plummeted by approximately 28.4% that day, from $7.64 to $5.47, on volume of 178,828,816 shares – over four times the trading volume of 38,088,772 shares during the prior trading day.  This loss, which was caused by the January 8, 2008 disclosures, was dramatically larger, to a statistically significant extent, than any losses that would have occurred as a result of ordinary market forces.  By contrast, on January 8, 2008, the S&P 500 fell by just 1.80%.  The abnormal return for this event as calculated by Plaintiffs' expert using the event study methodology, was -20.22%, after controlling for market and industry factors; the abnormal return t-stat was -4.43, which indicates statistical significance at well above the 99% confidence level, and the abnormal dollar movement was -$1.46 per share.

932.  Nonetheless, these losses were tempered by additional misrepresentations by Defendants made on the same day.  On January 8, 2008, *Reuters* reported in an article titled "Countrywide Rejects Bankruptcy Rumor" that Countrywide had stated that "[t]here is no substance to the rumor that Countrywide is planning to file for bankruptcy, and we are not aware of any basis for the rumor that any of the major rating agencies are contemplating negative action relative to the company."

933.  The Company's statement on January 8, 2008, was false and misleading for the same reasons set forth in Section X. above.

934.  The next day, on January 9, 2008, before the market opened, Countrywide disclosed that foreclosures and late payments rose to the highest level

on record. Specifically, it issued a press release and filed a Form 8-K releasing its operational data for December 2007. In this monthly operating report, Countrywide disclosed that by December 31, 2007, its rate of pending foreclosures as a percentage of unpaid principal balance had more than doubled to 1.44%, compared to 0.70% as of December 31, 2006. Similarly, Countrywide also disclosed that by December 31, 2007, its rate of delinquency as a percentage of unpaid principal balance had increased by more than 50% to 7.20%, compared to 4.6% as of December 31, 2006.

935. As a *Reuters* article published after the markets closed on January 9, 2008 explained, the rates of foreclosures and delinquencies that Countrywide disclosed in its December monthly operating report were "the highest on record, sending its shares tumbling . . . to their lowest in nearly 13 years." As *Reuters* noted, "[a]nalysts attributed Wednesday's drop to deteriorating credit quality reflected in Countrywide's monthly operating report, and renewed concern the lender might not survive the housing crunch and could seek bankruptcy protection." *Reuters* quoted Lehman Brothers analyst Bruce Harting's statement that "[t]he extent of the deterioration is a surprise and does not bode well for the fourth-quarter results of companies with mortgage credit exposure that may have to further add to reserves."

936. Countrywide's January 8 and January 9, 2008 revelations partially revealed the falsity of Countrywide's representations about the quality of its loan origination and underwriting standards, Countrywide's financial reporting, including its loan loss reserves and its reported assets, and Countrywide's false statements on October 26, 2007, about the likelihood that Countrywide would return to profitability in the fourth quarter of 2007 and in 2008.

937. Countrywide's stock dropped on January 9, 2008, by approximately 6.4%, from $5.47 to $5.12, on heavy volume of 164,158,592 shares. This loss, which was caused by the January 8-9, 2008 partial corrective disclosures, was

dramatically larger, to a statistically significant extent, than any losses that would have occurred as a result of ordinary market forces.  By contrast, on January 9, 2008, the S&P 500 rose by 1.37%.  The abnormal return for this event as calculated by Plaintiffs' expert using the event study methodology, was -9.17%, after controlling for market and industry forces; the abnormal return t-stat was -2.00, which indicates statistical significance at the 95% confidence level; and the abnormal dollar movement was -$0.47 per share.

938.   At the end of the trading day on January 9, 2008, Moody's cut Countrywide Alt-A mortgage loan deals, causing Countrywide's securities prices to fall further.  The next day, January 10, however, Countrywide stock rose by approximately 51.4% to close at $7.75 after *The Wall Street Journal* first reported at 2:15 p.m. that Bank of America was "in advanced talks to acquire . . . Countrywide."

939.   The next day, before the securities markets opened on Friday, January 11, 2008, "Bank of America Corporation . . . announced a definitive agreement to purchase Countrywide Financial Corp. in an all-stock transaction worth approximately $4 billion."  Specifically, Bank of America agreed to offer 0.1822 shares of its stock to Countrywide shareholders for every Countrywide share.

940.   After Bank of America disclosed the terms of the purchase on Friday, January 11, however, Countrywide's stock price slumped back down to close at $6.33, giving up the majority of its gain the day before.

941.   The approximately $4 billion that Bank of America announced on January 11 that it was paying for Countrywide represented only about 27% of Countrywide's most recently reported book value of approximately $15.3 billion, which was reported as of September 30, 2007.

942.   A January 11, 2008 report by Wachovia Capital Markets commented: The purchase price of roughly $4B is well below the most recently reported equity capital base of $15B. We believe that BAC [Bank of

America Corporation] will use the difference (negative goodwill) to write down a large percentage of CFC's assets. Candidates include residual securities, the $84B held for investment portfolio (mostly option ARMs and high LTV prime home equity loans) and the $31B held for sale portfolio, which includes a large portfolio of subprime loans.

943. Countrywide's stock price declined on January 11, 2008, by approximately 18.3%, from $7.75 to $6.33, on heavy volume of 234,155,264 shares.

### 6.   <u>March 8, 2008 Partial Corrective Disclosure</u>

944. On Saturday, March 8, 2008, *The Wall Street Journal* reported that the FBI is probing Countrywide over possible securities fraud, including misrepresentations regarding its financial condition and the quality of its loans in securities filings. It further disclosed that ***"[t]he inquiry involves whether company officials made misrepresentations about the Company's financial position and the quality of its mortgage loans in securities filings,*** four people with knowledge of the matter said." The *WSJ* also noted that "Countrywide issued more than $100 billion in mortgage-backed securities between 2004 and 2007" and that "[m]ore than two dozen Wall Street firms helped construct those deals, making it possible that some of them will also face law-enforcement scrutiny." The *WSJ* also reported that:

> Federal investigators are looking at evidence that may indicate widespread fraud in the origination of Countrywide mortgages, said one person with knowledge of the inquiry. If borne out, that could raise questions about whether company executives knew about the prospect that Countrywide's mortgage securities would suffer many more defaults than predicted in offering documents. Another potential issue facing the company is whether it has been candid in its

accounting for losses.   People familiar with the matter said that Countrywide's losses may be several times greater than it has disclosed.

945.   The *WSJ's* March 8, 2008 story further disclosed the falsity of Defendants' prior statements and omissions in Countrywide's financial statements and related SEC filings, including, but not limited to, representations concerning Countrywide's loan loss reserves, earnings, and assets.   In addition, the March 8 *WSJ* story further disclosed the falsity of Defendants' prior false and misleading statements and omissions about Countrywide's institutional stability and its ability to weather the housing crisis and to capture market share at the expense of purportedly weaker competitors.   The story further disclosed the falsity of Defendants' prior false and misleading statements about the quality of Countrywide's loan origination and underwriting standards.

946.   On Monday, March 10, 2008, the first day that the securities markets were open following the publication of the *WSJ's* March 8 story, Countrywide stock declined by approximately 14%, from $5.07 to close at $4.36 – its lowest level since April 1995 – on volume exceeding 35 million shares.   This loss, which was caused by the March 8, 2008 partial corrective disclosure, was dramatically larger, to a statistically significant extent, than any losses that would have occurred as a result of ordinary market forces.   By contrast, on March 10, 2008, the S&P 500 fell by just 1.54%.   The abnormal return for this event as calculated by Plaintiffs' expert using the event study methodology, was -11.22%, after controlling for market and industry forces; the abnormal return t-stat was -2.50, which indicates statistical significance well above the 95% confidence level; and the abnormal dollar movement was -$0.55 per share.

## XII.   DEFENDANTS' CONDUCT CAUSED PLAINTIFFS' LOSS

947.   Throughout the Relevant Period, as detailed above, the prices of the Company's securities were artificially inflated as a direct result of Defendants'

misrepresentations and omissions regarding the Company. When the truth about the Company was partially revealed to the market beginning July 24, 2007, and continuing throughout the Relevant Period, the inflation that had been caused by Defendants' misrepresentations and omissions was eliminated from the price of the Company's securities, causing significant damages to Plaintiffs.

948. The Company's false statements and omissions regarding its lending practices, underwriting standards, financial reporting and accounting practices, financial stability, access to liquidity and business ethics and integrity used by Defendants to paint a false picture of Countrywide, were material information to Plaintiffs. Had the truth been disclosed to the market at or before the Relevant Period, Plaintiffs would have been unwilling to purchase the Company's securities at the prices then being offered in the market.

949. No later than July 24, 2007, Countrywide and various Officer Defendants finally began to partially reveal the truth about matters concerning which Countrywide and the Officer Defendants had made materially false and misleading statements and omissions. Those matters included Countrywide's lending practices, underwriting standards, financial reporting and accounting practices, lack of financial stability, lack of access to liquidity, and lack of business ethics and integrity. Additional public revelations of the truth concerning these and other matters critical to Countrywide's business were issued by government agencies, including the FBI, the SEC, various United States Trustees, and a series of state Attorneys General; the business media; and participants in the financial markets, including analysts and rating agencies.

950. These revelations related to matters highly material to buyers of Countrywide's publicly traded securities. Between July 24, 2007, and March 10, 2008, the revelation of the truth concerning such material facts caused Plaintiffs to suffer substantial losses. Each new revelation caused an additional drop in the value of Countrywide's securities and additional losses to Plaintiffs.

Those losses were a direct result of the revelation of the truth about the materially false and misleading statements alleged herein and were dramatically larger, to a statistically significant degree, than any losses Plaintiffs would have sustained due to ordinary market forces.

951.   As alleged herein, throughout the Relevant Period, investors faced substantially greater risks than disclosed by Defendants.  In particular, Defendants misled investors with regards to the quality of Countrywide's loans and loan origination process and as a result disguised that the riskiness of Countrywide's operations had increased so dramatically, that even an initial mild downturn in the economy and/or housing prices would imperil the liquidity and survival of the Company to a degree that was beyond what could have been predicted from publicly available information.  This undisclosed excess risk materialized in the form of Company-specific announcements of surprisingly poor performance of Countrywide's loans and the evaporation of demand for Countrywide's loans in the secondary market.  These events are the economically foreseeable consequences of the type of excessive risk-taking in which Defendants engaged as alleged herein.

952.   The risk of a credit crisis to Countrywide's business was within the zone of risks about which Countrywide defrauded investors.  A key purpose of Countrywide's purported loan origination "guidelines" was to screen potential borrowers and determine which were creditworthy and thus likely to repay their mortgage loans, whether in good economic times or bad.  Further, Countrywide's risk-taking with its mortgage originations, as detailed herein, created the real possibility that if the loans it originated performed badly, Countrywide's ability to continue accessing the capital markets would be frustrated – a concern voiced repeatedly by Countrywide's top executives.  In short, while the mortgage industry generally faced a credit crunch, that does not mean that Countrywide's widespread underwriting violations did not cause the general predicament and/or place Countrywide in a materially worse position in competing for remaining liquidity

than if it had not engaged in those previously concealed fraudulent practices as detailed herein. Indeed, Countrywide could have sustained the credit crunch if it had actually maintained quality lending and underwriting practices, rather than those that undermined confidence in the secondary market for Countrywide products. Indeed, as Judge Pfaelzer recognized in the related derivative case:

> the Company's own SEC filings recognize that ongoing access to the secondary mortgage market requires the consistent production of quality mortgages and servicing of those mortgages at levels that meet or exceed secondary mortgage market standards. . . . Independent of any turmoil in the capital markets, the widespread violations of underwriting standards, as alleged, would significantly raise the risk of loan default. When combined with what [Derivative] Plaintiffs allege are misrepresentations concerning the quality of Countrywide's loans, these underwriting issues would ultimately undermine confidence in the secondary market for Countrywide products.

953.   In sum, as detailed herein, Countrywide's operations so diverged from soundness that Countrywide's repeated assurances of good practices, quality loan origination, and consistently prudent underwriting guidelines were rendered false. This triggered a sharp decline in the value of Countrywide-related securities as the truth emerged. Even as the market began its downturn, Countrywide held itself out as situated differently from other subprime lenders. *See Countrywide*, 588 F. Supp. 2d at 1173-74.

954.   Alan Hess, Ph.D., the SEC's economic expert who was prepared to testify in the SEC case, submitted as evidence an Expert Report (made publicly available in the SEC case and reviewed by Plaintiffs' counsel) that opined that "the econometric evidence demonstrates that adverse changes in economic conditions explain little if any of Countrywide's stock price decrease." Rebuttal Expert Report of Alan Hess, Ph.D., at 1. Dr. Hess pointed out that if Defendants'

conjectures that adverse changes in economic conditions were the principal causes of the decline in Countrywide's stock price were correct (which they are not), a market model for Countrywide that includes factors that represent housing market and liquidity conditions should explain Countrywide's price decrease.  Dr. Hess explained, however, that such market model does not explain Countrywide's price decrease.  Dr. Hess concluded that "[t]he housing and debt markets had little effect on Countrywide's stock price."   Indeed, as demonstrated in the chart below, Countrywide's price decoupled sharply from those of its competitors[29] after having tracked them in the three year period preceding Countrywide's July 24, 2007 Conference Call:



---

[29]  The "Peer Index" or "Peer Group" is the equally-weighted index of companies in the KBW Mortgage Finance Index, excluding Countrywide and other companies accused of fraud during the Relevant Period, with allegations of fraud (*e.g.*, Fannie Mae, Freddie Mac, Indy Mac, MGIC, and Washington Mutual).

955.   Countrywide's Company-specific stock price movement and the timing of events, belie the notion that economic factors unrelated to Countrywide's own risk profile were the underlying cause of the declines in value on the corrective disclosure days.

956.   While the macroeconomic environment impacted Countrywide, the evidence will belie the notion that the credit crisis can wholly explain Plaintiffs' losses.   First, Plaintiffs' expert has explicitly controlled for market forces and industry forces on the alleged corrective disclosure events and therefore only includes Countrywide-specific price declines in determining how much of the stock price movement was attributable to company-specific new information.   The result of this is that even under Plaintiffs' expert's analysis, a portion of the total decline in Countrywide's stock price is not attributable to the fraud, but rather is attributed to other non-company specific factors.

957.   Second, the timing of the decline in Countrywide's stock price is inconsistent with the notion that it was a stable financial institution that was simply caught up in a macroeconomic wave of declining home prices that had nothing to do with Plaintiffs' allegations.   The peak of the financial crisis did not occur until September 2008, when Lehman Brothers Holdings, Inc. ("Lehman") and other major financial institutions failed.   The vast majority of stock price declines that Plaintiffs attribute to the alleged misstatements occur before or during August 2007, more than a year earlier.

958.   Moreover, the chart below shows the S&P Case-Shiller Home Price Index from January 2000 through August 2007, by which time Countrywide was facing increasing liquidity concerns.   The data shows that while housing prices had leveled off and started to decline slightly, housing prices in August 2007 were still 100% higher than in 2000, 19.8% higher than in 2004, 3.8% higher than in 2005, and only 4% lower than in 2006.   If it were true, as Defendants professed, that Countrywide would flourish during a housing downturn as a result of its superior

1  underwriting and that its pay-option ARM portfolio had relatively low LTV ratios

2  (thus able to absorb declines in housing prices), the mild downturn in housing

3  prices as of August 2007, would not have put Countrywide on a financial precipice.



S&P Case-Shiller Composite-20 Home Price Index
January 2000 to August 2007

Case-Shiller Composite-20 Home Price Index Changes:

June 2004 to August 2007:     +19.75%
June 2005 to August 2007:     +3.82%
June 2006 to August 2007:     -4.374%

17  959.  Moreover, Countrywide's share price dropped 11% **before**

18  Countrywide was forced to draw down its line of credit on August 16, 2007.

19  Moreover, the risk of a credit crisis to Countrywide's business was precisely within

20  the zone of risks about which Countrywide defrauded investors.  Countrywide's

21  risk-taking with its mortgages originations created the very real possibility that if

22  the loans it originated performed badly, Countrywide's ability to continue

23  accessing the capital markets would be frustrated – a concern voiced repeatedly by

24  Countrywide's top executives.  A key purpose of Countrywide's loan originating

25  guidelines was to screen potential borrowers and determine which were

26  creditworthy and thus likely to repay their mortgage loans, whether in good

27  economic times or bad.

28

COMPLAINT

960.   Finally, to the extent that Countrywide's stock price declines purportedly correlate with industry indexes, much of the correlation is spurious. Countrywide represented a significant portion of many industry indexes, making Countrywide's performance material to index performance.   Further, there was extensive speculation in the markets that the problems disclosed at Countrywide were present in other peer companies, including peer companies similarly tainted by allegations of mortgage fraud.   Numerous news articles published contemporaneous with revelations of the truth about matters concerning which Countrywide and the Officer Defendants had made materially false and misleading statements and omissions attributed, at least in part, declines in market indexes or other peer company stock price declines to negative news about Countrywide.   For example, on July 24, 2007, the *Associate Press Newswires* published a story titled "Countrywide Financial warning drags down S&P 500," which stated that:

> The broadly monitored Standard & Poor's 500 fell Tuesday, hurt by a warning from Countrywide Financial Corp.  The S&P 500 lost 30.53 points to 1,511.04.

Likewise, on August 15, 2007, the *Los Angeles Times* published a news story titled: "LOANS; Lender reports rising defaults; Countrywide home foreclosures and delinquencies surge to five-year highs in July.  Mortgage stocks tumble," which stated that:

> In a grim report that helped send mortgage stocks reeling, No. 1 home lender Countrywide Financial Corp. said Tuesday that foreclosures and delinquencies jumped in July to the highest levels in more than five years . . . Countrywide shares fell $2.15, or 8.1%, to $24.46, bringing their loss this year to 42%.  Other mortgage stocks also tumbled Tuesday on bad news of their own and in reaction to Countrywide's difficulties . . . .

961.   In sum, Defendants cannot simply point to the "credit crisis" as the cause of Plaintiffs' losses.  Plaintiffs' consulting expert has controlled for market forces in its causation analysis.  Furthermore, most of the declines in Countrywide stock occurred when the housing market had only begun to decline – well before the calamitous market events at the apex of the credit crisis – thus demonstrating, rather than disproving – that Countrywide was a much riskier investment than portrayed in its public statements.

## XIII.  PLAINTIFFS RELIED UPON DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

962.   Throughout the Relevant Period, Plaintiffs justifiably expected Defendants to disclose material information as required by law and SEC regulations in the Company's periodic filings with the SEC and in the Company's offering documents for the sale of the Company's securities.  Plaintiffs would not have purchased the Company's securities at artificially inflated prices if Defendants had disclosed all material information then known to them, as detailed herein.

963.   The market for Countrywide securities was at all times an efficient market for the following reasons, among others:

(a)   Countrywide's stock met the requirements for listing and was listed on the New York Stock Exchange;

(b)   As a regulated issuer, Countrywide filed periodic public reports with the SEC;

(c)   Countrywide's securities volume was substantial during the Relevant Period;

(d)   Countrywide was followed by various analysts employed by major brokerage firms, including Deutsche Bank Securities Inc., JP Morgan, Jefferies & Company, Inc., Morgan Stanley, Raymond James & Associates, Inc. and others, who wrote

reports which were distributed to the sales force and certain customers of their respective brokerage firms and which were available to various automated data retrieval services; and

(e)   The market price of Countrywide securities reacted efficiently to new information entering the market.

964.   The foregoing facts clearly indicate the existence of an efficient market for trading of Countrywide securities and support application of the fraud-on-the-market theory.  Plaintiffs relied on the integrity of the market price for the Company's securities and are entitled to a presumption of reliance with respect to Defendants' misstatements and omissions alleged in this Complaint.

## XIV.  <u>TOLLING OF THE STATUTE OF LIMITATIONS</u>

965.   On August 14, 2007, George Pappas, on behalf of himself and all others similarly situated, filed a class action complaint on behalf of purchasers of publicly traded Countrywide securities against Defendants Countrywide, Mozilo, and Sieracki alleging violations of Sections 10(b) and 20(a) of the Exchange Act. *See Pappas v. Countrywide Fin. Corp.*, No. 2:07-cv-05295 (C.D. Cal.) ("*Pappas*").  On August 31, 2007, a similar class action complaint was filed against Defendant Sambol (and others) alleging violations of the same securities laws as in the *Pappas* complaint.  *See Norfolk Cnty. Ret. Sys. v. Countrywide Fin. Corp., et al.*, No. 2:07-cv-05727 (C.D. Cal.) ("*Norfolk*").  On September 19, 2007, a similar class action complaint on behalf of purchasers of CCV 7% Capital Securities was filed against Defendants Countrywide, CCV, Mozilo, Sieracki, and Sambol (and others) alleging violations of Sections 11 and 15 of the Securities Act.  *See Jack McBride v. Countrywide Fin. Corp., et al.*, No. 2:07-cv-06083 (C.D. Cal.) (*"McBride"*).  On November 5, 2007, a similar class action complaint on behalf of purchasers of the 7% Capital Securities was filed against Defendants Countrywide, CCV, Mozilo, Sieracki, and Sambol (and others) alleging violations of Sections 11, 12, and 15 of the Securities Act.  *See Barry Brahn v. Countrywide*

*Capital V, et al.*, No. 2:07-cv-07259 (C.D. Cal.) ("*Brahn*").  On January 25, 2008, a similar class action complaint on behalf of purchasers of publicly traded Countrywide securities (including, *inter alia*, the Series B Medium-Term Notes, 6.25% Notes, and 7% Capital Securities) was filed against Defendants Countrywide, CCV, Mozilo, Sieracki, and Sambol (and others) alleging violations of Sections 10(b) and 20(a) of the Exchange Act and Sections 11, 12, and 15 of the Securities Act.  *See New York City Emps' Ret. Sys., et al. v. Countrywide Fin. Corp., et al.*, No. 2:08-cv-00492 (C.D. Cal.) ("*New York Funds*").

966.  The *Pappas*, *Norfolk*, *McBride*, *Brahn* and *New York Funds* actions, as well as other class action cases filed against Defendants alleging securities law violations with respect to Countrywide securities, were consolidated in November 2007 and March 2008 by United States District Judge Mariana R. Pfaelzer, in *In re Countrywide Fin. Corp. Sec. Litig.*, No. CV 07-05295 MRP (MANx) (C.D. Cal.).  On April 14, 2008, the court-appointed Lead Plaintiff in the consolidated cases filed a Consolidated Amended Class Action Complaint ("Consolidated Complaint") against Defendants (and others) asserting claims for all of the above-referenced securities law violations.  On April 6, 2009, Judge Pfaelzer substantially denied defendants' motions to dismiss the Consolidated Complaint.  On December 9, 2009, Judge Pfaelzer granted class certification (including with respect to claims alleged herein) and, on August 2, 2010, preliminarily approved a proposed class action settlement.  On October 18, 2010, Plaintiffs timely submitted their requests for exclusion from the proposed class action settlement.

967.  The *Pappas, Norfolk, McBride, Brahn* and *New York Funds* class action complaints, and the Consolidated Complaint, were all filed (a) less than one year after Plaintiffs discovered or reasonably could have discovered the facts upon which the Securities Act claims asserted herein are based, and less than three years after the securities upon which such claims are based were bona fide offered to the public and sold to Plaintiffs in the relevant transactions; and (b) less than two years

after Plaintiffs discovered or reasonably could have discovered the facts upon which the Exchange Act claims asserted herein are based, and less than five years after the date the misrepresentations upon which such claims are based were made. The filing of these class action complaints, or some of them, served to toll any applicable statute of limitations and repose for the claims set forth in this Complaint pursuant to the doctrine announced in *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 552 (1974).

968.   Further, on April 4, 2011, Plaintiffs and the Countrywide and Officer Defendants entered into a Tolling Agreement which tolled, *inter alia*, the claims alleged in this Complaint, effective March 1, 2011, until March 1, 2012, or such earlier time as one of the parties terminates the Tolling Agreement. Plaintiffs have thus timely filed their claims.

## XV.   INAPPLICABILITY OF STATUTORY SAFE HARBOR

969.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as and were not "forward looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, the Officer Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Countrywide who knew that those statements were false.

## XVI.  AS COUNTRYWIDE'S SUCCESSOR, BANK OF AMERICA IS LIABLE FOR COUNTRYWIDE'S ACTIONS

970.   On January 11, 2008, Bank of America announced that it would purchase Countrywide for $4.1 billion in an all-stock transaction.  On July 1, 2008, Bank of America completed its merger with Defendant Countrywide.

971.   On October 6, 2008, Bank of America filed a Form 8-K announcing, among other things, that Countrywide would transfer all, or substantially all, of its assets to unnamed subsidiaries of Bank of America.  Bank of America offered virtually no details about the contemplated asset sale.  On information and belief, the intended effect of this transaction was to integrate those assets further into the operations of Bank of America while leaving the liabilities with Countrywide.

972.   Countrywide transferred substantially all of its assets to Bank of America on November 7, 2008.  On or about that time, Countrywide ceased filing its own financial statements, and its assets and liabilities have since been included in Bank of America's financial statements.  As Bank of America reported to the SEC, this transfer of assets occurred "in connection with the integration of Countrywide Financial Corporation with [Bank of America's] other businesses and operations."  Again, virtually no details of this transaction were disclosed.  On information and belief, largely as a result of this transfer of assets, Countrywide and a merger subsidiary (created to effectuate the merger) are now moribund organizations, with few, if any, assets or operations.  As admitted in the Notice of Interested Parties Pursuant to L.R. 7.1-1 filed on May 20, 2011, in *Children's Hospital & Medical Center Found. of Omaha v. Countrywide Fin. Corp.*, 11-CV-02056-MRP-MAN (C.D. Cal.), Bank of America is the "ultimate parent" to Countrywide Financial Corporation.

973.   On April 27, 2009, Bank of America announced in a press release that "[t]he Countrywide brand has been retired" and that it had rebranded Countrywide Home Loans as "Bank of America Home Loans."  The press release announced

that Bank of America Home Loans "represents the combined operations of Bank of America's mortgage and home equity business and Countrywide Home Loans."

974.   The April 27, 2009, press release made clear that Bank of America planned to complete its integration of Countrywide into Bank of America in 2009. While the integration was being completed, Countrywide customers had access to Bank of America's 6,100 banking centers.  The press release explained that Bank of America was in the process of rebranding former Countrywide "locations, account statements, marketing materials and advertising" as Bank of America Home Loans, and stated that "the full systems conversion" to Bank of America Home Loans would occur later in 2009.

975.   As of September 21, 2009, former Countrywide bank deposit accounts were reportedly converted to Bank of America accounts.  On November 9, 2009, online account services for Countrywide mortgages were reportedly transferred to Bank of America's Online Banking website.  According to press reports, Bank of America Home Loans operates out of Countrywide's offices in Calabasas, California with substantially the same employees as the former Countrywide entities.  On information and belief, Bank of America's rebranded consumer real estate business now operates out of over 1,000 former Countrywide offices nationwide.  Many former Countrywide locations, employees, assets, and business operations now continue under the Bank of America Home Loans brand. Countrywide has disclosed that its employees' 401(k) plans were rolled into Bank of America's 401(k) plan, effective April 6, 2009.  Countrywide's former website now redirects to the Bank of America website. Bank of America Home Loans is thus a direct continuation of Countrywide's operations and is operating Countrywide's mortgage origination business as its own.

976.   Bank of America's Form 10-Q for the period ending September 3, 2009 stated that, "[t]he acquisition of Countrywide significantly expanded the Corporation's mortgage originating and servicing capabilities, making it a leading

mortgage originator and servicer."   The Form 10-Q acknowledged pending litigation against Countrywide and stated that "Countrywide's results of operations were included in the Corporation's results beginning July 1, 2008."

977.   The Bank of America website has announced that the companies merged.  Bank of America noted on its website that it was "combining the valuable resources and extensive product lines of both companies."   Under the "Merger History" tab of Bank of America's website, Countrywide is included among the list of companies Bank of America has acquired.   Under the "Time Line" tab, the website states that Bank of America "became the largest consumer mortgage lender in the country" following its acquisition of Countrywide in 2008.  Lastly, under the "Our Heritage" tab, the website states that the acquisition of Countrywide "resulted in the launch of Bank of America Home Loans in 2009, making the bank the nation's leading mortgage originator and servicer."   The Countrywide logo appears on the page.

978.   In many other public statements, Bank of America has described its acquisition of Countrywide and its subsidiaries as a merger and made clear its intent to fully integrate Countrywide and its subsidiaries into Bank of America.

979.   For example, in a July 2008 Bank of America press release, Barbara Desoer ("Desoer"), identified as the head of the "combined mortgage, home equity and insurance businesses" of Bank of America and Countrywide, said: "Now we begin to combine the two companies and prepare to introduce our new name and way of operating."   The press release stated that the bank

> anticipates substantial cost savings from combining the two companies. Cost reductions will come from a range of sources, including the elimination of positions announced last week, and the reduction of overlapping technology, vendor and marketing expenses.  In addition, Countrywide is expected to benefit by leveraging its broad product set to deepen relationships with existing Countrywide customers.

980.   In October 2008, Desoer commented that the integration was proceeding on schedule, noting, "The company has named a mix of Bank of America and former Countrywide executives to leadership roles and will be tapping more managers through the end of the year."

981.   Desoer was interviewed for the May 2009 issue of *Housing Wire* magazine, which reported that:

> While the move to shutter the Countrywide name is essentially complete, the operational effort to integrate across two completely distinct lending and service systems is just getting under way.  One of the assets [Bank of America] acquired with Countrywide was a vast technology platform for originating and servicing loans, and Desoer says that the bank will be migrating some aspects of [Bank of America's] mortgage operations over to Countrywide's platforms.

982.   Desoer was also quoted as saying: "We're done with defining the target, and we're in the middle of doing the development work to prepare us to be able to do the conversion of the part of the portfolio going to the legacy Countrywide platforms."  Desoer explained that the conversion would happen in the "late fall" of 2009, and that the integration of the Countrywide and Bank of America platforms was a critical goal.

983.   After the integration had further progressed, Desoer stated in the October 2009 issue of *Mortgage Banking* that "the first year is a good story in terms of the two companies [coming] together and meeting all the major [goals and] milestones that we had set for ourselves for how we would work to integrate the companies."  For Desoer, it was "the highlight of the year . . . when we retired the Countrywide brand and launched the Bank of America Home Loans brand."  In the same issue, Mary Kanaga, a Countrywide transition executive who helped oversee integration, likened the process of integration to the completion of a mosaic:

Everything [*i.e.,* each business element] counts. Everything has to get there, whether it's the biggest project or the smallest project. It's very much putting a puzzle together. If there is a missing piece, we have a broken chain and we can't complete the mosaic.

984. Likewise, in its 2008 Annual Report, Bank of America confirmed that "[o]n July 1, 2008, we acquired Countrywide," and stated that the merger "significantly improved our mortgage originating and servicing capabilities, making us a leading mortgage originator and servicer." In the Q&A section of the same report, the question was posed: "How do the recent acquisitions of Countrywide and Merrill Lynch fit into your strategy?" Bank of America responded that by acquiring Countrywide it became the "No. 1 provider of both mortgage originations and servicing" and "as a *combined* company," it would be recognized as a "responsible lender who is committed to helping our customers become successful homeowners." Similarly, in a July 1, 2008 Countrywide press release, Defendant Mozilo stated that "the *combination* of Countrywide and Bank of America will create one of the most powerful mortgage franchises in the world."

985. In purchasing Countrywide and its subsidiaries for only 27% of its book value at the time, Bank of America was fully aware of the pending claims and potential claims against Countrywide and factored them into the transaction.[30] Bank of America has since confirmed, in numerous statements and actions, that it has expressly or impliedly assumed Countrywide's contractual and tort liabilities, including claims and potential claims against Countrywide and its former officers and directors.

---

[30]  Bank of America's purchase of Countrywide for just 27% of its book value further suggests that the acquisition was structured to strip the corporate shells left behind of recoverable assets.

986.   For example, in an interview published on February 22, 2008, in the legal publication *Corporate Counsel,* a Bank of America spokesperson admitted that Bank of America had assumed Countrywide's liabilities:

> Handling all this litigation won't be cheap, even for Bank of America, the soon-to-be largest mortgage lender in the country.  Nevertheless, the banking giant says that Countrywide's legal expenses were not overlooked during negotiations.  *"We bought the company and all of its assets and liabilities," spokesman Scott Silvestri says, "We are aware of the claims and potential claims against the company and have factored these into the purchase."*

987.   Further, on October 6, 2008, during an earnings call, Joe Price, Bank of America's CFO, stated that "As we transfer those operations (*i.e.,* Countrywide and its subsidiaries] our company intends to assume the outstanding Countrywide debt totaling approximately $21 billion."  Asked about the "formal guaranteeing" of Countrywide's debt, Kenneth D. Lewis ("Lewis"), Bank of America's former Chairman and CEO, responded that:

> The normal process we followed is what are the operational movements we'll make to *combine the operations.*  When we do that we've said the debt would fall in line and quite frankly that's kind of what we've said the whole time  . . . . [T]hat's been very consistent with deals we've done in the past from this standpoint.

988.   Similarly, Lewis was quoted in a January 23, 2009 *New York Times* article reporting on the acquisition of Countrywide and its subsidiaries, in which he acknowledged that Bank of America knew of the legal liabilities of Countrywide and its subsidiaries and impliedly accepted them as part of the cost of the acquisition:

> We did extensive due diligence. We had 60 people inside the company for almost a month.  It was the most extensive due diligence

we have ever done.  So we feel comfortable with the valuation.  We looked at every aspect of the deal, *from their assets to potential lawsuits* and we think we have a price that is a good price.

989.  Bank of America made additional statements showing that it has assumed the liabilities of Countrywide.  In a press release announcing the merger, Lewis stated that he was aware of the "issues within the housing and mortgage industries" and said that "the transaction [with Countrywide] reflects those challenges."  Despite these challenges, Lewis stated in October 2009 that "[t]he Merrill Lynch and Countrywide integrations are on track and returning value already."

990.  Likewise, in Bank of America's Form 10-K for 2009, Bank of America acknowledged that "[W]e face increased litigation risk and regulatory scrutiny as a result of the Merrill Lynch and Countrywide acquisitions."

991.  Brian Moynihan ("Moynihan"), Bank of America's CEO and President, testified before the FCIC on January 13, 2010, that

our primary window into the mortgage crisis came through the acquisition of Countrywide.  The Countrywide acquisition has positioned the bank in the mortgage business on a scale it had not previously achieved.  There have been losses, and lawsuits, from the legacy of Countrywide operations, but we are looking forward.

992.  Addressing investor demands for refunds on faulty loans sold by Countrywide, Moynihan stated "There's a lot of people out there with a lot of thoughts about how we should solve this, but at the end of the day, *we'll pay for the things that Countrywide did*."  And, in a *New York Times* article published in December 2010, Moynihan, speaking about Countrywide, stated that "*[o]ur company bought it and we'll stand up; we'll clean it up.*"

993.  Similarly, Jerry Dubrowski, a spokesman for Bank of America, was quoted in an article published by *Bloomberg* in December 2010 that the bank will

"act responsibly" and repurchase loans in cases where there were valid defects with the loans.  Through the third quarter of 2010, Bank of America has faced $26.7 billion in repurchase requests and has resolved, declined or rescinded $18 billion of those claims.  It has established a reserve fund against the remaining $8.7 billion in repurchase requests, which at the end of the third quarter stood at $4.4 billion.

994.   During an earnings call for the second quarter of 2010, Charles Noski ("Noski"), Bank of America's CFO, stated that "we increased our reps and warranties expense by $722 million to $1.2 billion as a result of our continued evaluation of exposure to repurchases including our exposure to repurchase demands from certain monoline insurers."  And during the earnings call for the third quarter of 2010, Noski stated that "[t]hrough September, we've received $4.8 billion of reps and warranties claims related to the monoline-insured deals, of which $4.2 billion remains outstanding, and approximately $550 million were repurched."

995.   Consistent with its assumption of Countrywide's liabilities, Bank of America has reached various settlement agreements in which it has directly taken responsibility for Countrywide's liabilities and paid to restructure certain of Countrywide's home loans.  On October 6, 2008, Bank of America settled lawsuits brought against Countrywide by state Attorneys General by agreeing to loan modifications for 390,000 borrowers, an agreement valued up to $8.68 billion (including up to $3.5 billion to California borrowers).  Bank of America also agreed to pay $150 million to help Countrywide customers who were already in or were at serious risk of foreclosure, and an additional $70 million to help Countrywide customers who had already lost their homes to make the transition to other living arrangements.  The loans were made before Bank of America acquired Countrywide.  In 2008, Bank of America restructured 300,000 home loans of which 87% had been originated or serviced by Countrywide.  In announcing that

its loan modification program, known as the National Homeowners Retention Program ("NHRP"), will now have a "principal forgiveness" component, Bank of America noted that it "developed and launched the NHRP to provide assistance to Countrywide borrowers."

996. On January 3, 2011, Bank of America paid $2.8 billion to GSEs Freddie Mac and Fannie Mae to settle claims of misrepresentations on billions of dollars in loans that went sour after Fannie Mae and Freddie Mac bought them from Countrywide. In exchange for the payments, Freddie Mac and Fannie Mae agreed to drop their demands that Bank of America buy back the Countrywide mortgages. The payment of $1.28 billion to Freddie Mac settled 787,000 loan claims (current and future) sold by Countrywide through 2008. The payment of $1.34 billion (after applying credits to an agreed upon settlement amount of $1.52 billion) to Fannie Mae settled repurchase claims on 12,045 Countrywide loans (with approximately $2.7 billion of unpaid principal balance) and other specific claims on 5,760 Countrywide loans (nearly $1.3 billion of unpaid principal balance).

997. On June 29, 2011, Bank of America announced that it had reached an $8.5 billion agreement to resolve nearly all of the legacy Countrywide-issued first-lien RMBS repurchase exposure. The settlement covers about $424 billion of the mortgage bonds created by Countrywide between 2004 and 2008. Bank of America stated that with this agreement and other mortgage-related actions in the second quarter of 2011, the company believed it had recorded reserves in its financial statements for a substantial portion of its exposure to representation and warranties claims on loans issued by Countrywide. The amount of the provision totaled $14 billion. The settlement was the third in six months for Bank of America, following the Fannie Mae and Freddie Mac settlement, and a similar deal with insurer Assured Guaranty. "This is another important step we are taking in the interest of our shareholders to minimize the impact of future economic

uncertainty and put legacy issues behind us," said Bank of America CEO Moynihan. "We will continue to act aggressively, and in the best interest of our shareholders, to clean up the mortgage issues largely stemming from our purchase of Countrywide."

998.   Bank of America has also taken responsibility for liabilities arising out of litigation against Countrywide's former officers and directors, including the Officer Defendants.   In October 2010, *The New York Times* reported that Bank of America is "on the hook" for $20 million of the disgorgement that Defendant Mozilo agreed to pay in his settlement agreement with the SEC.   The agreement and plan of merger between Bank of America and Countrywide provided that all indemnification provisions "shall survive the merger and shall continue in full force and effect . . . . for a period of six years."   According to the article, "Because Countrywide would have had to pay Mr. Mozilo's disgorgement, Bank of America took on the same obligation, even though it had nothing to do with the company's operations at the time."

999.   Still, Bank of America has generated significant earnings from the absorption of Countrywide's mortgage business.

1000. Bank of America's 2009 annual report stated that "[r]evenue, net of interest expense on a fully taxable-equivalent (FTE) basis, rose to $120.9 billion, representing a 63% increase from $74.0 billion in 2008, reflecting in part the addition of Merrill Lynch and the full-year impact of Countrywide."   Bank of America also reported that "[m]ortgage banking income increased $4.7 billion driven by higher production and servicing income . . . primarily due to increased volume as a result of the full-year impact of Countrywide . . . ."   Insurance income also increased $927 million "due to the full-year impact of Countrywide's property and casualty businesses."

1001. Based on the above, Bank of America has "*de facto*" merged with Countrywide, consolidating and merging with the Countrywide Defendants and

acquiring substantially all of the assets of all the Countrywide Defendants.  Indeed, based on the same facts, the Supreme Court of the State of New York in *MBIA Ins. Corp. v. Countrywide Home Loans, et al.*, Index No. 602825/2008, held that MBIA sufficiently alleged a *de facto* merger "in which Bank of America intended to absorb and continue the operation of Countrywide."  Order on Motion to Dismiss at 15 (Apr. 29, 2010).

1002. Bank of America is thus Countrywide's successor in liability, and is liable for any all damages resulting to Plaintiffs from the wrongful actions of Countrywide.

## XVII. CLAIMS FOR RELIEF

### COUNT I

#### VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER
#### (*AGAINST COUNTRYWIDE, MOZILO, SAMBOL, AND SIERACKI*)

1003. Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

1004. This Count is asserted against Countrywide and the Officer Defendants.

1005. Throughout the Relevant Period, Countrywide and the Officer Defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the United States mail, engaged and participated in a continuous course of conduct to conceal adverse material information about Countrywide, including its true financial condition and results, underwriting and loan origination practices and internal controls and prospects, as specified herein. This plan, scheme and course of conduct was intended to and, throughout the Relevant Period, did: (a) deceive the investing public, including Plaintiffs, as alleged herein; (b) artificially inflate the market price of Countrywide securities; and (c) cause Plaintiffs to purchase Countrywide securities at artificially inflated prices.

1006. In furtherance of this unlawful scheme, plan and course of conduct, these Defendants, individually and jointly, took the actions set forth herein. While in possession of material, adverse non-public information, these Defendants (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; (c) sold shares while in possession of material, adverse non-public information; and (d) engaged in acts, practices and a course of conduct which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to create and maintain artificially high market prices for Countrywide's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Each of these Defendants was a direct, necessary and substantial participant in the common course of conduct alleged herein.

1007. These Defendants knew or, but for their deliberate recklessness, should have known, that the Company's reported financial conditions and results during the Relevant Period, as filed with the SEC and disseminated to the investing public, were materially misstated and were not presented in accordance with GAAP. Further, these Defendants knew of existing adverse facts which undermined their representations about Countrywide's existing business, underwriting and loan origination practices, internal controls and prospects during the Relevant Period.

1008. In addition to the duties of full disclosure imposed on the Officer Defendants, as a result of their responsibility for the Company's financial statements and making affirmative statements and reports to the investing public, the Officer Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §§ 210.1-01, *et seq.*) and Regulation S-K (17 C.F.R. §§ 229.10, *et seq.*) and other SEC

regulations, including accurate and truthful information with respect to the Company's financial condition, earnings and expenses so that the market price of the Company's securities would be based on truthful, complete and accurate information.

1009. Countrywide and the Officer Defendants, the top executive officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as officers of the Company, each of these Defendants was able to and did control the content of the public statements disseminated by Countrywide. With knowledge of the falsity and/or misleading nature of the statements contained therein and in reckless disregard of the true financial results of the Company, these Defendants caused the heretofore complained of public statements to contain misstatements and omissions of material facts as alleged herein.

1010. Countrywide and the Officer Defendants acted with scienter throughout the Relevant Period in that they either had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with deliberate reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Officer Defendants were among the senior management of the Company and were therefore directly responsible for the false and misleading statements and/or omissions disseminated to the public through press releases, news reports and filings with the SEC.

1011. Countrywide and the Officer Defendants' misrepresentations and/or omissions were intentional or reckless and in some instances done for the purpose of enriching themselves at the expense of the Company's investors, including Plaintiffs, and to conceal the Company's true operating condition from the investing public.  Countrywide and the Officer Defendants engaged in this scheme

to inflate the Company's reported revenues and prospects in order to create the illusion that Countrywide was a successful, strong and growing company.

1012. As a result of those deceptive practices and false and misleading statements and/or omissions, the market price of Countrywide's securities was artificially inflated throughout the Relevant Period. In ignorance of the false and misleading nature of the representations and/or omissions described above and the deceptive and manipulative devices employed by Countrywide and the Officer Defendants, Plaintiffs, in reliance on the integrity of the market and/or directly on the statements and reports of Defendants and the statements for which they are responsible, purchased Countrywide's securities at artificially inflated prices and were damaged thereby.

1013. Had Plaintiffs known of the material adverse information not disclosed by Countrywide and the Officer Defendants, or been aware of the truth behind these Defendants' material misstatements, they would not have purchased Countrywide securities at artificially inflated prices, or at all.

1014. By virtue of the foregoing, Countrywide and the Officer Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER (*AGAINST KPMG*)

1015. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

1016. This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC, on behalf of Plaintiffs against Defendant KPMG.

1017. As alleged herein, throughout the Relevant Period, KPMG, directly and indirectly, by the use of the means or instrumentalities of interstate commerce,

the United States mail and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. KPMG intended to and did, as alleged herein, (i) deceive the investing public, including Plaintiffs; (ii) artificially inflate and maintain the prices of Countrywide common stock and other publicly traded securities, including but not limited to public debt and preferred securities specifically alleged herein; and (iii) cause Plaintiffs to purchase Countrywide securities at artificially inflated prices.

1018. KPMG was responsible for issuing its false and misleading audit reports and opinions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Plaintiffs, by virtue of having prepared, approved, signed and/or disseminated documents which contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

1019. As set forth above, KPMG made its false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Plaintiffs who purchased Countrywide common stock and/or other Countrywide public securities, including but not limited to the securities specifically alleged herein, during the Relevant Period.

1020. In ignorance of the false and misleading nature of KPMG's statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market prices for Countrywide common stock and other publicly traded securities, Plaintiffs purchased Countrywide securities at artificially inflated prices during the Relevant Period. But for the fraud, Plaintiffs would not have purchased Countrywide securities at artificially inflated prices. As set forth herein,

when the true facts were subsequently disclosed, the prices of Countrywide common stock and other publicly traded securities declined precipitously and Plaintiffs were harmed and damaged as a direct and proximate result of their purchases of Countrywide securities at artificially inflated prices and the subsequent decline in the prices of those securities when the truth began to be disclosed.

1021. By virtue of the foregoing, Defendant KPMG is liable to Plaintiffs for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT III

### VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT (*AGAINST MOZILO, SAMBOL, AND SIERACKI*)

1022. Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

1023. This Count is asserted against the Officer Defendants.

1024. Mozilo, by virtue of his position with Countrywide and his specific acts, was, at the time of the wrongs alleged herein, a controlling person of Countrywide within the meaning of Section 20(a) of the Exchange Act. He had the power and influence, and even exercised same, to cause Countrywide to engage in the illegal conduct and wrongful practices complained of herein. Mozilo was the Company's co-founder and the Chairman of the Board, and actively managed the Company, its reporting to investors and its accounting practices. Mozilo was thereby and otherwise liable as a control person under Section 20(a) for the fraud perpetrated by Defendants as alleged herein.

1025. Sambol, by virtue of his position with Countrywide and his specific acts, was, at the time of the wrongs alleged herein, a controlling person of Countrywide within the meaning of Section 20(a) of the Exchange Act. He had the power and influence, and even exercised same, to cause Countrywide to engage in

the illegal conduct and wrongful practices complained of herein. Sambol became the Company's President and COO in September 2006 and a member of the Board from 2007 through the merger, and actively managed the Company, its reporting to investors and its accounting practices. Sambol was thereby and otherwise liable as a control person under Section 20(a) of the Exchange Act for the fraud perpetrated by Defendants as alleged herein.

1026. Sieracki, by virtue of his position with Countrywide and his specific acts, was, at the time of the wrongs alleged herein, a controlling person of Countrywide within the meaning of Section 20(a) of the Exchange Act. He had the power and influence, and even exercised same, to cause Countrywide to engage in the illegal conduct and practices complained of herein. Sieracki was the Company's Executive Managing Director and CFO, and actively managed the Company, its reporting to investors and its accounting practices. Sieracki was thereby and otherwise liable as a control person under Section 20(a) of the Exchange Act for the fraud perpetrated by Defendants as alleged herein.

1027. By reason of the conduct of Countrywide as alleged in this Complaint, the Officer Defendants are liable for the aforesaid wrongful conduct of Countrywide and liable to Plaintiffs for the substantial damages which they suffered in connection with their purchases or acquisitions of securities as a result of Countrywide's violations of the Exchange Act.

## COUNT IV

### VIOLATIONS OF SECTION 20A OF THE EXCHANGE ACT
### (*AGAINST MOZILO AND SAMBOL*)

1028. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

1029. This Count is asserted pursuant to Section 20A of the Exchange Act against Defendants Mozilo and Sambol on behalf of Plaintiffs that purchased Countrywide common stock contemporaneously with any of these Defendants'

sales of Countrywide common stock during the Relevant Period (the "Section 20A Plaintiffs").

1030. Each of these Defendants sold substantial numbers of shares of Countrywide common stock during the Relevant Period while in possession of material, adverse, nonpublic information. This conduct violated Section 20A of the Exchange Act.

1031. The Section 20A Plaintiffs purchased shares of Countrywide common stock on the same day as, or close in time to, sales of Countrywide common stock by the Defendants named in this Count while these Defendants were in possession of material, adverse, nonpublic information. These sales and purchases were contemporaneous within the meaning of Section 20A of the Exchange Act.

1032. Accordingly, under Section 20A of the Exchange Act, the Defendants named in this Count are each liable to the Section 20A Plaintiffs for all profits gained and losses avoided by them as a result of their stock sales.

1033. The Defendants named in this Count are required to account for all such stock sales and to disgorge their profits or ill-gotten gains.

## COUNT V

### VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT BY PURCHASERS OF SERIES B MEDIUM-TERM NOTES
### *(AGAINST COUNTRYWIDE, MOZILO, SAMBOL, SIERACKI AND KPMG)*

1034. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein except for allegations of fraudulent intent. For purposes of this Count, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

1035. This Count is brought pursuant to Section 11 of the Securities Act against Defendants Countrywide, Mozilo, Sambol, Sieracki and KPMG by Plaintiffs BlackRock Funds, Thrivent Funds, and T. Rowe Price Funds that, during the Relevant Period, purchased or otherwise acquired Countrywide Series B

Medium-Term Notes issued pursuant or traceable to the Series B Medium-Term Notes Registration Statement (the "Series B Plaintiffs").

1036. Countrywide was the registrant for the Series B Medium-Term Notes Registration Statement, and issued Series B Medium-Term Notes pursuant to the Series B Medium-Term Notes Registration Statement.

1037. Defendants Mozilo, Sambol, and Sieracki each signed the Series B Medium-Term Notes Registration Statement.

1038. At the time the Series B Medium-Term Notes Registration Statement and Prospectus were filed, Defendant Mozilo was a director of Countrywide.

1039. Defendant KPMG was the auditor for Countrywide during the Relevant Period and consented to being named in the Series B Medium-Term Notes Registration Statement as a party that certified the audited financial statements contained or incorporated by reference therein. KPMG's audit report incorrectly stated that its audits were performed in accordance with GAAS and that the Company's financial statements were fairly presented in accordance with GAAP.

1040. As set forth above, the Series B Medium-Term Notes Registration Statement contained untrue statements of material fact, including the financial statements of Countrywide. In addition, the Series B Medium-Term Notes Registration Statement omitted to state other facts required to be stated therein or necessary to make the statements therein not misleading, including Countrywide's violations of GAAP. The facts misstated and omitted would have been material to a reasonable person reviewing the Series B Medium-Term Notes Registration Statement.

1041. Countrywide, as issuer of the Series B Medium-Term Notes, is strictly liable for the material misstatements and omissions contained in the Series B Medium-Term Notes Registration Statement.

1042. Defendants Mozilo, Sambol, Sieracki, and KPMG owed to the Series B Plaintiffs the duty to make a reasonable and diligent investigation of the statements contained in the Series B Medium-Term Notes Registration Statement, to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein in order to make the statements contained therein not misleading.

1043. These Defendants did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the Series B Medium-Term Notes Registration Statement, and did not possess reasonable grounds for believing that the Series B Medium-Term Notes Registration Statement did not contain an untrue statement or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

1044. Defendants Mozilo, Sambol, and Sieracki were negligent in failing to conduct a reasonable investigation of the statements contained in the Series B Medium-Term Notes Registration Statement regarding Countrywide's financial performance, internal controls, underwriting standards and lending practices and did not possess reasonable grounds for believing that the statements contained therein were true and not materially misstated.

1045. Defendant KPMG, which consented to the inclusion of its opinions in the Series B Medium-Term Notes Registration Statement, negligently failed to perform its audits of Countrywide in a reasonable manner and, thus, its audits did not constitute a reasonable investigation of whether the Company's financial statements were presented in compliance with GAAP and whether management's assessment of internal controls was properly and accurately presented.

1046. The Series B Plaintiffs purchased Series B Medium-Term Notes issued pursuant or traceable to the Series B Medium-Term Notes Registration Statement and were damaged thereby.

COMPLAINT

1047. The Series B Plaintiffs did not know, nor in the exercise of reasonable diligence could have known, of the untrue statements of material fact or omissions of material facts in the Series B Medium-Term Notes Registration Statement when they purchased or acquired their securities.

1048. By reason of the foregoing, the Defendants named in this Count are liable to the Series B Plaintiffs for violation of Section 11 of the Securities Act.

## COUNT VI

### VIOLATIONS OF SECTION 12(a)(2) OF THE SECURITIES ACT BY PURCHASERS OF SERIES B MEDIUM-TERM NOTES
### *(AGAINST COUNTRYWIDE)*

1049. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein except for allegations of fraudulent intent. For purposes of this Count, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

1050. This Count is brought pursuant to Section 12(a)(2) of the Securities Act against Defendant Countrywide by Plaintiffs Thrivent Funds and T. Rowe Price Funds that, during the Relevant Period, purchased or otherwise acquired Countrywide Series B Medium-Term Notes issued pursuant to the Series B Medium-Term Notes Prospectus.

1051. Countrywide was a statutory seller of the Series B Medium-Term Notes, including under SEC Rule 159A, which provides that an issuer is a statutory seller for purposes of Section 12(a)(2) of the Securities Act regardless of the form of underwriting.  In addition, Countrywide solicited the purchase of its Series B Medium-Term Notes, to serve its own financial interests, by the use of means or instruments of transportation or communication in interstate commerce or of the United States mail and by means of the Series B Medium-Term Notes Prospectus. Further, the Series B Medium-Term Notes Registration Statement, of which Countrywide is the registrant, states that "for the purpose of determining liability of a registrant under the Securities Act of 1933 to any purchaser in the initial

distribution of the securities, each undersigned registrant undertakes that in a primary offering of securities . . . regardless of the underwriting method used to sell the securities to the purchaser . . . the undersigned registrant will be a seller to the purchaser and will be considered to offer or sell such securities to such purchaser."

1052. As alleged herein, the Series B Medium-Term Notes Prospectus contained untrue statements of material fact, including the financial statements of Countrywide. In addition, the Series B Medium-Term Notes Prospectus omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, including Countrywide's violations of GAAP. The facts misstated and omitted would have been material to a reasonable person reviewing the Series B Medium-Term Notes Prospectus.

1053. Countrywide owed to Plaintiffs Thrivent Funds and T. Rowe Price Funds the duty to make a reasonable and diligent investigation of the statements contained in the Series B Medium-Term Notes Prospectus, to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein in order to make the statements contained therein not misleading.

1054. Countrywide did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the Series B Medium-Term Notes Prospectus and did not possess reasonable grounds for believing that the Series B Medium-Term Notes Prospectus did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

1055. Plaintiffs Thrivent Funds and T. Rowe Price Funds did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the Series B Medium-Term Notes Prospectus when they purchased or acquired the securities.

COMPLAINT

1056. Plaintiffs Thrivent Funds and T. Rowe Price Funds purchased Series B Medium-Term Notes pursuant to the Series B Medium-Term Notes Prospectus in an initial public offering, within 40 days of the relevant prospectus supplement, pricing supplement, or free writing prospectus, and were damaged thereby.

1057. By reason of the foregoing, Countrywide and Bank of America are liable to Plaintiffs Thrivent Funds and T. Rowe Price Funds for violations of Section 12(a)(2) of the Securities Act. With respect to Series B Medium-Term Notes that Plaintiffs Thrivent Funds and T. Rowe Price Funds have retained, Plaintiffs Thrivent Funds and T. Rowe Price Funds have the right to rescind and recover the consideration paid for such notes. Plaintiffs Thrivent Funds and T. Rowe Price Funds are entitled to rescission by tendering the Series B Medium-Term Notes, or proceeds from the sale thereof, to Countrywide and/or Bank of America in exchange for the value of the consideration paid for such notes, plus interest. In the alternative, Plaintiffs Thrivent Funds and T. Rowe Price Funds are entitled to damages in an amount to be proven at trial.

## COUNT VII

### VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT BY PURCHASERS OF SERIES B MEDIUM-TERM NOTES
### *(AGAINST MOZILO, SAMBOL, AND SIERACKI)*

1058. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein except for allegations of fraudulent intent. For purposes of this Count, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

1059. This Count is brought pursuant to Section 15 of the Securities Act against Defendants Mozilo, Sambol, and Sieracki by the Series B Plaintiffs.

1060. Countrywide violated Section 11 of the Securities Act by issuing the Series B Medium-Term Notes Registration Statement which contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary in order to make the statements therein not misleading. The

facts misstated and omitted would have been material to a reasonable person reviewing the Series B Medium-Term Notes Registration Statement.

1061. Countrywide violated Section 12(a)(2) of the Securities Act by soliciting the purchase of Series B Medium-Term Notes by means of the Series B Medium-Term Notes Prospectus which contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary in order to make the statements therein not misleading. The facts misstated and omitted would have been material to a reasonable person reviewing the Series B Medium-Term Notes Prospectus.

1062. Defendants Mozilo and Sambol were controlling persons of Countrywide when each of the Series B Medium-Term Notes Registration Statement and Series B Medium-Term Notes Prospectus was filed and became effective, because of their senior executive positions with Countrywide; their direct involvement in the Company's day-to-day operations, including its mortgage banking and lending practices and financial reporting and accounting functions; and their signatures on, and participation in, the preparation and dissemination of this registration statement and prospectus.

1063. By virtue of the foregoing, Defendants Mozilo, Sambol, and Sieracki each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Countrywide, including the content of its financial statements and these registration statements and prospectuses.

1064. Defendants Mozilo, Sambol, and Sieracki acted negligently and without reasonable care regarding the accuracy of the information contained and incorporated by reference in these registration statements and prospectuses and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

1065. The Series B  Plaintiffs purchased Countrywide Series B Medium-Term Notes pursuant or traceable to the Series B Medium-Term Notes Registration

Statement, or pursuant to the Series B Medium-Term Notes Prospectus, and were damaged thereby.

1066. The Series B Plaintiffs did not know, nor in the exercise of reasonable diligence could have known, of the untrue statements of material fact or omissions of material facts in the Series B Medium-Term Notes Registration Statement and Prospectus when they purchased or acquired the securities.

1067. By reason of the foregoing, Defendants Mozilo, Sambol, and Sieracki are liable to the Series B Plaintiffs for violations of Section 15 of the Securities Act.

## COUNT VIII

### VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT BY PURCHASERS OF 6.25% NOTES
### *(AGAINST COUNTRYWIDE, MOZILO, SAMBOL, SIERACKI AND KPMG)*

1068. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein except for allegations of fraudulent intent. For purposes of this Count, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

1069. This Count is brought pursuant to Section 11 of the Securities Act against Defendants Countrywide, Mozilo, Sambol, Sieracki and KPMG by Plaintiffs Thrivent Funds, TIAA-CREF Funds, and T. Rowe Price Funds that purchased or otherwise acquired Countrywide 6.25% Notes pursuant or traceable to the 6.25% Notes Registration Statement ("6.25% Plaintiffs").

1070. Countrywide was the registrant for the 6.25% Notes Registration Statement, and issued 6.25% Notes pursuant to the 6.25% Notes Registration Statement.

1071. Defendants Mozilo, Sambol, and Sieracki each signed the 6.25% Notes Registration Statement.

1072. At the time the 6.25% Notes Registration Statement and Prospectus were filed, Defendant Mozilo was a director of Countrywide.

1073. Defendant KPMG was the auditor for Countrywide during the Relevant Period and consented to being named in the 6.25% Notes Registration Statement as a party that certified the audited financial statements contained or incorporated by reference therein. KPMG's audit report incorrectly stated that its audits were performed in accordance with GAAS and that the Company's financial statements were fairly presented in accordance with GAAP.

1074. As set forth above, the 6.25% Notes Registration Statement contained untrue statements of material fact, including the financial statements of Countrywide. In addition, the 6.25% Notes Registration Statement omitted to state other facts required to be stated therein or necessary to make the statements therein not misleading, including Countrywide's violations of GAAP. The facts misstated and omitted would have been material to a reasonable person reviewing the 6.25% Notes Registration Statement.

1075. Countrywide, as issuer of the 6.25% Notes, is strictly liable for the material misstatements and omissions contained in the 6.25% Notes Registration Statement.

1076. Defendants Mozilo, Sambol, Sieracki, and KPMG owed to the 6.25% Plaintiffs the duty to make a reasonable and diligent investigation of the statements contained in the 6.25% Notes Registration Statement, to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein in order to make the statements contained therein not misleading.

1077. These Defendants did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the 6.25% Notes Registration Statement, and did not possess reasonable grounds for believing that the 6.25% Notes Registration Statement did not contain an untrue statement or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

COMPLAINT

1078. Defendants Mozilo, Sambol, and Sieracki were negligent in failing to conduct a reasonable investigation of the statements contained in the 6.25% Notes Registration Statement regarding Countrywide's financial performance, internal controls, underwriting standards and lending practices and did not possess reasonable grounds for believing that the statements contained therein were true and not materially misstated.

1079. Defendant KPMG, which consented to the inclusion of its opinions in the 6.25% Notes Registration Statement, negligently failed to perform its audits of Countrywide in a reasonable manner and, thus, its audits did not constitute a reasonable investigation of whether the Company's financial statements were presented in compliance with GAAP and whether management's assessment of internal controls was properly and accurately presented.

1080. The 6.25% Plaintiffs purchased 6.25% Notes issued pursuant or traceable to the 6.25% Notes Registration Statement and were damaged thereby.

1081. The 6.25% Plaintiffs did not know, nor in the exercise of reasonable diligence could have known, of the untrue statements of material fact or omissions of material facts in the 6.25% Notes Registration Statement when they purchased or acquired their securities.

1082. By reason of the foregoing, the Defendants named in this Count are liable to the 6.25% Plaintiffs for violation of Section 11 of the Securities Act.

## COUNT IX

### VIOLATIONS OF SECTION 12(a)(2) OF THE SECURITIES ACT BY PURCHASERS OF 6.25% NOTES
### *(AGAINST COUNTRYWIDE)*

1083. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein except for allegations of fraudulent intent. For purposes of this Count, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

1084. This Count is brought pursuant to Section 12(a)(2) of the Securities Act against Defendant Countrywide by Plaintiffs TIAA-CREF Funds and T. Rowe Price Funds that, during the Relevant Period, purchased or otherwise acquired Countrywide 6.25% Notes issued pursuant to the 6.25% Notes Prospectus.

1085. Countrywide was a statutory seller of the 6.25% Notes, including under SEC Rule 159A, which provides that an issuer is a statutory seller for purposes of Section 12(a)(2) of the Securities Act regardless of the form of underwriting.  In addition, Countrywide solicited the purchase of its 6.25% Notes, to serve its own financial interests, by the use of means or instruments of transportation or communication in interstate commerce or of the United States mail and by means of the 6.25% Notes Prospectus.  Further, the 6.25% Notes Registration Statement, of which Countrywide is the registrant, states that "for the purpose of determining liability of a registrant under the Securities Act of 1933 to any purchaser in the initial distribution of the securities, each undersigned registrant undertakes that in a primary offering of securities . . . regardless of the underwriting method used to sell the securities to the purchaser . . . the undersigned registrant will be a seller to the purchaser and will be considered to offer or sell such securities to such purchaser."

1086. As alleged herein, the 6.25% Notes Prospectus contained untrue statements of material fact, including the financial statements of Countrywide. In addition, the 6.25% Notes Prospectus omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, including Countrywide's violations of GAAP. The facts misstated and omitted would have been material to a reasonable person reviewing the 6.25% Notes Prospectus.

1087. Countrywide owed to Plaintiffs TIAA-CREF Funds and T. Rowe Price Funds the duty to make a reasonable and diligent investigation of the statements contained in the 6.25% Notes Prospectus, to ensure that the statements

contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein in order to make the statements contained therein not misleading.

1088. Countrywide did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the 6.25% Notes Prospectus and did not possess reasonable grounds for believing that the 6.25% Notes Prospectus did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

1089. Plaintiffs TIAA-CREF Funds and T. Rowe Price Funds did not know, nor in the exercise of reasonable diligence could they have known, of the untrue statements of material fact or omissions of material facts in the 6.25% Notes Prospectus when they purchased or acquired the securities.

1090. Plaintiffs TIAA-CREF Funds and T. Rowe Price Funds purchased 6.25% Notes pursuant to the 6.25% Notes Prospectus in an initial public offering, within 40 days of the relevant prospectus supplement or free writing prospectus, and were damaged thereby.

1091. By reason of the foregoing, Countrywide and Bank of America are liable to Plaintiffs TIAA-CREF Funds and T. Rowe Price Funds for violations of Section 12(a)(2) of the Securities Act. With respect to 6.25% Notes that Plaintiffs TIAA-CREF Funds and T. Rowe Price Funds have retained, such Plaintiffs have the right to rescind and recover the consideration paid for such notes. Plaintiffs TIAA-CREF Funds and T. Rowe Price Funds are entitled to rescission by tendering the 6.25% Notes, or proceeds from the sale thereof, to Countrywide and/or Bank of America in exchange for the value of the consideration paid for such notes, plus interest. In the alternative, Plaintiffs TIAA-CREF Funds and T. Rowe Price Funds are entitled to damages in an amount to be proven at trial.

# COUNT X

## VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT BY PURCHASERS OF 6.25% NOTES
### *(AGAINST MOZILO, SAMBOL, AND SIERACKI)*

1092. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein except for allegations of fraudulent intent. For purposes of this Count, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

1093. This Count is brought pursuant to Section 15 of the Securities Act against Defendants Mozilo, Sambol, and Sieracki by the 6.25% Plaintiffs.

1094. Countrywide violated Section 11 of the Securities Act by issuing the 6.25% Notes Registration Statement which contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary in order to make the statements therein not misleading. The facts misstated and omitted would have been material to a reasonable person reviewing the 6.25% Notes Registration Statement.

1095. Defendants Mozilo, Sambol, and Sieracki were controlling persons of Countrywide when the 6.25% Notes Registration Statement was filed and became effective, because of their senior executive positions with Countrywide; their direct involvement in the Company's day-to-day operations, including its mortgage banking and lending practices and financial reporting and accounting functions; and their signatures on and participation in the preparation and dissemination of each of this registration statement and prospectus.

1096. By virtue of the foregoing, Defendants Mozilo, Sambol, and Sieracki each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Countrywide, including the content of its financial statements and these registration statements and prospectuses.

1097. Defendants Mozilo, Sambol, and Sieracki acted negligently and without reasonable care regarding the accuracy of the information contained and

incorporated by reference in these registration statements and prospectuses and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

1098. The 6.25% Plaintiffs purchased 6.25% Notes pursuant or traceable to the 6.25% Notes Registration Statement or Prospectus, and were damaged thereby.

1099. The 6.25% Plaintiffs did not know, nor in the exercise of reasonable diligence could have known, of the untrue statements of material fact or omissions of material facts in the 6.25% Notes Registration Statement and Prospectus when they purchased or acquired the securities.

1100. By reason of the foregoing, Defendants Mozilo, Sambol, and Sieracki are liable to the 6.25% Plaintiffs for violations of Section 15 of the Securities Act.

## COUNT XI

### VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT BY PURCHASERS OF 7% CAPITAL SECURITIES
#### *(AGAINST ALL DEFENDANTS)*

1101. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein except for allegations of fraudulent intent. For purposes of this Count, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

1102. This Count is brought pursuant to Section 11 of the Securities Act against Defendants Countrywide, CCV, Mozilo, Sambol, Sieracki and KPMG by Plaintiff Nuveen Funds that purchased or otherwise acquired CCV 7% Capital Securities pursuant or traceable to the 7% Capital Securities Registration Statement.

1103. Countrywide and CCV were the registrants for the 7% Capital Securities Registration Statement, and CCV issued the 7% Capital Securities pursuant to that registration statement.

1104. Defendants Mozilo, Sambol, and Sieracki each signed the 7% Capital Securities Registration Statement.

1105. At the time the 7% Capital Securities Registration Statement and prospectus supplement were filed, Defendant Mozilo was a director of Countrywide.

1106. Defendant KPMG was the auditor for Countrywide during the Relevant Period and consented to being named in the 7% Capital Securities Registration Statement as a party that certified audited financial statements contained or incorporated by reference therein. KPMG's audit report incorrectly stated that its audits were performed in accordance with GAAS and that the Company's financial statements were fairly presented in accordance with GAAP.

1107. As set forth above, the 7% Capital Securities Registration Statement contained untrue statements of material fact, including the financial statements of Countrywide. In addition, the 7% Capital Securities Registration Statement omitted to state other facts required to be stated therein or necessary to make the statements therein not misleading, including Countrywide's violations of GAAP. The facts misstated and omitted would have been material to a reasonable person reviewing the 7% Capital Securities Registration Statement.

1108. CCV, as issuer of the 7% Capital Securities, is strictly liable for the material misstatements and omissions contained in the 7% Capital Securities Registration Statement.

1109. The other Defendants named in this Count owed Plaintiff Nuveen Funds the duty to make a reasonable and diligent investigation of the statements contained in the 7% Capital Securities Registration Statement, to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein in order to make the statements contained therein not misleading.

1110. These Defendants did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the 7% Capital Securities Registration Statement, and did not possess reasonable grounds

for believing that the 7% Capital Securities Registration Statement did not contain an untrue statement or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

1111. Similarly, Defendants Mozilo, Sambol, and Sieracki were negligent in failing to conduct a reasonable investigation of the statements contained in the 7% Capital Securities Registration Statement regarding Countrywide's financial performance, internal controls, underwriting standards and lending practices, and did not possess reasonable grounds for believing that the statements contained therein were true and not materially misstated.

1112. Defendant KPMG, which consented to the inclusion of its opinions in the 7% Capital Securities Registration Statement, negligently failed to perform its audits of Countrywide in a reasonable manner and, thus, its audits did not constitute a reasonable investigation of whether the Company's financial statements were presented in compliance with GAAP and whether management's assessment of internal controls was properly and accurately presented.

1113. Plaintiff Nuveen Funds purchased 7% Capital Securities issued pursuant or traceable to the 7% Capital Securities Registration Statement and was damaged thereby.

1114. Plaintiff Nuveen Funds did not know, nor in the exercise of reasonable diligence could have known, of the untrue statements of material fact or omissions of material facts in the 7% Capital Securities Registration Statement when it purchased or acquired its securities.

1115. By reason of the foregoing, the Defendants named in this Count are liable to Plaintiff Nuveen Funds for violations of Section 11 of the Securities Act.

COMPLAINT

# COUNT XII

## VIOLATIONS OF SECTION 12(a)(2) OF THE SECURITIES ACT BY PURCHASERS OF 7% CAPITAL SECURITIES
### (AGAINST COUNTRYWIDE AND CCV)

1116. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein except for allegations of fraudulent intent. For purposes of this Count, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

1117. This Count is brought pursuant to Section 12(a)(2) of the Securities Act against Defendants Countrywide and CCV by Plaintiff Nuveen Funds that purchased or otherwise acquired CCV 7% Capital Securities pursuant to the 7% Capital Securities Registration Statement.

1118. Countrywide and CCV were statutory sellers of the 7% Capital Securities including under SEC Rule 159A, which provides that an issuer is a statutory seller for purposes of Section 12(a)(2) of the Securities Act regardless of the form  of underwriting.  In addition, Countrywide and CCV solicited the purchase of the 7% Capital Securities, to serve their own financial interests, by the use of means or instruments of transportation or communication in interstate commerce or of the United States mail and by means of the 7% Capital Securities Prospectus. Further, the 7% Capital Securities Registration Statement, of which Countrywide and CCV are registrants, states that "for the purpose of determining liability of a registrant under the Securities Act of 1933 to any purchaser in the initial distribution of the securities, each undersigned registrant undertakes that in a primary offering of securities . . . regardless of the underwriting method used to sell the securities to the purchaser . . . the undersigned registrant will be a seller to the purchaser and will be considered to offer or sell such securities to such purchaser."

1119. As alleged herein, the 7% Capital Securities Prospectus contained untrue statements of material fact, including the financial statements of

Countrywide. In addition, the 7% Capital Securities Prospectus omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, including Countrywide's violations of GAAP. The facts misstated and omitted would have been material to a reasonable person reviewing the 7% Capital Securities Prospectus.

1120. Countrywide and CCV owed to Plaintiff Nuveen Funds the duty to make a reasonable and diligent investigation of the statements contained in the 7% Capital Securities Prospectus, to ensure that the statements contained or incorporated by reference therein were true and that there was no omission to state a material fact required to be stated therein in order to make the statements contained therein not misleading.

1121. Countrywide and CCV did not make a reasonable and diligent investigation of the statements contained or incorporated by reference in the 7% Capital Securities Prospectus and did not possess reasonable grounds for believing that the 7% Capital Securities Prospectus did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

1122. Plaintiff Nuveen Funds purchased 7% Capital Securities pursuant to the 7% Capital Securities Prospectus in an initial public offering, within 40 days of the relevant prospectus supplement, and was damaged thereby.

1123. Plaintiff Nuveen Funds did not know, nor in the exercise of reasonable diligence could have known, of the untrue statements of material fact or omissions of material facts in the 7% Capital Securities Prospectus when it purchased or acquired the securities.

1124. By reason of the foregoing, Countrywide, CCV, and Bank of America are liable to Plaintiff Nuveen Funds for violations of Section 12(a)(2) of the Securities Act. With respect to 7% Capital Securities that Plaintiff Nuveen Funds has retained, Nuveen Funds has the right to rescind and recover the consideration

paid for such notes. Plaintiff Nuveen Funds is entitled to rescission by tendering the 7% Capital Securities, or proceeds from the sale thereof, to Countrywide and/or Bank of America in exchange for the value of the consideration paid for such notes, plus interest. In the alternative, the Plaintiff Nuveen Funds is entitled to damages in an amount to be proven at trial.

## COUNT XIII

### VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT BY PURCHASERS OF 7% CAPITAL SECURITIES
### *(AGAINST MOZILO, SAMBOL, AND SIERACKI)*

1125. Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein except for allegations of fraudulent intent. For purposes of this Count, Plaintiffs assert only strict liability and negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

1126. This Count is brought pursuant to Section 15 of the Securities Act against Defendants Mozilo, Sambol, and Sieracki by Plaintiff Nuveen Funds.

1127. Countrywide and CCV violated Section 11 of the Securities Act by issuing the 7% Capital Securities Registration Statement which contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary in order to make the statements therein not misleading. The facts misstated and omitted would have been material to a reasonable person reviewing the 7% Capital Securities Registration Statement.

1128. Countrywide and CCV violated Section 12(a)(2) of the Securities Act by soliciting the purchase of 7% Capital Securities by means of the 7% Capital Securities Prospectus which contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary in order to make the statements therein not misleading. The facts misstated and omitted would have been material to a reasonable person reviewing the 7% Capital Securities Prospectus.

1129. Defendants Mozilo, Sambol, and Sieracki were controlling persons of Countrywide and CCV when the 7% Capital Securities Registration Statement and 7% Capital Securities Prospectus were filed and became effective, because of their senior executive positions with Countrywide; their direct involvement in the Company's day-to-day operations, including its mortgage banking and lending practices and financial reporting and accounting functions; and their signatures on, and participation in, the preparation and dissemination of the 7% Capital Securities Registration Statement and 7% Capital Securities Prospectus.

1130. By virtue of the foregoing, Defendants Mozilo, Sambol, and Sieracki each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Countrywide and CCV, including the content of Countrywide's financial statements and the 7% Capital Securities Registration Statement and 7% Capital Securities Prospectus.

1131. Defendants Mozilo, Sambol, and Sieracki acted negligently and without reasonable care regarding the accuracy of the information contained and incorporated by reference in the 7% Capital Securities Registration Statement and 7% Capital Securities Prospectus and lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

1132. Plaintiff Nuveen Funds purchased the 7% Capital Securities pursuant or traceable to the 7% Capital Securities Registration Statement, or pursuant to the 7% Capital Securities Prospectus, and was damaged thereby.

1133. Plaintiff Nuveen Funds did not know, nor in the exercise of reasonable diligence could have known, of the untrue statements of material fact or omissions of material facts in the 7% Capital Securities Registration Statement and 7% Capital Securities Prospectus when it purchased or acquired the securities.

1134. By reason of the foregoing, Defendants Mozilo, Sambol, and Sieracki are liable to Plaintiff Nuveen Funds for violations of Section 15 of the Securities Act.

## COUNT XIV

## SUCCESSOR LIABILITY AGAINST BANK OF AMERICA
### *(AGAINST BANK OF AMERICA)*

1135. Plaintiff repeats and realleges each and every allegation as if set forth in full herein.

1136. Bank of America is liable for any and all damages resulting from the wrongful actions of Countrywide, as alleged herein, because it is the successor-in-interest to Countrywide and is vicariously liable for the conduct of Countrywide as a result of a de facto merger of the two entities.

1137. This acquisition was a de facto merger because Bank of America intended to take over and effectively took over Countrywide and its subsidiaries in their entirety and, thus, should carry the liabilities of Countrywide as a concomitant to the benefits it derived from the purchase.

1138. The acquisition resulted in continuity of ownership – a hallmark of a de facto merger – because the shareholders of Countrywide became shareholders of Bank of America as a result of Bank of America's acquisition of Countrywide on July 1, 2008, through an all-stock transaction involving a wholly-owned Bank of America subsidiary that was created for the sole purpose of facilitating the acquisition of Countrywide.  Bank of America has described the transaction as a merger, and has actively incorporated Countrywide's mortgage business into Bank of America.

1139. Bank of America assumed the liabilities ordinarily necessary for the uninterrupted continuation of the business of Countrywide – another hallmark of a de facto merger.  Among other things, the Countrywide brand has been retired and the old Countrywide website redirects customers to the mortgage and home loan sections of Bank of America's website.  On April 27, 2009, Bank of America announced that "[t]he Countrywide brand has been retired."  Instead, Bank of America operated its home loan and mortgage business through a new division

named Bank of America Home Loans, which "represents the combined operations of Bank of America's mortgage and home equity business and Countrywide Home Loans." The integration of Countrywide into Bank of America is complete.

1140. The ordinary business of Countrywide was ceased and the Company dissolved soon after the acquisition – another hallmark of a de facto merger. On November 7, 2008, Bank of America acquired substantially all of the assets of Countrywide. And, at that time, Countrywide ceased submitting filings to the SEC; Countrywide's assets and liabilities are now included in Bank of America's filings.

1141. Bank of America has also taken responsibility for the pre-merger liabilities of Countrywide, including restructuring hundreds of thousands of loans created and serviced by Countrywide. As a spokesperson for Bank of America admitted: "We bought the company and all of its assets and liabilities."

1142. Because Bank of America has merged with Countrywide, and acquired substantially all of the assets of Countrywide, Bank of America is the successor-in-interest to the Countrywide Defendants, and is vicariously liable for the wrongful conduct, as alleged herein, of the Countrywide Defendants.

## XVIII.     **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

1.     Awarding Plaintiffs compensatory and general damages, including rescissionary damages where applicable, according to proof;

2.     Awarding special damages according to proof;

3.     Awarding punitive and exemplary damages according to proof;

4.     Awarding Plaintiffs pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs;

5.     Awarding extraordinary, equitable and/or injunctive relief as permitted by law and equity; and

6.     Awarding such other relief as this Court may deem just and proper.

# XIX.  **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Dated: July **27** 2011                    Respectfully submitted,

BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP

_____
BLAIR A. NICHOLAS

BLAIR A. NICHOLAS (Bar No. 178428)
TIMOTHY A. DeLANGE (Bar No.190768)
NIKI L. MENDOZA (Bar No. 214646)
DAVID KAPLAN (Bar No. 230144)
JOSEPH W. GOODMAN (Bar No. 230161)
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:   (858) 793-0070
Fax:   (858) 793-0323
blairn@blbglaw.com
timothyd@blbglaw.com
nikim@blbglaw.com
davidk@blbglaw.com
joe.goodman@blbglaw.com

COMPLAINT

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Philip S. Gutierrez and the assigned discovery Magistrate Judge is Patrick J. Walsh.

The case number on all documents filed with the Court should read as follows:

## CV11- 6239 PSG (PJWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] Western Division | [ ] Southern Division | [ ] Eastern Division |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

AO 440 (Rev. 12/09)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Central District of California

Government of Guam Retirement Fund, et al.
(Additional Plaintiffs Listed on Attachment A)

*Plaintiff*

v.

Countrywide Financial Corporation, Countrywide
Capital V, Bank of America Corporation, Angelo R. Mozilo,
David Sambol, Eric P. Sieracki, and KPMG LLP

*Defendant*

)
)
)
)
)
)
)
)
)

**CV11  06239 PSG PJWx**

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Please see Attachment B.

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Bernstein Litowitz Berger & Grossmann LLP
Blair A. Nicholas
Timothy A. DeLange
12481 High Bluff Drive, Suite 300
San Diego, CA 92130

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: __JUL 2 8 2011__

**CHRISTOPHER POWERS**

*Signature of Clerk or Deputy Clerk*

## ATTACHMENT A TO SUMMONS

ADDITIONAL PLAINTIFFS:

| |
|---|
| • Montana Board of Investments |
| • Maryland State Retirement and Pension System |
| • Norges Bank |
| • Royal Mail Pension Plan |
| • Stichting Pensioenfonds Zorg en Welzijn represented by PGGM Vermogensbeheer B.V. |
| • Thrivent Financial for Lutherans<br>• Mr. Robert L. Kosnoski<br>• Thrivent Financial for Lutherans Foundation<br>• Kalamazoo Anesthesiology PSP FBO Dr. Barbara A. Page<br>• Thrivent Large Cap Value Fund, a series of Thrivent Mutual Funds<br>• Thrivent Large Cap Stock Portfolio, a series of Thrivent Series Fund, Inc.<br>• Thrivent Partner All Cap Portfolio, a series of Thrivent Series Fund, Inc.<br>• Thrivent Large Cap Value Portfolio, a series of Thrivent Series Fund, Inc.<br>• Thrivent Balanced Fund, a series of Thrivent Mutual Funds<br>• Thrivent Large Cap Stock Fund, a series of Thrivent Mutual Funds<br>• Thrivent Large Cap Index Fund I, a series of Thrivent Mutual Funds<br>• Thrivent Large Cap Index Fund, a series of Thrivent Mutual Funds<br>• Thrivent Balanced Portfolio, a series of Thrivent Series Fund, Inc.<br>• Thrivent Large Cap Index Portfolio, a series of Thrivent Series Fund, Inc.<br>• Thrivent Financial Defined Benefit Plan Trust<br>• Thrivent Core Bond Fund, a series of Thrivent Mutual Funds<br>• Thrivent Bond Index Fund, a series of Thrivent Mutual Funds<br>• Thrivent Bond Index Portfolio, a series of Thrivent Series Fund, Inc.<br>• Thrivent Income Fund, a series of Thrivent Mutual Funds<br>• Thrivent Limited Maturity Bond Fund, a series of Thrivent Mutual Funds<br>• Thrivent Income Portfolio, a series of Thrivent Series Fund, Inc.<br>• Thrivent Limited Maturity Bond Portfolio, a series of Thrivent Series Fund, Inc.<br>• Thrivent Life Insurance Company |
| • American Century Investment Management<br>• American Century Capital Portfolios, Inc. – Equity Index Fund<br>• American Century Quantitative Equity Funds, Inc. – Income & Growth Fund<br>• American Century Variable Portfolios, Inc. – VP Income & Growth Fund |
| • Nuveen Investments, Inc.<br>• Nuveen Equity Premium Opportunity Fund<br>• Nuveen Growth Allocation Fund, a series of Nuveen Investment Trust<br>• Nuveen Multi-Manager Large-Cap Value Fund, a series of Nuveen Investment Trust<br>• Nuveen NWQ Large-Cap Value Fund, a series of Nuveen Investment Trust<br>• Nuveen NWQ Multi-Cap Value Fund, a series of Nuveen Investment Trust<br>• Nuveen Santa Barbara Dividend Growth Fund, a series of Nuveen Investment Trust II<br>• Nuveen Quality Preferred Income Fund |

- Nuveen Multi-Strategy Income and Growth Fund 2
- Nuveen Quality Preferred Income Fund 2
- Nuveen Quality Preferred Income Fund 3
- Nuveen Multi-Strategy Income and Growth Fund

- SunAmerica Asset Management Corp.
- Strategic Multi-Asset Portfolio, a series of Anchor Series Trust
- Focus Growth Portfolio, a series of Seasons Series Trust
- Large Cap Composite Portfolio (merged into the Large Cap Growth Portfolio, a series of Seasons Series Trust), a series of Seasons Series Trust
- Large Cap Growth Portfolio, a series of Seasons Series Trust
- Large Cap Value Portfolio, a series of Seasons Series Trust
- Stock Portfolio, a series of Seasons Series Trust
- Focused Value Portfolio (renamed SunAmerica Strategic Value Portfolio), a series of SunAmerica Focused Series, Inc. (renamed SunAmerica Series, Inc.)
- Equity Index Portfolio, a series of SunAmerica Series Trust
- MFS Total Return Portfolio, a series of SunAmerica Series Trust
- Asset Allocation Fund, a series of VALIC Company I
- Blue Chip Growth Fund, a series of VALIC Company I
- Dividend Value Fund, a series of VALIC Company I
- Stock Index Fund, a series of VALIC Company I

- T. Rowe Price Associates, Inc.
- T. Rowe Price Equity Income Fund
- T. Rowe Price Growth Stock Fund
- T. Rowe Price Value Fund
- T. Rowe Price Blue Chip Growth Fund
- T. Rowe Price Equity Income Portfolio
- T. Rowe Price Equity Index 500 Fund
- T. Rowe Price Personal Strategy Growth Fund
- T. Rowe Price Personal Strategy Balanced Fund
- T. Rowe Price Financial Services
- T. Rowe Price Growth & Income Fund
- T. Rowe Price New America Growth Fund
- T. Rowe Price Personal Strategy Income Fund
- T. Rowe Price Capital Opportunity Fund
- T. Rowe Price Blue Chip Growth Portfolio
- T. Rowe Price New Income Fund
- T. Rowe Price Personal Strategy Balanced Portfolio
- T. Rowe Price Short-Term Bond Fund
- T. Rowe Price Total Equity Market Index Fund
- T. Rowe Price New America Growth Portfolio
- T. Rowe Price Balanced Fund
- T. Rowe Price Institutional U.S. Structured Research Fund
- T. Rowe Price Institutional Large-Cap Core Growth Fund
- T. Rowe Price Inflation Focused Bond Fund

- T. Rowe Price Georgia Tax-Free Bond Fund
- T. Rowe Price Equity Index 500 Portfolio
- T. Rowe Price Limited-Term Bond Portfolio
- T. Rowe Price Structured Research Common Trust Fund
- T. Rowe Price Equity Income Trust
- T. Rowe Price Equity Index Trust
- T. Rowe Price Stable Value Common Trust Fund
- T. Rowe Price Growth and Income Trust
- Alaska Large-Cap Trust
- T. Rowe Price Managed Bond Common Trust Fund
- T. Rowe Price Growth Stock Trust
- T. Rowe Price Bond Index Trust
- Alaska Money Market Trust
- Alaska International Trust

- Teacher Retirement System of Texas

- Teachers Insurance and Annuity Association - College Retirement Services
- College Retirement Equities Fund Equity Index Account
- College Retirement Equities Fund Global Equities Account
- College Retirement Equities Fund Stock Account
- TIAA-CREF Asset Management Commingled Funds Trust I Large Cap Value Fund
- TIAA Separate Account VA-1 Stock Index Account
- TIAA-CREF Funds Equity Index Fund
- TIAA-CREF Funds Large-Cap Value Fund
- TIAA-CREF Funds Large-Cap Value Index Fund
- TIAA-CREF Funds S&P 500 Index Fund
- TIAA-CREF Life Funds Large-Cap Value Fund
- TIAA-CREF Life Funds Stock Index Fund

- California Public Employees' Retirement System

- BlackRock Financial Management, Inc.
- Obsidian Master Fund Trust
- Ausgleichsfonds der Alters-und Hinterlassenenversicherung
- Master S&P 500 Index Series of Quantitative Master Series Trust
- Equity Index Trust
- Large Cap Value Index Trust of QA Collective Trust Series
- Russell 1000 Alpha Tilts Fund B
- Equity Index Fund
- Alpha Tilts Fund B
- iShares S&P 500 Index Fund
- iShares Russell 1000 Value Fund
- Russell 1000 Index Fund
- Russell 1000 Value Fund
- Russell 1000 Alpha Tilts BL
- Active Stock Fund E

- Ascent Life US Equity Fund
- iShares S&P 500 Growth Fund
- Barclays International Funds - USA Equity Fund
- Russell 1000 Value Fund B
- Russell 3000 Index Fund
- US Alpha Tilts – Tokyo Pension Clients
- NC R3000 Tilts Sep Acct
- Russell 1000 Value Alpha Tilts Fund B
- Equity Index Fund B
- Large Capitalization Core Tilts Fund B
- U.S. Equity Market Fund B
- Active Stock Master Portfolio
- OMERS Russell 1000 Enhanced Index Mandate
- BlackRock CDN US Alpha Tilts Non-Taxable Fund
- FMC-US R3000 Alpha Tilts U/A
- iShares Russell 1000 Indx Fund
- BlackRock CDN US Equity Index Non-Taxable Fund
- iShares Russell 3000 Index Fund
- iShares Dow Jones US Financial Sector Index Fund
- CDP Alpha Tilts Separate Account
- MSCI U.S. Equity Index Fund B
- NZ Super US Tilts
- Lucent Eq Indx Sep Acct
- Aquila Life US Equity Index Fund
- Ascent Life US Equity Fund

## ATTACHMENT B TO SUMMONS

| DEFENDANT | ADDRESS |
|---|---|
| Countrywide Financial Corporation | Care of Counsel:<br>Goodwin Procter LLP<br>Exchange Place<br>53 State Street<br>Boston, MA 02109 |
| Countrywide Capital V | Care of Counsel:<br>Goodwin Procter LLP<br>Exchange Place<br>53 State Street<br>Boston, MA 02109 |
| Bank of America Corporation | Care of Counsel:<br>O'Melveny & Myers LLP<br>400 South Hope Street<br>Los Angeles, CA 90071 |
| Angelo R. Mozilo | Care of Counsel:<br>Irell & Manella LLP<br>1800 Avenue of the Stars, Suite 900<br>Los Angeles, CA 90067 |
| David Sambol | Care of Counsel:<br>Orrick, Herrington & Sutcliffe LLP<br>777 South Figueroa Street, Suite 3200<br>Los Angeles, CA 90017 |
| Eric P. Sieracki | Care of Counsel:<br>DLA Piper LLP<br>401 B Street, Suite 1700<br>San Diego, CA 92101-4297 |
| KPMG LLP | Care of Counsel:<br>Bingham McCutchen LLP<br>The Water Garden<br>Fourth Floor, North Tower<br>1620 26th Street<br>Santa Monica, CA 90404-4060 |

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

*By Fax*

RECOPY

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
Government of Guam Retirement Fund, et al. (Additional Plaintiffs Listed on Attachment A)

**DEFENDANTS**
Countrywide Financial Corporation, Countrywide Capital V, Bank of America Corporation, Angelo R. Mozilo, David Sambol, Eric P. Sieracki, and KPMG LLP

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
Bernstein Litowitz Berger & Grossmann LLP, Blair A. Nicholas
12481 High Bluff Drive, Suite 300
San Diego, CA 92130; Telephone: (858) 793-0070

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** – For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☒ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes   ☒ No          ☐ **MONEY DEMANDED IN COMPLAINT: $** _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Violations of §§ 10(b), 20(a) & 20A of the Exchange Act of 1934; and §§ 11, 12(a)(2) and 15 of the Securities Act of 1933; and Successor Liability

**VII. NATURE OF SUIT** (Place an X in one box only.)

| | | | | | |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 540 Mandamus/Other | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 550 Civil Rights | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 340 Marine | **BANKRUPTCY** | ☐ 555 Prison Condition | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE / PENALTY** | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 610 Agriculture | **PROPERTY RIGHTS** |
| ☐ 810 Selective Service | | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 620 Other Food & Drug | ☐ 820 Copyrights |
| ☒ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 630 Liquor Laws | **SOCIAL SECURITY** |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 640 R.R. & Truck | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 650 Airline Regs | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | **IMMIGRATION** | | ☐ 660 Occupational Safety /Health | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 690 Other | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | **FEDERAL TAX SUITS** |
| | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:** Case Number: _____

**CV11  06239**

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

CV-71 (05/08)                    CIVIL COVER SHEET                    Page 1 of 2

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☑ No  ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No  ☑ Yes
If yes, list case number(s):  CV 07-05295 MRP (MANx)

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)  ☑ A. Arise from the same or closely related transactions, happenings, or events; or
☑ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☑ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐  Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Please see Attachment B | Please see Attachment B |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐  Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Countrywide Financial Corporation and Countrywide Capital V; Angelo R. Mozilo; David Sambol; and Eric P. Sieracki - Los Angeles | Bank of America Corporation - North Carolina; KPMG LLP - New York |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
   Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _Blair A. Nicholas_    Date  7/27/11

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

## ATTACHMENT A TO CIVIL COVER SHEET

I (a) ADDITIONAL PLAINTIFFS:

- Montana Board of Investments
- Maryland State Retirement and Pension System
- Norges Bank
- Royal Mail Pension Plan
- Stichting Pensioenfonds Zorg en Welzijn represented by PGGM Vermogensbeheer B.V.
- Thrivent Financial for Lutherans
- Mr. Robert L. Kosnoski
- Thrivent Financial for Lutherans Foundation
- Kalamazoo Anesthesiology PSP FBO Dr. Barbara A. Page
- Thrivent Large Cap Value Fund, a series of Thrivent Mutual Funds
- Thrivent Large Cap Stock Portfolio, a series of Thrivent Series Fund, Inc.
- Thrivent Partner All Cap Portfolio, a series of Thrivent Series Fund, Inc.
- Thrivent Large Cap Value Portfolio, a series of Thrivent Series Fund, Inc.
- Thrivent Balanced Fund, a series of Thrivent Mutual Funds
- Thrivent Large Cap Stock Fund, a series of Thrivent Mutual Funds
- Thrivent Large Cap Index Fund I, a series of Thrivent Mutual Funds
- Thrivent Large Cap Index Fund, a series of Thrivent Mutual Funds
- Thrivent Balanced Portfolio, a series of Thrivent Series Fund, Inc.
- Thrivent Large Cap Index Portfolio, a series of Thrivent Series Fund, Inc.
- Thrivent Financial Defined Benefit Plan Trust
- Thrivent Core Bond Fund, a series of Thrivent Mutual Funds
- Thrivent Bond Index Fund, a series of Thrivent Mutual Funds
- Thrivent Bond Index Portfolio, a series of Thrivent Series Fund, Inc.
- Thrivent Income Fund, a series of Thrivent Mutual Funds
- Thrivent Limited Maturity Bond Fund, a series of Thrivent Mutual Funds
- Thrivent Income Portfolio, a series of Thrivent Series Fund, Inc.
- Thrivent Limited Maturity Bond Portfolio, a series of Thrivent Series Fund, Inc.
- Thrivent Life Insurance Company
- American Century Investment Management
- American Century Capital Portfolios, Inc. – Equity Index Fund
- American Century Quantitative Equity Funds, Inc. – Income & Growth Fund
- American Century Variable Portfolios, Inc. – VP Income & Growth Fund
- Nuveen Investments, Inc.
- Nuveen Equity Premium Opportunity Fund
- Nuveen Growth Allocation Fund, a series of Nuveen Investment Trust
- Nuveen Multi-Manager Large-Cap Value Fund, a series of Nuveen Investment Trust
- Nuveen NWQ Large-Cap Value Fund, a series of Nuveen Investment Trust
- Nuveen NWQ Multi-Cap Value Fund, a series of Nuveen Investment Trust
- Nuveen Santa Barbara Dividend Growth Fund, a series of Nuveen Investment Trust II
- Nuveen Quality Preferred Income Fund

- Nuveen Multi-Strategy Income and Growth Fund 2
- Nuveen Quality Preferred Income Fund 2
- Nuveen Quality Preferred Income Fund 3
- Nuveen Multi-Strategy Income and Growth Fund

---

- SunAmerica Asset Management Corp.
- Strategic Multi-Asset Portfolio, a series of Anchor Series Trust
- Focus Growth Portfolio, a series of Seasons Series Trust
- Large Cap Composite Portfolio (merged into the Large Cap Growth Portfolio, a series of Seasons Series Trust), a series of Seasons Series Trust
- Large Cap Growth Portfolio, a series of Seasons Series Trust
- Large Cap Value Portfolio, a series of Seasons Series Trust
- Stock Portfolio, a series of Seasons Series Trust
- Focused Value Portfolio (renamed SunAmerica Strategic Value Portfolio), a series of SunAmerica Focused Series, Inc. (renamed SunAmerica Series, Inc.)
- Equity Index Portfolio, a series of SunAmerica Series Trust
- MFS Total Return Portfolio, a series of SunAmerica Series Trust
- Asset Allocation Fund, a series of VALIC Company I
- Blue Chip Growth Fund, a series of VALIC Company I
- Dividend Value Fund, a series of VALIC Company I
- Stock Index Fund, a series of VALIC Company I

---

- T. Rowe Price Associates, Inc.
- T. Rowe Price Equity Income Fund
- T. Rowe Price Growth Stock Fund
- T. Rowe Price Value Fund
- T. Rowe Price Blue Chip Growth Fund
- T. Rowe Price Equity Income Portfolio
- T. Rowe Price Equity Index 500 Fund
- T. Rowe Price Personal Strategy Growth Fund
- T. Rowe Price Personal Strategy Balanced Fund
- T. Rowe Price Financial Services
- T. Rowe Price Growth & Income Fund
- T. Rowe Price New America Growth Fund
- T. Rowe Price Personal Strategy Income Fund
- T. Rowe Price Capital Opportunity Fund
- T. Rowe Price Blue Chip Growth Portfolio
- T. Rowe Price New Income Fund
- T. Rowe Price Personal Strategy Balanced Portfolio
- T. Rowe Price Short-Term Bond Fund
- T. Rowe Price Total Equity Market Index Fund
- T. Rowe Price New America Growth Portfolio
- T. Rowe Price Balanced Fund
- T. Rowe Price Institutional U.S. Structured Research Fund
- T. Rowe Price Institutional Large-Cap Core Growth Fund
- T. Rowe Price Inflation Focused Bond Fund

- T. Rowe Price Georgia Tax-Free Bond Fund
- T. Rowe Price Equity Index 500 Portfolio
- T. Rowe Price Limited-Term Bond Portfolio
- T. Rowe Price Structured Research Common Trust Fund
- T. Rowe Price Equity Income Trust
- T. Rowe Price Equity Index Trust
- T. Rowe Price Stable Value Common Trust Fund
- T. Rowe Price Growth and Income Trust
- Alaska Large-Cap Trust
- T. Rowe Price Managed Bond Common Trust Fund
- T. Rowe Price Growth Stock Trust
- T. Rowe Price Bond Index Trust
- Alaska Money Market Trust
- Alaska International Trust

---

- Teacher Retirement System of Texas

---

- Teachers Insurance and Annuity Association - College Retirement Services
- College Retirement Equities Fund Equity Index Account
- College Retirement Equities Fund Global Equities Account
- College Retirement Equities Fund Stock Account
- TIAA-CREF Asset Management Commingled Funds Trust I Large Cap Value Fund
- TIAA Separate Account VA-1 Stock Index Account
- TIAA-CREF Funds Equity Index Fund
- TIAA-CREF Funds Large-Cap Value Fund
- TIAA-CREF Funds Large-Cap Value Index Fund
- TIAA-CREF Funds S&P 500 Index Fund
- TIAA-CREF Life Funds Large-Cap Value Fund
- TIAA-CREF Life Funds Stock Index Fund

---

- California Public Employees' Retirement System

---

- BlackRock Financial Management, Inc.
- Obsidian Master Fund Trust
- Ausgleichsfonds der Alters-und Hinterlassenenversicherung
- Master S&P 500 Index Series of Quantitative Master Series Trust
- Equity Index Trust
- Large Cap Value Index Trust of QA Collective Trust Series
- Russell 1000 Alpha Tilts Fund B
- Equity Index Fund
- Alpha Tilts Fund B
- iShares S&P 500 Index Fund
- iShares Russell 1000 Value Fund
- Russell 1000 Index Fund
- Russell 1000 Value Fund
- Russell 1000 Alpha Tilts BL
- Active Stock Fund E

- Ascent Life US Equity Fund
- iShares S&P 500 Growth Fund
- Barclays International Funds - USA Equity Fund
- Russell 1000 Value Fund B
- Russell 3000 Index Fund
- US Alpha Tilts -- Tokyo Pension Clients
- NC R3000 Tilts Sep Acct
- Russell 1000 Value Alpha Tilts Fund B
- Equity Index Fund B
- Large Capitalization Core Tilts Fund B
- U.S. Equity Market Fund B
- Active Stock Master Portfolio
- OMERS Russell 1000 Enhanced Index Mandate
- BlackRock CDN US Alpha Tilts Non-Taxable Fund
- FMC-US R3000 Alpha Tilts U/A
- iShares Russell 1000 Indx Fund
- BlackRock CDN US Equity Index Non-Taxable Fund
- iShares Russell 3000 Index Fund
- iShares Dow Jones US Financial Sector Index Fund
- CDP Alpha Tilts Separate Account
- MSCI U.S. Equity Index Fund B
- NZ Super US Tilts
- Lucent Eq Indx Sep Acct
- Aquila Life US Equity Index Fund
- Ascent Life US Equity Fund

## ATTACHMENT B TO CIVIL COVER SHEET

IX. VENUE
   (a) Plaintiffs:

| County in this District: | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| SunAmerica Funds - Los Angeles | Government of Guam Retirement Fund – Guam |
| | American Century Funds – Missouri |
| | Maryland State Retirement and Pension System – Maryland |
| | Montana Board of Investments – Montana |
| | Norges Bank – Norway |
| | Nuveen Funds – Illinois |
| | Royal Mail Pension Plan – United Kingdom |
| | Stichting Pensioenfonds Zorg en Welzijn represented by PGGM Vermogensbeheer B.V. - Netherlands |
| | T. Rowe Price Funds - Maryland |
| | Teacher Retirement System of Texas - Texas |
| | Thrivent Funds - Minnesota |
| | TIAA-CREF Funds – New York |
| | CalPERS – Sacramento, CA |
| | BlackRock Funds - New York |